# 22-2965

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

**Gordon Clark (*individual capacity*), Gordon Clark (*as Lillian's husband*), Gordon Clark (*as sole fiduciary, sole beneficiary, and sole creditor of the Estate of Lillian J. Clark*), and Estate of Lillian J. Clark,**

Plaintiff-Appellant,

v.

**Santander Bank, N.A., Timothy Wennes, Pierre Habis, Kenneth O'Neill, Wells Fargo & Company, Scott Powell (*as former CEO of Santander, and as COO of Wells Fargo*), Bendett & McHugh, PC, Adam L. Bendett, Jeffrey M. Knickerbocker, Mark A. Piech, Joseph Abraham, Dominick D. Neveux, John Doe(s), and Jane Doe(s),**

Defendants-Appellees.

---

On Appeal from the United States District Court
for the District of Connecticut

---

**Appendix of Plaintiff-Appellant Gordon Clark**

Gordon Clark, Pro Se
70 Elm Street, Enfield, CT 06082
860.833.3195

**1**

# TABLE OF CONTENTS

1. District Court Docket Sheet …………………………………………....... 5

2. Orders being appealed …………………………………………....... 26

    ECF Document 133 ……………………………………………… 26

    ECF Document 154 ……………………………………………… 28

    ECF Document 159 ……………………………………………… 30

3. Notice of Appeal ………………………………………………….. 31

4. Exhibits ………………………………………………………… 34

    Exhibit 1: Face to the Name (Lillian & Gordon Clark) …............. 34

    Exhibit 2: Fiduciary's Certificate ……………………………….. 36

    Exhibit 3: May 1, 2019 – Santander Bank Demand Letter ……… 38

    Exhibit 4: Town of Enfield - Zero property taxes due ………….. 40

    Exhibit 5: Santander Bank $550 Million Settlement article …….. 42

    Exhibit 6: Santander Bank, N.A.'s Complaint ………………….. 45

    Exhibit 7: Defendants' Answer (Jury Demand) …………..…….. 54

    Exhibit 8: Santander's Reply (no fraud nor mutual mistake) …… 58

    Exhibit 9: Certificate of Closed Pleadings ……………...…..… 63

    Exhibit 10: Closing Statement …………………..……………… 65

    Exhibit 11: *Connecticut v. Hahn*, 207 Conn. 555 (1988). ……..... 75

    Exhibit 12: *Harlach v. Metropolitan*, 221 Conn. 185 (1992). ….. 78

Exhibit 13: *JPMorgan v. Virgulak*, 341 Conn. 750 (2022). …….. 81

Exhibit 14: Second Amended Appeal ……………..…………. 96

Exhibit 15: Constitutionality Notice ……………………….… 99

Exhibit 16: Amended Preliminary Statement of Issues ………… 115

Exhibit 17: *Petrello v. White*, 533 F.3d 110, 113 (2d Cir. 2008). 126

Exhibit 18: *U.S. v. Magassouba*, 544 F.3d 387, 400 (2d Cir.). ….130

Exhibit 19: Civil Interlocutory Appeals in Federal Court ……… 142

Exhibit 20: Santander Bank's exit from mortgage market ...…… 150

Exhibit 21: Motion to Preserve Records [ECF. 46] ………..…… 156

Exhibit 22: Local Rule 46.2 Attorney Discipline ……………..… 168

Exhibit 23: Motion for Sanctions Against Attorneys [ECF. 97]. 176

Exhibit 24: Notice of Settlement Negotiations [ECF. 143] …….. 207

Exhibit 25: Request to Cancel Settlement Conference [147] …... 211

Exhibit 26: Settlement Conference orders and filing ………….... 213

Exhibit 27: Motion for New Settlement Conference [ECF. 166]. 223

Exhibit 28: The Declaration of Independence ……………...…... 241

Exhibit 29: The Judiciary Act of 1789 ………..……………….... 245

Exhibit 30: *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir.). .... 259

Exhibit 31: *Iannaccone v. Law,* 142 F.3d 553, 559 (2d Cir.). ..… 264

Exhibit 32: Santander Bank branch closings article ...………..… 272

Exhibit 33: *Self-government is worth defending* article ………… 276

Exhibit 34: Judge Ponsor's SCOTUS article ………...………… 279

Exhibit 35: Judge Posner retirement article ……….…………..… 281

Exhibit 36: *A Republic, if you can keep it* article ………..……… 285

Exhibit 37: *SCOTUS religious accommodations* article ……..… 288

Exhibit 38: Letter from Birmingham Jail ……….……………… 292

5.  Certificate of Service ……………………………………………….. 299

**U.S. District Court**
**District of Connecticut (New Haven)**
**CIVIL DOCKET FOR CASE #: 3:22–cv–00039–SVN**

Clark et al v. Santander Bank, N.A. et al
Assigned to: Judge Sarala V. Nagala
Demand: $2,878,000
Cause: 28:1332 Diversity–Fraud
**Plaintiff**

Date Filed: 01/10/2022
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Gordon Clark**                    represented by   **Gordon Clark**
Gordon Clark
70 Elm Street
Enfield, CT 06082
860–833–3195
Email: gordon@christianeconomics.net
PRO SE

**Plaintiff**

**Estate of Lillian J. Clark**

V.

**Defendant**

**Santander Bank, N.A.**             represented by   **Jeffrey M. Knickerbocker**
Bendett & McHugh, P.C.
270 Farmington Ave. Suite 151
Farmington, CT 06032
860–255–5008
Fax: 860–773–6328
Email: jknickerbocker@bmpc–law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
Saul Ewing, LLP
131 Dartmouth Street
Ste 501
Boston, MA 02116
617–912–0947
Email: patrick.tracey@saul.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Timothy Wennes**                   represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pierre Habis**                     represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kenneth O'Neill**     represented by     **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Wells Fargo & Company**     represented by     **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean R. Higgins**
K&L Gates, LLP– MA
State Street Financial Center
One Lincoln Street
Boston, MA 02111–2950
617–261–3100
Fax: 617–261–3175
Email: sean.higgins@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Scott Powell**     represented by     **Jeffrey M. Knickerbocker**
*as former CEO of Santander*
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean R. Higgins**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bendett & McHugh, PC**     represented by     **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Adam L. Bendett**                    represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jeffrey M. Knickerbocker**          represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark A. Piech**                      represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Abraham**                     represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dominick D. Neveux**                 represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Doe**                                  represented by **Jeffrey M. Knickerbocker**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Patrick S. Tracey**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Jane Doe**                                  represented by **Jeffrey M. Knickerbocker**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Patrick S. Tracey**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Scott Powell**                              represented by **Jeffrey M. Knickerbocker**
*as COO of Wells Fargo*                       (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Patrick S. Tracey**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Sean R. Higgins**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2022 | 1 | COMPLAINT against All Defendants, filed by Gordon Clark. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fazekas, J.) Modified on 1/18/2022 to correct filer(Fazekas, J.). (Entered: 01/11/2022) |
| 01/10/2022 | 2 | Order on Pretrial Deadlines: Amended Pleadings due by 3/11/2022. Discovery due by 7/12/2022. Dispositive Motions due by 8/16/2022.<br>Signed by Clerk on 01/10/2022.(Fazekas, J.) (Entered: 01/11/2022) |
| 01/10/2022 | 3 | ELECTRONIC FILING ORDER FOR COUNSEL – PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER<br>Signed by Judge Sarala V. Nagala on 01/10/2022.(Fazekas, J.) (Entered: 01/11/2022) |
| 01/10/2022 | 4 | STANDING PROTECTIVE ORDER<br>Signed by Judge Sarala V. Nagala on 01/10/2022.(Fazekas, J.) (Entered: 01/11/2022) |
| 01/11/2022 | 5 | NOTICE TO COUNSEL/SELF–REPRESENTED PARTIES : Counsel or self–represented parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 4 Standing Protective Order, 3 Electronic Filing Order, 1 Complaint filed by Lillian J. Clark, 2 Order on Pretrial Deadlines<br>Signed by Clerk on 01/11/2022.(Fazekas, J.) (Entered: 01/11/2022) |
| 01/11/2022 |  | Request for Clerk to issue summons as to Santander Bank, N.A.. (Bozek, M.) (Entered: 01/11/2022) |

| 01/11/2022 | | Request for Clerk to issue summons as to Timothy Wennes. (Bozek, M.) (Entered: 01/11/2022) |
|---|---|---|
| 01/11/2022 | | Request for Clerk to issue summons as to Pierre Habis. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Kenneth O'Neill. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Wells Fargo & Company. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Scott Powell. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Bendett & McHugh, PC. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Adam L. Bendett. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Jeffrey M. Knickerbocker. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Mark A. Piech. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Joseph Abraham. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Dominick D. Neveux. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Jane Doe, John Doe. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 6 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Santander Bank, N.A.* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 7 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Timothy Wennes* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 8 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Pierre Habis* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 9 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Kenneth O'Neill* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 10 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Wells Fargo & Company* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 11 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Scott Powell* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 12 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Bendett & McHugh, PC* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 13 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Adam L. Bendett* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 14 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Jeffrey M. Knickerbocker* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 15 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Mark A. Piech* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |

| 01/11/2022 | 16 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Joseph Abraham* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
|---|---|---|
| 01/11/2022 | 17 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Dominick D. Neveux* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 18 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Jane Doe, John Doe* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/14/2022 | 19 | SUMMONS Returned Executed by Estate of Lillian J. Clark, Gordon Clark. Joseph Abraham served on 1/12/2022, answer due 2/2/2022; Adam L. Bendett served on 1/12/2022, answer due 2/2/2022; Bendett & McHugh, PC served on 1/12/2022, answer due 2/2/2022; Jeffrey M. Knickerbocker served on 1/12/2022, answer due 2/2/2022; Dominick D. Neveux served on 1/12/2022, answer due 2/2/2022; Mark A. Piech served on 1/12/2022, answer due 2/2/2022. (Imbriani, Susan) (Entered: 01/18/2022) |
| 01/14/2022 | 20 | JUDICIAL NOTICE of the Proper and Lawful Service of six summonses and complaints by Gordon Clark, Estate of Lillian J. Clark re 19 Summons Returned Executed, (Imbriani, Susan) (Entered: 01/18/2022) |
| 01/20/2022 | 21 | Consent to Electronic Notice by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 22 | MOTION to participate in electronic filing by Gordon Clark.Responses due by 2/10/2022 (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 23 | NOTICE of Pro Se Appearance by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 24 | Plaintiff's Judicial Notice to Superior Court of Hartford by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 25 | Judicial Notice of the proper and lawful service of an additional five summonses and complaints by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 26 | Judicial Notice of Unsolicited Legal Advice from Attorney of K&L Gates, LLP by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 28 | SUMMONS Returned Executed by Gordon Clark. Jane Doe served on 1/14/2022, answer due 2/4/2022; John Doe served on 1/14/2022, answer due 2/4/2022; Pierre Habis served on 1/14/2022, answer due 2/4/2022; Kenneth O'Neill served on 1/14/2022, answer due 2/4/2022; Santander Bank, N.A. served on 1/14/2022, answer due 2/4/2022; Timothy Wennes served on 1/14/2022, answer due 2/4/2022. (Imbriani, Susan) (Entered: 01/24/2022) |
| 01/21/2022 | 27 | ORDER granting Plaintiff's Motion to Participate in Electronic Filing (ECF No. 22 ). Signed by Judge Sarala V. Nagala on 1/21/22. (Marks, Joshua) (Entered: 01/21/2022) |
| 01/21/2022 | 33 | ELECTRONIC FILING ORDER – PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. SELF–REPRESENTED FILERS ARE REQUIRED TO COMPLY WITH THE JUDGE'S STANDARD ELECTRONIC FILING ORDER WHICH IS ATTACHED. Signed by Judge Sarala V. Nagala on 1/21/2022.(Bozek, M.) (Entered: 01/25/2022) |
| 01/24/2022 | 29 | NOTICE of Appearance by Patrick S. Tracey on behalf of Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes (Tracey, Patrick) (Entered: 01/24/2022) |
| 01/24/2022 | 30 | Corporate Disclosure Statement by Santander Bank, N.A.. (Tracey, Patrick) (Entered: 01/24/2022) |
| 01/25/2022 | 31 | NOTICE of Appearance by Sean R. Higgins on behalf of Scott Powell, Wells Fargo & Company (Higgins, Sean) (Entered: 01/25/2022) |
| 01/25/2022 | 32 | NOTICE of Appearance by Jeffrey M. Knickerbocker on behalf of Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech (Knickerbocker, Jeffrey) (Entered: 01/25/2022) |
| 01/25/2022 | 34 | JUDICIAL NOTICE of Attorney Sean Higgins of K&L Gates, LLP refusal to accept service of process for defendants Wells Fargo and Scott Powell by Gordon Clark (Imbriani, Susan) |

| | | |
|---|---|---|
| | | (Entered: 01/25/2022) |
| 01/25/2022 | 35 | JUDICIAL NOTICE of the proper and lawful service of the final two summonses and complaints by Gordon Clark (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/25/2022 | 36 | SUMMONS Returned Executed by Gordon Clark. Scott Powell served on 1/24/2022, answer due 2/14/2022. (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/25/2022 | 37 | SUMMONS Returned Executed by Gordon Clark. Wells Fargo & Company served on 1/24/2022, answer due 2/14/2022. (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/25/2022 | 38 | Summons Returned Unexecuted by Gordon Clark as to Scott Powell. (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/25/2022 | 39 | Summons Returned Unexecuted by Gordon Clark as to Wells Fargo & Company. (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/26/2022 | 40 | MOTION for Extension of Time until 3/15/2022 to File Responsive Pleading to 1 Complaint by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 01/26/2022) |
| 01/26/2022 | 41 | OBJECTION re 40 MOTION for Extension of Time until 3/15/2022 to File Responsive Pleading to 1 Complaint filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 01/26/2022) |
| 01/27/2022 | 42 | ORDER granting in part and denying in part Defendants' Motion for Extension of Time (ECF No. 40 ). Any response to the complaint shall be filed no later than **February 25, 2022**. Defendants are reminded that going forward, any motion for an extension of time shall comply with Connecticut Local Rule of Civil Procedure 7(b)2 and include whether the Plaintiffs have been informed of the request for additional time, and Plaintiffs position on such request. Signed by Judge Sarala V. Nagala on 1/27/22. (Marks, Joshua) (Entered: 01/27/2022) |
| 01/27/2022 | | Answer deadline updated for Joseph Abraham to 2/25/2022; Adam L. Bendett to 2/25/2022; Bendett & McHugh, PC to 2/25/2022; Jane Doe to 2/25/2022; John Doe to 2/25/2022; Pierre Habis to 2/25/2022; Jeffrey M. Knickerbocker to 2/25/2022; Dominick D. Neveux to 2/25/2022; Kenneth O'Neill to 2/25/2022; Mark A. Piech to 2/25/2022; Santander Bank, N.A. to 2/25/2022; Timothy Wennes to 2/25/2022. See 42 order. (Bozek, M.) (Entered: 01/28/2022) |
| 01/29/2022 | 43 | MOTION to Stay by Gordon Clark, Estate of Lillian J. Clark.Responses due by 2/19/2022 (Clark, Gordon) (Entered: 01/29/2022) |
| 02/01/2022 | 44 | ORDER denying Plaintiffs' Motion for Stay (ECF No. 43 ). Plaintiffs request the Court enter an order staying two pending Connecticut state court actions solely because Mr. Clark "is not capable of simultaneously administering and litigating" three separate actions. However, under the Anti–Injunction Act, a federal district court is not allowed to grant an injunction staying proceedings in a state court action except "as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Other Courts in this District have held that a federal court is without power to enjoin a concurrently pending foreclosure action in Connecticut state court. *See Rhodes v. Advanced Prop. Mgmt. Inc.*, No. 3:10–CV–826 JCH, 2011 WL 3204597, at *2 (D. Conn. July 26, 2011); *Chekroun v. U.S. Small Bus. Admin.*, No. CIV.A3:97CV2625(AWT), 1998 WL 231158, at *3 (D. Conn. May 4, 1998).<br><br>Similarly, here Plaintiffs have presented no evidence that any of the narrow exceptions set forth in 28 U.S.C. § 2283 apply to the present action. Therefore, this Court is without power to enjoin the state court proceedings, and Plaintiffs' motion must be DENIED. Signed by Judge Sarala V. Nagala on 2/1/22. (Marks, Joshua) (Entered: 02/01/2022) |
| 02/03/2022 | 45 | Corporate Disclosure Statement by Wells Fargo & Company. (Higgins, Sean) (Entered: 02/03/2022) |
| 02/11/2022 | 46 | Emergency MOTION for *Defendant Santander Bank, N.A. to* Preserve All Records Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 02/11/2022) |
| 02/11/2022 | 47 | ORDER. Santander Bank, N.A. shall file any opposition to Plaintiffs' Emergency Motion to Preserve All Records (ECF No. 46) no later than **February 18, 2022**. Signed by Judge Sarala V. Nagala on 2/11/22. (Marks, Joshua) (Entered: 02/11/2022) |

| 02/11/2022 | | Set Deadline as to <u>46</u> Emergency MOTION for *Defendant Santander Bank, N.A. to* Preserve All Records Order. Response due by 2/18/2022. See 47 Order. (Bozek, M.) (Entered: 02/14/2022) |
|---|---|---|
| 02/14/2022 | <u>48</u> | NOTICE by Gordon Clark, Estate of Lillian J. Clark (Clark, Gordon) (Entered: 02/14/2022) |
| 02/14/2022 | <u>49</u> | MOTION to Dismiss by Scott Powell, Wells Fargo & Company.Responses due by 3/7/2022 (Higgins, Sean) (Entered: 02/14/2022) |
| 02/14/2022 | <u>50</u> | Memorandum in Support re <u>49</u> MOTION to Dismiss filed by Scott Powell, Wells Fargo & Company. (Attachments: # <u>1</u> Exhibit 1; Lien by Clark on His Wife's Home)(Higgins, Sean) (Entered: 02/14/2022) |
| 02/14/2022 | <u>51</u> | NOTICE by Scott Powell, Wells Fargo & Company re <u>49</u> MOTION to Dismiss *to Self−Represented Litigants Regarding Motions to Dismiss as required by Local Rule 12* (Higgins, Sean) (Entered: 02/14/2022) |
| 02/18/2022 | <u>52</u> | Memorandum in Opposition re <u>46</u> Emergency MOTION for *Defendant Santander Bank, N.A. to* Preserve All Records Order filed by Santander Bank, N.A.. (Tracey, Patrick) (Entered: 02/18/2022) |
| 02/18/2022 | <u>53</u> | AFFIDAVIT re <u>52</u> Memorandum in Opposition to Motion Signed By Patrick S. Tracey filed by Santander Bank, N.A.. (Tracey, Patrick) (Entered: 02/18/2022) |
| 02/22/2022 | <u>54</u> | REPLY to Response to <u>46</u> Emergency MOTION for *Defendant Santander Bank, N.A. to* Preserve All Records Order filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 02/22/2022) |
| 02/23/2022 | 55 | ORDER denying Plaintiffs' Motion to Preserve all Records (ECF No. <u>46</u> ). In their motion, Plaintiffs request the Court order Defendant Santander preserve "all U.S. Residential Mortgage and HELOC records and all related employment records." ECF No. 46 at 2. In examining a request for a preservation order, Courts in this District apply a balancing test and consider the "specific, significant, and imminent threat of loss or destruction of evidence against the burden that preserving that evidence would impose." *Jumpp v. Anaya*, No. 3:13 CV 1228 JBA, 2015 WL 2237516, at *1 (D. Conn. May 1, 2015).<br><br>Here, Plaintiff requests in his motion, and reaffirms in his reply, that he seeks a court order requiring Santander to preserve *all* residential mortgage and HELOC records, as well as all related employment records, regardless of whether the documents have any relation to the present litigation. ECF No. <u>46</u> at 2; ECF No. <u>54</u> at 6. Such a broad order would place a serious burden on Santander. Additionally, given Santander's representations in its response (ECF No. <u>52</u> ), there is little chance that any of the relevant documents will be destroyed. Plaintiffs provide no evidence that Santander has destroyed any relevant documents, nor do Plaintiffs provide any evidence that Santander is planning on destroying any relevant documents. Further, in its response, Santander represents that a broad preservation letter has been circulated within the company to ensure that no relevant documents are destroyed.<br><br>Finally, as Santander points out, "the obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). At this point in the litigation, it is clear that Santander is on notice that all relevant information must be preserved, and Santander has acknowledged as much through the circulation of preservation letters. Thus, the risk that any information will be destroyed or deleted "has been diminished, if not eliminated." *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, No. 3:06CV1380(AHN), 2008 WL 11376620, at *3 (D. Conn. Nov. 5, 2008). Therefore, the burden that the broad order requested here would place on Santander far outweighs the risk of destruction of relevant documents. The Plaintiffs' motion is DENIED. Signed by Judge Sarala V. Nagala on 2/23/22. (Marks, Joshua) (Entered: 02/23/2022) |
| 02/24/2022 | <u>56</u> | First Corporate Disclosure Statement *for Bendett & McHugh, PC* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 02/24/2022) |
| 02/24/2022 | <u>57</u> | First MOTION to Dismiss *Complaint* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech.Responses due by 3/17/2022 (Attachments: # <u>1</u> Memorandum in Support of Motion to Dismiss, # <u>2</u> Exhibit A − State Court Docket, # <u>3</u> Exhibit B − Redacted Mortgage Deed, # <u>4</u> Exhibit C − Motion from State Court)(Knickerbocker, Jeffrey) (Entered: 02/24/2022) |

| | | |
|---|---|---|
| 02/24/2022 | 58 | First NOTICE by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech re 57 First MOTION to Dismiss *Complaint to Self Represented Party Concerning the Motion to Dismiss* (Knickerbocker, Jeffrey) (Entered: 02/24/2022) |
| 02/25/2022 | 59 | MOTION to Dismiss by Santander Bank, N.A..Responses due by 3/18/2022 (Attachments: # 1 Memorandum in Support)(Tracey, Patrick) (Entered: 02/25/2022) |
| 02/25/2022 | 60 | NOTICE by Santander Bank, N.A. *to Self−Represented Litigant Concerning Motion to Dismiss* (Tracey, Patrick) (Entered: 02/25/2022) |
| 03/03/2022 | 61 | Emergency MOTION for Extension of Time until March 17, 2022 *for Superior Court* Evidentiary Hearing 49 MOTION to Dismiss by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 03/03/2022) |
| 03/03/2022 | 62 | Joint MOTION for Rule 16 Conference *with Request for Expedited Consideration (jointly filed by all defendants)* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell, Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Higgins, Sean) (Entered: 03/03/2022) |
| 03/04/2022 | 63 | ORDER granting Defendants' request for a Rule 16 conference. The Court will hold a Rule 16 conference on March 15, 2022, at 10:00 am, at the Abraham A. Ribicoff Federal Courthouse, 450 Main Street, Hartford Connecticut, in Courtroom One.<br><br>It is further ORDERED that all deadlines on all pending motions are hereby VACATED. The Court will set a new briefing schedule at the Rule 16 conference. Signed by Judge Sarala V. Nagala on 3/4/22. (Marks, Joshua) (Entered: 03/04/2022) |
| 03/04/2022 | 64 | ORDER finding as moot Plaintiffs' Request for an Extension of time (ECF No. 61 ) in light of the Court's order granting a Rule 16 conference and vacating all current deadlines. Signed by Judge Sarala V. Nagala on 3/4/22. (Marks, Joshua) (Entered: 03/04/2022) |
| 03/04/2022 | 65 | NOTICE OF E−FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Rule 16 Conference set for 3/15/2022 10:00 AM in Courtroom One, 450 Main St., Hartford, CT before Judge Sarala V. Nagala. (Velez, F.) (Entered: 03/07/2022) |
| 03/10/2022 | 66 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Plaintiffs' Pending Amended Motion to Strike the Complaint in Superior Court* (Clark, Gordon) (Entered: 03/10/2022) |
| 03/11/2022 | 67 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Plaintiffs' Revised Grievance Complaints Against 5 Attorneys of Bendett & McHugh, P.C.* (Clark, Gordon) (Entered: 03/11/2022) |
| 03/15/2022 | 69 | ORAL MOTION for Extension of Time to Respond to 57 First MOTION to Dismiss *Complaint*, 49 MOTION to Dismiss , 59 MOTION to Dismiss by Gordon Clark, Estate of Lillian J. Clark. (Bozek, M.) (Entered: 03/18/2022) |
| 03/15/2022 | 70 | Consent ORAL MOTION to Stay Discovery by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell, Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes.Responses due by 4/5/2022. (Bozek, M.) (Entered: 03/18/2022) |
| 03/15/2022 | 71 | Minute Entry. Proceedings held before Judge Sarala V. Nagala: granting 69 Oral Motion for Extension of Time to Respond to 57 First MOTION to Dismiss Complaint, 49 MOTION to Dismiss, 59 MOTION to Dismiss; granting 70 Consent Oral Motion to Stay Discovery; Motion Hearing held on 3/15/2022 re 69 ORAL MOTION for Extension of Time to Respond to 57 First MOTION to Dismiss Complaint, 49 MOTION to Dismiss, 59 MOTION to Dismiss filed by Gordon Clark, Estate of Lillian J. Clark, 70 Consent ORAL MOTION to Stay Discovery filed by John Doe, Pierre Habis, Wells Fargo & Company, Jeffrey M. Knickerbocker, Santander Bank, N.A., Jane Doe, Dominick D. Neveux, Joseph Abraham, Adam L. Bendett, Kenneth O'Neill, Scott Powell, Bendett & McHugh, PC, Mark A. Piech, Timothy Wennes; Rule 16 Conference held on 3/15/2022. 27 minutes (Court Reporter: Melissa Cianciullo.) (Bozek, M.) (Entered: 03/18/2022) |

| | | |
|---|---|---|
| 03/16/2022 | 68 | ORDER. As discussed at the Rule 16 conference, Plaintiffs shall file an amended complaint no later than **April 5, 2022**. Upon the filing of Plaintiffs' amended complaint, Defendants' answer or other responsive motions shall be due as provided in the Federal and Local Rules of Civil Procedure. Additionally, on consent of all parties, all discovery in this case, including the requirement to file a Rule 26(f) report, shall be stayed pending resolution of any future motions to dismiss the complaint filed by Defendants. Signed by Judge Sarala V. Nagala on 3/16/22. (Marks, Joshua) (Entered: 03/16/2022) |
| 03/16/2022 | | Set Deadline per 68 Order: Amended Pleadings due by 4/5/2022. (Bozek, M.) (Entered: 03/17/2022) |
| 04/05/2022 | 72 | AMENDED COMPLAINT against All Defendants, filed by Estate of Lillian J. Clark, Gordon Clark.(Clark, Gordon) (Entered: 04/05/2022) |
| 04/08/2022 | 73 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Notice of Assignment of Grievance Complaints Against 5 Attorneys* (Clark, Gordon) (Entered: 04/08/2022) |
| 04/08/2022 | 74 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Plaintiffs' Motion for Reconsideration–Reargument with the Superior Court* (Clark, Gordon) (Entered: 04/08/2022) |
| 04/12/2022 | 75 | ORDER. As discussed during the hearing on March 15, 2022, Plaintiff need not file with this Court notices concerning his filings in other fora, including in the state court or with the Statewide Bar Grievance Committee, as those tribunals are distinct from this Court. Signed by Judge Sarala V. Nagala on 4/12/22. (Marks, Joshua) (Entered: 04/12/2022) |
| 04/14/2022 | 76 | NOTICE by Gordon Clark, Estate of Lillian J. Clark re 75 Order, *of Plaintiffs' Understanding of Judicial Notice Filings* (Clark, Gordon) (Entered: 04/14/2022) |
| 04/14/2022 | 77 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Plaintiffs' Superior Court Filing of Objection to Summary Judgment* (Clark, Gordon) (Entered: 04/14/2022) |
| 04/14/2022 | 78 | MOTION for Admonishment of Bendett & McHugh, P.C. Defendants Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 04/14/2022) |
| 04/14/2022 | 79 | MOTION to Vacate *Stay of Discovery* by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 04/14/2022) |
| 04/15/2022 | 80 | ORDER denying Plaintiffs' Motion for Admonishment (ECF No. 78 ). Under Federal Rule of Civil Procedure 11(c)(2), if Defendants are contemplating filing a motion for sanctions, they are required to provide notice to Plaintiffs, offer Plaintiffs the opportunity to correct what Defendants believe to be wrongful conduct, and provide a copy of the proposed motion to Plaintiffs in advance of filing. The conduct outlined by Plaintiffs in their motion appears to be no more than that required under Rule 11. If Defendants elect to file the motion, Plaintiffs will have the opportunity to file an opposition at that time. Signed by Judge Sarala V. Nagala on 4/15/22. (Marks, Joshua) (Entered: 04/15/2022) |
| 04/15/2022 | 81 | ORDER. The Court clarifies its previous orders to Plaintiffs concerning filings from other tribunals. Specifically, Mr. Clark may file any orders or decisions issued by the state court or Statewide Bar Grievance Committee if they bear on issues in the present case. Mr. Clark shall not file in this Court either his filings or the filings of any other parties made in other fora, as the Court can access those filings through public sources. If the Court is unable to access these filings from public sources and they are deemed necessary to issues in the present case, the Court will request such records from the appropriate party or parties. Signed by Judge Sarala V. Nagala on 4/15/22. (Marks, Joshua) (Entered: 04/15/2022) |
| 04/19/2022 | 82 | Amended MOTION to Dismiss *Amended Complaint* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech.Responses due by 5/10/2022 (Attachments: # 1 Memorandum in Support Motion to Dismiss Amended Complaint, # 2 Exhibit A – State Foreclosure Docket, # 3 Exhibit B – Mortgage Deed, # 4 Exhibit C – Admission that Federal Case related to State Case)(Knickerbocker, Jeffrey) (Entered: 04/19/2022) |
| 04/19/2022 | 83 | MOTION to Dismiss *Plaintiff's First Amended Complaint* by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes.Responses due by 5/10/2022 (Tracey, Patrick) (Entered: 04/19/2022) |
| 04/19/2022 | 84 | Memorandum in Support re 83 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 04/19/2022) |

| | | |
|---|---|---|
| 04/19/2022 | 85 | NOTICE by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes *to Self–Represented Litigant Concerning Motion to Dismiss* (Tracey, Patrick) (Entered: 04/19/2022) |
| 04/19/2022 | 86 | Amended NOTICE by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech re 82 Amended MOTION to Dismiss *Amended Complaint to self represented Plaintiff* (Knickerbocker, Jeffrey) (Entered: 04/19/2022) |
| 04/19/2022 | 87 | MOTION to Dismiss by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company.Responses due by 5/10/2022 (Higgins, Sean) (Entered: 04/19/2022) |
| 04/19/2022 | 88 | Memorandum in Support re 87 MOTION to Dismiss filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 04/19/2022) |
| 04/19/2022 | 89 | NOTICE by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company *to Self–Represented Litigants Regarding Motions to Dismiss as required by Local Rule 12* (Higgins, Sean) (Entered: 04/19/2022) |
| 05/03/2022 | 90 | First MOTION for Sanctions *Pursuant to Rule 11 For Plaintiff's Refusal to Follow Court Orders* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech.Responses due by 5/24/2022 (Knickerbocker, Jeffrey) (Entered: 05/03/2022) |
| 05/04/2022 | 91 | ORDER finding as moot ECF Nos. 49 , 57 , and 59 in light of the filing of the Amended Complaint (ECF No. 72 ) and the subsequent renewed motions to dismiss (ECF Nos. 82 , 83 , and 87 ). Signed by Judge Sarala V. Nagala on 5/4/22. (Marks, Joshua) (Entered: 05/04/2022) |
| 05/05/2022 | 92 | Joint Memorandum in Opposition *to Plaintiffs' Motion* re 79 MOTION to Vacate *Stay of Discovery* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Tracey, Patrick) (Entered: 05/05/2022) |
| 05/09/2022 | 93 | Emergency MOTION for Extension of Time to File Response/Reply *Objections to Three Motions to Dismiss* as to 87 MOTION to Dismiss , 82 Amended MOTION to Dismiss *Amended Complaint*, 83 MOTION to Dismiss *Plaintiff's First Amended Complaint* until May 31, 2022 by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/09/2022) |
| 05/10/2022 | 94 | ORDER granting Plaintiffs' Motion for Extension of Time (ECF No. 93 ). Any oppositions to Defendants' Motions to Dismiss (ECF Nos. 82 , 83 , and 87 ) are due no later than **May 31, 2022**.<br><br>The parties are reminded, however, that under District of Connecticut Local Rule 7(b) "all motions for extension of time shall be filed at least three (3) business days before the deadline sought to be extended." All future motions for extension of time in this matter shall be made in accordance with the Local Rules. Signed by Judge Sarala V. Nagala on 5/10/22. (Marks, Joshua) (Entered: 05/10/2022) |
| 05/10/2022 | 95 | OBJECTION re 93 Emergency MOTION for Extension of Time to File Response/Reply *Objections to Three Motions to Dismiss* as to 87 MOTION to Dismiss , 82 Amended MOTION to Dismiss *Amended Complaint*, 83 MOTION to Dismiss *Plaintiff&#0 filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A.. (Tracey, Patrick) (Entered: 05/10/2022)* |
| 05/10/2022 | | Set Deadline as to 83 MOTION to Dismiss *Plaintiff's First Amended Complaint*, 82 Amended MOTION to Dismiss *Amended Complaint*, 87 MOTION to Dismiss . Response due by 5/31/2022. See 94 Order. (Bozek, M.) (Entered: 05/11/2022) |
| 05/12/2022 | 96 | Emergency MOTION for Cease and Desist Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/12/2022) |
| 05/12/2022 | 97 | First MOTION for Sanctions by Gordon Clark, Estate of Lillian J. Clark.Responses due by 6/2/2022 (Clark, Gordon) (Entered: 05/12/2022) |
| 05/12/2022 | 98 | MOTION for Subpoena and Expedited Hearing Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/12/2022) |

| 05/17/2022 | 99 | Joint MOTION Rule 16 Conference and Expedited Consideration by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes.Responses due by 6/7/2022 (Tracey, Patrick) (Entered: 05/17/2022) |
|---|---|---|
| 05/18/2022 | 100 | ORDER denying Defendants' Request for a Rule 16 Status Conference. The Court has received each of the motions filed by the Plaintiffs and the Defendants in this action. Many of these motions have opposition deadlines that have not yet passed. The Court will review and render its decision on each of these motions, including the two pending motions for sanctions, in due course. As such, the Court does not believe that it will be a productive use of the Court's or the parties' time to hold another Rule 16 Conference at this time. Signed by Judge Sarala V. Nagala on 5/18/22. (Marks, Joshua) (Entered: 05/18/2022) |
| 05/19/2022 | 101 | REPLY to Response to 79 MOTION to Vacate *Stay of Discovery* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/19/2022) |
| 05/24/2022 | 102 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice of Grievance Complaints, Superior Court Order, etc.* (Clark, Gordon) (Entered: 05/24/2022) |
| 05/24/2022 | 103 | Memorandum in Opposition *to Bendett & McHugh Defendants' Motion for Sanction* re 90 First MOTION for Sanctions *Pursuant to Rule 11 For Plaintiff's Refusal to Follow Court Orders* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/24/2022) |
| 05/31/2022 | 104 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice of Notice of Appointment, Replies to Statewide Bar, Motions & Depositions* (Clark, Gordon) (Entered: 05/31/2022) |
| 05/31/2022 | 105 | Memorandum in Opposition *to Santander Bank N.A. Defendants' Motion to Dismiss* re 83 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/31/2022) |
| 05/31/2022 | 106 | Memorandum in Opposition *to Bendett & McHugh Defendants' Motion to Dismiss* re 82 Amended MOTION to Dismiss *Amended Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/31/2022) |
| 05/31/2022 | 107 | Memorandum in Opposition *to Wells Fargo Defendants' Motion to Dismiss* re 87 MOTION to Dismiss filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/31/2022) |
| 05/31/2022 | 108 | MOTION to Amend/Correct *Complaint* by Gordon Clark, Estate of Lillian J. Clark.Responses due by 6/21/2022 (Attachments: # 1 Second Amended Complaint)(Clark, Gordon) (Entered: 05/31/2022) |
| 06/01/2022 | 109 | ORDER. In light of the recent activity in this action, the Court will hold a Zoom status conference on **Friday June 3, 2022, at 11:00 am**. At this conference the parties should be prepared to discuss Plaintiffs' motion to vacate the stay of discovery (ECF No. 79 ). Signed by Judge Sarala V. Nagala on 6/1/22. (Marks, Joshua) (Entered: 06/01/2022) |
| 06/01/2022 | 110 | Emergency MOTION for Hearing re 109 Order, *Request to Reschedule Zoom Status Conference* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Higgins, Sean) (Entered: 06/01/2022) |
| 06/01/2022 | 111 | ORDER granting Defendants' Emergency Motion to Re−schedule Status Conference (ECF No. 110 ). The status conference previously scheduled for June 3, 2022, is reschedule to **Monday June 6, 2022, at 2:00 pm**. Signed by Judge Sarala V. Nagala on 6/1/22. (Marks, Joshua) (Entered: 06/01/2022) |
| 06/02/2022 | 112 | NOTICE OF E−FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Status Conference set for 6/6/2022 at 02:00 PM via Zoom before Judge Sarala V. Nagala. (Bozek, M.) (Entered: 06/02/2022) |

| | | |
|---|---|---|
| 06/02/2022 | | NOTICE regarding hearing via Zoom: The status conference scheduled for 6/6/2022 at 2:00 PM will be conducted via Zoom. The video link is https://www.zoomgov.com/j/1607492267?pwd=bmFnWmZtbk1FZEhmTVZIS3lueE1NUT09 and call in numbers are 1–669–254–5252 US (San Jose) or 1–646–828–7666 US (New York).<br><br>Meeting ID: 160 749 2267<br><br>Meeting Password: 536968<br><br>Please note: Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, screenshots, streaming, and rebroadcasting in any form, of court proceedings. The Judicial Conference of the United States, which governs the practices of the federal courts, has prohibited it. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Bozek, M.) (Entered: 06/02/2022) |
| 06/02/2022 | 113 | Memorandum in Opposition *to Plaintiffs' Motion* re 97 First MOTION for Sanctions filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 06/02/2022) |
| 06/02/2022 | 114 | Memorandum in Opposition *to Plaintiffs' Motion* re 98 MOTION for Subpoena and Expedited Hearing Order filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 06/02/2022) |
| 06/02/2022 | 115 | Memorandum in Opposition *to Plaintiffs' Motion* re 96 Emergency MOTION for Cease and Desist Order filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 06/02/2022) |
| 06/06/2022 | 116 | ORDER. On the status conference that took place on June 6, the Court instructed Defendants to order and file a copy of the transcript of the proceedings. The Court believes it is more appropriate for **all** parties to split the cost of the transcript. Thus, Plaintiffs and Defendants are instructed to split the cost of ordering the transcript of the status conference. Signed by Judge Sarala V. Nagala on 6/6/22. (Marks, Joshua) (Entered: 06/06/2022) |
| 06/06/2022 | 117 | Minute Entry. Proceedings held before Judge Sarala V. Nagala: denying 79 Motion to Vacate Stay of Discovery, denying 90 Motion for Sanctions, denying 96 Motion for Cease and Desist Order, denying 97 Motion for Sanctions, denying 98 Motion for Subpoena and Expedited hearing Order, taking under advisement 108 Motion to Amend/Correct Complaint; Status Conference held on 6/6/2022; Motion Hearing held on 6/6/2022 re 79 MOTION to Vacate *Stay of Discovery* filed by Gordon Clark, Estate of Lillian J. Clark, 90 First MOTION for Sanctions *Pursuant to Rule 11 For Plaintiff's Refusal to Follow Court Orders* filed by Jeffrey M. Knickerbocker, Bendett & McHugh, PC, Dominick D. Neveux, Mark A. Piech, Joseph Abraham, Adam L. Bendett, 96 Emergency MOTION for Cease and Desist Order filed by Gordon Clark, Estate of Lillian J. Clark, 97 First MOTION for Sanctions filed by Gordon Clark, Estate of Lillian J. Clark, 98 MOTION for Subpoena and Expedited Hearing Order filed by Gordon Clark, Estate of Lillian J. Clark, and 108 MOTION to Amend/Correct *Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. 49 minutes (Court Reporter: Melissa Cianciullo.) (Bozek, M.) (Entered: 06/10/2022) |
| 06/13/2022 | 118 | ORDER. In this action, Plaintiff Gordon Clark represents himself *pro se* and purports to represent Plaintiff Estate of Lillian J. Clark. In *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997), the U.S. Court of Appeals for the Second Circuit held that "an administratrix or executrix of an estate may not proceed pro se when the estate has beneficiaries or creditors other than the litigant." The Court requested and obtained the Petition/Administration or Probate of Will for the Estate of Lillian J. Clark filed on July 19, 2021, in North Central Connecticut Probate Court. It appears to list a number of heirs and beneficiaries of the estate besides Plaintiff Gordon Clark. In light of this information, the Court must consider whether the Estate of Lillian J. Clark may continue to proceed *pro se* in this matter. *See Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010) (noting that the Court must consider "whether all parties before the court are properly represented even in cases where the parties themselves do not raise the issue").<br><br>To that end, by **June 27, 2022**, Plaintiffs shall submit a brief no longer than 8 pages in length addressing their position on whether the Estate of Lillian J. Clark can continue to proceed *pro* |

| | | |
|---|---|---|
| | | *se* in this action. By **July 12, 2022**, Defendants shall submit any responses to Plaintiff's submission. Any brief submitted by a Defendant shall be no longer than 8 pages in length.Signed by Judge Sarala V. Nagala on 6/13/22. (Marks, Joshua) (Entered: 06/13/2022) |
| 06/14/2022 | 119 | REPLY to Response to 87 MOTION to Dismiss filed by Scott Powell(as former CEO of Santander), Wells Fargo & Company. (Higgins, Sean) (Entered: 06/14/2022) |
| 06/15/2022 | 120 | Memorandum in Opposition *to Plaintiff's Motion to File Amended Complaint* re 108 MOTION to Amend/Correct *Complaint* filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 06/15/2022) |
| 06/21/2022 | 121 | ORDER. On June 6, 2022, in ECF No. 116, the Court ordered that Plaintiffs and Defendants split the cost of ordering the transcript of the status conference that took place that day. To clarify, the Court orders that Plaintiffs collectively pay 50%, and Defendants collectively pay 50%, of the cost of the transcript. Signed by Judge Sarala V. Nagala on 6/21/2022.(Bozek, M.) (Entered: 06/21/2022) |
| 06/21/2022 | 122 | First MOTION to Seal Entries Indicated in Motion by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 06/21/2022) |
| 06/24/2022 | 123 | ORDER. The Court has reviewed the Motion to Seal (ECF No. 122 ) and it appears that appended to the Motion to Seal is a "Memorandum of Law in Support of Defendant's Motion To Dismiss" which differs in certain respects from the memorandum of law the Bendett & McHugh Defendants filed in support of their pending motion to dismiss. (ECF No. [82−1]). No later than **June 27, 2022**, the Bendett & McHugh Defendants shall file a notice on the docket detailing why they attached a memorandum in support of their motion to dismiss to their motion to seal and what effect they believe this filing should have on the currently pending motion to dismiss. Signed by Judge Sarala V. Nagala on 6/24/22. (Marks, Joshua) (Entered: 06/24/2022) |
| 06/27/2022 | 124 | Amended MOTION to Seal *CORRECTED TO REMOVE EXTRANEOUS PAGES* ITEMS INDICATED IN MOTION by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 06/27/2022) |
| 06/27/2022 | 125 | RESPONSE re 118 Order,,,,,, *Plaintiffs' Brief in Support of Estate Appearing Pro Se* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 06/27/2022) |
| 06/28/2022 | 126 | ORDER finding as moot Motion to Seal (ECF No. 122 ) in light of the filing of the Bendett & McHugh Defendants' Amended Motion to Seal. (ECF No. 124 ) Signed by Judge Sarala V. Nagala on 6/28/22. (Marks, Joshua) (Entered: 06/28/2022) |
| 06/28/2022 | 127 | ORDER denying Motion to Seal. The motion to seal requests that the Court seal, in their entirety, fourteen separate docket entries. The motion fails, however, to provide any particularized support "demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. Civ. R. 5(e)3. Thus, the Court is without an adequate basis on which to grant the motion. <br><br> This motion is denied without prejudice to Defendants renewing the motion, with a properly supported motion, providing reasons why the docket entries in question should be sealed, as well as a showing that the requested relief is narrowly tailored to serve those reasons. If it is not necessary to seal an entire docket entry, Defendant shall submitted proposed redacted versions of the documents, leaving unredacted any information that does not need to be sealed. Signed by Judge Sarala V. Nagala on 6/28/22. (Marks, Joshua) (Entered: 06/28/2022) |
| 06/29/2022 | 128 | REPLY to Response to 108 MOTION to Amend/Correct *Complaint Reply to Santander Bank Defendants' Objection to Motion to File Amended Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 06/29/2022) |
| 07/12/2022 | 129 | RESPONSE re 125 Response *to Plaintiffs' Brief in Support of Estate Appearing Pro Se* filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 07/12/2022) |
| 07/12/2022 | 130 | RESPONSE re 125 Response *TO PLAINTIFFS BRIEF IN SUPPORT OF THE ESTATE OF LILLIAN J. CLARK APPEARING PRO SE* filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 07/12/2022) |

| 07/12/2022 | 131 | First RESPONSE re 118 Order,,,,,, 125 Response filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 07/12/2022) |
|---|---|---|
| 07/12/2022 | 132 | First RESPONSE re 118 Order,,,,,, 125 Response *(Revised to fix title)* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 07/12/2022) |
| 07/13/2022 | 133 | The Court has reviewed the parties' filings in response to its request for briefing on whether Mr. Clark may continue to represent the estate of Lillian Clark *pro se*. To appear in a matter *pro se* means to appear "for one's self"; thus, "a person may not appear on another person's behalf in the other's cause." *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998). Therefore, the threshold question in determining whether a litigant may appear *pro se* is a determination "whether a given matter is plaintiff's own case or one that belongs to another." *Id*. In the context of an estate, a party seeking to proceed pro se must demonstrate: (1) he has been appointed administrator or executor of the estate; (2) he is the sole beneficiary of the estate; and (3) the estate has no other creditors. *Davis v. Yale New Haven Hosp*., No. 3:16–CV–01578 (VLB), 2017 WL 6459499, at *4 (D. Conn. Dec. 11, 2017). Without such a showing, anyone attempting to proceed pro se on behalf of an estate would in reality be proceeding on behalf of another. *Id*. Simply put, the executor of an estate "may not proceed pro se when the estate has beneficiaries or creditors other than the litigant." *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997).

In the present action, there can be no dispute that Mr. Clark is not the sole beneficiary of the estate. In his filing in support of proceeding *pro se*, Mr. Clark noted that there are several specific items totaling approximately $900 that have been left to persons other than Mr. Clark. ECF No. 125 12. While it is true that $900 does not seem to be a particularly large amount, and likely constitutes but a small part of the estate, Mr. Clark has provided no case law, and the Court has been unable to locate any, supporting the proposition that the amount of money left to other beneficiaries is relevant to the inquiry. Rather, the rule announced in *Pridgen* is clear: unless the estate has *no* other beneficiaries, it cannot proceed pro se.

Mr. Clark also cannot proceed *pro se* on behalf of the estate, as the estate has creditors other than Mr. Clark. Nearly the entire litigation presently before this Court relates to Santander Bank's efforts to foreclose on Ms. Clark's former house. The house is the property of the estate and thus Santander is a creditor on the estate. Again, whether Mr. Clark believes Santander's claim to the house to be correct or incorrect appears to be of no relevance. The estate has "creditors other than the litigant," which prevents Mr. Clark from proceeding *pro se* on behalf of it. *Pridgen*, 113 F.3d at 393.

It is thus ORDERED that no later than **August 15, 2022**, Mr. Clark obtain representation to pursue any claims made on behalf of the estate. If an attorney for the estate has not entered an appearance on the docket by August 15, all claims brought on behalf of the estate will be dismissed. Signed by Judge Sarala V. Nagala on 7/13/22. (Marks, Joshua) (Entered: 07/13/2022) |
| 07/27/2022 | 134 | OBJECTION re 133 Order,,,,,,,,,,, *Plaintiffs' Objection to Court Order – Document 133* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 07/27/2022) |
| 07/27/2022 | 135 | MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration–Reargument of Court Order – Document 133* by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 07/27/2022) |
| 07/29/2022 | 136 | ORDER. Defendants shall file any opposition to Plaintiff's motion for reconsideration, either jointly or separately, no later than **August 12, 2022**. Signed by Judge Sarala V. Nagala on 7/29/22. (Marks, Joshua) (Entered: 07/29/2022) |
| 07/29/2022 | | Set Deadline as to 135 MOTION for Reconsideration re 133 Order, *Motion for Reconsideration–Reargument of Court Order – Document 133*. Responses due by 8/12/2022. See 136 order. (Bozek, M.) (Entered: 08/01/2022) |
| 08/12/2022 | 137 | Joint Memorandum in Opposition re 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration–Reargument of Court Order – Document 133* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 08/12/2022) |

| 08/15/2022 | 138 | REPLY to Response to 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,,, *Motion for Reconsideration–Reargument of Court Order – Document 133 Reply to Defendants' Joint Objection to Motion for Reconsideration* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 08/15/2022) |
|---|---|---|
| 08/15/2022 | 139 | Emergency MOTION to Stay re 133 Order,,,,,,,,,,, 134 Objection, 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration–Reargument of Court Order – Document 133*, 138 Reply to Response to Motion, *Emergency Motion to Stay USDC Proceeding Pending Superior Court Ruling* by Gordon Clark, Estate of Lillian J. Clark.Responses due by 9/5/2022 (Clark, Gordon) (Entered: 08/15/2022) |
| 08/19/2022 | 140 | Joint Memorandum in Opposition re 139 Emergency MOTION to Stay re 133 Order,,,,,,,,,,, 134 Objection, 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration–Reargument of Court Order – Document 133*, 138 Reply to Response to Motion, filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 08/19/2022) |
| 08/23/2022 | 141 | TRANSCRIPT of Proceedings: Type of Hearing: Status Conference. Held on 6/6/2022 before Judge Sarala V. Nagala. Court Reporter: Melissa J. Cianciullo. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 9/13/2022. Redacted Transcript Deadline set for 9/23/2022. Release of Transcript Restriction set for 11/21/2022. (Cianciullo, Melissa) (Entered: 08/23/2022) |
| 08/26/2022 | 142 | REPLY to Response to 139 Emergency MOTION to Stay re 133 Order,,,,,,,,,,, 134 Objection, 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration–Reargument of Court Order – Document 133*, 138 Reply to Response to Motion, *Reply to Defendants' Joint Objection to Motion to Stay 140* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 08/26/2022) |
| 08/29/2022 | 143 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice of Settlement Negotiations* (Clark, Gordon) (Entered: 08/29/2022) |
| 08/29/2022 | 144 | ORDER. Based on Plaintiff's recent filing discussing settlement negotiations between Plaintiff and Defendant Santander Bank, the Court will refer this matter to a U.S. Magistrate Judge for purposes of a settlement conference. Signed by Judge Sarala V. Nagala on 8/29/22. (Marks, Joshua) (Entered: 08/29/2022) |
| 08/29/2022 | 145 | ORDER REFERRING CASE to Magistrate Judge Thomas O. Farrish to conduct a settlement conference. Signed by Judge Sarala V. Nagala on 8/29/2022.(Bozek, M.) (Entered: 08/29/2022) |
| 08/30/2022 | 146 | ORDER: Telephonic pre–settlement conference set for September 8, 2022 at 9:00 a.m. before Judge Thomas O. Farrish. Please call in to the Court's conference call line at 1–888–557–8511 and enter the pass code of 4478772# when prompted. A date for the settlement conference will be set during the telephone call. Because the parties will likely be ordered to attend the conference, either in–person or via videoconference, counsel are instructed to obtain their client's schedules over the next ninety days and have them available during the pre–conference. Counsel should also have their own calendars available to aid in scheduling. During the telephone call, counsel should be prepared to discuss what, if any, information needs to be exchanged and anything else that needs to be accomplished prior to the settlement conference to maximize its chances of success. If either counsel has a firm, unavoidable conflict at the appointed date and time, e.g., a previously–scheduled appearance in another court, s/he should not file a motion for continuance on the docket but rather should call Chambers at 860–240–3605 as soon as possible with opposing counsel on the line to work out an alternate day and time for the pre–conference with Judge Farrish's law clerk. Signed by Judge Thomas O. Farrish on 8/30/22.(Wood, R.) (Entered: 08/30/2022) |
| 08/30/2022 | 147 | STATUS REPORT by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth |

| | | O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 08/30/2022) |
|---|---|---|
| 09/01/2022 | 148 | AMENDED ORDER – The pre–settlement conference call has been rescheduled to September 9, 2022 at 1:30 p.m. with Judge Farrish, re 146 Order.<br>Signed by Judge Thomas O. Farrish on 9/1/22.(Wood, R.) (Entered: 09/01/2022) |
| 09/09/2022 | 149 | Minute Entry for proceedings held before Judge Thomas O. Farrish: Telephonic Pre–Settlement Conference held on 9/9/2022. Judge Farrish directed the plaintiff to submit an *ex parte* letter of no more than five pages, addressed to his chambers at 450 Main St., Hartford, CT, 06103. The letter should explain, in a civil and respectful tone, (1) the facts and law that cause the plaintiff to believe that he will prevail on his claims; (2) the plaintiff's assessment of each side's damage claims; and (3) what the plaintiff would be willing to accept by way of a settlement. Judge Farrish will review the letter and, if he concludes that a mediation would likely be productive, will contact the parties to discuss scheduling. Time 15 minutes (Wood, R.) Modified on 9/12/2022 to include Judge's Order (Wood, R.). (Entered: 09/12/2022) |
| 09/22/2022 | 150 | SETTLEMENT CONFERENCE ORDER. Judge Farrish will conduct a settlement conference over Zoom on Tuesday, October 25, 2022 at 1:00 p.m. The courtroom deputy will e–mail the connection information to Mr. Clark and to defendants' appearing counsel by Microsoft Outlook Calendar invitation. Any party wishing to submit a written mediation statement in advance of the conference may do so by 5:00 p.m. on October 18, 2022. Mediation statements are limited to ten double–spaced pages and may be submitted on an *ex parte* basis via e–mail to TOF_Settlement@ctd.uscourts.gov. It is so ordered.<br>Signed by Judge Thomas O. Farrish on 9/22/22.(Wood, R.) (Entered: 09/22/2022) |
| 09/28/2022 | 151 | AMENDED ORDER – The settlement conference on October 25, 2022 will start at 2:00 p.m. with Judge Farrish. Please note the new start time, re 150 Order.<br>Signed by Judge Thomas O. Farrish on 9/28/22.(Wood, R.) (Entered: 09/28/2022) |
| 10/17/2022 | 152 | Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint* by Gordon Clark, Estate of Lillian J. Clark.Responses due by 11/7/2022 (Attachments: # 1 Amended Second Amended Complaint)(Clark, Gordon) (Entered: 10/17/2022) |
| 10/17/2022 | 153 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice in Reference to Recent Filings & Settlement Conference* (Clark, Gordon) (Entered: 10/17/2022) |
| 10/18/2022 | 154 | ORDER granting 135 Motion for Reconsideration but denying the requested relief.<br><br>The standard for granting a motion for reconsideration is strict "and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Shrader v. CSX Tansp., Inc.*, 70 F.3d 225, 257 (2d Cir. 1995); *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) ("It is well settled that [a motion for reconsideration] is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." (citation and internal quotation marks omitted)). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).<br><br>Here, Plaintiff contends that the Court failed to adequately consider that the only other beneficiary in Mrs. Clark's will, her twin sister, predeceased her, thus making Mr. Clark the sole beneficiary of the estate. ECF No. 135 at 4. Further, Mr. Clark contends that no one, including Santander Bank, filed a claim against the estate in probate court, and thus the estate has no creditors. *Id.* Therefore, Plaintiff asserts, as there are no other creditors or beneficiaries, he can represent the estate *pro se*. While Plaintiff should have raised these arguments during the initial briefing of this issue, the Court nonetheless believes these arguments warrant further consideration, especially in light of Plaintiff's *pro se* status, and thus grants Plaintiff's motion for reconsideration.<br><br>Upon reconsideration, however, the Court adheres to its previous decision. The definitions of "creditor" and "claim" as they relate to an estate are set forth in Connecticut General Statute § 45a–353(d) and (e). A "creditor" is defined as "any person having a claim." A "claim" is defined as "all claims against a decedent (1) existing at the time of the decedent's death or (2) |

arising after the decedent's death, including, but not limited to, claims which are mature, unmatured, liquidated, unliquidated, contingent, founded in tort, or in the nature of exoneration, specific performance or replevin."

Under these broad definitions, Santander is a creditor against the estate, as it had a claim against Mrs. Clark for a debt she allegedly owed Santander at the time of her death. *See Santander Bank, N.A. v. Clark et al*, No. HHD–CV19–6120472–S, Complaint. While Plaintiff presents arguments that Santander's claim may ultimately be unsuccessful because it never filed a claim against the estate in probate court, that does not change the fact that it is a creditor under Connecticuts expansive definition of the term, for purposes of whether Mr. Clark can represent the estate *pro se* in this action. This case cannot be described solely as Mr. Clark's own because "*possible* creditors... will be affected by the outcome of the proceedings." *Iannaccone v. Law*, 142 F.3d 553, 559 (2d Cir. 1998) (emphasis added). Santander is at least a "possible" creditor of the estate. Thus, the Court adheres to its earlier decision that Mr. Clark may not represent the estate *pro se. See Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997).

Thus, it is ORDERED that no later than **November 18, 2022** Mr. Clark obtain representation to pursue any claims made on behalf of the estate. If an attorney for the estate has not entered an appearance on the docket by November 18, all claims brought on behalf of the estate will be dismissed. Signed by Judge Sarala V. Nagala on 10/18/22. (Marks, Joshua) (Entered: 10/18/2022)

| | | |
|---|---|---|
| 10/18/2022 | 155 | ORDER denying as moot 139 Motion for Stay. Plaintiff requests that the Court stay this case pending a decision of the Superior Court of Hartford on a motion to dismiss filed in a related state court action. While Plaintiff has presented no legal basis supporting the argument that such a stay is warranted, the Court notes that on September 29, 2022, the Hartford Superior Court entered an order denying Plaintiff's motion to dismiss. *Santander Bank, N.A. v. Clark et al*, HHD–CV19–6120472–S, Entry No. 231. As a result, Plaintiff's motion for a stay is denied as moot. Signed by Judge Sarala V. Nagala on 10/18/22. (Marks, Joshua) (Entered: 10/18/2022) |
| 10/21/2022 | 156 | OBJECTION re 154 Order on Motion for Reconsideration,,,,,,,,,,,,,,, *Plaintiffs' Objection to Court Order – Document 154* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 10/21/2022) |
| 10/21/2022 | 157 | MOTION for Reconsideration re 154 Order on Motion for Reconsideration,,,,,,,,,,,,,, *Motion for Reconsideration–Reargument of Court Order – Document 154* by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 10/21/2022) |
| 10/25/2022 | 158 | Minute Entry for proceedings held before Judge Thomas O. Farrish: Settlement Conference held on 10/25/2022. The case did not settle. Total Time: 1 hour and 9 minutes (Wood, R.) (Entered: 10/25/2022) |
| 10/28/2022 | 159 | ORDER denying Motion for Reconsideration. ECF No. 157 . As detailed in the Court's order on Mr. Clark's previous motion for reconsideration, the standard for granting such a motion is strict. The Court has now examined the question at issue twice and arrived at the same conclusion both times. Plaintiff's most recent memorandum does not point to a change in controlling law, new evidence not previously available, or a clear error that must be corrected to prevent manifest injustice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). Instead, Plaintiff's motion for reconsideration largely restates the same arguments made in his first motion for reconsideration and alleges that the controlling Second Circuit precedents were decided incorrectly. Thus, Plaintiff's motion for reconsideration must be denied.<br><br>The Court further notes that while it appreciates Plaintiff's position on this issue, the issue has now been fully litigated and this case must progress forward. As such, absent a showing of a change in controlling authority, the Court will not entertain further motions for reconsideration on this issue. Signed by Judge Sarala V. Nagala on 10/28/22. (Marks, Joshua) (Entered: 10/28/2022) |
| 11/02/2022 | | Judge Thomas O. Farrish no longer assigned to case. Referral Completed. (Bozek, M.) (Entered: 11/02/2022) |
| 11/03/2022 | 161 | First MOTION for Extension of Time to File Response/Reply as to 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File* |

| | | |
|---|---|---|
| | | *Second Amended Complaint* until November 21, 2022 by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 11/03/2022) |
| 11/04/2022 | 162 | OBJECTION re 161 First MOTION for Extension of Time to File Response/Reply as to 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint* until November 21, 2022 *Plaintiffs' Objection to Wells Fargo Defendants' Motion for Extension of Time* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 11/04/2022) |
| 11/04/2022 | 163 | ORDER granting Motion for Extension of Time. Wells Fargo and Scott Powell shall file their opposition to Plaintiff's Amended Motion to Amend no later than **November 21, 2022**. Signed by Judge Sarala V. Nagala on 11/4/22. (Marks, Joshua) (Entered: 11/04/2022) |
| 11/04/2022 | | Set Deadline as to 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint.* Opposition due by 11/21/2022. (Bozek, M.) (Entered: 11/08/2022) |
| 11/07/2022 | 164 | Joint Memorandum in Opposition re 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 11/07/2022) |
| 11/09/2022 | 165 | ORDER. Judge Nagala's chambers has received an envelope from Plaintiff Marked "For Settlement Purposes Only Not For Docket." Given this marking on the envelope, the Court has not reviewed the letter. Settlement conferences are intentionally scheduled in front of Magistrate Judges to assure that the District Judge presiding over the case is considering only the evidence and other information properly put before the Court during the course of the litigation, and is not informed of the confidential discussions that take place during the settlement conference. For this reason, Judge Nagala will not be reviewing this letter from Plaintiff and advises the Plaintiff that, in the future, he should refrain from sending such information to Judge Nagala. Signed by Judge Sarala V. Nagala on 11/9/22. (Marks, Joshua) (Entered: 11/09/2022) |
| 11/10/2022 | 166 | Emergency MOTION for Settlement Conference With Different USDC Magistrate Judge Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 11/10/2022) |
| 11/11/2022 | 167 | Memorandum in Opposition re 166 Emergency MOTION for Settlement Conference With Different USDC Magistrate Judge Order filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 11/11/2022) |
| 11/14/2022 | 168 | REPLY to Response to 166 Emergency MOTION for Settlement Conference With Different USDC Magistrate Judge Order filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 11/14/2022) |
| 11/14/2022 | 169 | MOTION for Order to Show Cause *as to Why Attorney Sean R. Higgins Defamatory Conduct Should Not Be Subject to Sanctions* by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 11/14/2022) |
| 11/15/2022 | 170 | ORDER denying Plaintiffs' Emergency Motion for Settlement Conference with Different USDC Magistrate Judge. ECF No. 166 . The Court has received and reviewed Plaintiffs' request for a new settlement conference with a different Magistrate Judge. The Court notes that, in ECF No. 165, it made clear that it did not review the materials sent to chambers because it intentionally did not want to be informed about confidential settlement discussions. The order made clear that Plaintiff should refrain from sending such information to Judge Nagala in the future. Nonetheless, Plaintiff has now filed a motion discussing details of the settlement conference on the public docket, in direct contravention of the Court's desire to be insulated from settlement discussions. Although the Court grants Plaintiff latitude as a *pro se* litigant, **the Court will consider imposing sanctions on Plaintiff if he continues to disregard orders of the Court.**

Upon review of Plaintiff's submission, Plaintiff appears to complain largely about the process employed during settlement conferences in this district writ large. Since the pandemic began, all of the court's magistrate judges have regularly conducted settlement conferences via Zoom. Additionally, settlement conferences involve the magistrate judge speaking with each party individually in an attempt to arrive at settlement terms acceptable to all parties. Thus, as Plaintiff's complaints are primarily inherent in the process of a settlement conference and |

| | | |
|---|---|---|
| | | would occur with any magistrate judge, it does not appear that referral to a new magistrate judge would be an efficient use of the Court's resources. The motion for settlement conference with another magistrate judge is DENIED, without prejudice to renew at a later stage of the case should circumstances warrant it. Signed by Judge Sarala V. Nagala on 11/15/22. (Marks, Joshua) (Entered: 11/15/2022) |
| 11/15/2022 | 171 | ORDER denying Plaintiff's Motion for Order to Show Cause why Attorney Higgins Should not be Sanctioned. ECF No. 169 . In response to Plaintiff's motion for a settlement conference with a new magistrate judge, the Wells Fargo Defendants, through Attorney Higgins, filed a short opposition brief laying out their position as to why the Plaintiff's motion should be denied. In doing so, Attorney Higgins was advocating for his client and nothing more. Nothing in this opposition appears to the Court improper or otherwise out of line. Thus, Plaintiff's motion for an order to show cause is DENIED. Signed by Judge Sarala V. Nagala on 11/15/22. (Marks, Joshua) (Entered: 11/15/2022) |
| 11/17/2022 | 172 | NOTICE OF APPEAL as to 154 Order on Motion for Reconsideration, 159 Order on Motion for Reconsideration by Gordon Clark. Filing fee $ 505, Manual Receipt# 730539. (Mendez, D) (Entered: 11/17/2022) |
| 11/17/2022 | 173 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 172 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Dinah Milton Kinney, Clerk. Documents manually filed not included in this transmission: none (Mendez, D) (Entered: 11/17/2022) |
| 11/18/2022 | 174 | Emergency MOTION to Stay *USDC Proceedings Pending Appeal* by Gordon Clark, Estate of Lillian J. Clark.Responses due by 12/9/2022 (Clark, Gordon) (Entered: 11/18/2022) |
| 11/21/2022 | 175 | ORDER. Defendants shall file any opposition to Plaintiff's Motion to Stay no later than **December 9, 2022**. Signed by Judge Sarala V. Nagala on 11/21/22. (Marks, Joshua) (Entered: 11/21/2022) |
| 11/21/2022 | 176 | Memorandum in Opposition re 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint* filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 11/21/2022) |
| 11/21/2022 | | Set Deadline as to 174 Emergency MOTION to Stay *USDC Proceedings Pending Appeal.* Responses due by 12/9/2022. (Bozek, M.) (Entered: 11/22/2022) |
| 12/01/2022 | 177 | REPLY to Response to 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint Reply to Defendants' Oppositions to Amended Motion to File Second Amended Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 12/01/2022) |
| 12/09/2022 | 178 | Memorandum in Opposition re 174 Emergency MOTION to Stay *USDC Proceedings Pending Appeal* filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 12/09/2022) |
| 12/09/2022 | 179 | Joint Memorandum in Opposition re 174 Emergency MOTION to Stay *USDC Proceedings Pending Appeal* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 12/09/2022) |
| 12/19/2022 | 180 | REPLY to Response to 174 Emergency MOTION to Stay *USDC Proceedings Pending Appeal* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 12/19/2022) |
| 06/06/2023 | 181 | Third MOTION for Rule 16 Conference by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Attachments: # 1 Exhibit A – Memo of Decision in State Foreclosure Case)(Knickerbocker, Jeffrey) (Entered: 06/06/2023) |
| 06/07/2023 | 182 | ORDER granting 181 Motion for Rule 16 Conference. The Court will hold an in person status conference on **June 28, 2023, at 1:00 pm**. |

| | | In advance of this conference and no later than **June 21, 2023**, all parties shall submit briefing on the issue of whether this Court retains jurisdiction to rule on the pending motions to dismiss and to amend the complaint in this action, in light of the pendency of Plaintiff's appeal at the Second Circuit and that court's denial of Wells Fargo's motion to dismiss. While the Court will not set a specific page limit for this briefing, the Court encourages brevity.<br><br>After reviewing the briefing filed on June 21, if any party wishes to file an opposition, such opposition shall be filed no later than **June 26, 2023**. Signed by Judge Sarala V. Nagala on 6/7/23. (Marks, Joshua) (Entered: 06/07/2023) |
|---|---|---|
| 06/09/2023 | 183 | NOTICE OF E–FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Status Conference set for 6/28/2023 at 01:00 PM in Courtroom One, 450 Main St., Hartford, CT before Judge Sarala V. Nagala. (Bozek, M.) Modified on 6/9/2023 to correct hearing type (Bozek, M.). (Entered: 06/09/2023) |
| 06/09/2023 | 184 | Docket Entry Correction re 183 Calendar Entry. Modified docket text to correct hearing type. Changed from show cause hearing to status conference. (Bozek, M.) (Entered: 06/09/2023) |
| 06/21/2023 | 185 | RESPONSE re 182 Order on Motion for Conference,,, filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Higgins, Sean) (Entered: 06/21/2023) |
| 06/21/2023 | 186 | RESPONSE re 182 Order on Motion for Conference,,, *Brief on Second Circuit Jurisdiction* filed by Gordon Clark, Estate of Lillian J. Clark. (Attachments: # 1 Exhibit Brief on Second Circuit Jurisdiction)(Clark, Gordon) (Entered: 06/21/2023) |
| 06/26/2023 | 187 | RESPONSE re 186 Response filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Higgins, Sean) (Entered: 06/26/2023) |
| 06/26/2023 | 188 | RESPONSE re 185 Response, *Opposition to Defendants' Memorandum of Law* filed by Gordon Clark, Estate of Lillian J. Clark. (Attachments: # 1 Exhibit Opposition to Defendants' MOL)(Clark, Gordon) (Entered: 06/26/2023) |
| 06/28/2023 | 189 | Minute Entry for proceedings held before Judge Sarala V. Nagala held on 6/28/2023: Status Conference and Motion Hearing; d iscussed various motions which were all taken under advisement. Defense Counsel, Tracey, will file notice regarding additional authority by end of week. Time: 54 minutes.(Court Reporter Denae Hovland) (Velez, F.) (Entered: 06/28/2023) |
| 06/29/2023 | 190 | First NOTICE OF COMPLIANCE WITH PRETRIAL ORDER by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech *FILED IN COMPLIANCE WITH ORDER TO SUPPLY AUTHORITIES* (Attachments: # 1 Exhibit A – Indicative ruling from different case)(Knickerbocker, Jeffrey) (Entered: 06/29/2023) |

Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Order

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Wed 7/13/2022 1:01 PM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Connecticut**

**Notice of Electronic Filing**

The following transaction was entered on 7/13/2022 at 1:01 PM EDT and filed on 7/13/2022

**Case Name:**      Clark et al v. Santander Bank, N.A. et al

**Case Number:**      3:22-cv-00039-SVN

**Filer:**

**Document Number:** 133(No document attached)

**Docket Text:**
**The Court has reviewed the parties' filings in response to its request for briefing on whether Mr. Clark may continue to represent the estate of Lillian Clark *pro se*. To appear in a matter *pro se* means to appear "for one's self"; thus, "a person may not appear on another person's behalf in the other's cause." *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998). Therefore, the threshold question in determining whether a litigant may appear *pro se* is a determination "whether a given matter is plaintiff's own case or one that belongs to another." *Id*. In the context of an estate, a party seeking to proceed pro se must demonstrate: (1) he has been appointed administrator or executor of the estate; (2) he is the sole beneficiary of the estate; and (3) the estate has no other creditors. *Davis v. Yale New Haven Hosp.*, No. 3:16-CV-01578 (VLB), 2017 WL 6459499, at \*4 (D. Conn. Dec. 11, 2017). Without such a showing, anyone attempting to proceed pro se on behalf of an estate would in reality be proceeding on behalf of another. *Id*. Simply put, the executor of an estate "may not proceed pro se when the estate has beneficiaries or creditors other than the litigant." *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997).**

**In the present action, there can be no dispute that Mr. Clark is not the sole beneficiary of the estate. In his filing in support of proceeding *pro se*, Mr. Clark noted that there are several specific items totaling approximately $900 that have been left to persons other than Mr. Clark. ECF No. [125] 12. While it is true that $900 does not seem to be a particularly large amount, and likely constitutes but a small part of the estate, Mr. Clark**

has provided no case law, and the Court has been unable to locate any, supporting the proposition that the amount of money left to other beneficiaries is relevant to the inquiry. Rather, the rule announced in *Pridgen* is clear: unless the estate has *no* other beneficiaries, it cannot proceed pro se.

Mr. Clark also cannot proceed *pro se* on behalf of the estate, as the estate has creditors other than Mr. Clark. Nearly the entire litigation presently before this Court relates to Santander Bank's efforts to foreclose on Ms. Clark's former house. The house is the property of the estate and thus Santander is a creditor on the estate. Again, whether Mr. Clark believes Santander's claim to the house to be correct or incorrect appears to be of no relevance. The estate has "creditors other than the litigant," which prevents Mr. Clark from proceeding *pro se* on behalf of it. *Pridgen*, 113 F.3d at 393.

It is thus ORDERED that no later than August 15, 2022, Mr. Clark obtain representation to pursue any claims made on behalf of the estate. If an attorney for the estate has not entered an appearance on the docket by August 15, all claims brought on behalf of the estate will be dismissed. Signed by Judge Sarala V. Nagala on 7/13/22. (Marks, Joshua)

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker     jknickerbocker@bmpc-law.com, jmknicker@yahoo.com

Sean R. Higgins     sean.higgins@klgates.com

Patrick S. Tracey     ptracey@bowditch.com, cdocketing@bowditch.com, gkeville@bowditch.com, jgribouski@bowditch.com

Gordon Clark     gordon@christianeconomics.net

**3:22-cv-00039-SVN Notice has been delivered by other means to:**

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Tue 10/18/2022 4:30 PM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Connecticut**

**Notice of Electronic Filing**

The following transaction was entered on 10/18/2022 at 4:29 PM EDT and filed on 10/18/2022

**Case Name:**        Clark et al v. Santander Bank, N.A. et al

**Case Number:**        3:22-cv-00039-SVN

**Filer:**

**Document Number:** 154(No document attached)

**Docket Text:**

**ORDER granting [135] Motion for Reconsideration but denying the requested relief.**

**The standard for granting a motion for reconsideration is strict "and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked."** *Shrader v. CSX Tansp., Inc.***, 70 F.3d 225, 257 (2d Cir. 1995);** *Analytical Surveys, Inc. v. Tonga Partners, L.P.***, 684 F.3d 36, 52 (2d Cir. 2012) ("It is well settled that [a motion for reconsideration] is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." (citation and internal quotation marks omitted)). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."** *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.***, 956 F.2d 1245, 1255 (2d Cir. 1992).**

**Here, Plaintiff contends that the Court failed to adequately consider that the only other beneficiary in Mrs. Clark's will, her twin sister, predeceased her, thus making Mr. Clark the sole beneficiary of the estate. ECF No. 135 at 4. Further, Mr. Clark contends that no one, including Santander Bank, filed a claim against the estate in probate court, and thus the estate has no creditors.** *Id.***. Therefore, Plaintiff asserts, as there are no other creditors**

**28**

or beneficiaries, he can represent the estate *pro se*. While Plaintiff should have raised these arguments during the initial briefing of this issue, the Court nonetheless believes these arguments warrant further consideration, especially in light of Plaintiff's *pro se* status, and thus grants Plaintiff's motion for reconsideration.

Upon reconsideration, however, the Court adheres to its previous decision. The definitions of "creditor" and "claim" as they relate to an estate are set forth in Connecticut General Statute § 45a-353(d) and (e). A "creditor" is defined as "any person having a claim." A "claim" is defined as "all claims against a decedent (1) existing at the time of the decedent's death or (2) arising after the decedent's death, including, but not limited to, claims which are mature, unmatured, liquidated, unliquidated, contingent, founded in tort, or in the nature of exoneration, specific performance or replevin."

Under these broad definitions, Santander is a creditor against the estate, as it had a claim against Mrs. Clark for a debt she allegedly owed Santander at the time of her death. *See Santander Bank, N.A. v. Clark et al*, No. HHD-CV19-6120472-S, Complaint. While Plaintiff presents arguments that Santander's claim may ultimately be unsuccessful because it never filed a claim against the estate in probate court, that does not change the fact that it is a creditor under Connecticuts expansive definition of the term, for purposes of whether Mr. Clark can represent the estate *pro se* in this action. This case cannot be described solely as Mr. Clark's own because "*possible* creditors... will be affected by the outcome of the proceedings." *Iannaccone v. Law*, 142 F.3d 553, 559 (2d Cir. 1998) (emphasis added). Santander is at least a "possible" creditor of the estate. Thus, the Court adheres to its earlier decision that Mr. Clark may not represent the estate *pro se*. *See Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997).

Thus, it is ORDERED that no later than November 18, 2022 Mr. Clark obtain representation to pursue any claims made on behalf of the estate. If an attorney for the estate has not entered an appearance on the docket by November 18, all claims brought on behalf of the estate will be dismissed. Signed by Judge Sarala V. Nagala on 10/18/22. (Marks, Joshua)

3:22-cv-00039-SVN Notice has been electronically mailed to:

Jeffrey M. Knickerbocker     jknickerbocker@bmpc-law.com, jmknicker@yahoo.com

Sean R. Higgins     sean.higgins@klgates.com

Patrick S. Tracey     ptracey@bowditch.com, cdocketing@bowditch.com, gkeville@bowditch.com, jgribouski@bowditch.com

Gordon Clark     gordon@christianeconomics.net

3:22-cv-00039-SVN Notice has been delivered by other means to:

Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Order on Motion for Reconsideration

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Fri 10/28/2022 12:44 PM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Connecticut**

**Notice of Electronic Filing**

The following transaction was entered on 10/28/2022 at 12:44 PM EDT and filed on 10/28/2022

**Case Name:**      Clark et al v. Santander Bank, N.A. et al

**Case Number:**      3:22-cv-00039-SVN

**Filer:**

**Document Number:** 159(No document attached)

**Docket Text:**

**ORDER denying Motion for Reconsideration. ECF No. [157]. As detailed in the Court's order on Mr. Clark's previous motion for reconsideration, the standard for granting such a motion is strict. The Court has now examined the question at issue twice and arrived at the same conclusion both times. Plaintiff's most recent memorandum does not point to a change in controlling law, new evidence not previously available, or a clear error that must be corrected to prevent manifest injustice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). Instead, Plaintiff's motion for reconsideration largely restates the same arguments made in his first motion for reconsideration and alleges that the controlling Second Circuit precedents were decided incorrectly. Thus, Plaintiff's motion for reconsideration must be denied.**

**The Court further notes that while it appreciates Plaintiff's position on this issue, the issue has now been fully litigated and this case must progress forward. As such, absent a showing of a change in controlling authority, the Court will not entertain further motions for reconsideration on this issue. Signed by Judge Sarala V. Nagala on 10/28/22. (Marks, Joshua)**

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

Gordon Clark (*in his individual capacity*), and )
Gordon Clark (*in his capacities as husband;* )
*sole fiduciary, sole beneficiary, and sole* )
*creditor of the Estate of Lillian J. Clark*), )
)
      Plaintiffs, )
)
    vs. )
)
Santander Bank, N.A., )
Scott Powell (*as former CEO of Santander*), )
Timothy Wennes, )
Pierre Habis, )
Kenneth O'Neill, )
John/Jane Doe(s) (*of Santander Bank, N.A.,*) )
Wells Fargo & Company, )
Wells Fargo Bank, N.A., )
Scott Powell (*as COO of Wells Fargo*), )
Bendett & McHugh, P.C., )
Adam L. Bendett, )
Jeffrey M. Knickerbocker, )
Dominick D. Neveux, )
Joseph Abraham, and )
Mark A. Piech, )
)
      Defendants. )

Civil Case No. 3:22-CV-00039-SVN

NOV 17 2022 AM 11:11
FILED-USDC-CT-HARTFORD

November 17, 2022

# NOTICE OF APPEAL
# TO THE UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

Notice is hereby given that the above-named Plaintiffs in the above-named case hereby appeal to the *United States Court of Appeals for the Second Circuit* from *Orders* entered in this action on October 18, 2022, and October 28, 2022, that ordered *pro se* Plaintiff Gordon Clark to obtain an attorney for the *Estate of Lillian J. Clark* by November 18, 2022, or all claims brought on behalf of said *Estate* will be dismissed. ECF No. [154 & 159].

Thank you for your time, consideration, and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on November 17, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195
gordon@christianeconomics.net

2

# Certificate of Service

I, Plaintiff Gordon Clark, certify that a copy of the above **NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT** will be served via *electronic service* on November 17, 2022, to the following:

Patrick S. Tracey, Esq. *(Represents all six (6) Santander Bank, N.A. named Defendants)*
c/o Bowditch & Dewey, LLP
101 Federal Street, Suite 1405
Boston, MA 02110
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq.
*(Represents himself, and the five (5) additional Bendett & McHugh, P.C. named Defendants)*
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Represents all three (3) Wells Fargo named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**

Dated and signed at Enfield, Connecticut, on November 17, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195
gordon@christianeconomics.net

# Exhibit 1

# Face to the Name
## Lillian and Gordon Clark
### (An Uncommon, Unbreakable, and Eternal Love)



My Precious Lilli-Bella • The Most Beautiful Girl in the World • 1929 • Bronx, NY



Gordon & Lilli-Bella • Our Wedding Day • February 14, 1993



Lilli-Bella • The Love of My Life • February 3, 2018 • Her Beloved Home



Lilli-Bella & Gordon • 10th Wedding Anniversary • February 14, 2003 • Gramercy Tavern • New York, NY

# Exhibit 2

FIDUCIARY'S PROBATE
CERTIFICATE
PC-450  REV. 7/15

**STATE OF CONNECTICUT**

**COURT OF PROBATE**

| COURT OF PROBATE,  North Central Connecticut | **DISTRICT NO. PD11** | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Lillian J. Clark, AKA Lillian Jennie Clark   (21-0414) | | DATE OF CERTIFICATE<br><br>August 1, 2022 |

| FIDUCIARY'S NAME AND ADDRESS | FIDUCIARY'S POSITION OF TRUST | DATE OF APPOINTMENT |
|---|---|---|
| Gordon Clark<br>70 Elm Street<br>Enfield, CT 06082 | Executor | August 6, 2021 |

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

**This certificate is valid for one year from the date of the certificate.**

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Nanci Scott, Chief Clerk

**Court
Seal**

**NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED**

# Exhibit

# 3

 **Santander**

May 1, 2019

Lillian Byron f/k/a Lillian Clark
70 Elm St.
Enfield, CT  06082

**Property Address 70 Elm St., Enfield, CT  06082**

Dear Lillian Byron:

Santander Bank, N.A. has recently been notified by the Town of Enfield Tax Authority regarding the outstanding delinquent/unpaid taxes on the property located at 70 Elm St., Enfield, CT  06082. In accordance with the terms of your HELOC, for loan account 5139015544, you are obligated to pay all property taxes as they become due.

**What you need to know**

- Santander Bank, N.A. has paid the delinquent/unpaid taxes in the amount of $171.18 to the Town of Enfield, on 10/05/2015, $22,605.40 to A1Z LLC on 10/05/2015, $14,799.28 to the Town of Enfield on 08/17/2018 in order to protect the Bank's interest of the collateral.
- You are required to pay the total amount of $37,575.86 no later than 05/20/2019 in order to cure the default of the HELOC as outlined in the Mortgage/Deed of Trust agreement to the address listed below:

  Santander Bank, N.A.
  Mail Code: 10-421-MC3
  450 Penn Street
  Reading, PA 19602
  ATTN: Tianna Agosto

- The payment must be made payable to Santander Bank, N.A. either by cashier's check, certified check or money order. Please include your loan account number on the check for reference purposes.

**What happens next**

- If the Bank does not receive payment by 05/20/2019, the Bank will exercise its rights to accelerate the amount secured by the collateral and institute a lawsuit to foreclose on the collateral.

**If you have questions**

- If you have any questions regarding this letter, please contact the Collections Default Department at 1-800-929-0234.
  - Monday through Thursday 8:00AM to 8:00PM ET
  - Friday 8:00AM to 6:00PM ET
  - Saturday 8:00AM to 1:00PM ET

Sincerely

Melissa Hinsey
Collections Operations
Santander Bank, N.A.

Santander Bank, N.A. is a Member FDIC and a wholly owned subsidiary of Banco Santander, S.A. ©2018 Santander Bank, N.A. All rights reserved. Santander, Santander Bank and the Flame logo are trademarks of Banco Santander, S.A. or its subsidiaries in the United States or other countries. All other trademarks are the property of their respective owners.

MK1419  144902  03/18

Consumer FCL Paid TAX/HOA 01.29.19

# Exhibit

# 4



# Town of Enfield

Town of Enfield
820 Enfield St

820 Enfield St, CT 06082
860-253-6340

## Bill Information



| Taxpayer Information | | | | |
|---|---|---|---|---|
| Bill # | 2017-1-0012701 (REAL ESTATE) | Town Benefit | | 1,000.00 |
| Unique ID | 000600020110-LIEN | Elderly Benefit | | (C) 1,000.00 |
| District/Flag | District: 2 | | | |
| Name | CLARK LILLIAN J | Assessment | | 101,440 |
| Care of/DBA | | Exemption | | 0 |
| Address | | Net | | 101,440 |
| Detail Information | 70 ELM ST | | | |
| Volume/Page | 0/0 | | | Town 33.4 |
| | | Mill Rate | | |

| Bill Information As of 05/07/2019 | | | | | | |
|---|---|---|---|---|---|---|
| Installment | Due Date | Town | District | | Total Due | |
| Inst #1 | 07/01/2018 | 694.05 | 682.69 | | Tax/ Princ/ Bond Due | 0.00 |
| Inst #2 | 01/01/2019 | 694.05 | | | Interest Due | 0.00 |
| Inst #3 | | | | | | |
| Inst #4 | | | | | Lien Due | 0.00 |
| Total Adjustments | | 0.00 | 0.00 | | Fee Due | 0.00 |
| Total Installment + Adjustment | | 1,388.10 | 682.69 | | | |
| Total Payments | | 2,070.79 | | | Total Due Now | 0.00 |
| | | | | | Balance Due | 0.00 |

**\*\*\* Note: This is not a tax form, please contact your financial advisor for information regarding tax reporting. \*\*\***

| Payment History | | | | | | |
|---|---|---|---|---|---|---|
| Payment Date | Type | Tax/Principal/Bond | Interest | Lien | Fee | Total |
| 04/30/2019 | PAY | 694.05 | 41.64 | 24.00 | 0.00 | 759.69 |
| 08/22/2018 | PAY | 1,376.74 | 41.30 | 0.00 | 0.00 | 1,418.04 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| \*\*\* Total payments made to taxes in | 2018 | $1,418.04 |
|---|---|---|

# Exhibit
# 5

# Santander Settles Predatory Auto-Lending Claims for $550 Million

Consumer-finance company was accused of making loans that borrowers couldn't afford to repay



Santander is one of the largest subprime auto lenders in the U.S.
PHOTO: JOHN LAMPARSKI/SOPA IMAGES/LIGHTROCKET/GETTY IMAGES

By *Ben Eisen* Follow *and* *AnnaMaria Andriotis* Follow
Updated May 19, 2020 2:34 pm ET

Santander Consumer USA Inc. has reached a $550 million deal with nearly three dozen states to settle charges of predatory auto lending to low-income and subprime borrowers.

The settlement, announced Tuesday, resolves charges that one of the largest subprime auto lenders in the U.S. made loans borrowers couldn't afford to repay. The states also claim that Santander failed to monitor dealers that falsified borrowers' incomes and other information when submitting loan applications.

"Over the last several years, we have strengthened our risk management across the board—improving our policies and procedures to identify and prevent dealer misconduct, and tightening standards to ensure affordability," Santander said in a written statement.

Thirty-three states and the District of Columbia accused Santander of extending loans that were too big relative to borrowers' incomes, charging excessive fees and failing to monitor dealership loan-approval practices.

California Attorney General Xavier Becerra said Santander profited by extending high-interest loans to buyers "who were doomed from the start" to default.

TRENDS IN AUTO LENDING

Auto Lenders Try to Lure Borrowers With Generous Terms—For Some

People Need Loans as Pandemic Spreads. Lenders Are Making Them Tougher to Get.

Car Dealers Push Online Sales to Make Up for Coronavirus Losses

Dealerships Give Car Buyers Some Advice: Just Stop Paying Your Loan

The Seven-Year Auto Loan: America's Middle Class Can't Afford Its Cars

The settlement includes $65 million of restitution for consumers. It also involves some $433 million in loan forgiveness, including for customers who have had cars repossessed but still owe money to Santander. The lender also agreed to waive balances for customers who have very low credit scores and who had stopped paying their loans as of the end of last year.

In addition to the penalty, Santander agreed to factor its borrowers' ability to repay its loans into its underwriting. It agreed not to fund loans that, when combined with other debt payments and monthly costs, would eat up a borrower's entire income.

Most auto-loan financing is arranged through dealerships, and lenders that fund the loans are supposed to carefully review borrowers' applications.

Lenders have been approving consumers for auto loans that they can't afford, including loans with larger monthly payments than borrowers' incomes, The Wall Street Journal reported last year. Consumers are increasingly signing up for loans that are larger than their car's purchase price, the Journal reported, increasing their chances of default.

Consumer lawyers say the practices often result in repossessed cars and damaged credit scores that make it harder for people to qualify for affordable financing.

Santander didn't verify several numbers in consumers' auto-loan applications that would have determined whether they could afford the financing, the states said in their complaints. It accepted stated-income loans without requiring documentation from dealers or consumers that would prove the income listed on the application, the states said.

Loan applicants' housing costs were also rarely verified, and Santander didn't have measures in place to catch falsified figures, the states alleged. When a loan application didn't include housing costs, Santander would assume a lower figure than what was reasonable for the area, according to the complaints.

The settlement highlights lenders' reliance on dealerships to boost loan sales. There was internal tension at Santander over how to handle dealerships that were found to have falsified applications, according to the states' complaints. The lender, the states said, tracked problematic dealers but often failed to cut ties with them if they were delivering enough profitable loans.

Santander's loans, which often come with double-digit interest rates, are typically packaged into bonds and sold to investors. Last year, Santander issued $8.3 billion worth of these bonds, more than twice the amount of the next largest subprime auto lender, according to data from Finsight.

Santander in 2017 settled claims stemming from its subprime auto-lending practices with the attorneys general of Delaware and Massachusetts.

**Write to** Ben Eisen at ben.eisen@wsj.com and AnnaMaria Andriotis at annamaria.andriotis@wsj.com

*Appeared in the May 20, 2020, print edition as '.'*

# Exhibit 6

RETURN DATE: DECEMBER 17, 2019 : SUPERIOR COURT

SANTANDER BANK, N.A. : J.D. OF HARTFORD

VS. : AT HARTFORD

CLARK, LILLIAN J., ET AL : NOV 1 9 2019

## COMPLAINT

## COUNT 1- REFORMATION OF MORTGAGE

1. On March 21, 2008, Lillian J. Clark owed Sovereign Bank $100,000.00, as evidenced by a promissory note for said sum dated on said date, and payable to the order of Sovereign Bank with interest from said date, in monthly installments of principal and interest.

2. On said date, by a deed of that date, said Lillian J. Clark, to secure said note, mortgaged to Sovereign Bank the premises known as 70 Elm Street, Enfield, Connecticut, and described in Exhibit A attached hereto and made a part hereof.

3. Said mortgage deed was recorded on the Enfield Land Records on April 7, 2008 in Volume 2392 at Page 47. Said Mortgage correctly identifies the secured premises as 70 Elm Street, Enfield, CT, however, no property description was attached to the Mortgage Deed.

4. Upon information and belief, the legal description attached hereto as Exhibit A provides an accurate legal description of the mortgage premises.

5. Reformation of said mortgage to provide a detailed legal description as attached

hereto as Exhibit A would visit no prejudices upon any subsequent encumbrances because said mortgage correctly references the street address of the mortgage premises.

## COUNT II – FORECLOSURE OF THE MORTGAGE AS REFORMED

1.  On March 21, 2008, Lillian J. Clark owed Sovereign Bank $100,000.00, as evidenced by a promissory note for said sum dated on said date, and payable to the order of Sovereign Bank with interest from said date, in monthly installments of principal and interest.

2.  On said date, by a deed of that date, said Lillian J. Clark, to secure said note, mortgaged to Sovereign Bank the premises known as 70 Elm Street, Enfield, Connecticut, and described in Exhibit A attached hereto and made a part hereof.

3.  Said mortgage deed was recorded on the Enfield Land Records on April 7, 2008 in Volume 2392 at Page 47. Said Mortgage correctly identifies the secured premises as 70 Elm Street, Enfield, CT, however, no property description was attached to the Mortgage Deed.

4.  Sovereign Bank merged into and is now known as Santander Bank, N.A.

5.  On or before October 29, 2019, the Plaintiff became and at all times since then has been the party entitled to collect the debt evidenced by said note and is the party entitled to enforce said mortgage. The unpaid balance due pursuant to the terms of said note is $80,897.23, plus interest from May 10, 2019 and late charges and collection costs, that have not been paid although due and payable.

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 · TEL (860) 677-2868 · TDD/TYY PLEASE FIRST DIAL 711

6.    Said note and mortgage are now in default by virtue of nonpayment of the monthly installments of principal and interest due on June 10, 2019 and each and every month thereafter, and the Plaintiff has exercised its option to declare the entire balance of said note due and payable.

7.    The following encumbrances of record upon the property sought to be foreclosed are prior in right to the Plaintiff's mortgage and are not affected by this action:

(a)    Any taxes due the Town of Enfield that remain outstanding and properly perfected as of the date hereof pursuant to applicable law.

8.    On the aforementioned piece of property, the following interests are claimed which are subsequent to Plaintiff's said mortgage:

(a)    The Defendant, Midland Funding, LLC may claim an interest in said premises by virtue of a Judgment Lien in the amount of $14,304.93 dated April 18, 2012 and recorded May 2, 2012 in Volume 2552 at Page 644 of the Enfield Land Records.

(b)    The Defendant, Unifund Corporation, may claim an interest in said premises by virtue of a Judgment Lien in the amount of $5,090.00 dated October 14, 2015 and recorded October 19, 2015 in Volume 2630, Page 528 of the Enfield Land Records.

(c)    The Defendant, Saint Francis Hospital, may claim an interest in said premises by virtue of a Judgment Lien in the amount of $1,463.05 dated July 22, 2016 and

**48**

recorded July 28, 2016 in Volume 2646, Page 1143 of the Enfield Land Records.

(d)      The Defendant, Gordon Alexander Clark, may claim an interest in said premises by virtue of a Lien in the amount of $300,000.00 dated February 12, 2012 and recorded February 13, 2012 in Volume 2546, Page 1107 of the Enfield Land Records.

9.      Upon information and belief, the Defendant, Lillian J. Clark is the owner of record and in possession of said premises.

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

WHEREFORE, the Plaintiff claims **AS TO COUNT I:**

1.    Reformation of the mortgage by adding the legal description attached hereto as Exhibit A to said mortgage.

**AS TO COUNT II:**

1.    A foreclosure of said mortgage as reformed.
2.    Immediate possession of the mortgaged premises.
3.    A deficiency judgment. **No deficiency will be sought against any person whose obligation under the subject promissory note has been heretofore or hereafter discharged in bankruptcy.**
4.    The appointment of a receiver to collect rents and profits accruing from the premises.
5.    Reasonable attorney's fees and costs.
6.    Such other relief and further equitable relief as may be required.

**NOTICE: THE LAW FIRM OF BENDETT & MCHUGH, P.C. IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. IF YOU HAVE PREVIOUSLY RECEIVED A DISCHARGE IN BANKRUPTCY WHICH DISCHARGED THIS DEBT, THIS CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST PROPERTY.**

This action is within jurisdiction of the Superior Court.

Dated at Farmington, Connecticut, _____NOV 1 9 2019_____

THE PLAINTIFF,
SANTANDER BANK, N.A.

By _____
Dominick Neveux
Bendett & McHugh, P.C.
Its Attorneys
270 Farmington Avenue, Suite 151
Farmington, CT 06032
(860) 677-2868
Juris No. 102892

A TRUE COPY
ATTEST:

JOHN T. FIORILLO
CONNECTICUT STATE MARSHAL

**51**

RETURN DATE: DECEMBER 17, 2019      :     SUPERIOR COURT

SANTANDER BANK, N.A.            :     J.D. OF HARTFORD

VS.                                    :     AT HARTFORD

CLARK, LILLIAN J., ET AL         :     NOV **1 9** 2019

## STATEMENT OF AMOUNT IN DEMAND

    The amount, legal interest or property in demand is $15,000.00 or more, exclusive of interest and costs.

                                 PLAINTIFF,
                                 SANTANDER BANK, N.A.

                                 Dominick Neveux
                                 Bendett & McHugh, P.C.
                                 Its Attorneys
                                 270 Farmington Avenue, Suite 151
                                 Farmington, CT 06032
                                 (860) 677-2868
                                 Juris No. 102892

CLC/1162FC-20198219

Rev.053119

A TRUE COPY
ATTEST:

JOHN T. FIORILLO
CONNECTICUT STATE MARSH

**52**

Exhibit "A"

I        *the said releasor   have or ought to have in or to* a certain piece or parcel of land with buildings and improvements thereon and appurtenances thereto, situated on the Southerly side of Elm Street known as No. 70 Elm Street, in the Town of Enfield, County of Hartford and State of Connecticut bounded and described as follows:

NORTHERLY  –    By Elm Street a distance of Eighty-Five (85.00) feet;

EASTERLY  –    By land now or formerly of Clarence Provencher, Et Al a distance of One Hundred Sixty-Four and forty-two hundredths (164.42) feet;

SOUTHERLY  –    By land now or formerly of John Nareski, Et Ux a distance of Eighty-Five (85.00) feet;

WESTERLY  –    By land now or formerly of Frank Ruggiero, a distance of One Hundred Sixty-Eight and ninety hundredths (168.90) feet.

Reference is hereby made to a map entitled "Map of Land in Enfield, Conn. for Clarence D. Provencher Scale 1 inch equals 50 feet Mar. 1955 Wm E. Savage, Jr. Land Surveyor Thompsonville, Conn." on file in the Town Clerk's Office of said Town of Enfield, Book of Maps, Volume 5, Page 156, upon which map the above premises appears as the Westerly portion of land therein shown and to which reference is made for a more particular description.

7.

# Exhibit

# 7

|  |  |  |
|---|---|---|
| **Docket No. HHD-CV19-6120472-S** | ) | **Return Date: December 17, 2019** |
|  | ) | Superior Court |
| Santander Bank, N.A. | ) | Judicial District of Hartford |
| vs. | ) | at Hartford |
| Clark, Lillian J., et al. | ) | **April 29, 2022** |
|  | ) |  |

# DEFENDANTS' ANSWER, AFFIRMATIVE/SPECIAL DEFENSES, COUNTERCLAIM, AND JURY DEMAND

The Defendants, Gordon Clark (Mr. Clark), and Lillian J. Clark, hereby files *Defendants' Answer, Affirmative/Special Defenses, Counterclaim, and Jury Demand.*

## ANSWER

### COUNT ONE: REFORMATION OF MORTGAGE

1.) Denied.

2.) Denied.

3.) Denied.

4.) Denied.

5.) Denied.

### COUNT TWO: FORECLOSURE OF THE MORTGAGE AS REFORMED

1.) Denied.

2.) Denied.

3.) Denied.

4.) Without knowledge.

5.) Denied.

6.) Denied.

1

*alleged* mortgage.

2.) Compensatory damages.

3.) CUTPA double, or treble *punitive damages*.

4.) Legal fees and costs of litigation, under CUTPA.

5.) Such other and further relief as this Court may determine is just and equitable under CUTPA.

**COUNT TWO:**
**VIOLATIONS OF THE**
**CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA)**

1.) Denial of the equitable remedy of foreclosure and invalidation of the *alleged* note and *alleged* mortgage.

2.) Compensatory damages.

3.) CUTPA double, or treble *punitive damages*.

4.) Legal fees and costs of litigation, under CUTPA.

5.) Such other and further relief as this Court may determine is just and equitable under CUTPA.

**JURY DEMAND**

1.) The Counterclaimants demand a jury trial of the material facts in this matter.

**CERTIFICATION**

I, Gordon Clark, hereby certify that, pursuant to **Connecticut General Statutes § 42-110g(c)**, and as ***required by law***, a copy of *Defendants' Answer, Affirmative/Special Defenses, Counterclaim, and Jury Demand* has been mailed via *USPS Certified Mail* to the *Connecticut Attorney General*, Mr. William Tong, and the *Connecticut Commissioner of the Department of Consumer Protection*, Ms. Michelle H. Seagull.

Attorney General William Tong
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
**Mailed via *USPS Certified Mail***

Commissioner Michelle H. Seagull
Department of Consumer Protection
450 Columbus Boulevard, Suite 901
Hartford, Connecticut 06103-1840
**Mailed via *USPS Certified Mail***

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on April 29, 2022, by Defendant and Counterclaimant Gordon Clark, *in both his individual and executorship capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

31

# Exhibit

# 8

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

DOCKET NO: HHD-CV-19-6120472-S : SUPERIOR COURT

SANTANDER BANK, N.A. : J.D. OF HARTFORD

VS : AT HARTFORD

CLARK, LILLIAN J., ET AL : MAY 18, 2022

**PLAINTIFF'S REPLY TO DEFEDNANT'S SPECIAL DEFENSES, MATTERS IN AVOIDANCE, ANSWER AND SPECIAL DEFENSES TO COUNTER CLAIMS**

**I. REPLY TO SPECIAL DEFENSES**

Santander Bank, N.A., (the "Plaintiff") respectfully replies that pursuant to Practice Book § 10-56, Plaintiff generally denies the allegations of Defendant Gordon Clark ("Defendant's") special defenses and leaves Defendant to his proof.

**II. MATTERS IN AVOIDANCE**

Pursuant to Practice Book § 10-57, Plaintiff pleads the following matters in avoidance.

1. As to all special defenses, Defendant's breach of the obligations under the Note and Mortgage are fatal to Defendant's alleged defenses.

2. Defendant's failure to pay taxes when due and failure to offer a deed in lieu preclude Defendant from seeking any set-off.

**NOTICE: THE LAW FIRM OF BENDETT & MCHUGH, P.C. IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. IF YOU HAVE PREVIOUSLY RECEIVED A DISCHARGE IN BANKRUPTCY WHICH DISCHARGED THIS DEBT, THIS CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST PROPERTY.**

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

## III. ANSWER TO THE COUNTERCLAIMS.

### Count One

1.  As to paragraph 1 Plaintiff is without sufficient knowledge to admit or deny and leaves Defendant to his facts.

2.  As to Paragraphs 2 and 3, the allegations are denied as the court has denied a motion to dismiss and motion to strike based on an alleged lack of property description, further the mortgage includes the property address and citation to a document on the land records.

3.  As to Paragraph 4, Plaintiff admits it has a pending reformation count, but denies its mortgage is "invalid, defected and unenforceable."

4.  As to Paragraph 5, Plaintiff admits its complaint does not contain the words "mutual mistake" or "fraud," but denies the remainder of the allegations.

5.  As to Paragraphs 6, 7, and 8, Plaintiff denies the allegations contained therein.

### Count Two

1.  As to paragraph 1, 2, 3, 4, 5 and 6, the allegations contained therein are denied.

## IV. SPECIAL DEFENSES TO THE COUNTERCLAIM.

1.  As to both counts, the note and mortgage were breached by the borrower's failure to pay property taxes, and this breach has been admitted by Defendant in the Answer, on page

2

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

23, paragraph 2 where Defendant admits that the taxes were so far behind that the Town of Enfield conducted a "tax lien foreclosure sale where the property was sold in April 2015 to the highest bidder . . . ."

2.  As to both counts, any damages are a direct and proximate result of Defendant failing to promptly pay property taxes as required by the Note and Mortgage.

3.  As to both counts, any damages are a direct and proximate result of Defendant failing to turn the property over to Plaintiff after the breach of the borrower's obligation to pay property taxes.

Respectfully submitted,
PLAINTIFF

//414128
By_____
Jeffrey M. Knickerbocker, Esq.
Bendett & McHugh, P.C.
Its Attorneys

3

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

**CERTIFICATION**

  I hereby certify that a copy of the above was mailed or electronically delivered on May 18, 2022 to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served, as follows:

LILLIAN J CLARK
70 ELM STREET
ENFIELD, CT 06082

GORDON ALEXANDER CLARK
70 ELM STREET
ENFIELD, CT 06082

           //414128

           _____

           Jeffrey M. Knickerbocker
           Commissioner of the Superior Court

# Exhibit 9

For information on ADA accommodations,
contact a court clerk or go to: *www.jud.ct.gov/ADA.*

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



| Name of case *(Plaintiff v. Defendant)* | Docket number |
|---|---|
| **SANTANDER BANK, N.A.  v. CLARK, LILLIAN J Et Al** | **HHD-CV-19-6120472-S** |

| [X] Judicial District | [ ] Housing Session | [ ] Geographical Area number | Address of court *(number, street, town and zip code)* **95 WASHINGTON STREET HARTFORD, CT 06106** |
|---|---|---|---|

**I certify that the pleadings in this case are closed on the issue(s) as to all parties.**

Name of person making certification
**JEFFREY MARKS KNICKERBOCKER / BENDETT & MCHUGH PC**

| Signature ▶ **414128** | [ ] Plaintiff  [X] Attorney for Plaintiff | [ ] Defendant  [ ] Attorney for Defendant |
|---|---|---|

**The pleadings being closed, the case will proceed as a(n):** *(Select all that apply)*

- [ ] Jury Trial *(Also file a Claim for Jury (Form JD-CL-53), with statutory fee.)*
- [ ] Hearing in Damages to the Court
- [ ] Hearing in Damages to the Jury *(Also file a Claim for Jury (Form JD-CL-53) with statutory fee.)*
- [ ] Administrative Appeal: *(Select applicable box)*   [ ] Record   [ ] Non-record
- [X] Non-Jury Matter *(court trial)*

**A. If case is privileged, then complete this section.**

1. Basis of privilege under Section 14-9 of the Connecticut Practice Book:  *(Select all that apply)*

- [ ] hearing under the fair employment practices act or the labor relations act;
- [ ] an action brought by or on behalf of the state, other than actions upon probate bonds;
- [ ] appeal from the employment security board of review;
- [ ] appeal from probate or from the doings of commissioners appointed by court of probate;
- [ ] action brought by receiver of insolvent corporation by order of court;
- [ ] action by or against any person sixty-five years of age or older or who reaches such age while the action is pending;
- [ ] appeal from findings, orders, or other actions of the public utilities control authority;
- [ ] equitable action tried to the court in which the essential claim asserted is for a permanent injunction and any claim for damages or other relief, legal or equitable, is merely in lieu of, or supplemental to, the claim for injunction;

- [ ] habeas corpus proceeding;
- [ ] motion to dissolve temporary injunction;
- [ ] motion for temporary injunction;
- [ ] writ of ne exeat, prohibition, or mandamus;
- [ ] application for appointment of receiver;
- [ ] disclosure by garnishee;
- [ ] action by or against executor, administrator, or trustee in bankruptcy or insolvency;
- [ ] hearing to the court in damages on default or case where there is an issue as to damages after the court has granted a summary judgment on the issue of liability;
- [ ] case remanded by the   [ ] Supreme Court   [ ] Appellate Court for a new trial or case in which a verdict has been set aside, a new trial granted, or a mistrial declared.

2. If privilege is other than those specified in Section 14-9 of the Connecticut Practice Book, state ground of claim and authority:

**Privileged pursuant to Conn. Gen. Stat. § 52-192**

**B. Relief requested. Excluding interest and costs, the amount, legal interest, or property in demand is:**

*(Select one amount)*
[X] $15,000 or more.   **OR**   [ ] less than $15,000.

*(Select if applicable)*
[X] I am claiming other relief in addition to, or instead of, money damages.

## Certification

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on *(date)*___**Apr-10-2023**___ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.

Name and address of each party and attorney that copy was or will be mailed or delivered to*

**LILLIAN J CLARK (Self Represented) - 70 ELM STREET ENFIELD, CT 06082**
**GORDON ALEXANDER CLARK (Self Represented) - 70 ELM STREET ENFIELD, CT 06082**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.

| Signed *(Signature of filer)* ▶ *414128* | Print or type name of person signing **JEFFREY MARKS KNICKERBOCKER** | Date signed **Apr-10-2023** |
|---|---|---|
| Mailing address *(Number, street, town, state and zip code)* **270 FARMINGTON AVE SUITE 151 FARMINGTON, CT 06032** | **64** | Telephone number **860-255-5008** |

# Exhibit 10

# CLOSING STATEMENT

Superior Court of Hartford
Judge Claudia A. Baio
May 4, 2023

Thank you, Judge Baio, for this opportunity to make a closing statement, I *sincerely* appreciate it.

This *tragic and avoidable* case that began over four (4) years ago, that is, shortly after an *erroneous, unjust, and malicious* May 1, 2019, letter was improperly address to Lillian Bryon and not Lillian Clark, and sent via *USPS First Class Mail* from Plaintiff *Santander Bank* demanding $37,575.86 in a lump sum in less than 19 days or face foreclosure from a 91-year-old woman battling daily and courageously against Parkinson's disease since 2009, and who had never missed a payment, and was current on her property taxes. This is certainly not right nor just to anyone with a conscience, and it is definitely illegal, and immoral; and *anyone who rationalizes, justifies, excuses, cover-ups, and/or turns a blind eye* to this reprehensible behavior is *condoning and enabling* this ongoing wrongdoing with impunity. This ongoing *painful and heart-wrenching trauma* is certainly about what unjustly, illegally, and immorally happened to my ***most beautiful, beloved, and precious*** wife of 27-years, Lillian Clark, in the last 8 years of her *precious* life that most certainly shortened her lifespan, and *likely* mine as well, which can be traced back to wrongdoings by the Plaintiff beginning in 2012. The Defendants have experienced over ten (10) years of unnecessary suffering and pain that continues to this day, all due to the Plaintiff's wrongful acts of ageism, sexism, racism, negligent incompetence, greed, power, and/or malice.

However, the much broader issue that effects all Americans, not just the Defendants, is whether or not truth or facts matter anymore in the United States of America, or are we all barreling down the road into a post-truth world, where our media is fill with false conspiracy theories, and the Internet is taken over by AI (Artificial Intelligence); and our courts, despite the efforts of many honorable people in the legal profession, appears to becoming increasingly places where the rich use their immense power and battery of lawyers to *hide the truth, and twist and contort the law, and manipulate the court rules and procedures*, which results in countless injustices to the poor and unrepresented. More specifically to this case, is the question of whether or not *the facts still matter or has the banks captured the courts?*, as one experienced and well-known Connecticut foreclosure attorney told and confirmed to me over the phone about 2 years ago, when this attorney surprisingly, boldly, unequivocally, and unashamedly stated, "***The facts don't matter, because the courts favor the banks***." It is certainly *tragic* the number of lies that we are all inundated with daily, especially, for our *precious and vulnerable* children; however, if lies, half-truths, ***which are whole-lies***, and/or material omissions, such as limiting proper, lawful, and reasonable discovery continues to infect our *beloved*, yet *imperfect* courts, we as a nation, and as a country, and as a people are *sadly* lost. And it will only be a matter of time, until authoritarian rule engulfs our *beloved*, yet *imperfect* nation, and fully corrupts our *beloved*, yet *imperfect* courts, but I digress.

1

In the matter before this Court today, I could stand here for hours repeating every detail of this case, all of which I have lived, suffered through, and continue to suffer, and have first-hand knowledge of it all. However, out of respect for this Court, and Judge Claudia Baio, who appears to have a sound understanding of the facts in this matter, I will attempt to keep my remaining closing statement relatively brief. Nonetheless, with all due respect to this Court, and to Judge Baio, the Defendants still assert and maintain their multiple Objections, which include, but are not limited to, the denial to stay the *Remote Court Trial* pending Appeal, the denial of a jury trial, the denial of discovery, the denial of my exhibits, the denial of a subpoena of Joanna Wheeler, the denial of a continuance, etc.

The simple, unequivocal, and undeniable facts in this matter include, but are not limited to the following:

> Despite Plaintiff *Santander Bank, N.A.*, and its *Representative Attorneys' **ongoing efforts to deceive, obfuscate, and to evade the material facts and relevant law in this case***, *Santander Bank*, and its *Representative Attorneys* will **never be able to change nor honestly deny any of the simple and basic material facts in this case**, some of which are:

> 1. The Defendants had **never missed a payment** before receiving *Santander Bank, N.A.'s erroneous, baseless, and meritless* letter dated May 1, 2019, **inexplicably** addressed to Lillian Byron, **not to Lillian Clark**, *threatening to foreclose* if a *lump sum payment* of **$37,575.86** was not paid *in less than 20 days*, by May 20, 2019.

> 2. The Defendants were also **current on their property taxes** before receiving *Santander Bank, N.A.'s erroneous, baseless, and meritless* letter dated May 1, 2019, **inexplicably** addressed to Lillian Byron, **not to Lillian Clark**, *threatening to foreclose* if a *lump sum payment* of **$37,575.86** was not paid *in less than 20 days*, by May 20, 2019.

> 3. *Santander Bank, N.A.*, has *admitted against interests* that they have a *defective/invalid alleged mortgage* that contains **no valid legal property description whatsoever** and that **was not and could not be in default** on or around May 1, 2019, and is an allege mortgage that *cannot be lawfully amended/reformed without the Defendants' consent*, *which the Defendants do not and will not grant*.

> 4. Consequently, by the *rule of law* Defendant Gordon Clark is the **only one** in a **valid and secured first lien position**, by being **first in time, first in right**; and therefore, Mr. Clark is the **only one** who has a **valid and secured lien to foreclose lawfully and rightfully** if Mr. Clark chooses to do so.

Santander Bank is a failing and corrupt bank which has never recovered from the 2008 Financial Banking and Mortgage Crisis whose business model consistently allows wrongful acts of ageism, sexism, racism, negligent incompetence, greed, power, and/or malice to be inflicted upon their *so-called* customers.

Case in point, on May 20, 2020, it was reported by *The Wall Street Journal* that *Santander Consumer USA Holdings, Inc's*, which is **also** a subsidiary (as is *Santander Bank, N.A.*) of Spain-headquartered parent company, *Banco Santander*, had reached a $550 million settlement with nearly three dozen *U.S. states attorney generals* to settle charges of *predatory auto lending* to low-income and subprime borrowers.

In this specific case before this court today, Santander Bank erroneously*, unjustly, and maliciously* sent said May 1, 2019, letter threatening foreclosure, which can be described only as an extortion letter, or what some would call a shakedown, if nearly $40,000 was not paid in less than 19 days. Not a 60-day notice of default letter sent via USPS Certified Letter as required by Connecticut law, but instead a fraudulent letter filled with errors, and addressed to Lillian Bryon, not Lillian Clark.

On or around February 2, 2022, *Santander Bank, N.A.*, ***abruptly, suddenly, inexplicably, and publicly*** announced their *exit* from the *U.S. Residential Mortgage and HELOC* lending market, which was only twenty-three (23) days ***after*** the Defendants filed their federal Complaint with the USDC on January 10, 2022, which is still pending.

On November 22, 2019, *Santander Bank, N.A.*, filed a *2-count Complaint* against the Defendants with the *Superior Court in Hartford*.

> *Count 1* of said *Santander Bank, N.A.'s 2-count Complaint* is: *Reformation of Mortgage*; and *Count 2* of said *Santander Bank, N.A.'s 2-count Complaint* is: *Foreclosure of the Mortgage as Reformed*.

Plaintiff *Santander Bank N.A.* **admits** to the following:

> 1.) ***Factually, undisputedly, and unequivocally admits that its alleged mortgage deed contains no legal property description whatsoever*** (**Please see: Complaint, Page 1, Paragraph 3**).

> 2.) ***Factually, undisputedly, and unequivocally admits its Complaint contains no claim nor proof of fraud*** by the Defendants (**Please see: Plaintiff's Answer, Page 2, Paragraph 4**).

> 3.) ***Factually, undisputedly, and unequivocally admits its Complaint contains no claim nor proof of a mutual mistake*** (**Please see: Plaintiff's Answer, Page 2, Paragraph 4**).

Defendants assert Thirty (30) affirmative/special defenses, which include, but is not limited to, multiple breaches of written and oral contract, such as:

> 1. *Santander Bank, N.A.* has a *moral and lawful duty* to not breach their contract.

2. *Santander Bank, N.A.* *breached their moral and lawful duty* to not breach their contract.

3. *Santander Bank, N.A.* failed to give proper *notice of default*.

4. *Santander Bank, N.A.* failed to send a *legal breach letter*.

5. *Santander Bank, N.A.* failed to give at least *60 days* to cure *alleged* default in their May 1, 2019, letter.

6. *Santander Bank, N.A.* failed to make contractual *absolute obligation advances*.

7. *Santander Bank, N.A.* failed to change payments to *interest only* upon request.

8. *Santander Bank, N.A.* **reneged** on their novated (oral) **"pay back when you can"** agreements, which were *given twice* on or around October 2015 and on or around October 2018.


*Once again*, Santander Bank, N.A., **admits against interest** that *Santander Bank, N.A.'s alleged mortgage* contains **no legal property description whatsoever**.


The *Supreme Court of Connecticut* decided, in **State of Connecticut v. Hahn**, the following:

*"... **we must decide whether a mortgage deed that contains no description of the mortgaged property can reasonably be held to be "fully drawn with respect to every essential feature thereof." We conclude that it cannot.** Whether we turn to the requirements of our recordation statutes; General Statutes §§ 47-5, 47-10 and 47-36c; or to those of the statute of frauds; General Statutes § 52-550; **it is evident that a mortgage is unenforceable without identification of the mortgaged property.**"*


The *Supreme Court of Connecticut* decided in **Harlach v. Metropolitan Property**, the following:

*"**Reformation is appropriate in cases of mutual mistake—.... [R]eformation is also available in equity when the instrument does not express the true intent of the parties owing to mistake of one party coupled with fraud, actual or constructive, or inequitable conduct on the part of the other**. ... **Here, there was neither claim nor proof of a mutual mistake, fraud or inequitable conduct on the part of either party. Since none of these elements was present, application of the equitable principle of reformation was not proper**."*

4

The *Supreme Court of Connecticut* decided in **JPMorgan Chase Bank v. Robert J. Virgulak, et al.**, the following:

*"The Supreme Court, held that:* **no mutual mistake warranted reformation of mortgage, and trial court could not foreclose mortgage without first reforming it**.

*"... that* **'[t]he court finds that the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it [was] entitled to the equitable remedy of reformation of the mortgage deed ....**"

**"... did not abuse its discretion by declining to reform the mortgage deed because the plaintiff did not meet its burden of proving by clear and convincing evidence that the mortgage deed did not conform to the parties' agreement;** *...*"

**REFORMATION IS NOT GRANTED FOR THE PURPOSE OF ALLEVIATING A HARD OR OPPRESSIVE BARGAIN,** *...*

**Additionally, "[w]here fraud is absent, it must be established that both parties agreed to something different from what is expressed in writing, and the proof on this point should be clear so as to leave no room for doubt." There is no allegation of fraud in this case."**

**""We have stated the standard of proof for reformation in different ways but all with the same substantive thrust: evidence should be clear, substantial and convincing." "This is the quality of the evidence required in cases of this type." "The burden of proof on the issue of reformation is [on] the party seeking it." Id."**

**"The court finds that the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it is entitled to the equitable remedy of reformation of the mortgage deed ....."**

**"... as the trial court correctly noted, the evidence presented on that specific question fell short of the very high burden required to demonstrate mutual mistake."**

**"THIS COURT REPEATEDLY HAS WARNED THAT THE POWER OF COURTS TO REFORM WRITTEN INSTRUMENTS IS ONE THAT SHOULD BE EXERCISED CAUTIOUSLY.**

**("[T]HIS STANDARD OF PROOF SHOULD OPERATE AS A WEIGHTY CAUTION UPON THE MINDS OF ALL JUDGES, AND IT FORBIDS RELIEF WHENEVER THE EVIDENCE IS \*768 LOOSE, EQUIVOCAL OR CONTRADICTORY"** *(stating that reformation will not be granted "unless the proof of mutual mistake [is] of the clearest and most satisfactory character"... [c]are all the more necessary when the asserted mistake relates to a writing, because the law of contracts ... attaches great weight to the written expression of an agreement").*"**

*"TO BE SURE, IDENTIFYING THE OBLIGATION SECURED BY A MORTGAGE DEED IS NOT A TECHNICAL OR SCRIVENER'S ERROR. Reforming the mortgage deed in the manner sought by the plaintiff without establishing that the change effects the original intention of the parties changes the defendant's \*769 obligations and creates a new contract between her and the plaintiff. This court has cautioned that "[a]n obstacle to reformation [that] we find insurmountable arises from the fundamental principle that there can be no reformation unless there is an antecedent agreement upon which the minds of the parties have met. Consequently, "a definite agreement on which the minds of the parties have met must have [preexisted] the instrument in question." Id. It is axiomatic that a "court cannot supply an agreement [that] was never made, for it is [a court's] province to enforce contracts, not to make or alter them."*

*"The defendant had no burden to demonstrate what other purpose or intent motivated her to sign the mortgage deed. It is the plaintiff, as the party seeking reformation, that must prove the preexisting agreement that it seeks to effectuate, and it must do so by clear and convincing evidence. It did not do so to the satisfaction of the trial court, and we cannot conclude that the trial court's findings in this regard were clearly erroneous."*

Consequently, since there is **no legal property description whatsoever** in *Santander Bank, N.A.'s admitted invalid/defective alleged mortgage*, and no claims by *Santander Bank, N.A.* of any *mutual mistake or fraud* by the Defendants, based on the previously and above cited and relevant *Supreme Court of Connecticut* legal authorities/case law citations, *Count 1, Reformation of Mortgage,* of said *Santander Bank, N.A.'s 2-count Complaint*, filed with the *Superior Court of Hartford*, **fails to state a claim upon which relief can be granted**; and consequently, the *Superior Court of Hartford* should *strike Count 1* from said *Complaint*; and therefore, *Count 2, Foreclosure of the Mortgage as Reformed,* of said *Santander Bank, N.A.'s 2-count Complaint* is moot.

On Monday, March 7, 2022, on or around 12:00 PM, Judge Mark H. Taylor of the *Superior Court of Hartford* presided over a *Remote Evidentiary Hearing* in this matter, where Mr. Knickerbocker, **knowingly, purposely, and falsely** stated *on and for the record* during said proceeding that the *admitted invalid/defective alleged mortgage* has a reference to the *legal property description* in the *Town of Enfield Land Records, Book 767, Page 310* when Mr. Knickerbocker **knowingly knew that this was a false statement**.

Instead, Mr. Knickerbocker's *knowingly erroneous and false* reference to the *Town of Enfield Land Records, Book 767, Page 310* in *open court* is **not** a reference to any *legal property description whatsoever*, but it is **actually** the witnessed and notarized *Certificate of Change of Name* that was filed by Mr. Clark's *beloved, precious, and deceased* wife, Lillian Clark, that she recorded with the *Town of Enfield Land Records* on March 3, 1993, shortly after our *Wedding Day* of February 14, 1993.

Yet, *once again*, Mr. Knickerbocker *audaciously* brought *fraud before the Superior Court of Hartford*, **in open court no less**, which should not be surprising *in the least* to Mr. Clark, since Mr. Clark has unfortunately had to *repeatedly experience* and *endure* Santander Bank's and Mr.

Knickerbocker's **never-ending and ongoing abuse of the legal process** in Mr. Knickerbocker's and *Santander Bank, N.A.'s **unjust and illegal*** attempt to **steal** the Defendants' property. All done by the Plaintiff *Santander Bank*, their representatives at *Bendett & McHugh, P.C.*, and *especially*, by Mr. Knickerbocker's **complete disregard** of the *material facts* in this case, along with **complete contempt** for the Defendants, in addition to **complete disdain** for basic *Contract Law*, *Property Law*, the *Connecticut Attorney's Oath*, and the *Rules of Professional Conduct*.

Based on the **erroneous, baseless, meritless, frivolous, bad faith, and fraudulent/sham foreclosure lawsuit** filed in the *Superior Court of Hartford* by *Santander Bank, N.A.* and its attorneys at *Bendett & McHugh, P.C.*, as well as all the material facts and relevant law referenced above, and the ongoing **reprehensible, egregious, and unrepentant behavior** by *Santander Bank, N.A.*, their *chosen* representatives at *Bendett & McHugh, P.C.*, and *especially*, by Mr. Knickerbocker over the past 3+ years, *it is clear* that *Santander Bank, N.A.* and their attorneys **do not** *have clean hands in this matter* before this Court.

The **Clean Hands Doctrine**, which is one of the Defendants' thirty (30) Affirmative/Special Defenses, reads as follows:

> *"The clean hands doctrine is based on the maxim of **equity** that states that one "who comes into equity must come with clean hands." This doctrine requires the court to deny **equitable relief** to a party who has violated **good faith** with respect to the subject of the **claim**. The purpose of the doctrine is to prevent a party from obtaining relief when that party's own wrongful conduct has made it such that granting the relief would be against good conscience. It is an **affirmative defense** that the **defendant may claim."***

But instead, *Santander Bank, N.A.* and their attorneys have *repeatedly* attempted to **abuse the legal process** in an **unjust and illegal** attempt to **steal** the Defendants' property, in **complete disregard** of the *material facts* in this case, along with **complete contempt** for the Plaintiffs and the *Superior Court of Hartford*, in addition to **complete disdain** for basic *Contract Law*, *Property Law*, the *Connecticut Attorney's Oath*, and the *Rules of Professional Conduct*. All while *surreptitiously* attempting to use *court rules and procedures* that the Defendants **do not fully understand**, in *Santander Bank, N.A.'s* and their attorneys' ongoing attempt to deny the Defendants their *U.S. Constitution guaranteed right to **due process of law***, which is certainly **not** *moral, ethical, lawful, just, right, legal, nor equitable* in *any way, shape, or form*.

Court actions, legal filings, and court rules and procedures are *supposed* to be used as a *lawful and civilized way* to resolve disputes **based on truth**; *not used as tools* to undermine the *Rule of Law*, nor thwart the truth, nor bully and trick your adversary, nor to prevail **at any cost** *based on lies*.

Nonetheless, *Santander Bank, N.A.*, a $50 billion national bank, and their *chosen* attorneys from *Bendett & McHugh, P.C.* **knowingly, intentionally, and purposely filed** an **erroneous, baseless, meritless, frivolous, bad faith, and fraudulent/sham** *foreclosure lawsuit* against the Defendants based on an *admitted invalid/defective alleged* mortgage, in an **unlawful, unjust, wrongful, and illegal** attempt to **steal** the Defendants' property. When the Defendants had **never** missed a

payment and were **current** on our property taxes. All while Mr. Clark's 92-year-old *beloved* wife of 27 years was *courageously and daily* battling Parkinson's disease for her *precious* life, while we were both *desperately hoping and praying* that she would not be **unjustly evicted** out of her *beloved and humble* home of 65 years that her *beloved* Papa helped her build; and that she would not be forced into a nursing home to **die alone** without Mr. Clark by her side, due to COVID-19 restrictions.

All of which, is **reprehensible behavior** by *Santander Bank, N.A.*, their *chosen* law firm *Bendett & McHugh, P.C.*, along with their founders, partners, and attorneys, and *especially*, by Mr. Knickerbocker. All *at the ongoing expense of the Defendants*, while Mr. Knickerbocker and his accomplices and co-conspirators at *Santander Bank, N.A.* and *Bendett & McHugh, P.C.* **with impunity** and *at any cost* continue to *line their own pockets with ill-gotten gains*, while attempting to **steal** the Defendants' property for their client, *Santander Bank, N.A.*

> As *Saint Paul*, formerly known as *Saul of Tarsus*, wrote to *Saint Timothy* nearly 2,000 years ago, **after** *Saint Paul's conversion and repentance* on the *Road to Damascus*:
>
> *"For the love of money is the root of all evil …"*
>
> 1 Timothy 6:10

Simply put, the Plaintiff Santander Bank has not met its burden of proof to reform the alleged mortgage, by neither claiming nor proving a mutual mistake and/or fraud by the Defendants. The Defendants had never missed a payment before receiving the erroneous and threatening May 1, 2019, letter from Santander Bank, and were current on their property taxes at that time. And the refusal to withdraw said erroneous and threatening May 1, 2019, letter caused, through contributory negligence, the subsequent withholding of payment, and alleged default, beginning in June 2019. Therefore, based on all the aforementioned facts and law, and the Defendants' thirty (30) Affirmative/Special Defenses, including *abandonment of alleged security*, and violations of the *Connecticut Unfair Trade Practices Act*, among many more facts detailed in the Defendants' pleadings, the Plaintiffs have failed to meet their burden of proof and have failed to state a claim upon which relief can be granted by this Court.

In closing, banks are extremely important and powerful institutions that nearly all of us rely upon; and therefore, banks are entrusted with immense power and privilege. However, with said immense power and privilege comes immense responsibilities, duties, and laws to abide by or what can be called being held to a *higher standard* in the public's interest, **NOT** a lower standard, and certainly **NOT ABOVE THE LAW**. And therefore, when any bank, such as Plaintiff Santander Bank has clearly and repeatedly harmed the Defendants for years, if the courts prove to be unwilling and/or unable to hold such a bank accountable when they have clearly done wrong, then the *Rule of Law* is further undermined, and the banks will continue to indiscriminately, blatantly, and with impunity inflict untold intentional pain and suffering on people, like my most beautiful, Lilli, in what should have been the most peaceful, restful, and

blessed time of her life, which Plaintiff Santander Bank egregiously and reprehensibly robbed from her.

Lastly, the Defendants *respectfully* ask this trial court to consider all the material facts AND the *letter ALONG WITH the spirit of the law* in this case, knowing that, *"Under Connecticut Law, foreclosure is an* **"equitable"** *action, which means the judge must consider any reasons why it would be unfair for the foreclosure to proceed."*

Nonetheless, as Judge Baio, has repeatedly reminded me, if I do not agree with her decision, I can file an Appeal, which I certainly will do, if necessary, but it is the Defendants' sincere hope and prayer that this nearly eleven (11) year nightmare, and nearly four (4) year court proceedings will *finally* be put to an end by this trial court rightly and justly by ruling on the Defendants' behalf.

Thank you, Judge Baio, for your time and consideration, and blessing *always* to you and yours. Please continue to stay healthy and be safe.

# Exhibit 11

# STATE OF CONNECTICUT

## v.

## RAY DAVID HAHN

Supreme Court of Connecticut.

Argued April 14, 1988. Decision released May 24, 1988.

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, JS.

556 *556 *Michael J. McClary,* with whom, on the brief, was *John J. Keefe, Jr.,* for the appellant (defendant).

*James A. Killen,* deputy assistant state's attorney, with whom, on the brief, were *John J. Kelly,* chief state's attorney, *Domenick Galluzzo,* deputy chief state's attorney, *James G. Clark,* assistant state's attorney, *Cathryn Krinitsky,* deputy assistant state's attorney, and *Jack Fischer,* legal intern, for the appellee (state).

PETERS, C. J.

The dispositive issue in this appeal is whether improper notarization of an incomplete mortgage deed constitutes forgery in the second degree, as defined by General Statutes § 53a-139 (a) (1),[1] in light of an information charging the defendant with false completion of a mortgage deed. The state alleged that the defendant, Ray David Hahn, with intent to defraud, deceive or injure Peter T. Dallicker, Martha H. Dallicker and Gerda Larras, had falsely completed their mortgage deed to the Dartmouth Plan, Inc. (Dartmouth Plan), by having added

557 his name as notary and having falsely acknowledged that these individuals had personally *557 appeared before him to execute this written instrument. After a jury verdict finding the defendant guilty as charged, the defendant unsuccessfully moved the trial court for a new trial or a judgment of acquittal. The defendant has appealed from the trial court's judgment of conviction. We find error.

The jury could reasonably have found the following facts. The defendant was employed as the credit manager of East Coast Siding Company (East Coast Siding), a contracting firm engaged in making home improvements. He had become a notary public at his employer's request. As credit manager, he processed credit applications submitted by the company's sales representatives. For mortgage financing, East Coast Siding relied upon the Dartmouth Plan. Such mortgages were initiated by having a sales representative ask his customers to sign a form denominated "Mortgage Deed" that designated the Dartmouth Plan as mortgagee. After notarization of the customers' signatures by the defendant, and the addition of the signatures of one or more witnesses, the mortgage was then forwarded to the Dartmouth Plan, which undertook to make the relevant credit checks of prospective mortgagors. Upon approval of credit, the Dartmouth Plan inserted the description of the mortgaged property in the mortgage deed and saw to its recordation.

The underlying transaction that led to the charges against the defendant arose out of a home improvement contract entered into in early September, 1985, between East Coast Siding and Peter and Martha Dallicker, and their son, Peter Dallicker, Jr. The Dallickers had contacted Sears, Roebuck and Company (Sears) in response to a Sears advertisement, and Sears, in accordance with prior arrangements of which the Dallickers were unaware, had forwarded their call to East Coast Siding. As the result of negotiations with an East Coast

558 Siding sales representative, the *558 Dallickers agreed to purchase windows and gutters to be installed at their New Fairfield family home, of which Gerda Larras was a co-owner. Although the Dallickers had expected financing for this acquisition to be arranged in accordance with their unsecured Sears line of credit, they unwittingly signed a document entitled "Mortgage Deed" that named the Dartmouth Plan as mortgagee.

The East Coast Siding sales representative forwarded a bundle of papers signed by the Dallickers to the East Coast Siding home office. There, the mortgage deed bearing their signatures, and that of Gerda Larras, was "witnessed" by Mark Scafariello, East Coast Siding's general manager, and then forwarded to the Dartmouth Plan. Because the mortgage deed did not then contain the requisite notarization, an employee of the Dartmouth Plan, Nancy Perretta, asked the defendant to come to the Dartmouth Plan office in Rocky Hill on September 3, 1985, to remedy this omission. In Perretta's presence, the defendant added his name as notary public in the acknowledgement portion of the mortgage deed. None of the mortgagors whose signatures he was acknowledging was then present. Thereafter Perretta signed her name to the deed as a witness to the signatures of the mortgagors, although at trial she testified that she was witnessing the defendant's notarization. No description whatsoever of the Dallicker property was on the deed at that time. At some time thereafter, that information was inserted into the mortgage deed and it was recorded by the town clerk in New Fairfield on November 23, 1985.[2]

559 *559 On this factual showing, the defendant was convicted of forgery in the second degree. In this appeal, the defendant claims the trial court erred: (1) in denying his motions for acquittal; (2) in charging the jury about various allegedly irrelevant aspects of the forgery statute; and (3) in denying his motion for a mistrial. Since we agree with the first claim of error, we need not address the latter two.

The defendant claims that the trial court should have ordered his acquittal because the evidence was insufficient to prove the charge against him, namely that he had falsely completed an incomplete mortgage deed with intent to defraud, deceive or injure, in violation of General Statutes § 53a-139 (a) (1). In assessing this claim, we need to refer to the precise contours of the charge against the defendant, which the state amplified in a long form information filed in response to a court order by *Geen, J.,* granting the defendant's motion for a bill of particulars and for a statement of essential facts.[3] The state accused the defendant of having *"falsely completed said written instrument"* [the mortgage deed from Peter T. Dallicker, Martha H. Dallicker and Gerda Larras] when he added/inserted his name as Notary and he acknowledged that Peter T. Dalliker [sic], Martha H. Dalliker [sic] and Gerda Larras personally appeared before him in the County of Fairfield, Connecticut and that they executed said instrument on September 3, 1985, *thereby transforming an incomplete written instrument into a complete mortgage deed* without the authority of anyone entitled to grant it, *so that such complete mortgage deed appeared on said land records and* purported to be

560 in all respects an authentic creation of or fully authorized by Peter T. Dalliker [sic], Martha H. Dalliker [sic], and Gerda *560 Larras, its ostensible makers, in violation of Connecticut General Statutes Section 53a-139." (Emphasis added.)

The defendant maintains that the evidence adduced at trial did not prove, beyond a reasonable doubt, either that he had "falsely completed" the Dallicker mortgage or that he had possessed the requisite criminal intent to defraud, deceive or injure. On appeal, our review of such a claim of error involves a two step process. We first construe the evidence presented at trial in a light most favorable to sustaining the verdict, and then determine whether the jury could reasonably have found " upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt...." (Citations omitted.) *State v. Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed.2d 772 (1984); *State v. Cavallo,* 200 Conn. 664, 673, 513 A.2d 646 (1986).

The evidence in this case would have permitted the jury to find that the defendant intentionally notarized a false acknowledgement on a mortgage deed. There was, however, no evidence before the jury that the mortgage deed, at the time of the defendant's improper notarization, contained any description whatsoever of the mortgaged property. To the contrary, evidence from the state's own witness indicated that the deed contained only the signatures of the intended mortgagors, the name of the intended mortgagee, and Scafariello's signature as witness.

The question before us is whether this evidence establishes guilt beyond a reasonable doubt of the crime of forgery in the second degree as that crime was particularized in a long form

561 information that repeatedly emphasized the defendant's wrongful completion of a *561 mortgage deed. Once a detailed information has been filed, "the state is limited to proving that the defendant has committed the offense in substantially the manner described." *State v. Ruiz,* 171 Conn. 264, 270, 368 A.2d 222 (1976); *State v. Eason,* 192 Conn. 37, 40-41, 470 A.2d 688 (1984); *State v. Roque,* 190 Conn. 143, 154-55, 460 A.2d 26 (1983).

In approaching this question, we are aided by the provisions of the penal code that provide definitions for forgery and related offenses. "Complete written instrument" is defined in General Statutes § 53a-137 (2) as "one which purports to be a genuine written instrument fully drawn with respect to every essential feature thereof." Consistently, an "incomplete written instrument," under § 53a-137 (3), "requires additional matter in order to render it a complete written instrument." A person "falsely completes" a written instrument, according to § 53a-137 (5), when he "transforms an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it, so that such complete instrument appears or purports to be ... fully authorized by its ostensible maker

Applying these definitions in the present circumstances, we must decide whether a mortgage deed that contains no description of the mortgaged property can reasonably be held to be "fully drawn with respect to every essential feature thereof." We conclude that it cannot. Whether we turn to the requirements of our recordation statutes; General Statutes §§ 47-5, 47-

562      10 and 47-36c; [4] or to those of the statute of frauds; General *562 Statutes § 52-550;[5] it is evident that a mortgage is unenforceable without identification of the mortgaged property. "
[C]ontracts for the sale of real estate must contain with certainty, without regard to parol proof, at least the essentials which describe the subject of the sale, its terms, and the parties to the contracts, thereby furnishing evidence of a complete agreement." _Robert Lawrence Associates, Inc. v. Del Vecchio_, 178 Conn. 1, 11, 420 A.2d 1142 (1979); _Montanaro Bros._

563      _Builders, Inc. v. Snow_, 190 Conn. 481, 485-86, 460 A.2d 1297 (1983). In this state, mortgages are conveyances of legal title; _Conference Center Ltd. v. TRC_, 189 Conn. *563 212, 218, 455 A.2d 857 (1983).[6] Accordingly, we conclude that there was insufficient evidence to support the defendant's conviction for forgery insofar as he was accused of having falsely completed the Dallicker mortgage.

The state argues that the defendant's conviction can, however, be sustained on an alternate ground, that the defendant falsely completed not the mortgage deed itself but the acknowledgement portion of the deed. The state concedes, as it must, that the long form information charged the defendant with false completion of the Dallicker mortgage deed. Nonetheless, the state maintains that it can rely on a theory of variance to invoke that part of § 53a-137 (2)'s definition of a "complete written instrument" that states that "[a]n

564      endorsement, attestation, acknowledgement or other similar signature or statement is deemed both a complete written instrument and a part of the main instrument in which it is contained or to which it attaches." The evidence at trial, according to the *564 state, would support a conviction on this latter basis, the defendant having admitted the signature on the acknowledgement portion of the mortgage deed to be his.[7] Arguing that, on this record, an amendment at trial to conform the information to the proof would have been permitted, the state urges us to hold that the defendant was on notice of his potential culpability for his false acknowledgement of the Dallicker mortgage. We are unpersuaded.

This court has, in limited circumstances, permitted a criminal conviction to be grounded on a variance from the precise contours of the crime that the information charged the defendant with having committed. When a defendant at trial has acquiesced in enlargement of the crime charged to include an alternative method of committing it, we have held that a deviation between the pleadings and the proof "does not rise to the level of a constitutional violation unless the record establishes a lack of proper notice or prejudice to the defendant." _State v. Franko_, 199 Conn. 481, 493, 508 A.2d 22 (1986); _State v. Scognamiglio_, 202 Conn. 18, 21-25, 519 A.2d 607 (1987). In those cases, the predicated acquiescence was found in the defendant's failure to object to the admission of evidence on, and instructions to the jury about, the alternative method of committing the crime charged.

565      In this case, the record at trial demonstrates no acquiescence in enlargement of the crime charged. The defendant took vigorous exception, throughout, to the introduction of evidence unrelated to his allegedly *565 felonious completion of a mortgage deed. He similarly objected to those portions of the trial court's instructions to the jury that went beyond the specific aspects of the statute that he had been charged with having violated, and continued, indeed, to press this issue in his claims of error on appeal to this court. Furthermore, even the state at trial explicitly justified its evidentiary proffers as consistent with the crime as charged in the long form information. In this vein, the state defended one of its requests for a jury instruction by stating: "One of the elements of the crime is falsely completing a written instrument in order for it to be a deed." On this record, the defendant had fair notice only of a charge of false completion of a mortgage deed and not of false completion of an acknowledgement.

In the absence of evidence sufficient to support the only crime with which the defendant was charged, his conviction of forgery in the second degree cannot stand. The trial court was in error in denying his motions for acquittal.

There is error, the judgment is set aside and the case is remanded with direction to render judgment of acquittal.

In this opinion the other justices concurred.

[1] General Statutes § 53a-139 (a) (1) provides: "FORGERY IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed: (1) A deed, will, codicil, contract, assignment, commercial instrument or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status."

[2] The Dallickers' complaint about their home improvement contract was limited to its financial aspects. Although the work done by East Coast Siding was acceptable, and although they had expected to incur finance charges to pay for the work, they had not understood that the Dartmouth Plan would assume the status of a secured creditor with a mortgage on their home. The identity of the Dartmouth Plan became known to them upon the receipt of payment notices, but they learned of the recordation of the mortgage only when they decided to sell their property.

[3] The record reveals that the statement of essential facts as well as the bill of particulars in this case are identical with the long form information that the state supplied to the defendant.

[4] "[General Statutes] Sec. 47-5. CONVEYANCES TO BE IN WRITING AND ACKNOWLEDGED. All conveyances of land shall be: (1) In writing; (2) if the grantor is a natural person, subscribed, with or without a seal, by the grantor with his own hand or with his mark with his name annexed to it or by his attorney authorized for that purpose by a power executed, acknowledged and witnessed in the manner provided for conveyances or, if the grantor is a corporation or partnership, subscribed by a duly authorized person; (3) acknowledged by the grantor, his attorney or such duly authorized person to be his free act and deed; and (4) attested to by two witnesses with their own hands."

"[General Statutes] Sec. 47-10. DEEDS TO BE RECORDED. No conveyance shall be effectual to hold any land against any other person but the grantor and his heirs, unless recorded on the records of the town in which the land lies. When a conveyance is executed by a power of attorney, the power of attorney shall be recorded with the deed, unless it has already been recorded in the records of the town in which the land lies and reference to the power of attorney is made in the deed."

"[General Statutes] Sec. 47-36c. STATUTORY FORMS FOR DEEDS. The forms set forth in this section may be used and are sufficient for their respective purposes. They shall be known as 'Statutory Form' and may be referred to as such. Nothing in this chapter precludes the use of any other legal form of deed or mortgage....

MORTGAGE DEED

... of ... to secure payment of ... dollars with interest payable as provided in a certain promissory note dated ... with final maturity on ... grant to ... of ... with MORTGAGE COVENANTS ... (Description and Encumbrances, if any and any additional provisions) This mortgage is made upon the STATUTORY CONDITION Signed this ... day of ... , 19 ... Witnessed by:

(Acknowledgment)"

[5] "[General Statutes] Sec. 52-550. STATUTE OF FRAUDS; WRITTEN AGREEMENT OR MEMORANDUM. (a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: (1) Upon any agreement to charge any executor or administrator, upon a special promise to answer damages out of his own property; (2) against any person upon any special promise to answer for the debt, default or miscarriage of another; (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest in or concerning real property; or (5) upon any agreement that is not to be performed within one year from the making thereof.

"(b) This section shall not apply to parol agreements for hiring or leasing real property, or any interest therein, for one year or less, in pursuance of which the leased premises have been or are actually occupied by the lessee, or any person claiming under him, during any part of the term."

[6] The state argues that parol evidence is always admissible between the immediate parties to a real property transaction. The cases upon which the state relies for this novel proposition are, however, distinguishable because they involve the use of parol evidence not to establish missing property descriptions but to interpret ambiguous property descriptions in the context of boundary disputes. _F. & AK, Inc. v. Sleeper_, 161 Conn. 505, 510-11, 289 A.2d 905 (1971); _Fogg v. Wakelee_, 40 Conn. Sup. 272, 283, 492 A.2d 843 (1983), aff'd, 196 Conn. 287, 492 A.2d 511 (1985). These cases do not persuade us that a mortgage deed that lacks a property description can properly be characterized as a "complete written instrument."

[7] We recognize that the defendant does not concede that his false acknowledgement suffices to prove his guilt of this alternate method of committing forgery in the second degree. At trial, the defendant vigorously resisted efforts by the state to explore the particulars of the acknowledgement. Mark Scafariello, the defendant's superior at East Coast Siding, testified that part of the acknowledgement was handwritten by someone other than the defendant. In light of our disposition of the defendant's appeal, we need not explore the further ramifications of this argument.

# Exhibit 12

**LOUISE HARLACH ET AL.**

v.

**METROPOLITAN PROPERTY AND LIABILITY INSURANCE COMPANY**

**Supreme Court of Connecticut.**

Argued October 30, 1991.

Decision released February 11, 1992.

SHEA, GLASS, COVELLO, BORDEN and BERDON, JS.

186 *186 *Donald R. Holtman,* for the appellant (defendant).

*Kerin Margaret Woods,* for the appellees (plaintiffs).

COVELLO, J.

This is an appeal from a declaratory judgment that determined that the plaintiffs were entitled to $300,000 of uninsured motorist coverage pursuant to an automobile insurance policy issued by the defendant. The sole issue is whether the insured was bound by his written request for a lesser amount of uninsured motorist coverage when he later claimed that: (1) he did not understand the nature of his coverage; and (2) he did not intend to request a lesser amount of coverage.

The relevant facts are not in dispute. On December 30, 1986, the named plaintiff, Louise Harlach, was injured in an automobile accident under circumstances that entitled her to present a claim under the uninsured motorist provisions of an automobile liability insurance policy issued by the defendant, Metropolitan Property and Liability Insurance Company, to her husband, the plaintiff, John Harlach (plaintiff).[1] The circumstances concerning the amount of uninsured motorist coverage available under the policy are as follows.

187 *187 On February 18, 1980, the defendant issued an automobile liability insurance policy to the plaintiff. The policy provided single limit liability coverage in the amount of $300,000 and uninsured motorist coverage in the amount of $20,000 per person and $40,000 per accident. Each policy renewal thereafter, to and including December 30, 1986, provided the same levels of coverage. Prior to obtaining automobile insurance with the defendant, the plaintiff had dealt with other carriers. Throughout these dealings, the plaintiff always obtained the minimum amounts of coverage required by law.

On July 5, 1983, the General Assembly enacted Public Acts 1983, No. 83-461, amending General Statutes § 38-175c (now General Statutes § 38a-336). The act required that every automobile liability policy "issued or renewed on and after July 1, 1984," was to have uninsured motorist coverage equal to the liability coverage of the policy *"unless the insured requests in writing a lesser amount."* [2] (Emphasis added.)

In October, 1983, in order to apprise its Connecticut policyholders of the change in the law, and in order to give them an opportunity to request in writing lesser amounts of uninsured motorist coverage, the defendant sent to all its policyholders, including the plaintiff, a computer generated notice. The notice invited the reader to "take a minute to read this important 188 letter about a change of the law in Connecticut." The notice *188 stated: "[T]he law was changed to require that your limits of coverage for uninsured motorist must be the same as your liability limits, *unless you request in writing a lower limit."* (Emphasis added.)

The notice further stated that higher uninsured motorist coverage, equal to the liability limits, would be provided and the "policy premium [would] be adjusted accordingly." The notice advised the policyholders that they could "request a lower limit of coverage at a lower premium" by placing their initials next to the desired option on a tear sheet at the bottom of the notice, signing the same and returning it to the defendant in an envelope that was provided.[3] Finally, the notice provided: "If you have any questions, please contact your sales representative or call our policyholder services department at the toll-free number (800) 422-4272."

On November 8, 1984, the plaintiff, a forty year old college graduate, initialed the minimum coverage option, i.e., "$20,000/$40,000," signed his name "John M. Harlach," dated the form "8 Nov 84," and mailed it to the defendant. On the basis of this request, the defendant issued a renewal policy to the plaintiff providing uninsured motorist coverage in the 189 same amount as in prior years, i.e., $20,000 per person *189 and $40,000 per accident. The defendant mailed the renewal policy and five subsequent renewal policies to the plaintiff, each of which reflected the $20,000/$40,000 uninsured motorist coverage limits.

The attorney trial referee found that the plaintiff did not fully understand what protection was provided to him by the uninsured motorist provisions of his policy when he completed and executed the tear sheet, and that he did not understand that "he was giving up his right to insurance coverage of $300,000 for protection for himself and his family in the event he or a family member was injured by an uninsured or underinsured tortfeasor." The attorney trial referee concluded that the plaintiff "did not make a conscious, knowing and purposeful waiver to accept less uninsured motorist coverage."[4] The trial court agreed, concluding that since the plaintiff did not fully perceive what coverage he was surrendering at the time he returned the tear sheet, he had not waived his statutorily mandated right to uninsured motorist coverage equal to the insurance policy's liability coverage. The trial court opined that "[i]nasmuch as the waiver question is a factual one, it is not subject to review by this court." The trial court then rendered judgment in accordance with the referee's report. The defendant appealed to the Appellate Court and we thereafter transferred the matter to ourselves pursuant to Practice Book § 4023.

190 *190 The defendant claims that despite its aleatory nature, a contract of insurance is nonetheless fundamentally a contract. The defendant argues that the trial court has reformed the contract that unambiguously provided uninsured motorist coverage of $20,000 per person and $40,000 per accident because the policyholder was unilaterally mistaken as to what coverage he was surrendering when he requested the lesser amount of coverage. The defendant argues that reformation of a contract is not available when the mistake, if any, is unilateral and is not accompanied by fraud or inequitable conduct on the part of the other party. We agree.

The contractual nature of insurance and the commercial relationship between insurer and insured are not altered by any peculiarities of uninsured motorist coverage. "The relationship between the insured and the insurer clearly is *contractual* in nature, and we find nothing in [the uninsured motorist statute] that alters the traditionally contractual setting in which insurance policies are purchased. Our [uninsured motorist] statute creates no fiduciary obligations .... As offeror, [the carrier] had no contractual duty *voluntarily* to explain the terms of its offer or the advantages and disadvantages to procuring uninsured motorist coverage.... All that is required ... for an effective rejection is a writing signed by the named insured." (Emphasis in original.) *Silver v. Slusher,* 770 P.2d 878, 883 (Okla. 1988), cert. denied, 493 U.S. 817, 110 S. Ct. 70, 107 L. Ed.2d 37 (1989).

"Reformation is appropriate in cases of mutual mistake—that is where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction. 5 Pomeroy, Equity Jurisprudence (2d Ed.) § 2096; 53 C.J. p. 941; Amer. Law 191 Institute *191 Restatement, Contracts, Vol. 2, §§ 504, 505 .... [R]eformation is also available in equity when the instrument does not express the true intent of the parties owing to mistake of one party coupled with fraud, actual or constructive, or inequitable conduct on the part of the other. 5 Pomeroy, Equity Jurisprudence (2d Ed.) § 2097; 53 C.J. p. 949...." (Citations omitted.) *Home Owners' Loan Corporation v. Stevens,* 120 Conn. 6, 9-10, 179 A. 330 (1935). Here, there was neither claim nor proof of a mutual mistake, fraud or inequitable conduct on the part of either party.[5] Since none of these elements was present, application of the equitable principle of reformation was not proper.

The plaintiff argues, however, that reformation of the contract here is required since an insurance contract must be read to include provisions which the law requires be included. The plaintiff claims that the 1983 amendment to § 38-175c required that uninsured motorist coverage in automobile liability insurance contracts must thereafter be equal to the limits of

liability coverage unless the insured requested a lesser amount in writing. The plaintiff argues that since his written request for a lesser amount was not a knowing one, the doctrine of waiver, in effect, voids his request for a lesser amount, thereby entitling him to uninsured motorist coverage equal to the $300,000 liability coverage found in this policy. We do not agree.

It is well settled that an insurance contract must be read to include provisions that the law requires be included and to exclude provisions that the law prohibits. See, e.g., *Nicolletta* v. *Nationwide Ins. Co.*, 211 *192 Conn. 640, 645-46, 560 A.2d 964 (1989).* "Unless the agreement indicates otherwise, [an applicable] statute existing at the time an agreement is executed becomes a part of it and must be read into it just as if an express provision to that effect were inserted therein." *Hatcho Corporation* v. *Della Pietra*, 195 Conn. 18, 21, 485 A.2d 1285 (1985).

The amendment to § 38-175c directed that automobile insurance contracts should thereafter provide for equal amounts of liability and uninsured motorist coverage. A statute that establishes contractual rights, however, is equally capable of setting forth the manner in which those rights may be surrendered. In this instance, an insured could relinquish his entitlement to the larger amount of uninsured motorist coverage by "request[ing] in writing a lesser amount." This is exactly what the plaintiff did.

It is uncontroverted that the plaintiff read the defendant's notice explaining the 1983 changes to § 38-175c; that he selected one of five available uninsured motorist coverages offered on the tear sheet; that he indicated his preference by placing his initials next to the coverage selected; that he dated and signed the tear sheet; and that he mailed the same to the defendant. Despite this overwhelming evidence that the plaintiff completely and fully complied with the statute, the plaintiff argued, and the referee agreed, that there had not been a legally effective waiver because of the plaintiff's "lack of understanding of what the coverage provided" and that "the notice sent ... did not in any way increase the [plaintiff's] understanding of the meaning of uninsured motorist coverage."

Although the word "waiver" nowhere appears in the statute, even if we assume, arguendo, that the waiver doctrine was applicable to the circumstances here, application of its *193 principles would not support the plaintiff's position. "Waiver is the voluntary relinquishment *193 of a known right. It involves the idea of assent, and assent is an act of understanding. This presupposes that the person to be affected has knowledge of his rights, but does not wish to assert them. Intention to relinquish must appear, but acts and conduct ... inconsistent with intention to terminate the contract are sufficient. *The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct.*" (Emphasis added.) *MacKay* v. *Aetna Life Ins. Co.*, 118 Conn. 538, 547-48, 173 A. 783 (1934).

"In order to waive a claim of law it is not necessary... that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy." *Jenkins* v. *Indemnity Ins. Co.*, 152 Conn. 249, 257-58, 205 A.2d 780 (1964). The plaintiff knew that he was selecting less coverage than that to which he was entitled. The notice made it very clear that increased amounts of coverage were available at a higher premium and that an election to accept less would reduce both the amount of coverage and the policy premium.

"Under the [trial] court's theory, waiver of a claim of law could rarely, if ever, be established, since the [plaintiff] could always claim, as in effect [he] did here, that [he] knew nothing about, or at least did not fully understand [the insurance coverage he was declining].... The conclusion that a party has waived a right is one of fact for the trier and not one which can be drawn by this court, unless, on the subordinate facts found, such a conclusion is required as a matter of law." Id., 258. We hold that such a conclusion is required here.

The judgment is reversed and the matter is remanded with direction to render judgment for the defendant.

In this opinion the other justices concurred.

[1] Although Louise Harlach was the named plaintiff on the complaint, references to the plaintiff throughout the balance of this opinion are to John Harlach.

[2] General Statutes (Rev. to 1983) § 38-175c (a), as amended by Public Acts 1983, No. 83-461, provided in part: "(2) Notwithstanding any provision of this section to the contrary, every such policy issued or renewed on and after July 1, 1984, shall provide uninsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless the insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. Such written request shall apply to all subsequent renewals unless changed in writing by the insured."

[3] The tear sheet at the bottom of the notice stated: "I UNDERSTAND MY POLICY LIMITS FOR UNINSURED MOTORISTS COVERAGE MAY BE THE SAME, BUT NOT HIGHER THAN MY LIMITS FOR LIBILITY COVERAGE (CURRENTLY XXX,XXX), AND I ACKNOWLEDGE THAT I HAVE BEEN OFFERED THESE LIMITS.

"I HEREBY REQUEST THE UNINSURED MOTORISTS COVERAGE LIMITS INDICATED BELOW WHICH ARE LESS THAN MY CURRENT LIABILITY LIMITS. (NOTE: SELECT ONLY ONE OPTION)

____50,000/50,000 ____300,000/300,000 ____20,000/40,000 ____100,000/100,000 ____500,000/500,000 NAME OF POLICY HOLDER POLICY NUMBER: XXX-XX-XXX-X

_____ / _____ SIGNATURE DATE "

[4] The referee relied extensively on our holding in *Travelers Indemnity Co.* v. *Malec*, 215 Conn. 399, 576 A.2d 485 (1990). In *Malec*, we concluded that the American Red Cross did not make a conscious decision to select a lesser amount of uninsured motorist coverage pursuant to General Statutes § 38-175 (c) because the insured's request predated the enactment of the enabling legislation by more than two years. Since the insured was unaware of the statute at the time of its request, we concluded that this did not constitute a request for a lesser amount pursuant to the statute. *Malec* is distinguishable from the present case where the plaintiff's response was the result of his carrier specifically informing him of the amendment to the statute and the options available to him.

[5] The referee did not conclude that the defendant's conduct was fraudulent or inequitable but that, as a matter of law, "[an] analysis of the case law construing Section 38-175c (a) (2) indicates that [the defendant] was required to provide [the plaintiff] with understandable information concerning his selection of uninsured motorist coverage so as to enable him to intelligently accept or reject the increased limits of coverage...."

# Exhibit 13

341 Conn. 750
Supreme Court of Connecticut.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

v.

Robert J. VIRGULAK et al.

(SC 20403)
|
Argued October 22, 2020
|
Officially released January 11, 2022*

**Synopsis**

**Background:** After note went into default, mortgagee brought action against mortgagor for foreclosure, reformation of mortgage deed, and unjust enrichment. After a bench trial, the Superior Court, Judicial District of Stamford-Norwalk, David R. Tobin, Judge Trial Referee, found in favor of mortgagor on foreclosure and reformation counts, denied mortgagee's motion to withdraw and amend responses to requests for admissions, determined that mortgagee's responses to requests for admissions precluded any recovery on its unjust enrichment claim, and denied mortgagee's motion for reargument. Mortgagee appealed. The Appellate Court, Keller, J., 192 Conn.App. 688, affirmed. Mortgagee appealed.

**Holdings:** The Supreme Court, Mullins, J., held that:

no mutual mistake warranted reformation of mortgage, and

trial court could not foreclose mortgage without first reforming it.

Affirmed.

**Attorneys and Law Firms**

**\*\*755** Brian D. Rich, with whom, on the brief, was Laura Pascale Zaino, Hartford, for the appellant (substitute plaintiff).

Alexander H. Schwartz, Southport, for the appellee (defendant Theresa Virgulak).

Jeffrey Gentes and J.L. Pottenger, Jr., and Chaarushena Deb, Sophie Laing, Zaria Noble, Stefanie Ostrowski and Emily Coady, law student interns, filed a brief for the Housing Clinic of the Jerome N. Frank Legal Services Organization as amicus curiae.

Robinson, C. J., and McDonald, D'Auria, Mullins, Kahn and Ecker, Js.

**Opinion**

MULLINS, J.

**\*752** The plaintiff, Manufacturers and Traders Trust Company (M&T Bank),[1] appeals from the judgment **\*753** of the Appellate Court in favor of the defendant Theresa Virgulak.[2] On appeal, the plaintiff claims that the Appellate Court improperly affirmed the judgment of the trial court because (1) the trial court improperly declined the plaintiff's request to reform a mortgage deed to reference that the mortgage deed executed by the defendant was given to secure a note executed by her husband, Robert J. Virgulak (Robert), and (2) even if the trial court properly denied the request to reform the mortgage deed, it incorrectly determined that the plaintiff was not entitled to foreclose the mortgage executed by the defendant because the defendant was not a borrower on the note. We disagree with the plaintiff and affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "On or about December 11, 2006, Robert ... executed and delivered to JPMorgan Chase Bank, National **\*\*756** Association (JPMorgan Chase), a note for a loan in the principal amount of $533,000 (note). The defendant was not a signatory on the note. On the same date, the defendant signed a document titled 'Open-End Mortgage Deed' (mortgage [deed]) for residential property she owns at 14 Bayne Court in Norwalk (property). The mortgage [deed] recited that it was given to secure a note dated December 11, 2006, and recited that the note was signed by the defendant as [the] '[b]orrower' in the amount of $533,000. The term '[b]orrower' is defined in the mortgage deed as '[Theresa Virgulak, married].' The mortgage [deed] did not reference Robert. The defendant did not sign any guarantee.

**\*754** "On or about February 1, 2010, after JPMorgan Chase failed to receive payments in accordance with the terms of the note, the note went into default and JPMorgan Chase elected to accelerate the balance due. On January 3, 2011, notices of default were sent to both the defendant and Robert, and, in February, 2013, JPMorgan Chase commenced this foreclosure action against the couple. The action sought to foreclose the mortgage that JPMorgan Chase claimed to have on the property. In September, 2014, JPMorgan Chase withdrew the foreclosure

action against Robert, as he had filed for bankruptcy and been granted an unconditional discharge of the debt.

"Thereafter, JPMorgan Chase filed a motion to substitute party plaintiff, stating that it had assigned the subject mortgage deed and note to Hudson City Savings Bank (Hudson). This motion was granted by the [trial] court on August 18, 2015.

"On September 25, 2015, the defendant filed a motion for summary judgment, arguing that Hudson was precluded from foreclosing the mortgage. In particular, she argued that she had not defaulted under the terms of the note because she was never a party to a promissory note with [Hudson] or any of its predecessors in interest. The motion was denied by the court on January 14, 2016, on the basis of the court's determination that an issue of material fact remained with respect to whether the mortgage deed provided reasonable notice to third parties that the defendant was securing Robert's obligation." *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, 192 Conn. App. 688, 692–93, 218 A.3d 596 (2019).

"On August 9, 2016, the plaintiff, M&T Bank, into which Hudson had merged, filed a motion to substitute itself as the party plaintiff and requested leave to amend the complaint in order to add two additional causes of **\*755** action. The court granted the motion on August 15, 2016. In the first count of the plaintiff's three count amended complaint, the plaintiff sought a judgment of foreclosure against the [defendant]. In the second count, it sought equitable reformation of the note in order to include the defendant as a borrower on the note. In the third count, the plaintiff pleaded that the defendant had been unjustly enriched because (1) the proceeds of the note were used to pay off loans [that] she was obligated to pay and (2) she had free use of the subject property without satisfying the terms of the mortgage [deed], which she had executed.

"On December 1, 2016, the defendant filed an amended answer denying the essential allegations of the amended complaint regarding her liability for the debt and the claim of unjust enrichment. She also set forth eight special defenses." (Footnote omitted.) Id., at 693–94, 218 A.3d 596.

"The parties tried the case before the court on December 6, 2016. The plaintiff presented three witnesses, including Wilkin Rodriguez, a mortgage banking research officer at JPMorgan Chase, the defendant, **\*\*757** and Robert. After the plaintiff rested, the defendant did not present additional evidence; she relied instead on the testimony and exhibits introduced during cross-examination of the witnesses called by the plaintiff." Id., at 694, 218 A.3d 596. The trial court ordered the parties to submit posttrial briefs.

"On April 12, 2017, the court issued its memorandum of decision. The court found in favor of the defendant on the foreclosure and reformation counts of the complaint. In particular, the court stated, among other things, that '[t]he court finds that the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it [was] entitled to the equitable remedy of reformation of the mortgage deed[3] .... Accordingly, **\*756** the court finds the issues on the second

**84**

count for [the defendant] and against the plaintiff. [Because] the plaintiff failed to present any authority to the court [that] would allow the plaintiff to prevail on the first count [foreclosure claim] in the absence of reformation of the mortgage deed, the court [also] finds the issues on the first count for [the defendant] and against the plaintiff.'

"The court then proceeded to address the plaintiff's unjust enrichment claim, noting that the defendant had been benefited in several respects as a result of the loan that Robert had obtained .... The court ultimately determined that [Hudson's] responses to the requests for admissions precluded any recovery on [the plaintiff's] unjust enrichment claim, except for the property tax payments that the defendant conceded that she owed to the plaintiff."[4] (Footnote added; footnote omitted.) **757** Id., at 695–97, 218 A.3d 596. Thereafter, the plaintiff appealed from the judgment of the trial court to the Appellate Court.

On appeal to the Appellate Court, the plaintiff claimed, inter alia, that the trial court (1) improperly failed to exercise its **758** discretion to consider the plaintiff's foreclosure claim as independent from its other claims and failed to grant the plaintiff the equitable remedy of foreclosure, (2) improperly declined to reform the mortgage deed, and (3) incorrectly concluded that Hudson's admissions limited the plaintiff's recovery under its unjust enrichment count. See id., at 691–92, 218 A.3d 596. The Appellate Court affirmed the judgment of the trial court. Id., at 722, 218 A.3d 596. It concluded, inter alia, that the trial court (1) "did not ignore the plaintiff's claim for foreclosure"; id., at 700–701, 218 A.3d 596; (2) properly "declined to grant foreclosure of the mortgage without reformation because it determined that the mortgage [deed], as executed, was a nullity because it secured a nonexistent debt"; id., at 703, 218 A.3d 596; see id., at 705, 218 A.3d 596; (3) did not abuse its discretion by declining to reform the mortgage deed because the plaintiff did not meet its burden of proving by clear and convincing evidence that the mortgage deed did not conform to the parties' agreement; see id., at 706, 218 A.3d 596; and (4) "did not abuse its discretion in limiting the award under the unjust enrichment count to the property taxes owed to the plaintiff." Id., at 721, 218 A.3d 596.

We granted the plaintiff's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly uphold the trial court's decision declining the plaintiff's request to reform the mortgage deed to reference the fact that the mortgage [deed] executed by the defendant was given to secure a note executed by [Robert]?" And (2) "[i]f the answer to the **758** first certified question is 'yes,' did the Appellate Court properly uphold the trial court's determination that the plaintiff was not entitled to foreclose the mortgage executed by the defendant because the defendant is not a borrower on the note?" *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, 333 Conn. 945, 219 A.3d 375 (2019). Additional facts will be set forth as necessary.

I

We first consider whether the Appellate Court properly affirmed the judgment of the trial court declining to grant reformation of the mortgage deed. The plaintiff asserts that the trial court improperly did not find that the parties intended for the mortgage deed signed by the defendant to secure the note signed by Robert. Therefore, the plaintiff contends, the mortgage deed should be reformed to reflect the parties' true agreement. The defendant counters that the trial court properly refused to reform the mortgage deed on the basis of the court's factual findings. We agree with the defendant.

"Reformation is appropriate only when the [contract] executed by the parties does not reflect the agreement the parties actually intended. ... Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties ...." (Internal quotation marks omitted.) *ARS Investors II 2012-1 HVB, LLC* v. *Crystal, LLC*, 324 Conn. 680, 692–93, 154 A.3d 518 (2017).

"A cause of action for reformation of a contract rests on the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed [on] and does not express the intention of the parties and that it was executed as the result of mutual mistake, or mistake of one party coupled with actual **759** or constructive fraud, or inequitable conduct on the part of the other. ... Equity evolved the doctrine because an action at law afforded no relief against an instrument ****759** secured by fraud or as a result of mutual mistake. ... The remedy of reformation is appropriate in cases of mutual mistake—that is where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction. ... In short, the mistake, being common to both parties, effects a result [that] neither intended." (Citations omitted; internal quotation marks omitted.) *Lopinto* v. *Haines*, 185 Conn. 527, 531–32, 441 A.2d 151 (1981). Additionally, "[w]here fraud is absent, it must be established that both parties agreed to something different from what is expressed in writing, and the proof on this point should be clear so as to leave no room for doubt." (Emphasis omitted; internal quotation marks omitted.) Id., at 535, 441 A.2d 151. There is no allegation of fraud in this case.

"We have stated the standard of proof for reformation in different ways but all with the same substantive thrust: evidence should be clear, substantial and convincing." (Internal quotation marks omitted.) Id., at 534, 441 A.2d 151. "This is the quality of the evidence required in cases of this type." Id., at 535, 441 A.2d 151. "The burden of proof on the issue of reformation is [on] the party seeking it." Id.

Here, the plaintiff had to establish the parties' clear agreement that the defendant's mortgage deed was intended to secure the note executed by Robert. As this court has recognized, "the trier is the judge of credibility and, specifically ... what the terms of the agreement were [is] a

question of fact for the trier. ... This court is limited to corrections of errors of law ....” (Citations omitted; footnote omitted.) Id., at 536, 441 A.2d 151. The question of whether, on the facts found, the court has held the **\*760** plaintiff, who had the burden of proof on the reformation issue, to the correct standard becomes one of law and is reviewable. See id.

In the present case, the plaintiff does not assert that the trial court improperly required it to prove the parties’ agreement by clear and convincing evidence. Instead, on appeal, the plaintiff challenges the trial court’s determination regarding the terms of the agreement between the parties, which is a factual determination subject to the clearly erroneous standard of review. See id.

The trial court noted that the parties stipulated to the following facts: “On or about December 11, 2006, Robert executed and delivered to [JPMorgan] Chase a note in the principal amount of $533,000 .... [The defendant] did not sign the note. The note was not timely paid, [it] went into default on or about February 1, 2010, and [JPMorgan Chase] elected to accelerate the balance due on the note. The present foreclosure action was commenced by [JPMorgan] Chase in February, 2013, at which time it held the note executed by Robert. ...

“On January 24, 2011, Robert filed for protection under chapter 7 of the [United States] Bankruptcy Code, listing the note as an unsecured debt. The filing listed no real property owned by Robert. ... [O]n April 26, 2011, Robert was granted an unconditional discharge from the bankruptcy court for his obligations under the note.

“[The defendant] signed [the mortgage deed] on December 11, 2006, which recited that it was given to secure a note dated December 11, 2006, signed by [the defendant] as the ‘[b]orrower,’ in the amount of $533,000. The term ‘[b]orrower’ is defined in the mortgage deed as ‘Theresa Virgulak, married.’ ... [The defendant] has never signed a [guarantee] of Robert’s obligations **\*\*760** under the note.” (Footnote omitted.)

**\*761** The trial court heard evidence from the parties over the course of a one day trial. The plaintiff introduced into evidence a copy of the note and mortgage deed. The trial court made the following findings.

The trial court found that the note was signed only by Robert, above a signature line labeled “Robert J. Virgulak,” and that the note does not contain a signature line with the defendant’s name. The trial court further found that “[t]he note ... recites the obligations of the ‘[b]orrower’ and does not otherwise define that term. However, page 3 of the note bears the signature of ‘Robert J. Virgulak—[b]orrower.’ The note does not bear [the defendant’s] signature, nor does it indicate in any way that any person, other than Robert, is obligated under the terms of the note.” (Citation omitted.)

The trial court explained that Rodriguez admitted that JPMorgan Chase’s files did not include

**87**

any originals or copies of any note signed by the defendant. Rodriguez did authenticate a United States Department of Housing and Urban Development Settlement Statement (HUD-1A form), a Transfer of Servicing Disclosure Statement, a Truth in Lending Statement, and a Notice of Right To Cancel, which were all signed by the defendant. None of these mortgage documents references the note executed by Robert.

The trial court also relied on the defendant's testimony.[5] At trial, the defendant testified that she had lived at the property for thirty-four years and had owned it for the last thirty years. The defendant further testified that she signed the mortgage deed at Robert's request. She admitted that she signed the HUD-1A form, the Transfer of Servicing Disclosure Statement, the Truth in Lending Statement, and the Notice of Right To Cancel, **\*762** but testified that she had not read the documents before signing them and that she signed them in Robert's presence only. The plaintiff presented no evidence to dispute this testimony.

The trial court explained that the defendant further testified that she had agreed that the proceeds of the subject note would be used to pay off a prior mortgage on the property but that she did not receive any portion of the $155,236.22 shown as paid to the "[b]orrower." The defendant explained that Robert managed the family's bills and paid all real estate taxes. The defendant further testified that she and Robert did not file joint tax returns or have credit cards in their names. The defendant also denied that she had signed any guarantees of Robert's debts.

The trial court also relied on Robert's testimony at trial.[6] He testified that, in his loan application, he included the value of the property, even though he knew that the property was solely in the defendant's name. Robert also testified that he had considered both he and the defendant jointly responsible for the prior mortgages on the property. Robert further testified that he had received the entire $155,236.22 in funds disbursed to the borrower at the closing. Robert explained that he used some of those funds to improve the kitchen and bathroom at the property. Robert testified that he paid the obligations under the note, real estate taxes and property insurance up until the time he filed for bankruptcy in 2010. Robert further testified **\*\*761** that, since that time, he has not made any payments under the note or for real estate taxes but did reinstate the property insurance. According to Robert, the defendant has occupied the property since 2006 but has not made mortgage payments or paid property taxes.

**\*763** During cross-examination, Robert testified that the majority of the documents relating to the mortgage were given to him, not the defendant. He further testified that the defendant was not present at the closing held at the attorney's office. Robert explained that all communications regarding the mortgage were sent to him, not the defendant. Robert also explained that he used $109,070.48 of the proceeds of the note to pay off credit cards that were his exclusive responsibility and that approximately $35,000 of it was used to improve the kitchen and bathroom at the property. Robert also testified that JPMorgan Chase "required that the prior mortgages be paid off as a condition of granting the loan."

The trial court ultimately found: "The documents in evidence and the testimony of the witnesses leave many gaps in the factual record. It is not clear [whether] Robert spoke with any individual representing [JPMorgan] Chase prior to applying for the mortgage. There was no mortgage commitment listing the terms under which [JPMorgan] Chase was prepared to close the loan and what role, if any, [it] intended [the defendant] to play in the transaction. The [HUD-1A form] lists only one disbursement to a law firm—the $525 paid to Bove & Milici. Although Robert testified that the closing took place in John Milici's office, he did not testify as to whether Milici was representing him, [JPMorgan] Chase, or both. There was no testimony as to who prepared or reviewed the closing documents. Both Robert and [the defendant] testified that [the defendant] did not attend the closing and that she signed the mortgage deed and four related documents at the family home. However, there was no explanation of how the mortgage [deed] came to bear the signatures of two witnesses, one of whom, [Milici], also purported to take [the defendant's] acknowledgement.

"The records authenticated by ... Rodriguez are silent as to any understanding [that JPMorgan] Chase **\*764** may have had with [the defendant] regarding her responsibility for the loan being made to Robert. Those records did not include a mortgage commitment letter or closing instructions, both of which typically would describe the transaction in detail and contain a checklist of documents required to be executed prior to disbursement of the proceeds of the loan."

On the basis of the foregoing, the trial court concluded: "The court finds that the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it is entitled to the equitable remedy of reformation of the mortgage deed .... Accordingly, the court finds the issues on the second count for [the defendant] and against the plaintiff." (Citation omitted.)

In a well reasoned opinion, the Appellate Court affirmed the judgment of the trial court, explaining that, "[a]s the [trial] court correctly noted, even with the various documents admitted into evidence at trial and the testimony of the witnesses, many gaps were left in the factual record." *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, supra, 192 Conn. App. at 714, 218 A.3d 596. We agree. Principal among those gaps is that the mortgage deed identifies a "[n]ote" but does not explicitly identify the note signed by Robert. In other words, the plaintiff failed to produce clear and convincing evidence of the particular debt obligation that was being secured by the mortgage deed executed by the **\*\*762** defendant. Indeed, in its posttrial brief, the plaintiff conceded that the parties never intended the mortgage deed to secure a note signed by the defendant.[7] There was no evidence produced or elicited by the plaintiff that required the trial court to find that the defendant intended the mortgage as security for Robert's loan.

**\*765** On appeal to this court, the plaintiff does not assert that any of the trial court's findings of fact are clearly erroneous or that the trial court incorrectly required that mutual mistake be shown by clear and convincing evidence. Instead, we understand the plaintiff's claim on appeal to be that the Appellate Court improperly affirmed the judgment of the trial court because the

trial court failed to find, but should have found, that the parties—and the defendant in particular—intended the mortgage deed to secure Robert's note.

It is well established that "[a] contract is to be construed according to what may be assumed to have been the understanding and intention of the parties. ... The intention of the parties is a question of fact to be determined from the language of the contract, the circumstances attending its negotiation, and the conduct of the parties in relation thereto. ... The trial court's finding of fact with respect to intent is reversible on appeal only if the court's finding was clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Voll* v. *Lafayette Bank & Trust Co.*, 223 Conn. 419, 426, 613 A.2d 266 (1992). We cannot conclude that the absence of a finding by the trial court that the parties intended the mortgage deed signed by the defendant to secure Robert's note was clearly erroneous.

In the present case, the language of the contract does not support the plaintiff's claim that the defendant's mortgage deed was intended to secure the note executed by Robert. Indeed, the language of the mortgage deed does not mention Robert or any note executed by him.

The circumstances attending the negotiation of the mortgage also do not necessarily support the plaintiff's claim that the parties intended the defendant's mortgage deed to secure Robert's note. There is no evidence that the plaintiff or its predecessors in interest ever **\*766** spoke with the defendant prior to her execution of the mortgage deed, or required her to secure the note as a condition of Robert's receiving the funds. The trial court also pointed to the undisputed fact that the defendant did not attend the closing and to the lack of evidence as to whether JPMorgan Chase, or its representative, was present.

Furthermore, the conduct of the parties in relation to the mortgage deed and the note also does not necessarily support the plaintiff's claim that the defendant and JPMorgan Chase intended the defendant's signature on the mortgage deed to secure the note signed by Robert. The trial court found that Robert received all of the net loan proceeds from the note and used most of those funds to pay off credit cards that were his exclusive responsibility. The plaintiff failed to introduce any evidence of communications with the defendant regarding the note and mortgage deed.

The trial court was not persuaded that the parties to the mortgage deed intended it to secure the note signed by Robert. As we have explained, this is a factual finding left to the trial court that can be overturned only if it is clearly erroneous. On the basis of the evidence in the present **\*\*763** case, we cannot conclude that the Appellate Court improperly affirmed the judgment of the trial court.

On appeal to this court, the plaintiff does not challenge the absence of a finding by the trial court that the parties intended the mortgage deed signed by the defendant to secure Robert's note as clearly erroneous or assert that the trial court applied the wrong standard in making its factual

finding. Instead, the plaintiff asserts that, because the defendant signed a mortgage deed that referenced a note with the same date and in the same amount as the note that Robert signed, the trial court incorrectly determined that the plaintiff did **\*767** not meet its high burden of showing that the defendant intended the mortgage deed to secure the note executed by Robert. The plaintiff essentially asserts that common sense dictates that the defendant intended to sign the mortgage deed to secure a note and that there is no other reason to sign a mortgage deed. From there, the plaintiff argues that the note Robert executed on the same day that the defendant signed the mortgage deed must be the note the defendant agreed to secure.

The question before this court, however, is not whether a fact finder could reasonably have concluded that the defendant intended the mortgage deed to secure a note signed by Robert but, rather, whether the trial court's conclusion that it could not make such a finding was clearly erroneous. We conclude that it was not because, as the trial court correctly noted, the evidence presented on that specific question fell short of the very high burden required to demonstrate mutual mistake. Indeed, Hudson, the plaintiff's predecessor in interest, admitted that the defendant did not borrow any money from Hudson or JPMorgan Chase, and the plaintiff **\*768** conceded that the mortgage deed was not intended to secure any note signed by the defendant. Further, the plaintiff failed to present any testimony regarding whether JPMorgan Chase itself intended the defendant's signature on the mortgage deed to secure the note signed by Robert. Because of this lack of evidence, we cannot conclude that the trial court's inability to find that the parties intended the mortgage deed signed by the defendant to secure Robert's note was clearly erroneous.

This court repeatedly has warned that the power of courts to reform written instruments is one that should be exercised cautiously. See, e.g., *Lopinto* v. *Haines*, supra, 185 Conn. at 539, 441 A.2d 151 ("[t]his standard of proof should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is **\*768** loose, equivocal or contradictory" (internal quotation marks omitted)); see also, e.g., *Philippine Sugar Estates Development Co., Ltd.* v. *Philippine Islands*, 247 U.S. 385, 391, 38 S. Ct. 513, 62 L. Ed. 1177 (1918) (stating that reformation will not be granted "unless the proof of mutual mistake [is] of the clearest and most satisfactory character" (internal quotation marks omitted)); cf. 1 Restatement (Second), Contracts § 155, comment (c), p. 410 (1981) ("[b]ecause experience teaches that mistakes are the exception and not the rule ... [c]are is all the more necessary when the asserted mistake relates to a writing, because the law of contracts ... attaches great weight to the written expression of an agreement").

In the present case, it is undisputed that Robert received an unconditional discharge of his obligations under the note through the bankruptcy proceeding in 2011. The defendant was not obligated under the terms of that note, and the plaintiff is not seeking reformation of that note. Moreover, the parties stipulated, and the trial court specifically found, that the defendant **\*\*764** was not a guarantor of the note executed by Robert. Instead, the plaintiff is effectively attempting to make the defendant a surety responsible for Robert's debt in the event of default.

See, e.g., *Bernd* v. *Lynes*, 71 Conn. 733, 736, 43 A. 189 (1899) ("the contract of a surety is a collateral engagement for another, as distinguished from an original and direct agreement for the party's own act" (internal quotation marks omitted)). We cannot conclude that the trial court's refusal to use its equitable power to reform the mortgage deed was improper under these circumstances.

To be sure, identifying the obligation secured by a mortgage deed is not a technical or scrivener's error. Reforming the mortgage deed in the manner sought by the plaintiff without establishing that the change effects the original intention of the parties changes the defendant's **\*769** obligations and creates a new contract between her and the plaintiff. This court has cautioned that "[a]n obstacle to reformation [that] we find insurmountable arises from the fundamental principle that there can be no reformation unless there is an antecedent agreement upon which the minds of the parties have met. The relief afforded in reforming an instrument is to make it conform to the previous agreement of the parties." *Hoffman* v. *Fidelity & Casualty Co. of New York*, 125 Conn. 440, 443, 6 A.2d 357 (1939). Consequently, "a definite agreement on which the minds of the parties have met must have [preexisted] the instrument in question." Id. It is axiomatic that a "court cannot supply an agreement [that] was never made, for it is [a court's] province to enforce contracts, not to make or alter them." Id. The issue here is whether it was clearly erroneous for the trial court not to find that a prior agreement existed between JPMorgan Chase and the defendant that the defendant would execute the mortgage deed in order to secure Robert's debt.

We recognize that the fact the mortgage deed and note have matching dates and refer to matching amounts could have allowed the trial court to infer that the transactions are related. However, based on the other evidence presented, which suggests that the defendant did not intend to secure Robert's debt, and the absence of any direct evidence that either party did intend the mortgage deed to secure a note executed by Robert, we cannot conclude that the absence of a finding by the trial court that JPMorgan Chase and the defendant intended for the defendant to execute the mortgage deed in order to secure Robert's note was clearly erroneous.

In its brief, the plaintiff posits the rhetorical question, what other reason would the defendant have to sign the mortgage deed if not to secure Robert's note? This question and the speculative answer it may yield, however, **\*770** do not provide anything like dispositive evidence of the parties' respective intentions here. The defendant had no burden to demonstrate what other purpose or intent motivated her to sign the mortgage deed. It is the plaintiff, as the party seeking reformation, that must prove the preexisting agreement that it seeks to effectuate, and it must do so by clear and convincing evidence. It did not do so to the satisfaction of the trial court, and we cannot conclude that the trial court's findings in this regard were clearly erroneous.

We cannot conclude, on the basis of the evidence before the trial court, that the absence of a finding by the court that the parties intended the mortgage deed signed by the defendant to secure the note signed by Robert was clearly erroneous. Thus, we conclude that the Appellate

**92**

Court properly upheld the trial court's decision to decline to reform the mortgage deed.

**765 II

We next consider whether the Appellate Court properly affirmed the judgment of the trial court determining that the plaintiff was not entitled to foreclose the mortgage executed by the defendant because the defendant is not a borrower on the note. On appeal, the plaintiff contends that, even if this court concludes that the Appellate Court properly upheld the trial court's denial of the request for reformation, the plaintiff is nevertheless entitled to foreclose. The plaintiff argues that this is so because it is undisputed that the defendant entered into a mortgage transaction and common sense dictates that she intended her property interest to be security for the note contemporaneously executed by Robert. The plaintiff contends that, therefore, foreclosure is the proper equitable relief. The defendant counters that the plaintiff cannot foreclose the mortgage without reformation. We agree with the defendant.

*771 As we noted previously, "[a] foreclosure action is an equitable proceeding. ... The determination of what equity requires is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *Deutsche Bank National Trust Co.* v. *Angle*, 284 Conn. 322, 326, 933 A.2d 1143 (2007). Thus, on appeal, we employ the abuse of discretion standard. See, e.g., id.

"In order to establish a prima facie case in a mortgage foreclosure action, the plaintiff must prove by a preponderance of the evidence that it is the owner of the note and mortgage, that the defendant mortgagor has defaulted on the note and that any conditions precedent to foreclosure, as established by the note and mortgage, have been satisfied." GMAC *Mortgage, LLC* v. *Ford*, 144 Conn. App. 165, 176, 73 A.3d 742 (2013), citing *Franklin Credit Management Corp.* v. *Nicholas*, 73 Conn. App. 830, 838, 812 A.2d 51 (2002), cert. denied, 262 Conn. 937, 815 A.2d 136 (2003).

In the present case, it is undisputed that the defendant did not sign the promissory note. Instead, the defendant signed only the mortgage deed, and the mortgage deed does not indicate that it was entered into to secure the note executed by Robert. The mortgage deed mentions only a nonexistent promissory note for which the defendant alone is the borrower. Hudson, the plaintiff's predecessor in interest, conceded that the defendant was not a borrower on any note.

We find the Appellate Court's reasoning persuasive in resolving this claim. The Appellate Court reasoned: "In reviewing the [trial] court's memorandum of decision and subsequent rulings on the plaintiff's motions, it is clear that it declined to grant foreclosure of the mortgage without reformation because it determined that the mortgage [deed], as executed, was a nullity because it secured a nonexistent debt." *772 *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, supra,

192 Conn. App. at 703, 218 A.3d 596. Accordingly, like the Appellate Court majority, we cannot conclude that the plaintiff was entitled to foreclose a mortgage for a debt for which the defendant was not responsible and that was not referenced in the mortgage deed.

On the basis of the foregoing, we conclude that the Appellate Court correctly concluded that the trial court did not abuse its discretion and properly affirmed the judgment of the trial court.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

## All Citations

341 Conn. 750, 267 A.3d 753

## Footnotes

\*      January 11, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

1      "The named plaintiff, JPMorgan Chase Bank, National Association ... is no longer a party in this matter ... [after filing] a motion to substitute Hudson City Savings Bank as the plaintiff, which the [trial] court granted on August 18, 2015. On August 9, 2016, M&T Bank filed a motion to substitute itself as the plaintiff, noting that it was the successor by merger to Hudson City Savings Bank. That motion was granted on August 15, 2016." *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, 192 Conn. App. 688, 691 n.1, 218 A.3d 596 (2019). For convenience, we refer to M&T Bank as the plaintiff in this opinion.

2      The original summons and complaint also listed the named defendant, Robert J. Virgulak, and the Department of Revenue Services as defendants. Subsequently, the named plaintiff, JPMorgan Chase Bank, National Association, withdrew the action against Robert J. Virgulak. Additionally, the Department of Revenue Services was defaulted for failure to plead. Therefore, in the interest of simplicity, we refer to Theresa Virgulak as the defendant.

3      The trial court explained the following in its memorandum of decision: "[I]n the second count of its complaint, the plaintiff seeks reformation of the [note] but not the mortgage deed. However, on page 7 of its posttrial brief ... the plaintiff concedes: 'Quite simply, there is ... no support for any notion that the mortgage [deed] was ever intended to secure a note executed by [the defendant].' According to the [posttrial] brief, it is now the plaintiff's position that the mortgage deed should be reformed 'to reference the fact that the mortgage [deed] executed by [the defendant] was to secure the note executed by Robert.' " (Citation omitted; footnote omitted.)

In its posttrial brief, the plaintiff asserted that the trial court should consider its new position that the mortgage deed, rather than the note, should be reformed because, "in an equitable proceeding such as a mortgage foreclosure, the trial court may consider equitable principles, even though they may not have been specifically pleaded, and may consider all relevant circumstances to [e]nsure that complete justice is done." (Internal quotation marks omitted.)

Even though the plaintiff did not plead in its complaint that it was entitled to reformation of the mortgage deed, the trial court

considered that claim and ultimately concluded that "the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it is entitled to the equitable remedy of reformation of the mortgage deed ...." (Citation omitted.) The defendant does not assert that it was improper for the trial court or the Appellate Court to consider reforming the mortgage deed instead of the note, so we also consider that claim.

4      In its response to the defendant's request for admissions, Hudson, the plaintiff's predecessor in interest, admitted, inter alia, that the defendant did not borrow any money from Hudson or JPMorgan Chase and did not owe them any money. See *JPMorgan Chase Bank, National Assn.* v. *Virgulak,* supra, 192 Conn. App. at 715–16, 218 A.3d 596. Approximately two weeks after trial, the plaintiff filed a motion seeking to withdraw and amend the responses to the defendant's request for admissions, which the court ultimately denied. See id., at 695–96, 218 A.3d 596.

5      The trial court elucidated that "[it] has ... consider[ed] all of the testimony given by Robert and [the defendant] to the extent that their credibility is at issue."

6      See footnote 5 of this opinion.

7      In its response to the defendant's request for admissions, Hudson also conceded that the defendant never borrowed any money from Hudson or JPMorgan Chase. See footnote 4 of this opinion.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**95**

# Exhibit

# 14

☐ APPEAL    ☐ JOINT APPEAL    ☐ CROSS APPEAL    ☒ *Second* AMENDED APPEAL    ☐ CORRECTED FORM

JD-SC-33  Rev. 11-21
P.B. Sections 3-8, 60-7, 60-8, 62-7, 62-8, 63-3, 63-4, 63-10, 72-3
C.G.S. Sections 31-301b, 51-197f, 52-470

*All appeals must be filed electronically unless an exemption from the requirements of electronic filing has been granted or you are an incarcerated self-represented party. For further information about e-filing or this form, see the Appeal Instructions, form JD-SC-34.*

☐ To Supreme Court    ☒ To Appellate Court

Name of case *(State full name of case)*

**SANTANDER BANK, N.A. v. CLARK, LILLIAN J Et Al**

Type of appellate matter *(If a writ of error, the writ and the signed marshal's return must be filed on the same business day as this form. See Practice Book Section 72-3.)*

## Appeal

| | | |
|---|---|---|
| **Trial Court History** | Tried to<br>**Court** | Trial court location<br>**95 Washington Street, Hartford, CT 06106** |
| | Trial court judges being appealed<br>**Judge Claudia A. Baio** | List all trial court docket numbers, including location prefixes<br>**HHD-CV19-6120472-S** |
| | All other trial court judges who were involved with the case<br>**Kevin Gene Dubay; Mark H. Taylor; and Matthew Joseph Budzik** | Judgment for *(Where there are multiple parties, specify those for whom judgment was rendered)*<br>**Santander Bank, N.A.** |
| | Date of judgment(s) or decision(s) being appealed<br>**4/25/23; May 1, 2, & 3, 2023; and 5/19/2023** | Date of issuance of notice on any order on any motion that would render judgment ineffective | Date for filing appeal extended to |
| | Case type<br>**Civil** | For Juvenile Cases<br>☐ Termination of Parental Rights    ☐ Order of Temporary Custody |
| | For Civil/Family Case Types, Major/Minor code:<br>**P00** | ☐ Other |

| | |
|---|---|
| **Appeal** | Appeal filed by *(Party name(s))*<br>**Defendant Gordon Clark; and Defendant Gordon Clark as Executor of the Estate of Lillian J. Clark**<br>From *(the action that constitutes the appealable judgment or decision)*<br>**205.86, 221.87, 222.86, 247.86, 253.86, 255.86, 256.86, 257.86, 263.86, 272.86, 275.86, 276.86, 281.86, 283.86, 284.86, 285.86, 292·00, 292·10, and 293·00 (Nineteen (19) Court Orders).**<br>If this appeal is taken by the State of Connecticut, provide the name of the judge who granted permission to appeal and the date of the order<br>Statutory Basis for Appeal to Supreme Court |

| | | | | |
|---|---|---|---|---|
| **Appearance** | By *(Signature of counsel of record)*<br>▶ *[signature]* | Telephone number<br>**860.833.3195** | Fax number<br>**N/A** | Juris number *(If applicable)* |
| | Type name and address of counsel of record filing this appellate matter *(This is your appearance; see Practice Book Section 62-8)*<br>**Gordon Clark**<br>**70 Elm Street, Enfield, CT 06082** | | E-mail address<br>**gordon@christianeconomics.net** | |
| | "X" one if applicable<br>☐ Counsel or self-represented party who files this appeal will be deemed to have appeared **in addition to** counsel of record who appeared in the trial court.<br>☐ Counsel or self-represented party who files this appeal is appearing **in place of:** | | Name of counsel of record | Juris number *(If applicable)* |

| | |
|---|---|
| **Certification** | I certify that a copy of this appeal form I am filing will immediately be delivered to each other counsel of record and I have included their names, addresses, e-mail addresses and telephone numbers; the appeal form has been redacted or does not contain any names or other personal identifying information that is prohibited from disclosure by rule, statute, court order or case law; and the appeal form complies with all applicable rules of appellate procedure in accordance with Practice Book Sections 62-7 and 63-3.<br>Date to be delivered **05/26/2023**<br>*If you have an exemption from e-filing under Practice Book Section 60-8, attach a list with the name, address, e-mail address, and telephone number of each counsel of record and the address where the copy was delivered.* |
| | If this appeal is a criminal or habeas corpus matter, I certify that a copy of this appeal form will immediately be delivered to the Office of the Chief State's Attorney Appellate Bureau. Date to be delivered<br>Signed *(Counsel of record)*<br>▶ *[signature]*    Date signed **05/26/2023** |

| | |
|---|---|
| **Required Documents** | To be filed with the Appellate Clerk within ten days of the filing of the appeal, if applicable. See Practice Book Section 63-4.<br>1. Preliminary Statement of the Issues<br>2. Designation of the Proposed Contents of the Clerk Appendix<br>3. Court Reporter's Acknowledgment or Certificate that no transcript is necessary<br>4. Docketing Statement<br>5. Statement for Preargument Conference (form JD-SC-28A)<br>6. Constitutionality Notice<br>7. Sealing Order form, if any |

| | | | |
|---|---|---|---|
| ☐ Entry Fee Paid | ☐ No Fees Required | ☐ Fees, Costs, and Security waived by Judge *(enter Judge's name below)* | **Court Use Only**<br>Date and time filed |
| Judge | | Date waived | |

## CERTIFICATE OF SERVICE

I, *pro se* Appellant Gordon Clark, certify that a copy of the above **SECOND AMENDED**

**APPEAL** will be served via *electronic service* on May 26, 2023, to the following:

Jeffrey M. Knickerbocker, Esq.
c/o Bendett & McHugh, P.C.
270 Farmington Avenue
Farmington, CT 06032
860.255.5008
jknickerbocker@bmpc-law.com
**Served via *electronic service***


It is also certified that this document does not contain any names or other personal

identifying information that is prohibited from disclosure by rule, statute, court order, or

case law.


Dated and signed at Enfield, Connecticut, on May 26, 2023, by *pro se* Appellant Gordon

Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit 15

| | )  | |
|---|---|---|
| **AC-46473** | ) | **Appeal Date: May 2, 2023** |
| | ) | **1st Amended Appeal: May 9, 2023** |
| **Docket No. HHD-CV19-6120472-S** | ) | **2nd Amended Appeal: May 26, 2023** |
| | ) | |
| Santander Bank, N.A. | ) | Appellate Court of Connecticut |
| vs. | ) | |
| Clark, Lillian J., et al. | ) | **May 26, 2023** |
| | ) | |

# PRO SE APPELLANTS' CONSTITUTIONALITY NOTICE

Pursuant to the applicable provisions of the *Constitution of the State of Connecticut*; the *Connecticut Practice Book*, including, but not limited to the *Connecticut Attorney's Oath*, the *Rules of Professional Conduct*, and **Section 60-1**; and the *Connecticut Foreclosures Practice and Procedure*. The *pro se* Appellants *respectfully* files with this Court their **CONSTITUTIONALITY NOTICE**, based on the following *material facts and relevant law* delineated below.

## MEMORANDUM OF LAW
*[Bold italic added throughout document for emphasis]*

1.) The *Constitution of the State of Connecticut*, reads, *in part*, as follows:

### CONSTITUTION OF THE STATE OF CONNECTICUT

### PREAMBLE.

The People of Connecticut acknowledging with gratitude, the good providence of God, in having permitted them to enjoy a free government; do, in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government.

**ARTICLE FIRST.
DECLARATION OF RIGHTS.**

That the great and essential principles of liberty and free government may be recognized and established,

**WE DECLARE:**

(**Equality of rights**.)
Sec. 1 All men when they form a social compact, **are equal in rights**; and no man or set of men are entitled to exclusive public emoluments or privileges from the community.

(**Trial by jury**.)
Sec. 19 **The right of trial by jury shall remain inviolate.**
*Amended by Article IV., of the Amendments to the Constitution of the State of Connecticut.*

(**Equal protection**. **No segregation or discrimination**.)
Sec. 20 **No person shall be denied the equal protection of the law** nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin.
*Amended by Article V., and Article XXI., of the Amendments to the Constitution of the State of Connecticut.*

**AMENDMENTS TO THE
CONSTITUTION OF THE STATE OF CONNECTICUT**

**ARTICLE IV**.

(**Trial by jury**. **Challenging of jurors**.)
Section 19 of article first of the Constitution is amended to read as follows:
**The right of trial by jury shall remain inviolate**, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate.

2

**ARTICLE V**.

(**Equal protection**. **No segregation or discrimination**.)
Section 20 of article first of the Constitution is amended to read as follows:
**No person shall be denied the equal protection of the law** nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin or sex.
*Amended by Article XXI., of the Amendments to the Constitution of the State of Connecticut.*

**ARTICLE XXI**.

(**Equal protection**. **No segregation or discrimination**.)
Article fifth of the amendments to the Constitution is amended to read as follows:
**No person shall be denied the equal protection of the law** nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability.

## STATEMENT OF FACTS
*[Bold italic added throughout document for emphasis]*

1.) From April 25, 2023 through May 19, 2023, *Superior Court of Hartford*, Judge Claudia A. Baio, issued nineteen (19) Court Orders, which denied the *pro se* Appellants' their constitutional rights under the *Constitution of the State of Connecticut*, which include, but are not limited to repeated violations of *pro se* Appellants' ***right to equal protection under the law***, by denying the *pro se* Appellants their ***due process of law rights to a jury trial, discovery, witnesses, exhibits, exculpatory evidence, and testimony***.

2.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 205.86**), denying *pro se* **DEFENDANTS'**

**MOTION FOR JUDGMENT IN ACCORDANCE WITH THREE (3) OPINIONS OF THE SUPREME COURT OF CONNECTICUT** (**Please see: Docket Entries – 205.00, and 205.86**), without issuing a *Memorandum of Decision*.

3.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 221.87**), denying *pro se* **DEFENDANTS' MOTION TO COMPEL PLAINTIFF SANTANDER BANK, N.A. TO PRODUCE DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS (Please see: Docket Entries - 221.00, 221.86, and 221.87)**, without issuing a *Memorandum of Decision*.

4.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 222.86**), sustaining **PLAINTIFF'S OBJECTION TO THE REQUEST FOR PRODUCTION (Please see: Docket Entries - 222.00, and 222.86)**, without issuing a *Memorandum of Decision*.

5.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 247.86**), granting **PLAINTIFF'S MOTION FOR ORDER OF COMPLIANCE (Please see: Docket Entries - 247.00, and 247.86)**, without issuing a *Memorandum of Decision*.

6.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 1, 2023, (**Please see: Docket Entry - 253.86**), overruling *pro se* **DEFENDANTS' OBJECTION TO PLAINTIFF SANTANDER BANK, N.A.'S FRAUDULENT**

**FILING OF CERTIFICATE OF CLOSED PLEADINGS; AND DEFENDANTS'
RESERVATION OF RIGHT TO FILE MOTIONS TO AMEND PLEADINGS
UPON COMPLETION OF DISCOVERY, AND RESERVATION OF RIGHT TO A
JURY TRIAL (Please see: Docket Entries - 253.00, and 253.86)**, without
issuing a *Memorandum of Decision.*

7.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May
1, 2023, (**Please see: Docket Entry - 255.86**), denying *pro se* **DEFENDANTS'
MOTION TO STRIKE PLAINTIFF SANTANDER BANK, N.A.'S FILING OF
FRAUDULENT CERTIFICATE OF CLOSED PLEADINGS** (**Please see: Docket
Entries – 255.00, and 255.86**), without issuing a *Memorandum of Decision.*

8.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May
2, 2023, (**Please see: Docket Entry - 256.86**), denying *pro se* **DEFENDANTS'
MOTION FOR SANCTIONS AGAINST ATTORNEYS JEFFREY M.
KNICKERBOCKER, AND ADAM L. BENDETT, AND BENDETT & MCHUGH,
P.C. FOR ITS ONGOING ABUSE OF COURT PROCEEDINGS AGAINST PRO
SE DEFENDANTS, WHICH INCLUDES, BUT IS NOT LIMITED TO THE FILING
OF A FRAUDULENT CERTIFICATE OF CLOSED PLEADINGS** (**Please see:
Docket Entries – 256.00, and 256.86**), without issuing a *Memorandum of
Decision.*

9.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May
2, 2023, (**Please see: Docket Entry - 257.86**), denying *pro se* **DEFENDANTS'**

**MOTION FOR CONTINUANCE OF A JURY TRIAL** (**Please see: Docket Entries – 257.00, and 257.86**), without issuing a *Memorandum of Decision*.

10.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 2, 2023, (**Please see: Docket Entry - 263.86**), denying *pro se* **EMERGENCY MOTION FOR ORAL ARGUMENT RECONSIDERATION-REARGUMENT OF MOTIONS 205.00, 221.00, AND 247.00** (**Please see: Docket Entries – 263.00, and 263.86**), without issuing a *Memorandum of Decision*.

11.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 2, 2023, (**Please see: Docket Entry - 272.86**), granting **PLAINTIFF'S MOTION TO STRIKE JURY CLAIM (Please see: Docket Entries - 272.00, and 272.86)**, without issuing a *Memorandum of Decision*.

12.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 2, 2023, (**Please see: Docket Entry - 275.86**), sustaining **PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTIONS 255.00, 256.00, 257.00 AND 263.00 (Please see: Docket Entries - 275.00, and 275.86)**, without issuing a *Memorandum of Decision*.

13.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 2, 2023, (**Please see: Docket Entry - 281.86**), granting

**PLAINTIFF'S MOTION FOR ORDER TO FIND NO APPELLATE STAY (Please see: Docket Entries - 281.00, and 281.86)**, without issuing a *Memorandum of Decision*.

14.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 3, 2023, (**Please see: Docket Entry - 276.86**), granting

**PLAINTIFF'S MOTION FOR THE COURT TO TAKE JUDICIAL NOTICE (Please see: Docket Entries - 276.00, and 276.86)**, without issuing a *Memorandum of Decision*.

15.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 3, 2023, (**Please see: Docket Entry - 283.86**), denying *pro se*

**DEFENDANTS' EMERGENCY MOTION TO SUBPOENA JOANNA WHEELER OF SANTANDER BANK, N.A.** (**Please see: Docket Entries – 283.00, and 283.86**), without issuing a *Memorandum of Decision*.

16.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 3, 2023, (**Please see: Docket Entry - 284.86**), overruling *pro se*

**DEFENDANTS' OBJECTION TO ATTORNEY JEFFREY M. KNICKERBOCKER'S FRAUDULENT LIST OF EXHIBITS FILING, AND FAILURE TO SUBMIT A WITNESS LIST TO THE PRO SE DEFENDANTS; AND THIS COURT'S FAILURE TO ENTER A TRIAL**

**MANAGEMENT ORDER BEFORE TRIAL TO THE PRO SE DEFENDANTS (Please see: Docket Entries - 284.00, and 284.86)**, without issuing a *Memorandum of Decision*.

17.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 3, 2023, (**Please see: Docket Entry - 285.86**), denying *pro se* **DEFENDANTS' MOTION FOR SANCTIONS AGAINST ATTORNEYS JEFFREY M. KNICKERBOCKER, AND ADAM L. BENDETT, AND BENDETT & MCHUGH, P.C. FOR ITS ONGOING ABUSE OF COURT PROCEEDINGS AGAINST PRO SE DEFENDANTS, WHICH INCLUDES, BUT IS NOT LIMITED TO THE FILING OF A FRAUDULENT LIST OF EXHIBITS FILING, AND FAILURE TO SUBMIT A WITNESS LIST TO THE PRO SE DEFENDANTS (Please see: Docket Entries – 285.00, and 285.86**), without issuing a *Memorandum of Decision*.

18.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order (*Memorandum of Decision*) on May 19, 2023, issuing judgment in favor of Plaintiff *Santander Bank, N.A.'s* Complaint, and also issuing judgment of *Foreclosure by Sale* against *pro se* Defendants (**Please see: Docket Entry – 292.00**).

19.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 19, 2023, against *pro se* Defendants, ordering *Foreclosure by Sale* on August 26, 2023 (**Please see: Docket Entry – 292.10**).

20.)  *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

(*Judgment*) on May 19, 2023, against *pro se* Defendants, ordering

*Judgment of Foreclosure by Sale* (**Please see: Docket Entry – 293.00**).


21.)  Lastly, *for what it is worth*, the *pro se* Appellant, Mr. Clark, has **repeatedly**

**experienced first-hand** over the past more than three (3) years, **unfair,**

**unjust, illegal, unlawful, unconstitutional, un-American, and immoral**

**maltreatment**, that is, the **denial of his constitutionally protected due**

**process of law rights** throughout this arduous judicial process; and

therefore, Mr. Clark has **first-hand knowledge** that many, *if not most*,

judicial officers, who are **supposed to be (speak and act)** public

servants, **unashamedly display their disdain, unprofessionalism,**

**incompetency, dishonesty, and even outright discrimination and**

**hatred** for *pro se* litigants.  And if anyone doubts these facts, one only has

to ask the **esteemed, distinguished, honorable, and honest** Judge

Richard Posner of the *United States Court of Appeals for the Seventh (7th)*

*Circuit* why he retired early, which **tragically and sadly** had to do with

how the judiciary and his colleagues (public servants) **repeatedly and**

**systemically mistreated pro se litigants** (**Please see attached article:**

**Exhibit A - *The Backstory Behind Judge Richard Posner's***

***Retirement***).


WHEREFORE, based on **all the material facts and relevant law** referenced above, as

well as all the *related, relevant, and previously* filed documents with this Court and the

*Superior Court of Hartford*, the *pro se* Appellants, *respectfully* files with this Court their

**CONSTITUTIONALITY NOTICE**.

# CERTIFICATION

I, Gordon Clark, hereby certify that, pursuant to **Connecticut General Statutes § 42-110g(c)**, and as ***required by law***, a copy of this **PRO SE APPELLANTS' CONSTITUTIONALITY NOTICE** will be mailed via *USPS Certified Mail* to the *Connecticut Attorney General*, Mr. William Tong, and the *Connecticut Commissioner of the Department of Consumer Protection*, Ms. Michelle H. Seagull.

Attorney General William Tong
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
**Mailed via *USPS Certified Mail***

Commissioner Michelle H. Seagull
Department of Consumer Protection
450 Columbus Boulevard, Suite 901
Hartford, CT 06103-1840
**Mailed via *USPS Certified Mail***

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on May 26, 2023, by *pro se* Appellant Gordon Clark, *in both his individual and executorship capacities*.

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

10

## CERTIFICATE OF SERVICE

I, *pro se* Appellant Gordon Clark, certify that a copy of the above **PRO SE**

**APPELLANTS' CONSTITUTIONALITY NOTICE** will be served via *electronic service* on

May 26, 2023, to the following:

Jeffrey M. Knickerbocker, Esq.
c/o Bendett & McHugh, P.C.
270 Farmington Avenue
Farmington, CT 06032
860.255.5008
jknickerbocker@bmpc-law.com
**Served via *electronic service***


It is also certified that this document does not contain any names or other personal

identifying information that is prohibited from disclosure by rule, statute, court order, or

case law.


Dated and signed at Enfield, Connecticut, on May 26, 2023, by *pro se* Appellant Gordon

Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit A

# The Backstory Behind Judge Richard Posner's Retirement

**Judge Posner had some very specific reasons for his surprise retirement from the bench.**

By DAVID LAT
September 7, 2017 at 1:44 PM



*(Photo by Chensiyuan via Wikimedia Commons.)*

In May, when I had lunch with Judge Richard Posner and his clerks in Chicago, the esteemed jurist was in fine form, as enjoyable a conversationalist as ever.

In July — after he made controversial comments about aging federal judges, including a call for a mandatory retirement age of 80 — I asked him whether he'd apply that rule to himself. He kept his options open, telling me, "It will depend on how I feel [when I turn 80], both in terms of physical and particularly mental health and in terms of interest in the job."

So like much of the legal world, I was taken by surprise when Judge Posner, currently 78, announced his retirement from the Seventh Circuit. He announced the news right before Labor Day weekend, and it took effect immediately.

And it's a *total* retirement, not the usual move to senior status (a sort of quasi-retirement for federal judges), as I learned when we traded emails earlier this week. I wrote:

*Hi Dick. Congratulations on your retirement — major news in the legal world, of course!*

*I haven't been able to glean this from what I've read so far (although I haven't read everything on the news, having just returned from vacation), but I was wondering: will you be*

*taking senior status and still hearing cases, or are you departing from the Seventh Circuit completely?*

He responded:

*Nice to hear from you, David. And I'm not taking senior status; my departure is total. It has to do with fact that I don't think the court is treating the pro se appellants fairly, and none of the other judges agrees with me (or rather, they don't like the pro se's and don't want to do anything with them, with occasional exceptions only).*

I wasn't sure if Judge Posner's comments on pro se litigants were fair game for public discussion — but now they are, thanks to this Chicago Daily Law Bulletin piece:

*[Judge Posner] intended to stay on the Chicago-based 7th Circuit until he turned 80… [b]ut "difficulty" with his colleague… moved up that date.*

*"I was not getting along with the other judges because I was (and am) very concerned about how the court treats pro se litigants, who I believe deserve a better shake," Posner wrote.*

*About 55 percent to 60 percent of the litigants who file appeals with the 7th Circuit represent themselves without lawyers. Very few pro se litigants are provided the opportunity to argue their cases in court. The 7th Circuit rules on most of those cases based on the briefs.*

Posner has long been concerned about the plight of pro se litigants. Back in 2015, for example, he benchslapped a trial judge for mistreating a pro se plaintiff.

If you're interested in learning more about Judge Posner's problems with the Seventh Circuit's treatment of pro se litigants, stay tuned:

*Posner wrote that he has a book coming out soon that explains his views on the topic — as well as the views of his former colleagues — "in considerable detail."*

Now *that* should be a juicy read! Judge Posner is famously candid, so don't expect him to go easy on ex-colleagues he disagrees with.

I followed up with Judge Posner and asked how his stepping down would advance the cause of pro se litigants at the Seventh Circuit. Wouldn't it be better for him to remain on the court and continue to advocate for their improved treatment?

Alas, it's a lost cause, in his view: "I had zero support from the other judges; I was a voice crying in the wilderness."

I also asked Posner whether he felt, in light of his comments about superannuated federal judges, whether he himself has been affected negatively by aging. He replied, in Posnerian fashion, "I think there should be compulsory retirement for all federal judges and Justices at age 80; I am as yet a mere child of 78.5."

2

**113**

Judge Posner, you will be missed. I don't know that I'd want a judiciary full of Richard Posners, but it sure was great to have one.

**David Lat is a lawyer turned writer**. He publishes Original Jurisdiction, a newsletter on Substack about law and legal affairs, and he writes for newspapers and magazines, including the New York Times, Washington Post, and Wall Street Journal. Prior to launching Original Jurisdiction, David founded Above the Law, one of the nation's most widely read legal news websites, and Underneath Their Robes, a popular blog about federal judges that he wrote under a pseudonym. He is also the author of a novel set in the world of the federal courts, Supreme Ambitions. **Before entering the media world, David worked as a federal prosecutor in Newark, New Jersey; a litigation associate at Wachtell, Lipton, Rosen & Katz, in New York; and a law clerk to Judge Diarmuid F. O'Scannlain of the U.S. Court of Appeals for the Ninth Circuit**. **David graduated from Harvard College and Yale Law School, where he served as an editor of the Yale Law Journal**.

https://abovethelaw.com/2017/09/the-backstory-behind-judge-richard-posners-retirement/?rf=1

# Exhibit 16

| | | |
|---|---|---|
| AC-46473 | ) | **Appeal Date: May 2, 2023** |
| | ) | **1st Amended Appeal: May 9, 2023** |
| **Docket No. HHD-CV19-6120472-S** | ) | **2nd Amended Appeal: May 26, 2023** |
| | ) | |
| Santander Bank, N.A. | ) | Appellate Court of Connecticut |
| vs. | ) | |
| Clark, Lillian J., et al. | ) | **May 26, 2023** |
| | ) | |

# <u>AMENDED PRELIMINARY STATEMENT OF ISSUES</u>

The *pro se* Defendant-Appellant Gordon Clark intends to present the following issues on

appeal:

1.) From April 25, 2023 through May 19, 2023, *Superior Court of Hartford*, Judge

Claudia A. Baio, issued nineteen (19) Court Orders, which denied the *pro se*

Appellants' their constitutional rights under the *Constitution of the State of*

*Connecticut*, which include, but are not limited to repeated violations of *pro se*

Appellants' **right to equal protection under the law**, by denying the *pro se*

Appellants their **due process of law rights to a jury trial, discovery, witnesses,**

**exhibits, exculpatory evidence, and testimony**.


2.) The *Superior Court of Hartford*, trial court, has failed to establish **subject matter**

**jurisdiction** over this matter, based on three (3) *Supreme Court of Connecticut*

rulings (**Please see: Docket Entry 205.00**).


3.) The *Superior Court of Hartford*, trial court, has lost **in personam jurisdiction** over

this matter, due to the death of *pro se* Defendant-Decedent-Appellant Lillian J.

Clark's, passing on October 18, 2020; and of the Plaintiff-Appellee's *subsequent*

1

**116**

*and repeated failure* to make a timely claim upon which relief can be granted against the *Estate of Lillian J. Clark* and/or its sole fiduciary and sole beneficiary, *pro se* Defendant-Appellant, Gordon Clark, when repeated demanded (five (5) times) to do so by the *pro se* Defendant-Appellant, Gordon Clark, who has and continues to contest the validity and veracity of Plaintiff-Appellee's Complaint (foreclosure lawsuit) (**Please see: Docket Entry 226.00**).

4.) The *Superior Court of Hartford*, trial court, has repeatedly denied the *pro se* Defendant-Appellant, Gordon Clark, his rights to **due process of law** by denying said *pro se* Defendant-Appellant a **fair trial of the facts and law**, which included, but was not limited to, the denial of discovery (production of documents); and the denial of a reasonable amount of time to complete discovery (interrogatories and depositions); and the denial of exculpatory witnesses (subpoenas); and the denial of all exhibits; and the denial of a jury trial; and the denial of a reasonable amount of time for a *pro se* Defendant to prepare for trial, etc. (**Please see: Second (2nd) Amended Appeal (May 26, 2023), which includes nineteen (19) Court Orders**).

5.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 205.86**), denying *pro se* **DEFENDANTS' MOTION FOR JUDGMENT IN ACCORDANCE WITH THREE (3) OPINIONS OF THE SUPREME COURT OF CONNECTICUT** (**Please see: Docket Entries – 205.00, and 205.86**), without issuing a *Memorandum of Decision*.

6.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 221.87**), denying *pro se* **DEFENDANTS' MOTION TO COMPEL PLAINTIFF SANTANDER BANK, N.A. TO PRODUCE DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS (Please see: Docket Entries - 221.00, 221.86, and 221.87)**, without issuing a *Memorandum of Decision*.

7.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 222.86**), sustaining **PLAINTIFF'S OBJECTION TO THE REQUEST FOR PRODUCTION (Please see: Docket Entries - 222.00, and 222.86)**, without issuing a *Memorandum of Decision*.

8.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 247.86**), granting **PLAINTIFF'S MOTION FOR ORDER OF COMPLIANCE (Please see: Docket Entries - 247.00, and 247.86)**, without issuing a *Memorandum of Decision*.

9.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 1, 2023, (**Please see: Docket Entry - 253.86**), overruling *pro se* **DEFENDANTS' OBJECTION TO PLAINTIFF SANTANDER BANK, N.A.'S FRAUDULENT FILING OF CERTIFICATE OF CLOSED PLEADINGS; AND DEFENDANTS' RESERVATION OF RIGHT TO FILE MOTIONS TO AMEND PLEADINGS UPON COMPLETION OF DISCOVERY, AND RESERVATION OF RIGHT TO A JURY**

**TRIAL (Please see: Docket Entries - 253.00, and 253.86)**, without issuing a *Memorandum of Decision.*

10.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 1, 2023, (**Please see: Docket Entry - 255.86**), denying *pro se* **DEFENDANTS' MOTION TO STRIKE PLAINTIFF SANTANDER BANK, N.A.'S FILING OF FRAUDULENT CERTIFICATE OF CLOSED PLEADINGS** (**Please see: Docket Entries – 255.00, and 255.86**), without issuing a *Memorandum of Decision.*

11.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 2, 2023, (**Please see: Docket Entry - 256.86**), denying *pro se* **DEFENDANTS' MOTION FOR SANCTIONS AGAINST ATTORNEYS JEFFREY M. KNICKERBOCKER, AND ADAM L. BENDETT, AND BENDETT & MCHUGH, P.C. FOR ITS ONGOING ABUSE OF COURT PROCEEDINGS AGAINST PRO SE DEFENDANTS, WHICH INCLUDES, BUT IS NOT LIMITED TO THE FILING OF A FRAUDULENT CERTIFICATE OF CLOSED PLEADINGS** (**Please see: Docket Entries – 256.00, and 256.86**), without issuing a *Memorandum of Decision.*

12.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 2, 2023, (**Please see: Docket Entry - 257.86**), denying *pro se* **DEFENDANTS' MOTION FOR CONTINUANCE OF A JURY TRIAL** (**Please see: Docket Entries – 257.00, and 257.86**), without issuing a *Memorandum of Decision.*

13.)     *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 2, 2023, (**Please see: Docket Entry - 263.86**), denying *pro se*

**EMERGENCY MOTION FOR ORAL ARGUMENT RECONSIDERATION-**

**REARGUMENT OF MOTIONS 205.00, 221.00, AND 247.00** (**Please see:**

**Docket Entries – 263.00, and 263.86**), without issuing a *Memorandum of*

*Decision*.


14.)     *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 2, 2023, (**Please see: Docket Entry - 272.86**), granting

**PLAINTIFF'S MOTION TO STRIKE JURY CLAIM (Please see: Docket**

**Entries - 272.00, and 272.86)**, without issuing a *Memorandum of Decision*.


15.)     *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 2, 2023, (**Please see: Docket Entry - 275.86**), sustaining

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTIONS 255.00, 256.00,**

**257.00 AND 263.00 (Please see: Docket Entries - 275.00, and 275.86)**,

without issuing a *Memorandum of Decision*.


16.)     *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 2, 2023, (**Please see: Docket Entry - 281.86**), granting

**PLAINTIFF'S MOTION FOR ORDER TO FIND NO APPELLATE STAY**

**(Please see: Docket Entries - 281.00, and 281.86)**, without issuing a

*Memorandum of Decision*.


17.)     *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

5

on May 3, 2023, (**Please see: Docket Entry - 276.86**), granting

**PLAINTIFF'S MOTION FOR THE COURT TO TAKE JUDICIAL NOTICE**

**(Please see: Docket Entries - 276.00, and 276.86)**, without issuing a

*Memorandum of Decision*.

18.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 3, 2023, (**Please see: Docket Entry - 283.86**), denying *pro se*

**DEFENDANTS' EMERGENCY MOTION TO SUBPOENA JOANNA**

**WHEELER OF SANTANDER BANK, N.A. (Please see: Docket Entries –**

**283.00, and 283.86**), without issuing a *Memorandum of Decision*.

19.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 3, 2023, (**Please see: Docket Entry - 284.86**), overruling *pro se*

**DEFENDANTS' OBJECTION TO ATTORNEY JEFFREY M.**

**KNICKERBOCKER'S FRAUDULENT LIST OF EXHIBITS FILING, AND**

**FAILURE TO SUBMIT A WITNESS LIST TO THE PRO SE DEFENDANTS;**

**AND THIS COURT'S FAILURE TO ENTER A TRIAL MANAGEMENT**

**ORDER BEFORE TRIAL TO THE PRO SE DEFENDANTS (Please see:**

**Docket Entries - 284.00, and 284.86)**, without issuing a *Memorandum of*

*Decision*.

20.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 3, 2023, (**Please see: Docket Entry - 285.86**), denying *pro se*

**DEFENDANTS' MOTION FOR SANCTIONS AGAINST ATTORNEYS**

**JEFFREY M. KNICKERBOCKER, AND ADAM L. BENDETT, AND**

**BENDETT & MCHUGH, P.C. FOR ITS ONGOING ABUSE OF COURT PROCEEDINGS AGAINST PRO SE DEFENDANTS, WHICH INCLUDES, BUT IS NOT LIMITED TO THE FILING OF A FRAUDULENT LIST OF EXHIBITS FILING, AND FAILURE TO SUBMIT A WITNESS LIST TO THE PRO SE DEFENDANTS** (**Please see: Docket Entries – 285.00, and 285.86**), without issuing a *Memorandum of Decision*.

21.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order (*Memorandum of Decision*) on May 19, 2023, issuing judgment in favor of Plaintiff *Santander Bank, N.A.'s* Complaint, and also issuing judgment of *Foreclosure by Sale* against *pro se* Defendants (**Please see: Docket Entry – 292.00**).

22.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 19, 2023, against *pro se* Defendants, ordering *Foreclosure by Sale* on August 26, 2023 (**Please see: Docket Entry – 292.10**).

23.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order (*Judgment*) on May 19, 2023, against *pro se* Defendants, ordering *Judgment of Foreclosure by Sale* (**Please see: Docket Entry – 293.00**).

24.) Lastly, *for what it is worth*, the *pro se* Appellant, Mr. Clark, has **repeatedly experienced first-hand** over the past more than three (3) years, **unfair, unjust, illegal, unlawful, unconstitutional, un-American, and immoral maltreatment**, that is, the **denial of his constitutionally protected due**

7

*process of law rights* throughout this arduous judicial process; and

therefore, Mr. Clark has **first-hand knowledge** that many, *if not most*,

judicial officers, who are **supposed to be (speak and act)** public servants,

**unashamedly display their disdain, unprofessionalism, incompetency,**

**dishonesty, and even outright discrimination and hatred** for *pro se*

litigants. And if anyone doubts these facts, one only has to ask the

**esteemed, distinguished, honorable, and honest** Judge Richard Posner

of the *United States Court of Appeals for the Seventh (7th) Circuit* why he

retired early, which **tragically and sadly** had to do with how the judiciary and

his colleagues (public servants) **repeatedly and systemically mistreated**

**pro se litigants** (**Please see attached article: Exhibit A -** *The Backstory*

*Behind Judge Richard Posner's Retirement*).


## CERTIFICATION

I, Gordon Clark, hereby certify that, pursuant to **Connecticut General Statutes § 42-110g(c)**, and as **required by law**, a copy of this **AMENDED PRELIMINARY STATEMENT OF ISSUES** will be mailed via *USPS Certified Mail* to the *Connecticut Attorney General*, Mr. William Tong, and the *Connecticut Commissioner of the Department of Consumer Protection*, Ms. Michelle H. Seagull.

Attorney General William Tong
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
**Mailed via** *USPS Certified Mail*

Commissioner Michelle H. Seagull
Department of Consumer Protection
450 Columbus Boulevard, Suite 901
Hartford, CT 06103-1840
**Mailed via** *USPS Certified Mail*

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on May 26, 2023, by *pro se* Appellant Gordon Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# CERTIFICATE OF SERVICE

I, *pro se* Appellant Gordon Clark, certify that a copy of the above **AMENDED**

**PRELIMINARY STATEMENT OF ISSUES** will be served via *electronic service* on May 26,

2023, to the following:

Jeffrey M. Knickerbocker, Esq.
c/o Bendett & McHugh, P.C.
270 Farmington Avenue
Farmington, CT 06032
860.255.5008
jknickerbocker@bmpc-law.com
**Served via *electronic service***

It is also certified that this document does not contain any names or other personal

identifying information that is prohibited from disclosure by rule, statute, court order, or

case law.

Dated and signed at Enfield, Connecticut, on May 26, 2023, by *pro se* Appellant Gordon

Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit
# 17

**Anthony G. PETRELLO and Cynthia A. Petrello, Plaintiffs-Counterclaim-Defendants-Appellees,**

**v.**

**John C. WHITE, Jr. and White Investment Limited Partnership, Defendants-Counterclaimants-Appellants.**

Docket Nos. 06-3624, 07-3812.

United States Court of Appeals, Second Circuit.

Motion Submitted: February 19, 2008.

Decided: July 10, 2008.

112    *112 Berg & Androphy, Houston, Texas (David H. Berg, Houston, TX, of counsel), for Plaintiffs-Counterclaim-Defendants-Appellees.

Greenberg Traurig, New York, N.Y. (Brian S. Cousin, Jonathan E. Goldberg, New York, NY, of counsel), for Defendants-Counterclaimants-Appellants.

Before: KEARSE, CALABRESI, and KATZMANN, Circuit Judges.

KEARSE, Circuit Judge:

Defendants John C. White ("White") and White Investment Limited Partnership have appealed from (a) an order of the United States District Court for the Eastern District of New York, Denis R. Hurley, *Judge*, granting partial summary judgment in favor of plaintiffs Anthony G. Petrello ("Petrello") and Cynthia A. Petrello (collectively "the Petrellos) on their claim for specific performance of a contract for the sale of land, and (b) an order denying defendants' motion for reconsideration of that order. Plaintiffs move to dismiss the appeals principally on the ground that they are untimely. Because the district court has not entered either a final judgment disposing of all the issues in the case or a partial final judgment pursuant to Fed.R.Civ.P. 54(b), and because the orders challenged are neither injunctions nor orders relating to injunctions as specified in 28 U.S.C. § 1292(a)(1), we dismiss the appeals for lack of an appealable order rather than for untimeliness.

## I. BACKGROUND

For purposes of these appeals and the present motion to dismiss, we summarize the pertinent history of this litigation largely as it is described in the opinion of the district court granting specific performance, reported at 412 F.Supp.2d 215 (2006) ("*Petrello I*"), familiarity with which is assumed. In 1998, White, the owner of a 57-acre farm in the Hamlet of Sagaponack, in the Town of Southampton, New York, agreed to sell the Petrellos 9.56 acres of his farm for $2.1 million. The contract, which was signed in the summer of 1998, provided that the closing would take place on or about September 10, 1998, subject to White's obtaining approval from state and local authorities for the subdivision of his property. Approval was not forthcoming until June 2000.

In the meantime, the price of real estate had skyrocketed, and the 9.56 acres at issue were appraised to be worth between $14.5 and $16 million. In late 2000, and again in April 2001, White's attorney sent Petrello closing documents, and Petrello signed and returned them; White, however, refused to sign.

As a result of White's refusals, the Petrellos commenced the present action, demanding, *inter alia*, specific performance of the contract and damages for White's delay in closing the sale. Defendants answered and asserted various counterclaims. After settlement attempts failed, plaintiffs moved for partial summary judgment, arguing that all of defendants' counterclaims and affirmative defenses lacked merit as a matter of law and requesting that the court award specific performance of the contract and direct White to close title in accordance with its terms.

In *Petrello I*, decided on February 2, 2006, the district court granted partial summary judgment to the Petrellos, stating that it "grants Petrello's request for specific performance
113    according to the terms of the 1998 Contract of Sale." 412 *113 F.Supp.2d at 231; *see also id.* at 236 ("Plaintiffs' motion for summary judgment is GRANTED and the Court ORDERS specific performance of the August 1998 Contract of Sale."). The court dismissed all of the counterclaims defendants had previously asserted, *see id.* at 226, 229, 233, but granted them leave to assert two new counterclaims, *see id.* at 236.

Following a period of some six months, during which the parties, *inter alia*, argued over whether the district court should enter a partial final judgment pursuant to Rule 54(b) and whether the portion of *Petrello I* that granted plaintiffs summary judgment on their specific performance claim was immediately appealable in the absence of such a judgment, defendants filed a notice of appeal from *Petrello I* on August 2, 2006. On August 4, defendants moved in the district court to stay, reconsider, and vacate *Petrello I*. In light of that motion — which plaintiffs opposed as untimely — plaintiffs were allowed to withdraw their Rule 54(b) motion without prejudice, and defendants were allowed to withdraw their appeal without prejudice.

Following the parties' additional unsuccessful efforts at settlement, the district court, in a Memorandum of Decision and Order dated August 7, 2007, reported at 2007 WL 2276300 ("*Petrello II*"), denied defendants' motion to reconsider and vacate *Petrello I*, finding the motion both untimely and lacking in merit. The court stated that it would "stay specific performance of the Contract subject to Defendants' restoration of their appeal within thirty (30) days of the date hereof." *Id.* at *12.

In September 2007, defendants' original appeal was reinstated. In addition, defendants filed a notice of appeal challenging *Petrello II*. Plaintiffs have moved to dismiss both appeals on the principal ground that they are untimely. For the reasons that follow, we dismiss the appeals instead for lack of an appealable order.

## II. DISCUSSION

The jurisdiction of the federal courts of appeals to entertain appeals from decisions of the district court is circumscribed by statute. Pursuant to 28 U.S.C. § 1291, we have jurisdiction to hear timely appeals from final judgments or from partial final judgments entered pursuant to Fed.R.Civ.P. 54(b). A final judgment or order is one that conclusively determines all pending claims of all the parties to the litigation, leaving nothing for the court to do but execute its decision. *See, e.g., Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). An appealable partial final judgment is one that adjudicates fewer than all of the pending claims and is entered upon the court's "express[ ] determin[ation] that there is no just reason for delay," Fed.R.Civ.P. 54(b). *See, e.g., Citizens Accord, Inc. v. Town of Rochester,* 235 F.3d 126, 128 (2d Cir.2000). Pursuant to 28 U.S.C. § 1292, we also have jurisdiction to hear timely appeals from interlocutory orders of the types specified in that section. To the extent invoked on these appeals, that section provides the courts of appeals with jurisdiction over appeals from

[i]nterlocutory orders of the district courts of the United States, ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.

28 U.S.C. § 1292(a)(1).

In the present action, there is no suggestion that appellate jurisdiction rests on § 1291. Plaintiffs' claims for damages remain pending for trial; no final judgment has been entered. *See*
114    *generally Liberty Mutual Insurance Co. v. Wetzel,* *114 424 U.S. 737, 744, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976)* (partial summary judgments "are by their terms interlocutory... and[,] where assessment of damages or awarding of other relief remains to be resolved[,] have never been considered to be 'final' within the meaning of 28 U.S.C. § 1291"). Nor has a partial

final judgment been entered here pursuant to Rule 54(b). Rather, invoking § 1292(a)(1), defendants contend that the district court's specific performance order in *Petrello I* is appealable as an interlocutory injunction, and that the court's refusal in *Petrello II* to vacate that order is appealable as an order refusing to dissolve an injunction. We disagree.

Requirements for the form and content of a proper injunction are set forth in the Federal Rules of Civil Procedure:

Every order granting an injunction and every restraining order must:

    (A) state the reasons why it issued;

    (B) state its terms specifically; and

    (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required.

Fed.R.Civ.P. 65(d)(1) (emphases added). This Rule "reflects Congress' concern with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds." *Sanders v. Air Line Pilots Ass'n*, 473 F.2d 244, 247 (2d Cir.1972); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2955, at 308-09 (2d ed.1995). Thus, Rule 65(d) "is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden" or required. *Fonar Corp. v. Deccaid Services, Inc.*, 983 F.2d 427, 430 (2d Cir.1993) (internal quotation marks omitted).

An interlocutory order that grants partial summary judgment without "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify [an] injunction[]" — or without having such an effect — is not ordinarily appealable under § 1292(a)(1). *See, e.g.*, *Cuomo v. Barr*, 7 F.3d 17, 19 (2d Cir.1993); *see also* *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 632 (2d Cir.1995) (an order directing a party "to remove any liens she may have asserted on the property that [wa]s subject to her mortgages" was immediately appealable because it had "the practical effect of granting injunctive relief within the meaning of section 1292(a)(1) [as] it [wa]s directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint," and "the appealing party demonstrate[d] serious, perhaps irreparable, consequences" if the order were not immediately appealable (internal quotation marks omitted)); *United States v. Bedford Associates*, 618 F.2d 904, 914-16 (2d Cir.1980) (finding a substantive specific-performance-related condition imposed by the district court in an order granting a preliminary injunction to be appealable by the party in whose favor the preliminary injunction was conditionally granted).

We have not heretofore had occasion to consider whether an interlocutory order granting specific performance of a contract is immediately appealable under § 1292(a)(1) as an injunction, but we have little doubt that if a given specific-performance order is injunctive in character, it would be so appealable. In *Union Oil Co. of California v. Leavell*, 220 F.3d 562 (7th Cir.2000), for example, the Court of Appeals for the Seventh Circuit considered the appealability of a district court order [*]115 that was not denominated an injunction but that granted the plaintiff partial summary judgment on its claim for specific performance of a environmental-cleanup contract and ordered the defendants to perform "eight [specified] tasks," *id.* at 565. That order was "injunctive in nature, requiring the [defendants] to perform enumerated steps under threat of the contempt power," *id.* at 566, and the court of appeals concluded that it had jurisdiction under § 1292(a)(1).

Similarly, in *Sheet Metal Workers' International Ass'n Local 19 v. Herre Bros., Inc.*, 201 F.3d 231 (3d Cir.1999), the Court of Appeals for the Third Circuit concluded that it had jurisdiction under that section to review an interlocutory order granting specific performance of a collective bargaining agreement. In that case, the district court's August 27, 1997 order for specific performance, which was not denominated an injunction, directed the defendant to, *inter alia*, "specifically perform the 1995 contract between the Union and the [employers' bargaining association] until it expired in 1998." *Id.* at 237. The order to "*perform ... until*" a specific date, plus the fact that the district court did not indicate that that part of its order, unlike certain other parts, was to be stayed until final judgment persuaded the court of appeals "that the court intended the order of specific performance to be an injunctive order that was effective immediately." *Id.* at 238 (emphasis in original). The August 27, 1997 order also "required [the defendant] to provide the Union with an accounting of all hours worked by nonunion workers between September 27, 1996, and *the date of the order*," *id.* at 237 (emphasis added), clearly indicating that use of nonunion workers was to cease as of the date of the order; and the memorandum accompanying the specific-performance order confirmed that the court was ordering the defendant "'to hire all of its workers from the union hiring hall,'" "for the remainder of [the contract] term,'" *id.* at 237-38.

On the other hand, an order for specific performance that lacks specificity is not a proper injunction. In *Trans Union Credit Information Co. v. Associated Credit Services, Inc.*, 805 F.2d 188 (6th Cir.1986) ("*Trans Union*"), which apparently was an appeal from a final judgment and hence did not concern appealability, the Court of Appeals for the Sixth Circuit reviewed a decree that granted specific performance of a service contract "[w]ithout providing much detail," *id.* at 191. The court of appeals observed that

    [i]n its explanation of the acts to be performed under its decree of specific performance, the district court merely directed the parties to comply with the terms of the service agreement. Without more detail, this direction contravenes Fed.R.Civ.P. 65(d) which provides in part:

    Every order granting an injunction and every restraining order shall ... *be specific in terms*; shall describe in reasonable detail, and not by reference to the complaint or *other document*, the act or acts to be restrained....

805 F.2d at 193 (emphases in *Trans Union*). The court of appeals concluded that the specific-performance order was unenforceable as an injunction absent an express enumeration of "the obligations each party has under the decree." *Id.* at 194.

In the present case, in granting specific performance, the district court simply stated in its opinion that it "grants Petrello's request for specific performance *according to the terms of the 1998 Contract of Sale*," *Petrello I*, 412 F.Supp.2d at 231 (emphasis added), and that "Plaintiff's motion for summary judgment is GRANTED and the [*]116 Court ORDERS specific performance of the August 1998 Contract of Sale," *id.* at 236. We think it plain that this language in the court's opinion is insufficient, for two principal reasons, to constitute an injunction.

First, *Petrello I* does not instruct White to perform specific acts; it does not describe the required conduct in any detail, much less "in reasonable detail" as required by Rule 65(d)(1). Nor can the acts that White is required to perform be ascertained — or the order be complied with — without consulting an "other document," Fed.R.Civ.P. 65(d)(1)(C), to wit, "the August 1998 Contract of Sale" to which *Petrello I* referred.

Second, even if the district court had repeated the pertinent terms of the August 1998 Contract of Sale *in haec verba*, obviating the need to consult another document in order to ascertain the terms of the injunction, we would conclude that the order did not constitute an injunction because it did not impose any deadline for White to perform any act. While the usual injunction is designed to maintain the status quo, and thus normally does not require the specification of deadlines for action, an injunction that requires a party to take affirmative actions must — in order that he may be sufficiently cognizant of his obligations to avoid being held in contempt — be sufficiently detailed to enable him to ascertain from the injunction the time by which he must take the required steps. Here, despite the district court's statement in *Petrello II* that it "stay[ed] specific performance of the Contract subject to Defendants' restoration of their appeal within thirty (30) days," 2007 WL 2276300, at * 12 (emphasis added), the fact remains that no date was specified by the court for White to sign and deliver documents, or participate in a closing, or perform any other acts that would be necessary for him to transfer title to plaintiffs. Without any specification of a time by which White was to act, the specific-performance order did not have injunctive effect. Indeed, in the absence of that detail, if *Petrello I's* 2006 specific-performance order were to be deemed injunctive and were applied literally — i.e., as requiring White to perform "according to the terms of the 1998 Contract of Sale" — White would, in theory, have been in contempt at the instant that *Petrello I* was entered, for that contract provided that the "[c]losing shall take place ... on or about September 10[,] 1998...."

Given the absence of an order that itself details the actions that White is required to perform and the absence of any specified deadline for performance of any act, we cannot regard the district court's granting of partial summary judgment in *Petrello I*, ordering specific performance, as an injunction. Accordingly, that order is not now appealable.

Further, as the specific performance order in *Petrello I* is not appealable, *Petrello II's* denial of reconsideration is likewise not appealable. *See generally* *Blanco v. United States*, 775 F.2d 53, 56 (2d Cir. 1985).

## CONCLUSION

**128**

We conclude that the orders challenged by defendants are not appealable orders for the reasons discussed above, and on that basis we grant plaintiffs' motion to dismiss the appeals.

No costs.

# Exhibit 18

**UNITED STATES of America, Appellee,**

v.

**Moustapha MAGASSOUBA, Defendant-Appellant.**

Docket No. 06-2628-cr.

**United States Court of Appeals, Second Circuit.**

Argued: May 10, 2007.

**Decided: September 19, 2008.**

391 *391 Andrew R. Polland (John P. Cooney, Jr., on the brief), New York, NY, for Defendant-Appellant.

Maria E. Douvas, Assistant United States Attorney (Jonathan S. Kolodner, Assistant United States Attorney, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

Before: B.D. PARKER, RAGGI, and WESLEY, Circuit Judges.

REENA RAGGI, Circuit Judge:

Defendant Moustapha Magassouba appeals from a May 10, 2006 interlocutory order of the United States District Court for the Southern District of New York (Deborah A. Batts, *Judge*) that (1) denied his motion to dismiss the indictment charging him with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A), 846; and (2) ordered his hospitalization pursuant to 18 U.S.C. § 4241(d)(2)(A) for psychiatric treatment, including the involuntary administration of antipsychotic medication. On this appeal, Magassouba does not dispute the merits of the district court's findings that (a) he is incompetent to stand trial, *see* 18 U.S.C. § 4241(d); (b) there is a substantial probability that, with treatment, he could attain competency in the foreseeable future, *see id.* § 4241(d)(2)(A); or (c) the circumstances of his case satisfy the criteria for involuntary treatment specified in *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). Instead, he argues that, at the time of the challenged order, the district court lacked authority to commit him for psychiatric treatment. He further submits that the length of his unauthorized confinement violated due process so as to require the dismissal of his indictment and his release from custody.

Magassouba's arguments largely depend on the construction of § 4241(d), a statute that authorizes a district court to commit a mentally incompetent defendant to custodial hospitalization (1) for a reasonable period "not to exceed four months" to determine whether he can attain competency to stand trial, 18 U.S.C. § 4241(d)(1); and, (2) if the court finds a 392 "substantial probability" that the defendant can attain such "§392 competency in the "foreseeable future," for an additional "reasonable period" of appropriate treatment, *id.* § 4241(d)(2) (A). Magassouba submits that a district court is only authorized to order additional hospitalization if it makes the requisite substantial probability finding under § 4241(d)(2)(A) within the term of a defendant's § 4241(d)(1) confinement, which was not done in this case.

The government submits that we lack jurisdiction to hear this interlocutory appeal. Alternatively, it challenges defendant's arguments on the merits.

For the reasons stated herein, we conclude that the collateral order doctrine supports our exercise of jurisdiction. We further conclude that the district court did not exceed its authority in ordering Magassouba's § 4241(d)(2)(A) commitment for additional custodial hospitalization and involuntary psychiatric treatment. We agree with defendant that § 4241(d) does not permit an incompetent defendant to be held in *uninterrupted* custodial hospitalization unless a district court finds, before the expiration of a defendant's initial term of § 4241(d)(1) confinement (which cannot exceed four months), that circumstances warrant additional hospitalization pursuant to § 4241(d)(2)(A). Thus, when a defendant's term of § 4241(d)(1) confinement expires and no § 4241(d)(2) order has yet been entered, the Attorney General lacks statutory authority to hold a defendant in further custodial hospitalization. But we cannot agree that the statute also limits a district court's authority to enter a § 4241(d)(2)(A) order to the term of § 4241(d)(1) confinement. Such a construction could itself raise constitutional concerns to the extent it failed to afford a defendant a reasonable period to secure and present evidence in opposition to additional § 4241(d)(2)(A) hospitalization, particularly hospitalization involving involuntary medication. *See Sell v. United States*, 539 U.S. at 180-81, 123 S.Ct. 2174.

In this case, it appears that the Attorney General exceeded his § 4241(d) authority by holding Magassouba in custodial hospitalization for a few weeks longer than the four months authorized by the district court's § 4241(d)(1) order. We conclude that this error was harmless because Magassouba was not subjected to psychiatric treatment during this unauthorized hospitalization, and his general confinement was otherwise authorized by the Bail Reform Act, 18 U.S.C. § 3142. Thus, the error could not deprive the district court of its authority subsequently to enter the challenged § 4241(d)(2)(A) order.

We further conclude that Magassouba's nineteen-month detention from the time he was found incompetent until the date of the challenged order was not constitutionally unreasonable so as to violate due process. Magassouba's refusal to accept treatment that his own lawyers acknowledged would likely render him competent required the district court carefully to consider a host of medical and legal factors that due process demands be satisfied before a defendant can be hospitalized for involuntary medication. *See Sell v. United States*, 539 U.S. at 180-81, 123 S.Ct. 2174.

Accordingly, we affirm the challenged order denying dismissal of the indictment and ordering further hospitalization and treatment pursuant to 18 U.S.C. § 4241(d)(2).

# I. *Background*

## A. *The Indictment and § 3142 Order of Detention*

Moustapha Magassouba is a citizen of Guinea who has resided in the United States since 1990. On August 12, 2003, a grand jury sitting in the Southern District of New York charged 393 Magassouba in a *393 one-count indictment with conspiracy to distribute one kilogram or more of heroin, a crime carrying a sentencing range from ten-years-to-life incarceration. *See* 21 U.S.C. §§ 841(a)(1) & (b)(1)(A), 846. This charge gave rise to a presumption of detention under the Bail Reform Act, 18 U.S.C. §§ 3142(e), (f)(1)(C) (establishing rebuttable presumption "that no condition or combination of conditions will reasonably assure the [defendant's] appearance... and the safety of the community" for drug offenses carrying maximum prison sentence of ten years or more), and Magassouba was ordered detained under this statute without objection.

A few months later, in November 2003, defendant's initial attorney was relieved and present counsel was appointed by the court. At no time in the district court did past or present counsel challenge the § 3142 detention order or seek its amendment. On January 29, 2004, however, defense counsel raised a concern as to Magassouba's mental competence. To understand the proceedings that ensued and defendant's challenge on this appeal, it is necessary briefly to outline the federal statutory scheme for resolving the competency of criminal defendants.

## B. *The Statutory Scheme for Determining a Criminal Defendant's Competency*

### 1. *The Initial Competency Determination*

**131**

When a criminal defendant's competency is called into question, 18 U.S.C. § 4241(d) requires the district court to make a preliminary finding as to whether a preponderance of the evidence demonstrates that the defendant is, in fact, incompetent, i.e., whether a "mental disease or defect" renders him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." To make this determination, the district court must conduct a hearing at which the defendant, represented by counsel, is afforded an opportunity to testify and to call and confront witnesses. See 18 U.S.C. §§ 4241(a), (c) & 4247(d). Prior to this hearing, the district court "may order" a psychiatric or psychological examination of the defendant. Id. § 4241(b). To effect such examination, the court "may" order the defendant committed "to the custody of the Attorney General for placement in a suitable facility." Id. § 4247(b). This commitment may not "exceed thirty days," although the statute permits the director of the designated commitment facility to apply for a "reasonable extension ... not to exceed fifteen days." Id.

## 2. The Evaluation and Treatment of Incompetent Defendants

If the district court makes a preliminary finding of incompetence, the second step of the statutory scheme — at issue in this case — mandates the defendant's custodial hospitalization for evaluation and possible treatment. The district court "shall commit the defendant to the custody of the Attorney General," who "shall hospitalize the defendant for treatment in a suitable facility." Id. § 4241(d). Initially, such hospitalization seeks "to determine whether there is a substantial probability that in the foreseeable future [the defendant] will attain the capacity to permit the proceedings to go forward." Id. § 4241(d)(1). This evaluative hospitalization is limited to "a reasonable period of time, not to exceed four months." Id. Thereafter, "if the court finds that there is a substantial probability" that the defendant "will attain the capacity to permit the proceedings to go forward," the law provides for further hospitalization "for an additional reasonable period of time." Id. § 4241(d)(2)(A).

*394 ## 3. The Final Competency Determination

At the conclusion of the specified hospitalization commitment, if the court determines that the defendant has not attained the competency necessary to proceed to trial, § 4241(d) provides for the defendant to be referred for civil commitment pursuant to 18 U.S.C. §§ 4246 and 4248. If, however, the director of the hospital facility to which the defendant is committed determines that he has attained the requisite mental competency, the director shall so certify to the court, which must then hold another competency hearing. See 18 U.S.C. § 4241(e). If the court then finds by a preponderance of the evidence that the defendant is competent to stand trial, it "shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings." Id. Upon such discharge, the defendant is "subject to the provisions of chapters 207 and 227," which include the detention provisions of the Bail Reform Act. Id.

## C. The Competency Proceedings Leading to the Challenged Order

### 1. The District Court Finding of Magassouba's Incompetency

When, on January 29, 2004, defense counsel voiced concern about Magassouba's mental competency, the district court did not order confinement for examination pursuant to 18 U.S.C. §§ 4241(b) and 4247(b). Instead, on January 30, 2004, it granted the defense motion to have Magassouba, who was then in the Metropolitan Detention Center ("MDC") pursuant to the Bail Reform Act, 18 U.S.C. § 3142, examined at that Brooklyn facility by a private psychologist, Dr. Gary Robert Collins. In a report dated March 31, 2004, Dr. Collins expressed his expert opinion that Magassouba was incompetent to stand trial. Dr. Collins found that Magassouba suffered from a psychotic disorder, with the most likely diagnosis being Delusional Disorder, Mixed Type.[1] Dr. Collins concluded that, as a result of this disorder, the defendant lacked both a reasonable degree of rational understanding of the proceedings against him and a present ability to consult with his attorneys with a reasonable degree of rational understanding. The doctor recommended Magassouba's hospitalization for a full medical and psychiatric-neurological evaluation and possible treatment with antipsychotic medication.

On October 13, 2004, at a competency hearing held pursuant to 18 U.S.C. § 4241(a), the district court heard directly from Dr. Collins, and from the Drug Enforcement Administration agent who had arrested Magassouba and reviewed telephone conversations between defendant and his wife recorded while the former was incarcerated in this case. The court found by a preponderance of the evidence that the defendant was "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to assist properly in his defense,... and perhaps may not even understand the nature of the charges against him and the consequences of the proceedings." Hearing Tr., Oct. 13, 2004, at 76.

### 2. Magassouba's Commitment Pursuant to § 4241(d)(1)

395 At the conclusion of the October 13, 2004 hearing, the district court orally ordered *395 Magassouba committed pursuant to § 4241(d)(1) "to the custody of the Bureau of Prisons ['BOP'] for a period of 60 days, during which time he shall be placed in a suitable hospital setting so that he may receive treatment to restore competency and be evaluated further to determine whether there is a substantial probability that he will attain mental competency in the foreseeable future." Id. at 77. The BOP was ordered to detail its determination as to the probability of Magassouba regaining competency in a written report to be filed with the court "[w]ithin 30 days of the expiration of this 60 day order," id., in short, by January 11, 2005. The order granted the parties two weeks thereafter to file written responses to the BOP report, after which the court would schedule a second competency hearing "as soon as is practicable." Id.[2]

### 3. The Bureau of Prisons' § 4241(d)(1) Report

Various circumstances contributed to the BOP not filing its evaluation report until May 27, 2005, more than seven months after the district court's initial hospitalization order. Notably, on or about November 18, 2004, more than a month after the district court had orally ordered Magassouba hospitalized for evaluation, prosecutors learned that the order had not yet been executed by the United States Marshals Service, apparently because the marshals had never received notice of the directive. The government alerted the district court to this fact, and, on November 22, 2004, the court reduced its commitment order to writing. The order was entered on the docket on November 24, 2004, and presumably transmitted to the Marshals Service at or about that time.

A month later, on December 22, 2004, Magassouba was finally admitted to the BOP hospital facility in Butner, North Carolina ("Butner").[3] By letter dated December 28, 2004, Butner's Warden wrote to the district court requesting that the ordered evaluation period commence with Magassouba's arrival at Butner and that the period be extended from 60 days to four months, ending on April 20, 2005. The district court granted the Warden's request on January 4, 2004, ordering the BOP to submit its written findings 30 days after the close of this evaluation period, i.e., on May 20, 2005. The court also scheduled a competency hearing for June 15, 2005. No party objected to this amended § 4241(d)(1) order.

Approximately six weeks later, on February 15, 2005, defense counsel sent a letter to the government's attorneys requesting the BOP's prompt completion of Magassouba's evaluation and noting that "significant due process concerns" were implicated in the length of defendant's evaluation confinement. Cooney Letter to Douvas, Feb. 15, 2005. Nothing in the record before this court indicates that a copy of this letter was filed with the district court, or that defense counsel otherwise objected to or sought amendment of the schedule set by the district court.

396 On May 3, 2005, four months and two weeks after Magassouba arrived at Butner, officials at that facility informed the marshals that "[t]he period of study and observation concerning the [defendant] has *396 ended. He is now ready to be returned to [the Southern District of New York] for continuation of proceedings." Memorandum from Cruze, Inmate Systems Manager at FMC Butner, to U.S. Marshals Service, May 3, 2005. Nine days later, on May 12, 2005, deputy marshals transported Magassouba back to New York where he has since been housed at the Metropolitan Correction Center ("MCC") in Manhattan.

On May 27, 2005, one week after the court-ordered May 20, 2005 filing deadline, the BOP issued a twenty-page single-spaced report of its determination as to the probability of Magassouba's regaining competency. Like Dr. Collins, the evaluating BOP psychiatrist and psychologist diagnosed Magassouba to have a Delusional Disorder, Mixed Type. The doctors reported that this disorder "prevents [Magassouba] from possessing a rational understanding of the charge against him," which "inhibits his ability to assist in his own defense." BOP Evaluation at 7. Further, Magassouba's "mental disease causes him to be unable to communicate verbally in a meaningful fashion with his attorney," in part because it caused him to hold "delusional beliefs" about his counsel as well as the prosecutors. *Id.* at 8.

The BOP evaluators nevertheless determined that it was substantially likely that Magassouba could regain competency through a course of psychotropic medication, which they explained in some detail. At the same time, they noted that, while at Butner, Magassouba had "rigidly opposed" taking any such medication, insisting that he was "not mentally ill." *Id.* at 7. Because Magassouba did not pose a threat to himself or others at the hospital facility, Butner officials had concluded that he did not meet the BOP's administrative criteria for involuntary medication derived from <u>Washington v. Harper</u>, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). *Id.* at 9. Nevertheless, the BOP doctors reported that involuntary medication for purposes of restoring competency might be authorized by the court pursuant to <u>Sell v. United States</u>, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197. *Id.* In *Sell*, the Supreme Court had ruled that an incompetent defendant may be involuntarily medicated for the sole purpose of rendering him competent to stand trial only if four criteria are satisfied: (1) there are important government interests in trying the individual; (2) the treatment will significantly further those interests; (3) the treatment is necessary to further those interests, considering any less intrusive alternatives; and (4) the treatment is medically appropriate. *See id.* at 180-81, 123 S.Ct. 2174. While the BOP evaluators reported that the first factor was outside the scope of their medical expertise, they discussed in detail how the remaining three factors supported Magassouba's involuntary medication.

## 4. *The Parties' Joint Proposal for Treatment to Help Magassouba Attain Competency*

On June 3, 2005, within days of receiving the BOP report, the district court afforded the parties thirty days within which to submit responses. In a June 29, 2005 letter response, defense counsel did not complain that Magassouba had been detained beyond the time permitted by statute, or that the district court lacked authority to order his further commitment or treatment, the arguments raised on this appeal. Instead, defense counsel joined with the government in agreeing with the BOP's determination that Magassouba's "competence could be restored with the administration of antipsychotic medication." Cooney Letter to Judge Batts, June 29, 2005, at 1; see Douvas Letter to Judge Batts, July 1, 2005, at 1 (urging that

*397 defendant be treated according to plan proposed by defense "to restore defendant's competency status"). In a proposed order, submitted by defense counsel on July 13, 2005, with the government's consent, the parties urged the district court to order Magassouba hospitalized for treatment "with or without defendant's consent" according to a modified version of the BOP treatment plan "consistent with the goals of restoring defendant's competency status and/or diagnosing his psychiatric and medical condition." Proposed Order at 3, accompanying Polland Letter to Judge Batts, July 13, 2005.[4]

## 5. *The District Court's Request for Additional Information*

Despite the parties' agreement, the district court did not sign the jointly proposed order. Instead, on July 15, 2005, it ordered that, within thirty days, the prosecution and the BOP provide the court with more information to assist it in determining the propriety of involuntary treatment consistent with <u>Sell v. United States</u>, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197. To ensure the first *Sell* factor, *i.e.*, that the government's interest in bringing Magassouba to trial was sufficiently important to overcome the defendant's interest in refusing the involuntary administration of drugs (the one issue not addressed by the BOP in its evaluation), the district court instructed the government to submit a "written offer of proof" with respect to the charged crime. Order, July 15, 2005, at 1. The court further directed the BOP to explain more particularly why it was "medically appropriate forcibly to administer antipsychotic drugs to an individual who is (1) *not* dangerous *and* (2) *is* competent to make up his own mind about treatment." *Id.* at 2 (emphasis in original).

## 6. *The Parties' Responses and Renewed Request for Involuntary Treatment*

By letter dated August 15, 2005, the prosecution declined to provide the requested offer of proof, stating that the government's strong interest in pursuing Magassouba's prosecution could be inferred from the ten-year mandatory minimum sentence that he faced if convicted of the charged conspiracy. Dissatisfied with what it characterized as a "nonresponse response," the district court issued a new order on August 18, 2005, directing the government for a "second time" to provide an offer of proof. Order, Aug. 18, 2005, at 1. The prosecution complied by filing a sealed, *ex parte* submission on September 2, 2005.[5]

*398 Meanwhile, the BOP inexplicably failed to respond to the district court's July 15, 2005 order until November 10, 2005. Its belated submission explained that, although Magassouba posed no threat of harm and was competent to make medical treatment decisions, an involuntary treatment order was "medically appropriate" from a "cost/benefit standpoint," in that the "potential for benefit from psychotropic medication would far [outweigh] the potential for significant adverse reactions." BOP Addendum to Evaluation at 1-2.

Thereafter government and defense counsel submitted letters to the district court that reiterated their agreement that Magassouba was incompetent to stand trial and that psychotropic medication would likely restore his competency. They each requested that the court order such treatment, involuntarily if necessary.[6]

## 7. *The District Court's Efforts to Secure Magassouba's Voluntary Submission to Treatment*

Even after the parties had thus communicated for a second time their agreement on the propriety of an order authorizing defendant's involuntary medication, the district court opted to proceed more cautiously. On January 3, 2006, the court entered an order finding that Magassouba was incompetent to stand trial and likely to remain so absent medication. The order employed language strongly encouraging Magassouba's voluntary submission to medication, but it stopped short of authorizing involuntary administration:

> Without medication, Mr. Magassouba continues to be incompetent to proceed to trial. Mr. Magassouba has declined to be medicated. Mr. Magassouba has been found not to be a danger to others or to himself.

> Mr. Magassouba represents that he wishes to move forward in this matter. In order for this court to find him competent, however, Mr. Magassouba has to voluntarily accept and continue medication. Until that time, this Court's finding of his incompetence stands.

Order, Jan. 3, 2006, at 1.

By letter dated January 27, 2006, defense counsel advised the court that Magassouba had directed them to convey his unwillingness to accept medication voluntarily. On January 30, 2006, the government renewed its motion for involuntary medication. The next day, the court summarily denied the motion.

## 8. *Magassouba's Motion for Dismissal of the Indictment and Unconditional Release*

Two months later, on March 22, 2006, defense counsel moved for dismissal of the indictment and for Magassouba's unconditional release. Counsel argued — for the first time — that the district court lacked authority to order Magassouba's additional hospitalization and treatment pursuant to § 4241(d)(2)(A) because it had not made a finding of a substantial probability that the defendant would attain competence in the foreseeable future within four months of *399 defendant's § 4241(d)(1) commitment, as required by statute. Alternatively, counsel argued that defendant's continued confinement to attain competency exceeded the "reasonable" period contemplated by the statute and the Due Process Clause.

The prosecution opposed the motion in a letter dated April 26, 2006. It argued that Magassouba was not being detained in violation of § 4241(d) because his hospitalization under that statute had ended more than a year earlier. It submitted that Magassouba's present detention in the MCC was pursuant to the Bail Reform Act, 18 U.S.C. § 3142, and based on the court's unchallenged finding at the time of defendant's arraignment that he posed a presumptive risk of flight and danger to the community. To the extent Magassouba had not yet been

**133**

brought to trial because of his incompetence, the prosecution asserted that his ability to regain competence was undisputed. Examining government and defense experts agreed that, with recommended medication, there was a substantial probability that the defendant would attain competence in the foreseeable future. The reason this probability had not been realized was that defendant refused to take the prescribed medication. Under these circumstances, the prosecution argued that Magassouba should not be allowed to use his incompetence as both a shield to avoid trial and a sword to demand unconditional release. It urged the district court to take the steps necessary to bring the case to trial, *i.e.*, (1) formally find under § 4241(d)(2) a substantial probability that, with the recommended medication, Magassouba would attain competency; and (2) order that the recommended medication be administered, involuntarily if necessary pursuant to *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197.

## 9. *The Challenged Order Denying Dismissal and Ordering Involuntary Medication*

By order dated May 10, 2006, the district court denied Magassouba's motion for dismissal and release. In so ruling, the court rejected the defense argument that it had failed to make the findings required by § 4241(d)(2). The court observed that the requisite finding that, with treatment, Magassouba could regain competence was implicit in its order seeking further information as to the propriety of ordering such treatment to be administered even involuntarily. While expressing a general reluctance to order involuntary medication for a defendant who posed no danger to himself or others, the district court acknowledged that such an order might be warranted to "move the criminal process forward" when a defendant, such as Magassouba, deliberately refused treatment likely to render him competent to stand trial. Order, May 10, 2006, at 3. Specifically detailing how each of the four *Sell* factors were satisfied in the case, the court ordered Magassouba "committed to the custody of the Attorney General for psychiatric treatment, including the involuntary administration of anti-psychotic medication ... in accordance with the Proposed Treatment Plan set forth in Defense counsel's letter of June 29, 2005, and agreed to by the Government." *Id.* at 4-5.

Magassouba appeals this commitment order.

## II. *Discussion*

### A. *Jurisdiction*

The government submits that this court lacks jurisdiction to hear Magassouba's appeal because the challenged order is not a "final decision" of the district court. 28 U.S.C. § 1291. The final-decision rule applies with particular force in criminal cases, which we generally review *400 only after sentence has been imposed and a judgment of conviction entered. *See United States v. Robinson*, 473 F.3d 487, 490 (2d Cir.2007); *United States v. Olmeda*, 461 F.3d 271, 278 (2d Cir.2006); *United States v. Gold*, 790 F.2d 235, 237 (2d Cir.1986). An order denying a motion to dismiss an indictment is usually viewed as "interlocutory and not appealable." *United States v. Midland Asphalt Corp.*, 840 F.2d 1040, 1042 (2d Cir.1988).

Under the collateral order doctrine, the law nevertheless recognizes a small class of preliminary rulings, even in criminal cases, as final when they (1) conclusively resolve a disputed question that (2) is an important issue completely separate from the merits of the action, and that (3) would be effectively unreviewable on appeal from a final judgment. *See, e.g., Flanagan v. United States*, 465 U.S. 259, 265, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984) (and cases cited therein); *accord United States v. Robinson*, 473 F.3d at 490-91 (and cases cited therein). Applying this three-part test in *United States v. Gold*, 790 F.2d 235, this Court concluded that a § 4241(d)(1) commitment order was immediately appealable. Gold observed that the order was based on a finding that defendant was incompetent to stand trial, which was conclusive in requiring defendant's custodial hospitalization for up to four months. *See 790 F.2d at 239. A finding of present incompetency to stand trial was, moreover, distinct from the expected trial issue of Gold's competency to commit the charged crime. *See id.* at 238. Finally, the order was effectively unreviewable on appeal from a final judgment because if defendant were never tried or were tried and acquitted, there would be no appellate review, and if he were tried and convicted, no meaningful relief would be available. *See id.* at 239 (noting that "[w]hether or not the conviction were set aside, nothing could recover for the defendant the time lost during his confinement; probably no one could be held liable to him in damages for the loss of his liberty").

While *Gold's* reasoning as to the appealability of § 4241(d)(1) hospitalization commitment orders would seem to apply with equal force to § 4241(d)(2) orders for additional custodial hospitalization,[7] we note one concern in relying on its conclusion that the challenged order "conclusively determine[d] Gold's present right to be at liberty prior to trial." *Id. Gold* does not indicate whether the § 4241(d)(1) order was the sole ground for the defendant's confinement or whether he was also detained pursuant to 18 U.S.C. § 3142. *See id.* at 236 (noting simply that defendant "was arrested and sent to the United States Medical Center for Federal Prisoners in Springfield, Missouri" for preliminary competency examination). An observation in *United States v. Filippi* suggests that the answer might be relevant to the application of the collateral order doctrine. *See* 211 F.3d 649, 650-51 (1st Cir.2000) (holding that collateral order doctrine supported jurisdiction to review challenged § 4241(d)(1) order in case where defendant was not otherwise detained, while noting that he was "not being detained as a flight risk or danger to the community" under 18 U.S.C. § 3142). Whether the custodial *401 hospitalization pursuant to § 4241(d)(1) or (d)(2) of a defendant who is already generally detained pursuant to § 3142 qualifies as an appealable final order in every case is not something we need here decide because the § 4241(d)(2)(A) order here at issue not only commits Magassouba for an additional period of hospitalization, but also authorizes his involuntary medication.

In *Sell v. United States*, the Supreme Court ruled that a § 4241(d) order authorizing the involuntary medication of an incompetent defendant is an immediately appealable collateral order. 539 U.S. at 177, 123 S.Ct. 2174. *Sell* observed that (1) an involuntary medication order conclusively resolves the legal question of the defendant's right to refuse treatment, which (2) is a legal question of constitutional significance separate from the merits of the underlying criminal action, that (3) is effectively unreviewable on appeal from a final judgment because, by that time, the defendant would have undergone the compelled medication he sought to avoid. *See id.* at 176-77, 123 S.Ct. 2174 (noting that defendant "cannot undo that harm even if he is acquitted. Indeed, if he is acquitted, there will be no appeal through which he might obtain review"). Following this precedent, we conclude that the collateral order doctrine affords us jurisdiction over this appeal, because the challenged order authorizes Magassouba's involuntary medication while confined to a prison hospital facility.

In urging against this conclusion, the government argues that *Sell* is inapplicable to this case because Magassouba, unlike Sell, does not challenge the adequacy of the district court's findings supporting his involuntary medication. Rather, he challenges the timing of the district court's medication order, claiming that because the district court failed to find within four months of his initial § 4241(d)(1) confinement a substantial probability that he would attain competence with additional hospitalization, the district court lacked authority to enter the challenged May 10, 2006 order. The government submits that this challenge is akin to a speedy trial claim, which precedent holds is not immediately appealable. *See generally United States v. MacDonald*, 435 U.S. 850, 858-60, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978); *United States v. Reale*, 834 F.2d 281, 283 (2d Cir.1987). We are not persuaded.

The jurisdictional dismissal of a speedy trial challenge results in a defendant going to trial. If the trial results in acquittal, there is no harm to review. If it results in conviction, the alleged speedy trial error can be fully addressed on direct appeal. But the jurisdictional dismissal of an involuntary treatment challenge results in an action — forcible medication — that cannot be effectively reviewed and remedied after trial for reasons explained in *Sell*, 539 U.S. at 176-77, 123 S.Ct. 2174. This conclusion applies regardless of whether the defendant's ground for challenging the involuntary treatment order is the purported inadequacy of the district court's findings, as in *Sell*, or its alleged lack of authority to enter the order at all, as in this case. Thus, here, no less than in *Sell*, the challenged order conclusively resolves against the defendant the legal question of his right not to be subjected to involuntary psychiatric treatment. Here, as in *Sell*, that legal question is distinct from the merits of the underlying criminal action. *See generally United States v. Charters*, 829 F.2d 479, 484 (4th Cir.1987) (observing that court's authority over defendant's person is necessary prerequisite to any forcible medication order). Finally, in this case, as in *Sell*, once the defendant is forcibly medicated, the challenged treatment order is effectively unreviewable.

*United States v. Deshazer*, 451 F.3d 1221 (10th Cir.2006), cited by the government, *402 warrants no different conclusion. In that case, the Tenth Circuit ruled that an appeal from the denial of a motion to dismiss an indictment on grounds of prejudicial delay in resolving defendant's competency was "in reality, a disguised speedy-trial claim," and it dismissed the case for lack of jurisdiction. *Id.* at 1222. Although Magassouba, like deShazer, also appeals the denial of a dismissal motion based on delay in his competency proceedings, his case differs from *Deshazer* in a critical respect. In *Deshazer*, the district court had not ordered the defendant's involuntary medication. Thus, the net effect of jurisdictional dismissal in *Deshazer* was simply to allow the defendant's competency review to continue. If his case proceeded to trial, his claim that delay prejudiced his defense could be reviewed after judgment. By contrast, the immediate effect of jurisdictional dismissal in Magassouba's case will be his involuntary medication without any effective opportunity for appellate review of that action. *See Sell v. United States*, 539 U.S. at 176-77, 123 S.Ct. 2174.

**134**

Accordingly, because we conclude that this appeal, like that in Sell, satisfies the collateral order doctrine, we proceed to exercise jurisdiction.

## B. *The District Court Did Not Exceed Its Authority in Issuing the Challenged § 4241(d)(2)(A) Order*

Magassouba submits that a district court is not authorized to commit an incompetent defendant for "additional" hospital treatment pursuant to 18 U.S.C. § 4241(d)(2) unless it finds, before the conclusion of the defendant's § 4241(d)(1) hospitalization "not to exceed four months," a substantial probability that the defendant will attain competency in the foreseeable future. The government agrees that § 4241(d)(2) commitment cannot be authorized without the requisite substantial probability finding, but it disputes that such a finding must be made before the end of § 4241(d)(1) hospitalization.[8] Because the parties' disagreement depends on the proper construction of § 4241(d), this appeal raises a question of law that we review de novo. *See, e.g., United States v. Olmeda,* 461 F.3d at 278.

## 1. *The Term of a Defendant's Evaluative Hospitalization Under § 4241(d)(1) Does Not Set a Deadline Beyond Which a District Court Lacks Authority to Order Additional Restorative Hospitalization Under § 4241(d)(2)*

### a. *Background to the Enactment of 18 U.S.C. § 4241*

403   Before discussing the relevant text of § 4241, we recognize two well-established principles that necessarily underlie this statute. The first principle recognizes the sovereign's "[p]ower to bring an accused to trial" as "fundamental to a *403 scheme of `ordered liberty' and prerequisite to social justice and peace." *Illinois v. Allen,* 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring) (cited with approval in *Riggins v. Nevada,* 504 U.S. 127, 135-36, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992)). The second holds that, consistent with due process, "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (noting that principle was cited by Blackstone, 4 *William Blackstone, Commentaries* *24); *see Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *accord Harris v. Kuhlmann,* 346 F.3d 330, 349 (2d Cir.2003).

To accommodate these two principles, federal law has long allowed the government to commit an incompetent defendant to custody in order to render him competent to stand trial. The original statutes, 18 U.S.C. §§ 4244, 4246 (1949), provided no time limit on such confinement. To avoid constitutional concerns with the prospect of indefinite commitment, federal appeals courts imposed a "rule of reasonableness" on the statutes, construing them to allow commitment "only for a `reasonable period of time' necessary to determine whether there is a substantial chance of [the defendant] attaining the capacity to stand trial in the foreseeable future." *Jackson v. Indiana,* 406 U.S. 715, 733, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (citing relevant cases). In *Jackson,* the Supreme Court ruled that such a reasonableness requirement was mandated by due process. *Id.* at 731, 92 S.Ct. 1845 (proscribing "indefinite commitment of a criminal defendant solely on account of his incompetency to stand trial"). To comport with due process,

> a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal.

*Id.* at 738, 92 S.Ct. 1845.

Responding to due process concerns identified in *Jackson v. Indiana,* in 1984, Congress enacted 18 U.S.C. § 4241. *See* S.Rep. No. 98-225, at 236 (1984), U.S.Code Cong. & Admin.News 3182 (noting that, "[i]n accord with the Supreme Court's holding in *Jackson v. Indiana,* commitment under section 4241 may only be for a reasonable period of time necessary to determine if there exists a substantial probability that the person will attain the capacity to permit the trial to go forward in the foreseeable future"); *see also United States v. Strong,* 489 F.3d 1055, 1061 (9th Cir.2007) (observing that § 4241(d) "was enacted in response to the *Jackson* decision and echoed *Jackson*'s language"); *United States v. Donofrio,* 896 F.2d 1301, 1302 (11th Cir.1990) (same); *United States v. Shawar,* 865 F.2d 856, 864 (7th Cir.1989) (same); *United States v. Filippi,* 211 F.3d at 652 (same).

404   b. *The Statutory Text*

In considering Magassouba's argument that § 4241(d)(2)(A) did not authorize the district court to order "additional" custodial hospitalization in his case outside the time frame of its four-month § 4241(d)(1) order, we begin, as we must, with the language of the statute. *See, e.g., Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). Where "statutory language is unambiguous," and where "the statutory scheme is coherent and consistent," our inquiry need go no further. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (internal quotation marks omitted). In determining whether statutory language is ambiguous, we "reference... the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341, 117 S.Ct. 843; *accord United States v. Boccagna,* 450 F.3d 107, 114 (2d Cir.2006). "Only if we conclude that statutory language is ambiguous `do we resort ... to canons of construction and, if the meaning [still] remains ambiguous, to legislative history.'" *United States v. Boccagna,* 450 F.3d at 114 (quoting *Daniel v. Am. Bd. of Emergency Med.,* 428 F.3d 408, 423 (2d Cir.2005)). Among the canons of construction relevant to our resolution of any textual ambiguity is the rule of constitutional avoidance, which instructs that "where an otherwise acceptable construction of a statute would raise serious constitutional problems," a court should "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *see Clark v. Martinez,* 543 U.S. 371, 380-82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005); *United States v. Martinez,* 525 F.3d 211, 215-16 (2d Cir.2008); *United States v. Gonzalez,* 420 F.3d 111, 123-25 (2d Cir.2005).

Applying these principles to this case, we readily identify certain language in § 4241 as unambiguous on its face. The statute plainly states that, if a district court finds by a preponderance of the evidence that a defendant is mentally incompetent to stand trial, "the court *shall* commit the defendant to the custody of the Attorney General." 18 U.S.C. § 4241(d) (emphasis added). In short, in contrast to the discretion afforded district courts in deciding whether to commit a defendant for a preliminary competency examination, *see id.* § 4241(b) (providing that district court "may order" a psychiatric or psychological examination of defendant's competency to stand trial pursuant to § 4247(b)); *id.* § 4247(b) (providing that district court "may commit" defendant for competency examination pursuant to § 4241), once a defendant is found incompetent, commitment pursuant to § 4241(d) is mandatory. *See United States v. Ferro,* 321 F.3d 756, 761 (8th Cir.2003) (noting that although "[i]t is clear that the statutory scheme detailed by Congress in § 4241(d) provides the district court with the discretion to initially determine whether the defendant is competent to stand trial ... after determining that a defendant is incompetent ... a district court is required to commit the defendant to the custody of the Attorney General for a reasonable period of time to evaluate whether treatment would allow the trial to proceed"); *United States v. Filippi,* 211 F.3d at 651 (stating that statute establishes nondiscretionary general rule of commitment without a "case-by-case choice by the district court as to whether to incarcerate once the incompetency finding has

405   been made"); *United States v. Donofrio,* 896 F.2d at 1302 (holding that commitment under § 4241(d) is "mandatory" once court determines defendant to be incompetent); *405 United States v. Shawar,* 865 F.2d at 860 (holding that "plain meaning" of phrase "shall commit" is "that once a defendant is found incompetent to stand trial, a district court has no discretion in whether or not to commit him").

For a defendant such as Magassouba, already detained as a risk of flight and danger to the community pursuant to 18 U.S.C. § 3142, the commitment mandate of § 4241(d) might be viewed as duplicative in depriving him of basic liberty. But the text of § 4241(d) goes further, mandating both a particular place and condition of confinement: "[t]he Attorney General *shall hospitalize* the defendant *for treatment* in a suitable facility." 18 U.S.C. § 4241(d) (emphasis added). At the same time that § 4241(d) mandates custodial hospitalization and treatment for defendants found mentally incompetent to stand trial, two subsections of the statute limit the time and purpose of such commitments.

Section 4241(d)(1) authorizes custodial hospitalization

for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future [the defendant] will attain the capacity to permit the proceedings to go forward.

As this language makes plain, the initial purpose of custodial hospitalization is evaluative: "to determine whether there is a substantial probability that in the foreseeable future [the defendant] will attain the capacity to permit the proceedings to go forward." *Id.* Consistent with *Jackson v. Indiana,* an incompetent defendant may be hospitalized for such an evaluative purpose only for "a reasonable period of time, not to exceed four months." *Id.* This four-month limitation is, in fact, the only explicit time reference in § 4241, and the lack of any provision for its extension appears deliberate in light of § 4247(b), which authorizes commitment "not to exceed thirty days" to make an initial determination of a defendant's competency, but allows for a reasonable extension "not to exceed fifteen days." *See generally Hamdan v. Rumsfeld,* 548 U.S. 557, 578, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (noting "familiar principle of statutory construction" that "negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute"); *Lindh v. Murphy,* 521 U.S. 320, 326-30, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (same).

Section 4241(d)(2) authorizes custodial hospitalization for an additional reasonable period of time until —

(A) [the defendant's] mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or

(B) the pending charges against him are disposed of according to law; whichever is earlier.

This language makes clear that the purpose of custodial hospitalization pursuant to subpart (A) is restorative: "until — (A) [the defendant's] mental condition is so improved that trial

<sup>406</sup> may proceed." 18 U.S.C. § 4241(d)(2)(A).[9] Such restorative *406 hospitalization is limited to an "additional reasonable period" necessary to that specified purpose. The fact that Congress placed no outside limit on this reasonable period (akin to the four months referenced in § 4241(d)(1)) affords district courts considerable discretion in making case-by-case determinations as to what reasonable period of additional custodial hospitalization will likely restore a defendant to competency consistent with due process. Congress's use of the word "additional" plainly signals its intent for any restorative commitment pursuant to § 4241(d)(2)(A) to follow evaluative commitment pursuant to § 4241(d)(1). Such additional commitment is not, however, presumed. To the contrary, § 4241(d)(2)(A) commitment is authorized only "if the court finds that there is a substantial probability that within such additional period of time [the defendant] will attain the capacity to permit the proceedings to go forward." *Id.*

<mark>What the statutory text does not clearly state is *when* the district court must make this finding.</mark> Defendant submits that the finding must be made before expiration of the defendant's § 4241(d)(1) commitment because nothing in the statute references an interruption between § 4241(d)(1) and § 4241(d)(2) commitments. Magassouba's argument finds its strongest support in the statute's mandate that district courts "shall commit" incompetent defendants. *Id.* § 4241(d). The statutory structure appears to contemplate that such commitment shall continue until the defendant is either restored to competency, in which case the district court "shall order his immediate discharge" from hospital confinement with further detainment subject to the Bail Reform Act, *id.* § 4241(e) (referencing chapter 207 of Title 18, which includes the Bail Reform Act), or, in the event the court determines that the defendant has not so improved, he is referred for possible civil commitment proceedings pursuant to 18 U.S.C. §§ 4246 and 4248, *see id.* § 4241(d).

We nevertheless find defendant's proposed construction of § 4241(d)(1) unconvincing. It ascribes to Congress an intent more focused on ensuring that a defendant's entire term of custodial hospitalization be uninterrupted — something not mandated by due process — than that an "additional" period of custodial hospitalization under 18 U.S.C. § 4241(d)(2)(A) be ordered only after a district court is satisfied as to the substantial probability that it will restore a defendant to competency — a due process requirement. *See Jackson v. Indiana,* 406 U.S. at 738, 92 S.Ct. 1845. We are mindful that circumstances can frequently arise that preclude a diligent district judge from making the required substantial probability finding within four months of a defendant's § 4241(d)(1) hospitalization. Indeed, those circumstances can themselves implicate the defendant's exercise of constitutional rights.

Specifically, a defendant may wish to oppose additional § 4241(d)(2)(A) commitment, and affording him sufficient time to exercise this due process right may delay the district court's substantial probability finding beyond the four-month limit on his § 4241(d)(1) hospitalization. To present effective opposition, defense counsel will need time to review the BOP record, to consult with the defendant, and to retain one or more independent mental health professionals. Those experts may, in turn, need time to examine the defendant,

<sup>407</sup> to review BOP records for themselves, and to prepare their own evaluations of defendant's ability to attain competency. Thereafter, government counsel will undoubtedly seek a reasonable *407 time to respond, whereupon the court may require an evidentiary hearing and briefing to permit it to make a careful finding as to whether there is a substantial probability of defendant attaining competency with additional custodial hospitalization. This sequence of events can easily take longer than four months, even when the parties and the court give the matter diligent attention.

To construe the four-month limit on the term of custodial hospitalization under § 4241(d)(1) as a four-month limit on the court's authority to order additional confinement under § 4241(d)(2)(A) thus raises due process concerns.[10] It is well-established that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones v. United States,* 463 U.S. 354, 361, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (quoting *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). More to the point, "where liberty is at stake, due process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." *United States v. Abuhamra,* 389 F.3d at 322. Thus, in the absence of a clear statement by Congress placing a time limitation on district courts' decisional authority to order § 4241(d)(2)(A) hospitalization, we decline to infer one from the evaluative confinement limit specified in § 4241(d)(1).[11] Indeed, the due process concern we identify is compounded when the § 4241(d)(2)(A) order at issue would authorize a defendant's involuntary medication. A defendant opposing such an order is entitled to reasonable time to develop and present evidence on a host of complex issues — medical and legal — identified in *Sell v. United States,* 539 U.S. at 180-81, 123 S.Ct. 2174. *Cf. United States v. Rivera-Guerrero,* 426 F.3d 1130, 1138-44 (9th Cir.2005) (identifying error in district court's refusal to grant defendant continuance to secure independent medical opinions before ordering involuntary medication while defendant committed pursuant to § 4241(d)(1)). <mark>Further, he is entitled to the district court's full and careful consideration of the *Sell* factors.</mark>

The constitutional concern we identify could not be avoided simply by requiring the BOP to report its § 4241(d)(1) findings well in advance of the expiration of an ordered four-month term of custodial hospitalization. First, we are doubtful that such action is contemplated by the statutory scheme. Section 4241(d)(1) authorizes "the Attorney General" to hospitalize an incompetent defendant for a period "not to exceed four months, as is necessary to determine" the probability of his regaining competency. We construe this language to reference a determination by the Attorney General, acting through his agents, the mental health professionals of the BOP. As the Ninth Circuit recently observed in *United States v.*

<sup>408</sup> *Strong,* the "overarching purpose of commitment under § 4241(d) [1] is to enable *medical professionals* *408 to accurately determine whether a criminal defendant is restorable to mental competency." 489 F.3d at 1062 (emphasis added). Thus, the Seventh Circuit similarly construes § 4241(d)(1) to "give[] the Attorney General the authority ... to conduct an in-depth evaluation of the defendant to assess the likelihood that he will regain competency.... It is during the evaluation period that *the Attorney General* has up to four months to assess whether the defendant will regain competency to stand trial." *United States v. Shawar,* 865 F.2d at 861 (emphasis added).

Second, even if a district court could order § 4241(d)(1) commitment for four months while affording the BOP only a fraction of that period for its evaluation, we expect it will rarely make sense for it to do so. The cases in which a district court anticipates protracted litigation as to the propriety of additional § 4241(d)(2)(A) hospitalization are the very ones in which mental health professionals will likely require a full four months to conduct careful and thorough § 4241(d)(1) evaluations. No one's interests — not the parties', not the court's, and not the public's — are well served by encouraging undue haste in § 4241(d)(1) evaluations. *See United States v. Ferro,* 321 F.3d at 762 (noting need for "careful and accurate diagnosis" to determine if defendant is restorable to mental competency); *accord United States v. Strong,* 489 F.3d at 1062 (citing *Ferro* with approval).[12]

Even if it were practical — which we doubt — for district courts routinely to impose evaluation deadlines significantly shorter than four months on the BOP, that action could not, in any event, ensure that the remaining time of § 4241(d)(1) commitment would be sufficient for the defense to secure and present evidence (including expert evidence) in opposition to further custodial hospitalization, for the government to respond to that challenge, and for the district court to hold hearings or to undertake any other review necessary to make a responsible finding as to the substantial probability of defendant attaining competency with further treatment, particularly treatment involving forced medication. Thus, in the absence of clear congressional direction to the contrary and consistent with the principle of constitutional avoidance, we decline § 4241(d)(2) to impose a four-month deadline on the district court's decisional authority to order § 4241(d)(2) commitment. Instead, we construe § 4241(d)(1) to impose a four-month limit only on the Attorney General's authority to hold an incompetent defendant in custodial hospitalization for the purpose of determining the probability of his regaining competency. If, at the end of an ordered term of § 4241(d)(1)

hospitalization "not to exceed four months," the district court has not ordered additional hospitalization pursuant to § 4241(d)(2), it does not lose its authority to do so. Rather, upon expiration of a § 4241(d)(1) order and in the absence of a § 4241(d)(2) order, it is the Attorney General who lacks authority to hold the defendant in further custodial hospitalization under § 4241(d). In such circumstances, the Attorney General must restore a defendant to the *status quo ante* his § 4241(d)(1) confinement.[13]

409  *409 *United States v. Baker,* 807 F.2d 1315 (6th Cir.1986), cited by defendant, supports no different statutory construction. Although *Baker* ruled that § 4241(d) "requires that a determination as to the individual's mental condition be made within four months," *id.* at 1320, the statement must be read in context. There was no question in *Baker* of a district court's authority to enter a § 4241(d)(2) order after the four-month period referenced in § 4241(d)(1). Rather, the issue in *Baker* was the Attorney General's authority to keep a defendant in custodial hospitalization for more than four months — specifically, from September 1985 to March 1986 — in the absence of anything but a § 4241(d)(1) order. In addressing this scenario, *Baker* ruled:

> This confinement was clearly in excess of four months, and there is nothing in the record to indicate that his period of confinement was properly extended. Therefore, although the court's initial commitment of appellant on September 30th was valid, we hold that there was no authority to confine appellant beyond the four months authorized by section 4241(d).

*Id.*

Similarly, in *United States v. Donofrio,* the Eleventh Circuit ruled that § 4241(d)(1) "limits confinement to four months, whether more time [for evaluation of probable recovery] would be reasonable or not," 896 F.2d at 1303. *Donofrio* explained that "[a]ny additional period of confinement depends upon the court's finding [that] there is a probability that within the additional time [the defendant] will attain capacity to permit trial." *Id.* But, like *Baker, Donofrio* had no occasion to consider, and thus did not address, the district court's authority to make such a finding after a term of § 4241(d)(1) confinement expired if a defendant were not held in custodial hospitalization in the interim. *See also United States v. Charters,* 829 F.2d at 484-86 (reversing forcible medication order and remanding case for further proceedings as defendant's "federal custodians do not at present have legal authority to detain" him because (a) § 4241(d)(1) order had expired, (b) court's finding that he was unlikely to recover precluded detention under § 4241(d)(2), and (c) court had failed to follow procedures necessary for civil commitment pursuant to § 4246). Having now considered the question not addressed in *Donofrio* and *Baker,* we conclude that district courts do have the authority to order a defendant's additional custodial hospitalization pursuant to § 4241(d)(2)(A) even after the limited period of evaluative hospitalization under § 4241(d)(1) has expired.

We expect that, when dealing with incompetent defendants, district courts will, in fact, generally strive to avoid breaks in custodial hospitalization by entering § 4241(d)(2) orders, whenever possible, before the expiration of § 4241(d)(1) orders. Such expeditious resolution of custodial treatment issues is to be encouraged. We here hold only that the statute does not affirmatively require a district court to issue a § 4241(d)(2) commitment order before the expiration of § 4241(d)(1) hospitalization order, nor does it strip a district court of the authority to do so thereafter.

### 3. *Applying the Statutory Construction to this Case*

410  With this understanding of the statute, we consider the record in this case and *410 conclude that, although the district court did not exceed its authority in issuing the challenged § 4241(d)(2) order after the conclusion of Magassouba's authorized term of § 4241(d)(1) hospitalization, the Attorney General, acting through his agent, the BOP, did exceed his authority in holding Magassouba in custodial hospitalization pursuant to § 4241(d)(1) for longer than four months. Because this error was harmless, we can readily conclude that it did not undermine the district court's authority to order additional § 4241(d)(2) hospitalization and treatment.

### a. *By Holding Magassouba in Custodial Hospitalization for Longer than Four Months, the BOP Exceeded Its Confinement Authority Under § 4241(d)*

As detailed in the Background section of this opinion, the district court first found Magassouba incompetent on October 13, 2004, and orally ordered his § 4241(d)(1) commitment that same date. The order was not acted on, however, until approximately November 24, 2004, when it was reduced to writing and served on the United States Marshals Service. As a consequence, the Attorney General did not actually "hospitalize the defendant for treatment," 18 U.S.C. § 4241(d), until December 22, 2004, when Magassouba was admitted to Butner. On January 4, 2005, in response to an unopposed application by the BOP, the district court ordered that Magassouba's § 4241(d)(1) confinement formally commence with his arrival at Butner and that the evaluation period be expanded to four months, to conclude on April 20, 2005. The record indicates that the BOP did not complete its evaluation until May 3, 2005, and that Magassouba remained at Butner until May 12, 2005, when federal marshals transported him to the MCC in New York.

Because § 4241(d)(1) is unequivocal in limiting custodial hospitalization under that subsection to a reasonable period of time, "not to exceed four months," we necessarily conclude that the Attorney General exceeded his authority in holding Magassouba in custodial hospitalization through May 12, 2005, approximately three weeks longer than the four months specified in the court's unopposed order of January 4, 2005.[14]

### b. *A § 4241(d)(1) Error May Be Reviewed for Harmlessness*

Having identified § 4241(d)(1) error by the BOP, we consider whether such error may be deemed harmless because a harmless error certainly would not warrant the relief Magassouba seeks: dismissal of the indictment.[15]

Rule 52 of the Federal Rules of Criminal Procedure states that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." The presumptive reach of this rule is broad. *See Neder v. United States,* 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (noting that harmless error presumptively applies to "all errors where a proper objection is made" (emphasis in original)); *Bank of Nova Scotia v.* *411 United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) ("Rule 52 is, in every pertinent respect, as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rule's mandate than they do to disregard constitutional or statutory provisions."). Thus, to demonstrate that a particular error is not subject to Rule 52 review, a defendant must point to "strong support" for that conclusion. *Zedner v. United States,* 547 U.S. 489, 507, 126 S.Ct. 1976, 164 L.Ed.2d 749 (2006). In *Zedner,* a case in which a trial court failed to make findings specifically required by the Speedy Trial Act, *see* 18 U.S.C. § 3161(h)(8), the Supreme Court identified such strong support in the statute's language, which was unequivocal both as to the findings mandated to extend the statute's time limitations and the remedy required for exceeding those limitations, *i.e.,* dismissal of the indictment. *See id.* at 506-08, 126 S.Ct. 1976.

This case is readily distinguishable from *Zedner* because, although § 4241(d)(1) is unequivocal in its mandate that evaluative hospitalization be limited to a reasonable period "not to exceed four months," the statute nowhere indicates an appropriate remedy for failing to abide by this limitation. Certainly, nowhere does the statute mandate the dismissal remedy that Magassouba seeks on this appeal. *See generally United States v. Ecker,* 78 F.3d 726, 728 (1st Cir.1996) (holding that incompetent defendant subject to civil commitment proceedings could not compel government to dismiss charges against him because "there is nothing in the statute's language that requires dismissal of a pending indictment"). Nor is such relief constitutionally required. In *Jackson v. Indiana,* 406 U.S. at 738, 92 S.Ct. 1845, the Supreme Court identified a due process denial in the more-than-three-year detention of an incompetent defendant without a substantial probability finding. Nevertheless, the Court did not order dismissal of the charges. Rather, it remanded the case to the state courts for them to decide, in the first instance, whether there was a substantial probability that Jackson could be restored to competency within a reasonable time and, if so, to ensure that his continued commitment was justified by progress toward that goal. *See id.*[16]

412  *412 Accordingly, we conclude that the § 4241(d)(1) error noted in this case may be reviewed for harmlessness. Indeed, that conclusion finds some support in the decisions of our sister circuits according Rule 52 review to other errors arising in competency proceedings. *See United States v. Denkins,* 367 F.3d 537, 545 (6th Cir.2004) (identifying district court's failure to hold competency hearing required by § 4241(a) as the "very essence of a `harmless error'" because all pertinent portions of process subsequently were employed at behest of

defendant); _United States v. Barfield_, 969 F.2d 1554, 1556-57 (4th Cir.1992) (applying harmless error review to competency proceeding); _Sturgis v. Goldsmith_, 796 F.2d 1103, 1109 (9th Cir.1986) (same).

## c. _The Scope of the § 4241(d)(1) Error_

Before undertaking harmlessness review, we consider defendant's argument that the scope of the § 4241(d)(1) error is, in fact, far greater than a mere two or three weeks of unauthorized custodial hospitalization at Butner. Magassouba asserts that he was in § 4241(d)(1) custody for at least nineteen months, from the district court's initial oral order of October 13, 2004, until its challenged § 4241(d)(2) order on May 10, 2006. We are not persuaded.[17]

To the extent Magassouba seeks to have the period from October 13, 2004, to December 22, 2004, when he was admitted to Butner, treated as § 4241(d)(1) custody, a question of waiver is raised by his counsel's failure to object to the district court's January 4, 2005 order dating the defendant's § 4241(d)(1) commitment to commence with his arrival at Butner. Similarly, the fact that, between May 12, 2004, when Magassouba was discharged from Butner, and March 22, 2006, when he moved to dismiss the indictment, his counsel never requested release from custody but, rather, urged the district court to order additional custodial hospitalization suggests possible invited error. _See generally United States v. Quinones_, 511 F.3d 289, 321 (2d Cir.2007) (comparing waivers resulting from defendant's failure to object to purported error with those attributable to "invited error").[18] We need not here decide the difficult question of whether these waiver principles apply against an incompetent defendant, _see, e.g._, _United States v. Purnett_, 910 F.2d at 55 ("Logically, the trial court cannot simultaneously question a defendant's mental competence to stand trial and at one and the same time be convinced that the defendant has knowingly and intelligently waived his right to counsel."); _Pate v. Robinson_, 383 U.S. 375, 384, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently `waive' his right to have the court determine his capacity to stand trial."), because we identify an alternate ground for rejecting Magassouba's claim that he was in § 4241(d)(1) custody for nineteen months.

413　By its terms, § 4241(d)(1) confinement is limited not only as to time and *413 purpose but also as to place: the Attorney General must "_hospitalize_ the defendant for treatment in a suitable facility." 18 U.S.C. § 4241(d)(1) (emphasis added). The only facility where Magassouba appears to have been held in custodial hospitalization is Butner, where he was confined for four months and three weeks. To the extent Magassouba was otherwise generally detained at the MDC or MCC, that commitment was authorized not by § 4241(d)(1) but by the Bail Reform Act, 18 U.S.C. § 3142.[19] Magassouba was ordered detained at the very start of this case as a presumptive risk of flight and a danger to the community pursuant to § 3142(e). While Magassouba never challenged his § 3142 detention in the district court, he contends on appeal that the statute could not authorize his detention after October 13, 2004, the date the district court found him incompetent pursuant to § 4241(d), because § 3142 applies only to cases "pending trial," 18 U.S.C. § 3142(a), and due process prohibits the trial of an incompetent defendant. Magassouba's argument conflates the concept of "pending trial" with that of being "on trial." While an incompetent criminal defendant cannot be placed "on trial" consistent with due process, there is no similar constitutional bar to his remaining "pending trial" while competency proceedings are resolved. In _Jackson v. Indiana_, the Supreme Court specifically held that the due process proscription on putting an incompetent defendant "on trial" did not preclude a court from conducting certain pretrial proceedings in his criminal case. _See_ 406 U.S. at 740-41, 92 S.Ct. 1845 (noting that states were not precluded from "allowing at a minimum, an incompetent defendant to raise certain defenses such as insufficiency of the indictment, or make certain pretrial motions through counsel that did not require personal participation of the defendant") (citing Model Penal Code § 4.06(3)). A court necessarily conducts such proceedings pending a defendant's trial.[20] Because we conclude that Magassouba remains pending trial through the completion of § 4241 proceedings, we necessarily reject his argument that he was no longer "pending trial" after the October 13, 2004 finding of incompetency and, therefore, no longer detainable under § 3142.

We have identified one unpublished decision, _United States v. Peppi_, No. 06-157, 2007 WL 674746, 2007 U.S. Dist. LEXIS 13997 (D.N.J. Feb. 27, 2007), in which a court declined to find that trial was pending against an incompetent defendant and, therefore, refused to impose release conditions under the Bail Reform Act. The case is factually distinguishable from the one before us in important respects. Specifically, in _Peppi_, the defendant's inability to regain competency was undisputed, and he had been referred for civil commitment pursuant

414　to § 4246. It was in that context that the court observed that "[b]ecause Mr. Peppi cannot be brought to trial now, it seems an impermissible fiction to pretend *414 that one is pending. If not pending trial, then the Bail Reform Act does not apply." 2007 WL 674746, at *5, 2007 U.S. Dist. LEXIS 13997, at * 15. We need not here decide what conclusion we would reach on facts similar to those in _Peppi_. We note simply that Magassouba has not been referred for civil commitment pursuant to § 4246 as a defendant unlikely to attain competency. Indeed, not only are § 4241(d) proceedings pending; the district court has specifically found pursuant to § 4241(d)(2) that there is a substantial probability that Magassouba will attain competency with appropriate medication. In these circumstances, we indulge no fiction to conclude that Magassouba remains pending trial.[21]

Accordingly, we conclude that the § 4241(d)(1) confinement error in this case is limited to the three weeks in excess of four months that Magassouba was held in custodial hospitalization at Butner.

## d. _The Identified § 4241(d)(1) Error Was Harmless_

In reviewing the identified error for harmlessness, we consider what prejudice to substantial rights Magassouba sustained therefrom, and we identify none. _See, e.g._, _United States v. Mejia_, 356 F.3d 470, 476 (2d Cir.2004) (holding that _ex parte_ communication by judge to jury in response to inquiry is harmless error where communication does not prejudice defendant); _United States v. Diaz_, 176 F.3d 52, 98 (2d Cir.1999).[22]

415　First, the unauthorized § 4241(d)(1) hospitalization did not deprive Magassouba of basic liberty. Had Magassouba been discharged from hospitalization under that statute at the *415 conclusion of the maximum four-month period, he would have been released from BOP custody. Rather, for reasons discussed in the preceding section, Magassouba would have been returned to pretrial detention pursuant to the Bail Reform Act, 18 U.S.C. § 3142(e). Second, Magassouba does not contend that he sustained a greater loss of liberty in his final three weeks at Butner than he would have experienced in a comparable time at a pretrial detention facility such as the MCC or MDC. It is, after all, undisputed that Magassouba was not subjected to involuntary medication during this period. Third, the unauthorized detention did not prejudice Magassouba in stating his position to the court on additional § 4241(d)(2)(A) confinement. As already noted, defense counsel urged additional custodial hospitalization, and Magassouba does not challenge the merits of the district court's § 4241(d) (2) order on this appeal. Finally, the statutory error in this case does not rise to the level of a due process violation under _Jackson v. Indiana_. Although Congress has established a maximum four-month period of custodial hospitalization to evaluate the probability of an incompetent defendant regaining competency to stand trial, due process itself draws no such bright time line. See _Jackson v. Indiana_, 406 U.S. at 738-39, 92 S.Ct. 1845 (declining "to prescribe arbitrary time limits," although noting that defendant had "been confined for three and one-half years on a record that sufficiently establishes the lack of a substantial probability that he will ever be able to participate fully in a trial"). At whatever point it becomes constitutionally unreasonable to confine an incompetent defendant for any further time solely to evaluate his competency to stand trial, we are satisfied that the line is not crossed at four months and three weeks. _See infra_ at 416-19 (explaining why even nineteen-month detention did not violate due process in this case).

In sum, although we identify error by the Attorney General in confining Magassouba to custodial hospitalization for two to three weeks longer than permitted by § 4241(d)(1), we conclude that the error was harmless. As such, we need not consider whether such an error could ever undermine a district court's authority to order additional § 4241(d)(2) confinement. We can confidently conclude that it had no such effect in this case.

## C. _Due Process Did Not Require the District Court to Dismiss the Indictment_

Although we reject Magassouba's statutory challenge to the district court's entry of a § 4241(d)(2) order on May 20, 2006, we proceed to consider his constitutional claim that, by that date, his continued confinement for the purpose of restoring competency to stand trial was no longer reasonable.

In _Jackson v. Indiana_, the Supreme Court identified a due process concern with committing a defendant "_solely_ on account of his incapacity to proceed to trial" for "more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." 406 U.S. at 738, 92 S.Ct. 1845

(emphasis added). As we have already observed, for much of the time between the district court's October 13, 2004 finding of incompetence and its challenged May 20, 2006 order, Magassouba was not confined solely to evaluate the probability of his regaining competency. He was also detained pursuant to the Bail Reform Act, 18 U.S.C. § 3142, as a risk of flight and danger to the community. We nevertheless conclude that the totality of Magassouba's post-October 13, 2003 confinement *416 is appropriately considered in determining whether further commitment beyond May 20, 2006 was so unreasonable as to violate due process.

We reach this conclusion mindful that the reasonableness of a defendant's § 3142 detention is generally defined by statutory and constitutional rights to a speedy trial. Under the Speedy Trial Act, however, any period spent resolving a defendant's competency to stand trial is excluded from consideration when determining the date by which a defendant must be brought to trial. *See* 18 U.S.C. § 3161(h)(1)(A) (excluding from Speedy Trial Act consideration any "delay resulting from any proceeding, including any examinations, to determine the mental competency ... of the defendant"). We think that implicit in this statutory exclusion is an assumption that defendant's competency proceedings will be resolved within the reasonable time requirements of due process. Otherwise, in a circumstance where a § 4241(d)(1) order expired and no § 4241(d)(2) order was entered, § 3142 could itself become the vehicle for doing what the Due Process Clause proscribes: subjecting incompetent defendants to indefinite commitment. Thus, we conclude that, once a defendant is found incompetent, continued confinement while the parties and the court assess his ability to regain competency must comport with the reasonable time limitations of due process, regardless of whether that confinement involves custodial hospitalization pursuant to § 4241(d) or general detention pursuant to § 3142.[23]

The nineteen-month period Magassouba spent in BOP custody from October 13, 2004, when he was found incompetent, to May 10, 2006, when the court entered the challenged § 4241(d)(2) order, is not insignificant. Nevertheless, we conclude that the time was not constitutionally unreasonable because Magassouba's refusal to accept the treatment likely to render him competent required the district court to address distinct and difficult due process concerns relating to involuntary medication preliminary to entering the challenged § 4241(d)(2) order.

In reaching this conclusion, we reiterate our earlier observation that the Constitution itself draws no bright lines signaling when an incompetent defendant's continued detention to restore competency becomes unreasonable. *See Jackson v. Indiana,* 406 U.S. at 738, 92 S.Ct. 1845. To the extent the government urges us to use the sentence a defendant faces on the underlying charges — in Magassouba's case a term of ten-years-to-life imprisonment — as a benchmark for assessing the reasonableness of confinement to restore competency, *see, e.g., United States v. Ecker,* 30 F.3d 966, 969 (8th Cir.1994) (concluding four-year detention not unreasonable in light of fifteen-year mandatory minimum sentence), we note some reservations as to the general utility of that particular tool to the specified task. We do not pursue the matter further because, in this case, we can confidently conclude that, as of May 20, 2006, Magassouba had not been confined for such an unreasonable time as to preclude additional § 4241(d)(2) commitment.

In determining what constitutes a constitutionally unreasonable period of detention for an incompetent defendant, we necessarily consider the totality of the circumstances, including (1) the length of time at issue; (2) the medical assessments *417 of the defendant's ability to attain competency; (3) the reason for any delay in helping the defendant attain competency; (4) the defendant's assertion of his rights, whether as to custody or treatment; and (5) any prejudice to the defendant, whether in attaining competency or in proceeding thereafter to trial.[24] We conclude that these factors do not demonstrate that Magassouba's detention was in violation of due process.

First, as with speedy trial, it is difficult to identify the precise time at which an incompetent defendant's continued detention becomes presumptively unreasonable. *Cf. United States v. Vassell,* 970 F.2d 1162, 1164 (2d Cir.1992) (discussing speedy trial). To be sure, the nineteen-month period here at issue is far shorter than the three and one-half years of commitment deemed unreasonable in *Jackson v. Indiana,* 406 U.S. at 738-39, 92 S.Ct. 1845. Nevertheless, mindful that after Magassouba's May 12, 2005 discharge from Butner his incompetency was untreated and his case was not advancing toward trial, we carefully consider other factors to assess the reasonableness of this continued confinement.

Second, in *Jackson,* the defendant was confined for a lengthy time despite the fact that medical experts had concluded that no effort could render him competent to stand trial in light of his severe mental and physical impairments. *See id.* at 717-19, 92 S.Ct. 1845. By contrast, in this case, all doctors and lawyers agree that there is a substantial probability that Magassouba can regain competency with additional hospitalization and treatment. *See supra* at 396-97. This immediately distinguishes this case from *United States v. Walker,* 335 F.Supp. 705, 708-09 (N.D.Cal.1971) (finding continued commitment unreasonable where court found defendant unlikely to regain competency in near future) and *United States v. Jackson,* 306 F.Supp. 4, 6 (N.D.Cal.1969) (finding defendant unlikely to attain competency in foreseeable future), relied on by defendant. Indeed, where the record establishes a substantial probability that additional confinement will restore a defendant to competency, continued confinement is "reasonable" under the Due Process Clause as long as the commitment is "justified by progress toward that goal." *Jackson v. Indiana,* 406 U.S. at 738, 92 S.Ct. 1845.

Third, insofar as the record indicates any delay in Magassouba's progress toward competency, we identify only brief times when anything less than conscientious attention was being given to his condition.[25] The first such period is the two months — from October 13, 2004, to December 22, 2004 — that it took to transport Magassouba to Butner for § 4241(d)(1) evaluation. The first month's delay appears to be the product of inadvertent human error in communicating the court's *418 § 4241(d)(1) order to federal marshals, a matter quickly resolved by the court when brought to its attention. As for the second month's delay, various holidays in this period may have presented particular transport challenges. Whatever the reason, these transport delays were not so egregious as to deny Magassouba due process.[26]

The second period of delay reflects the BOP's failure to meet court filing deadlines. Instead of submitting its initial evaluation report on the scheduled date of May 20, 2005, the BOP filed its report on May 27, 2005. Similarly, in responding to the court's inquiry for further information, the BOP ignored the scheduled deadline of August 30, 2005, filing its reply on November 10, 2005. We do not condone these unexcused delays; nor do we sanction a district court might impose in such circumstances. We hold only that they did not unreasonably prolong Magassouba's detention in violation of due process. *Cf. United States v. Vasquez,* 918 F.2d 329, 338 (2d Cir.1990) (rejecting speedy trial challenge because government's negligent delay in evaluating defendant's competency at Butner was result of "`institutional dysfunction' rather than deliberate wrongdoing or bad faith"). The delay in Magassouba's attainment of competency is largely attributable to his own action, specifically, his invocation while still at Butner of his right to refuse treatment. This required the district court carefully to weigh Magassouba's right to refuse treatment against the public's interest in bringing him to trial if he could, in fact, be restored to competency. In deciding the difficult question whether to order Magassouba's involuntary medication, the district court necessarily expended considerable time reviewing and developing evidence relevant to the factors specified in *Sell v. United States,* 539 U.S. at 180-81, 123 S.Ct. 2174. In acknowledging that, during the period from July 15, 2005, to May 10, 2006, the district court diligently pursued the *Sell* inquiry preliminary to entering the challenged § 4241(d)(2) order.[27] The fact that it did so cautiously both to ensure a result respectful of Magassouba's rights and to afford him some time to reconsider his medication refusal merits commendation, not criticism.

Fourth, it was not until March 2006, when Magassouba moved to dismiss the indictment, that he raised any court challenge to his continued confinement. Until that point, defense counsel had actively supported it.[28] Once the motion made it *419 evident that further judicial patience would not secure defendant's cooperation in his own treatment, the district court acted promptly in ordering defendant's additional custodial hospitalization pursuant to § 4241(d)(2), with authorization for involuntary medication.

Fifth, Magassouba has not demonstrated any undue prejudice from his confinement, either to his ability to attain competency or to his ability to defend against the charges at trial.

On the totality of these circumstances, we identify no merit in Magassouba's constitutional claim that, even though it is substantially probable that additional custodial hospitalization and treatment will render him competent, his continued confinement beyond May 10, 2006 for purposes of treatment was so unreasonable as to violate due process and warrant dismissal of the indictment. Accordingly, we affirm the challenged May 10, 2006 order and remand the case for further proceedings.[29]

## III. *Conclusion*

To summarize, we conclude:

1. Under the collateral order doctrine, we have jurisdiction to review defendant's interlocutory challenge to an order of commitment pursuant to 18 U.S.C. § 4241(d)(2)(A) that authorizes involuntary medication. No different conclusion is warranted because defendant's challenge focuses on the timeliness of the order rather than the grounds for its entry.

2. Magassouba's timeliness challenge fails because § 4241(d)(1) imposes an outside limit of four months only on the time the Attorney General can hold a criminal defendant in custodial hospitalization for purposes of determining the probability of his attaining competency in the foreseeable future. In the absence of a clear statement of congressional intent, we decline to infer from this statutory language a four-month limit on a district court's authority to order a defendant's additional hospitalization for treatment under § 4241(d)(2)(A), particularly as such a construction could raise constitutional concerns about affording defendants a reasonable opportunity to oppose § 4241(d)(2)(A) orders, particularly those providing for involuntary treatment.

3. Although Magassouba's custodial hospitalization pursuant to § 4241(d)(1) exceeded the four-month statutory limit by two to three weeks, this error was harmless in light of the fact that defendant was otherwise detained — without objection — pursuant to the Bail Reform Act, 18 U.S.C. § 3142. As such, the error could not deprive the district court of authority to order additional § 4241(d)(2) hospitalization and treatment.

4. Magassouba's constitutional challenge also fails because the totality of the circumstances — including Magassouba's refusal of treatment, which required the district court to engage in the multi-factor analysis outlined in *Sell v. United States*, 539 U.S. at 180-81, 123 S.Ct. 2174 — demonstrates that his total nineteen months' confinement from the time he was found incompetent to stand trial until the district court entered the challenged treatment order was not so unreasonable as to violate due process.

ORDER AFFIRMED.

[1] As Dr. Collins detailed in his report, a person with this disorder "suffers from false fixed beliefs of a `nonbizarre' quality." Dr. Collins determined that Magassouba suffered specifically from persecutory delusions, *i.e.*, he believed that the judge, the attorneys, and unknown court personnel involved in his case were conspiring against him and that his mother-in-law was trying to kill him.

[2] Had this schedule been adhered to, it is conceivable that the district court could have decided whether further hospitalization pursuant to § 4241(d)(2)(A) was warranted before February 14, 2005, four months after its April 6, 2004 § 4241(d)(1) order.

[3] In the interim, Magassouba had apparently written to the district court seeking reconsideration of its incompetency finding and replacement of counsel. The district court denied both applications by order dated December 9, 2004.

[4] The modified plan, set forth in a June 29, 2005 letter from defense counsel to the court and agreed to by the government, sought to provide treating physicians with "a more expansive range of options" than specified in the BOP evaluation report, by (1) expanding the "range of doses" for medications specified in the report, (2) authorizing "alternative and additional drugs," (3) authorizing "additional antipsychotic and mood stabilizing drugs ... as contingent medications," and (4) authorizing "continued psychotherapy ... as an additional treatment to supplement drug therapy." Cooney Letter to Judge Batts, June 29, 2005, at 1-2.

[5] Because Magassouba does not challenge the district court's ultimate conclusion that the government satisfied the *Sell* factors for ordering involuntary medication, we have no occasion on this appeal to consider the propriety of such an *ex parte*, sealed offer of proof. *Cf. United States v. Abuhamra*, 389 F.3d 309 (2d Cir.2004) (holding that *ex parte*, *in camera* submissions from the government should generally not be entertained in denying bail release). Similarly, we need not address the government's argument that such a proffer was unnecessary to establish the first *Sell* factor in light of the nature of the charge against Magassouba and its ten-year mandated minimum penalty.

[6] Defense counsel noted that, although Magassouba refused to consent to antipsychotic medication while at Butner, he had never been ordered by the court to submit to such treatment. Accordingly, counsel requested "that any forthcoming Order on this issue direct Mr. Magassouba to take the medication prescribed by his treating doctor(s) on his own accord, and only authorize the forcible administration of such drugs in the event he refuses to comply with the Court's order." Polland Letter to Judge Batts, Dec. 2, 2005, at 3; *see* Douvas Letter to Judge Batts, Dec. 6, 2005, at 4 (requesting order that BOP "medicate the defendant involuntarily should the defendant refuse to comply with the Court's [treatment] directive").

[7] *Gold* itself observed that its reasoning would not apply to § 4241 orders that committed a defendant for preliminary examination as to competency. *See United States v. Gold*, 790 F.2d at 239. As this court subsequently explained in *United States v. Barth*, 28 F.3d 253, 255-56 (2d Cir.1994), such a "first-step" order does not "resolve an important issue" distinct from the merits of the action, specifically, defendant's competency to stand trial. Rather, it "is a preliminary step" to the district court's "ultimate determination" of that issue. *Id.* at 255.

[8] The parties have devoted considerable energy to disputing when the district court first made the substantial probability finding required by § 4241(d)(2)(A). Because the parties' letters of June 29, 2005, and July 1, 2005, reported their agreement that the record demonstrated such a probability, there was little need for the district court to make detailed findings. In fact, we think its probability finding can be inferred from its July 15, 2005 order requesting more information on a difficult question — involuntary treatment — that it did not need to address unless it was satisfied that there was a substantial probability that the defendant would regain competency with additional custodial hospitalization for the prescribed course of treatment. The conclusion does not, however, dispose of defendant's statutory challenge because (1) § 4241(d)(1) limited defendant's custodial hospitalization under that subsection to four months; and (2) whatever predicate findings the district court may have made by July 2005, it did not enter a § 4241(d)(2)(A) order until May 10, 2006.

[9] Section 4241(d)(2)(B), which is written in the alternative and applies only when disposition of the pending criminal charges "is earlier" than defendant's restoration to competency under § 4241(d)(2)(A), is most obviously construed to permit additional custodial hospitalization of incompetent defendants who are not expected to regain competency until the criminal charges against them are dismissed in favor of civil commitment proceedings. We need not here consider or decide whether this statutory subsection admits any broader interpretation.

[10] The fact that these particular concerns are not at issue in this case is irrelevant to our obligation to construe the statute to avoid serious constitutional problems that could thus arise in many custodial hospitalization cases.

[11] Where Congress itself imposes procedural limitations, courts generally recognize them to define the process due. Still even such limitations may run afoul of due process if they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *See Medina v. California*, 505 U.S. 437, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992).

[12] Any number of circumstances may reasonably prevent the BOP from making a reliable § 4241(d)(1) evaluation on a short deadline. A defendant may suffer from a challenging mental defect that precludes speedy evaluation of the probability of his regaining competency, or a defendant may choose to obstruct rather than cooperate with the evaluative efforts of BOP doctors, or a defendant may develop a physical ailment that delays psychiatric treatments relevant to evaluating his ability to attain competency.

[13] In Magassouba's case, that was general BOP confinement pursuant to § 3142. To the extent Magassouba submits that an incompetent defendant cannot be confined pursuant to § 3142 because he is not "pending trial," our reasons for rejecting that argument are set forth infra at 412-13.

[14] Even if further inquiry were to reveal that Magassouba's custodial hospitalization ended on May 3, 2005, when Butner officials advised federal marshals that he could be transported back to New York for further proceedings, we would still have to conclude that the BOP had exceeded its § 4241(d)(1) detention authority, even if only by two weeks.

[15] For reasons discussed *infra* at 411 n. 16, we are inclined in any event to think that writs of mandamus or habeas corpus are the remedies available to a defendant detained in violation of § 4241(d)(1), not dismissal of the indictment.

[16] Although we here note the unavailability of a dismissal remedy in either § 4241(d) or Supreme Court precedent to support harmless error review of the statutory error alleged in this case, we do *not* suggest an incompetent defendant is without significant remedies for unlawful confinement. Such a defendant may petition this court for a writ of mandamus to compel an inattentive district court to make the findings required by law to support the challenged confinement. While the conditions necessary to secure mandamus relief are not easily met, *see Stein v. KPMG, LLP*, 486 F.3d 753, 759-60 (2d Cir.2007), even mandamus denials can be fashioned to encourage prompt action by a district court, *see, e.g., McGann v. New York*, 77 F.3d 672, 673 n. 1 (2d Cir.1996) (noting that district court ruling followed this court's order denying petition for writ of mandamus "without prejudice to renew if the district court failed to rule on his motions within 30 days"). A defendant may also petition for a writ of habeas corpus to secure release from unlawful custody. Because habeas corpus originates in equity, it affords courts considerable flexibility to intervene to ensure that cases of confined incompetent defendants are not allowed to languish, whether the confinement is alleged to be unlawful under § 4241(d), § 3142, some other statute, or the Constitution. *See Stone v. Powell*, 428 U.S. 465, 491 n. 31, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (describing habeas corpus "as a remedy for `whatever society deems to be intolerable restraints'" granted to "`persons whom society has grievously wronged'" (quoting *Fay v. Noia*, 372 U.S. 391, 401, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963))). To be sure, an incompetent defendant cannot be expected to pursue these remedies himself, but that is precisely why he has an attorney whose responsibility it is to safeguard the defendant's legal interests. *Cf. United States v. Purnett*, 910 F.2d 51, 55 (2d Cir.1990) (holding that defendant whose competency is challenged cannot waive right to counsel and represent himself).

[17] Although we reject Magassouba's claim that the identified nineteen months of confinement must be viewed as a whole in assessing the § 4241(d)(1) violation, we nevertheless conclude, for reasons discussed *infra* at 415-16, that this period of detention is properly considered in assessing defendant's due process challenge to further confinement.

[18] Our identification of possible waiver or invited error to should not be construed as any criticism of the representation afforded Magassouba by his able counsel.

[19] We do not consider on this appeal the possibility of the Attorney General satisfying the hospitalization mandate of § 4241(d) by designating an incompetent defendant to the medical wing of pretrial detention facilities. Nor do we here address whether the time a defendant, who is not otherwise detained pursuant to § 3142, spends in marshals' custody being transported to or from a prison hospital facility must be counted within the four-month term of § 4241(d)(1) custodial hospitalization.

[20] A defendant charged with an offense is viewed as "pending trial" from his first appearance before a judicial officer because the Constitution gives him the right to have the charged offense resolved through that particular proceeding. U.S. Const. amend VI (guaranteeing criminal defendant right to "speedy and public trial").

[21] No different conclusion is required by 18 U.S.C. § 4241(e), which expressly states that, in the case of a defendant who regains competency, "[u]pon discharge" from custodial hospitalization, "the defendant is subject to the provisions of chapter[] 207," which includes the Bail Reform Act. We do not construe this language to indicate that a § 3142 order of detention is somehow *vacated* by a § 4241(d) hospitalization order. Rather, we understand this language to signal Congress's intent to give full force to § 3142 and any order entered pursuant thereto whenever a defendant pending trial is not in hospital confinement. To be sure, Congress specifically addressed only hospital discharge occurring after a defendant's competency is restored. The explanation likely lies in our earlier observation that Congress did not anticipate circumstances requiring a discharge from § 4241(d)(1) evaluative hospitalization before the commencement of § 4241(d)(2) restorative hospitalization. *See supra* at 407. Nevertheless, nothing in the statutory text of § 4241(d) signals Congress's intent that, in any such an interval, a defendant who posed a risk of flight or a danger to the community would not remain in custody pending trial pursuant to § 3142.

[22] Although harmlessness review is most frequently employed after a judgment of conviction to determine whether error prejudiced the outcome of a defendant's trial, *see, e.g.*, *United States v. Kaplan*, 490 F.3d 110, 122 (2d Cir.2007) (noting that harmlessness of non-constitutional error is determined by reference to whether error "did not influence the jury, or had but very small effect" (quoting *Kotteakos v. United States*, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir.2003) (holding that non-constitutional error affects substantial rights if it had "substantial and injurious effect or influence" on jury's verdict), the breadth of Rule 52 supports harmlessness review in other circumstances, *see, e.g.*, *United States v. Thompson*, 287 F.3d 1244, 1253-54 (10th Cir.2002) (employing harmless error analysis in appeal of dismissal of indictment due to impropriety of sealing under Fed.R.Crim.P. 6(e)(4) by inquiring whether sealing error "substantially influenced a defendant's ability to defend against the charges").

[23] We do not here decide whether a different conclusion might apply when a defendant is confined pursuant to some other authority as, for example, when a defendant is confined on a judgment of conviction or as a danger to himself or others within a BOP facility.

[24] We conduct a similarly broad review of the totality of relevant circumstances in determining when pretrial confinement violates the Constitution's Speedy Trial Clause. *See Barker v. Wingo*, 407 U.S. 514, 530-33, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (providing for consideration of (1) length of confinement, (2) reason for delay, (3) defendant's assertion of rights, and (4) prejudice). Of course, the concerns animating due process concerns identified in *Jackson v. Indiana* are different from those informing the right to speedy trial. Moreover, the due process inquiry is conducted mindful that defendant, though represented by counsel, has been found incompetent.

[25] We have already concluded that the four months and three weeks that Magassouba spent in custodial hospitalization, although violative of § 4241(d)(1), was not constitutionally unreasonable. *See supra* at 414-15. This hospitalization allowed BOP to determine that Magassouba could be rendered competent with appropriate treatment, a conclusion that is undisputed even on this appeal.

[26] We, nevertheless, remind the government that, under the Speedy Trial Act, a presumption of unreasonableness attaches to times in excess of ten days used to transport a detained defendant to another district. *See* 18 U.S.C. § 3161(h)(1)(H). While this time frame does not control our due process determination, the government is well advised to use it as a benchmark and to alert the district court when circumstances prevent the timely transportation of an incompetent defendant subject to a § 4241(d) order.

[27] Although a district court may be able to make the substantial probability finding required by § 4241(d)(2) before resolving the question of involuntary treatment, that does not mean that it can enter a commitment order under that subsection. An involuntary medication decision would likely affect both the scope and term of a § 4241(d)(2) order.

[28] As noted earlier, defense counsel's February 15, 2005 letter to the prosecutors urging prompt completion of Magassouba's § 4241(d)(1) evaluation to avoid due process concerns with further detention appears not to have been filed with the court. As for Magassouba, although found incompetent, he communicated with the court both directly (seeking reconsideration of the incompetency finding and new counsel) and through counsel (reiterating his refusal to accept treatment). In no communication before March 2006 does he appear to have challenged his continued confinement.

[29] Mindful of both possible changes in Magassouba's mental condition and advances in medical science, we leave it to the sound discretion of the district court whether to seek updates of the evaluations informing the challenged order.

# Exhibit 19

# Civil Interlocutory Appeals in Federal Court

BY MARCY G. GLENN

*This article discusses jurisdictional bases for federal interlocutory appeals in civil matters and procedures relevant to those appeals. It focuses on US Supreme Court and Tenth Circuit Court of Appeals case law.*

The jurisdiction of federal courts of appeals is generally limited to the review of final judgments.[1] Yet various statutes, rules, and jurisprudential doctrines either require or permit those courts to hear appeals from non-final, or interlocutory, district court orders. This article presents the most significant jurisdictional bases for federal interlocutory appeals in civil cases and discusses procedures relevant to those appeals. It focuses on US Supreme Court and Tenth Circuit Court of Appeals case law applying relevant statutes, rules, and doctrines.[2]

**Interlocutory Appeals as of Right**

Appeals as of right are appeals that the federal courts of appeals must resolve if they are timely filed and comply with other jurisdictional requirements.

*Appeals from Interlocutory Orders on Injunctions under 28 USC § 1292(a)(1)*

The dominant category of federal interlocutory appeals as of right is from interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions," pursuant to 28 USC § 1292(a)(1). As a general rule, § 1292(a)(1) "should be narrowly construed to 'ensure that appeal as of right under § 1292(a)(1) will be available only in [limited] circumstances.'"[3] The Tenth Circuit, like other courts of appeals, looks to "the actual, practical effect of an order" before exercising jurisdiction under § 1292(a)(1), "consider[ing] the substance rather than the form of the motion and caption of the order."[4]

These general interpretive rules have generated abundant authority, often conflicting,

as to whether particular appeals fall within the scope of § 1292(a)(1). With that caveat, Supreme Court and Tenth Circuit cases have held:

- Absent "extraordinary circumstances," § 1292(a)(1) does not apply to orders granting or denying temporary restraining orders (TROs).[5]
- However, TROs that remain in effect more than 10 days may be treated as preliminary injunctions.[6] And TROs will be treated as appealable injunctions where they effectively resolve the dispute.[7] Also, the Tenth Circuit will review orders denying TROs "when an appellant will suffer irreparable harm absent immediate review."[8]
- Section 1292(a)(1) applies to permanent injunctions that are not otherwise appealable as final orders.[9]
- Orders *modifying* injunctions are appealable, but orders merely *clarifying* or *interpreting* injunctions are not.[10]
- Section 1292(a)(1) has been extended to orders not expressly styled as injunctions but having the practical effect of injunctions, but only if such orders have "'serious, perhaps irreparable, consequence'" and "can be 'effectually challenged' only by immediate appeal."[11]
- Section 1292(a)(1) does not apply to orders relating to the conduct or progress of cases, even if they have injunctive effect.[12] Under this principle, for example, the Tenth Circuit has held that a stay order in a civil forfeiture proceeding "relate[d] only to the internal progress of the forfeiture litigation" and, therefore, could not be challenged in an interlocutory appeal under § 1292(a)(1).[13]
- If the court of appeals has jurisdiction over an interlocutory appeal related to

an injunction order, it may—but is not required to—consider other issues interrelated with the injunction under its discretionary pendent appellate jurisdiction.[14] Relevant factors include (1) "whether the otherwise nonappealable issue is sufficiently developed, both factually and legally, for [its] review," (2) "whether review of the appealable issue involves consideration of factors closely related or relevant to the otherwise nonappealable issue," and (3) "whether judicial economy will be better served by resolving the otherwise nonappealable issue, notwithstanding the federal policy against piecemeal appeals[.]"[15]

*Appeals from Interlocutory Receivership Orders under 28 USC § 1292(a)(2)*

Title 28 USC § 1292(a)(2) authorizes appeals as of right from interlocutory orders related to receiverships, but "[c]ourts narrowly construe § 1292(a)(2) 'to permit appeals only from the three discrete categories of receivership orders specified in the statute, namely [1] orders appointing a receiver, [2] orders refusing to wind up a receivership, and [3] orders refusing to take steps to accomplish the purposes of winding up a receivership.'"[16] The statute permits immediate review of the conduct of appointed receivers only "when there has been a complete failure to act in furtherance of the receivership," but does not vest the court of appeals with jurisdiction to undertake "ongoing supervision of every action a receiver might be ordered to take."[17]

*Appeals from Interlocutory Orders in Admiralty Cases under 28 USC § 1292(a)(3)*

Given the geographic location of the Tenth Circuit,

it's unsurprising that the court has apparently issued only one published decision applying 28 USC § 1292(a)(3), which authorizes appeals as of right from interlocutory decrees "determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed."[18] That case, *In re Aramark Sports & Entertainment Services, LLC*,[19] however, makes clear that, in contrast to the narrow jurisdictional grants under 28 USC § 1292(a)(1) and (2), appellate jurisdiction over admiralty orders is broadly construed. "[T]o allow ship owners to seek an appeal to halt litigation at an early stage, in the hope of eliminating the need for further proceedings[,]" "all that is required is that a right or liability of a party have been determined[ ]" in an admiralty case.[20]

### Appeals as of Right under Other Statutes

Various other federal statutes provide for appeals as of right from specifically defined interlocutory orders. For example, without waiting for a final judgment, a party may appeal under the Federal Arbitration Act from an order denying a motion to stay proceedings, denying a motion to compel arbitration, confirming or denying confirmation of an arbitration award, or modifying, correcting, or vacating an award;[21] the Federal Deposit Insurance Corporation may appeal from orders remanding cases removed to federal court;[22] and a party may appeal an order remanding a removed case where a federal officer or agency is sued or certain claims are made under the federal civil rights laws.[23]

### A Variation on Interlocutory Appeals as of Right: The Collateral Order Doctrine

Appeals from collateral orders "feel" like interlocutory appeals, because they generally challenge a discrete order while the remainder of the case continues in the district court. In fact, they are more properly viewed as a subset of appeals from final judgments, with jurisdiction arising under 28 USC § 1291 (permitting "appeals from all final decisions of the district courts"), rather than pursuant to a statute or rule providing for interlocutory appeals.

As the Supreme Court first recognized in *Cohen v. Beneficial Industrial Loan Corp.*, collateral orders "finally determine claims of

right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."[24]

> The dominant category of federal interlocutory appeals as of right is from interlocutory orders 'granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions,' pursuant to 28 USC § 1292(a)(1).

To constitute a collateral order, a district court decision must (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) "be effectively unreviewable on appeal from a final judgment."[25]

The most common immediately appealable collateral orders are those that deny motions to dismiss based on claimed immunity from suit—including based on Eleventh Amendment immunity,[26] qualified immunity,[27] absolute immunity,[28] and tribal immunity.[29] Among other collateral orders recognized by the Supreme Court or the Tenth Circuit are orders remanding a case to state court based on abstention;[30] requiring the plaintiffs to post a substantial bond, under a state statute, to proceed with a shareholder derivative action filed in federal court;[31] and imposing on the defendants 90% of the costs of providing notice to class members in a class action.[32]

### Procedural Requirements

The procedural requirements for interlocutory appeals as of right, including under the collateral order doctrine, are the same as for traditional appeals from final judgments as set forth in the Federal Rules of Appellate Procedure (FRAP) and the Tenth Circuit Rules. Accordingly, the notice of appeal must be filed within the governing time period for appeals from final judgments,[33] and the rules related to briefing, appendices, and oral argument apply.[34]

### Practice Tips

Practitioners filing interlocutory appeals as a matter of right should consider the following:

- Parties often have considerable leeway in how they characterize their requested relief. A litigant anticipating a potential interlocutory appeal under § 1292(a)(1) (concerning interlocutory orders on injunctions) should structure the relief sought as injunctive in nature if the facts and the law support that characterization.
- The fact that a party has a right to file an interlocutory appeal does not necessarily mean that it should do so. A party is not required to seek permission to take an interlocutory appeal to avoid waiving whatever ultimate appeal right the party may have.[35] Some cases may present good reasons to defer appealing until the case has proceeded to final judgment, including to avoid the expense and delay associated with an interlocutory appeal, or to obtain the benefit of a better developed record.

**Permissive Interlocutory Appeals**

Various statutory provisions, court rules, and cases authorize permissive appeals, which the courts of appeals may, but are not required to, accept.

*Permissive Appeals under 28 USC § 1292(b)*

Under 28 USC § 1292(b), the appellant must persuade two courts that an interlocutory appeal is appropriate. Initially, the district court must certify in writing that (1) an interlocutory order "involves a controlling question of law[,]" (2) "there is substantial ground for difference of opinion" on that legal issue, and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]"[36] A party who clears this first hurdle must then petition and convince the court of appeals to accept the appeal.[37]

Section 1292(b) does not state factors a court of appeals should consider in deciding whether to review on an interlocutory basis an order that could be challenged instead as part of an eventual appeal from a final judgment. As a result, the court of appeals has unbridled discretion under § 1292(b). Litigants generally advocate based on the three prerequisites for district court certification: (1) a novel and purely legal issue; (2) a substantial ground for difference of opinion, ideally demonstrated through conflicting conclusions reached by different district courts within the circuit; and (3) that the court of appeals' resolution of the issue will likely be dispositive of all or part of the case.

The Tenth Circuit has granted § 1292(b) petitions on diverse procedural and substantive issues in a broad range of cases, including, for example, an oil and gas royalty class action;[38] a constitutional challenge to Colorado's Taxpayer Bill of Rights;[39] and cases brought under the Employee Retirement Income Security Act of 1974,[40] the Americans With Disabilities Act,[41] and 42 USC § 1983.[42]

If the district court certifies its order as meeting the § 1292(b) standards for interlocutory appeal, a petition for review must be filed in the court of appeals within 10 days of that certification.[43] When a party wishes to file a permissive appeal from a district court order that does not include the required certification under § 1292(b), the putative appellant may ask the district court to modify its order to recite the necessary conclusions and certification,

> **"**
>
> The most common immediately appealable collateral orders are those that deny motions to dismiss based on claimed immunity from suit—including based on Eleventh Amendment immunity, qualified immunity, absolute immunity, and tribal immunity.
>
> **"**

and the 10 days will run from the date of the reissued order.[44]

*Appeals from Orders Granting or Denying Class Certification Pursuant to Rule 23(f)*

Under Federal Rule of Civil Procedure (FRCP) 23(f), "[a] court of appeals may permit an appeal from an order granting or denying class-action certification[.]"[45] Unlike § 1292(b) appeals, there is no prerequisite of district court certification. But like § 1292(b) appeals, the court of appeals has absolute discretion to accept or reject the appeal. Although the Tenth Circuit has recognized the important reason for permitting interlocutory appeals from class certification decisions—because "a class-certification determination can force a resolution of the case that is independent of the merits"[46]—it has exercised its discretion sparingly, apparently granting FRCP 23(f) petitions only four times in the past six years.[47]

"[N]o rigid test" governs the Tenth Circuit's exercise of its "unfettered" discretion, but review "is generally appropriate" in cases that "involve an unresolved issue of law relating to class actions that is likely to evade end-of-case review" and is "significant to the case at hand, as well as to class action cases generally," and in cases where the certification order "is manifestly erroneous," usually on an issue of law.[48]

Rule 23(f) sets a 14-day deadline for petitioning for review of an order granting or denying class certification; when the United States or a federal agency or officer is a party to the case, that deadline is extended to 45 days.[49] Because that time limitation appears in a procedural rule, not a statute, it is classified as a nonjurisdictional claim-processing rule that an opposing party can waive or forfeit.[50] Nevertheless, the FRAP "express a clear intent to compel rigorous enforcement of Rule 23(f)'s deadline," and, therefore, neither the district court nor the court of appeals may extend the 14-day deadline.[51]

Under limited circumstances, a motion for reconsideration may affect the timing of an appeal from a class certification order. The Tenth Circuit has assumed without deciding that a motion for reconsideration of a certification order, if filed *before the deadline* under Rule 23(f), will toll the deadline for petitioning to the Tenth Circuit until 14 days after the order on the reconsideration motion.[52] But a motion for reconsideration filed *more than 14 days* after the original certification order will not restart the clock for seeking Tenth Circuit review unless the district court issues a new certification order;

thus, an order denying a late-filed reconsideration motion will accomplish nothing.[53]

### Appeals from Remand Orders in Removed Class Actions under 28 USC § 1453(c)(1)

Federal law generally provides that an order remanding a case to the state court from which it was removed is not reviewable on appeal.[54] However, under 28 USC § 1453(c)(1), part of the Class Action Fairness Act, a party may seek permission to appeal from orders granting or denying remand in most removed class actions.[55]

The appellant must apply to the court of appeals within 10 days after entry of the order granting or denying remand.[56] If the court accepts the appeal, it must decide the appeal quickly: (1) within 60 days after the appeal was "filed"[57] (which the courts of appeals have construed as the date the court accepted the appeal[58]); (2) within a longer time if agreed to by the parties[59]; or (3) if the parties cannot agree to an extension, within an extended period of up to only 10 days, upon a showing of good cause and in the interests of justice.[60] If the court does not issue a timely judgment, the appeal is deemed denied.[61]

### A Variation on Permissive Interlocutory Appeals: Pendent Appellate Jurisdiction

In *Swint v. Chambers*,[62] the US Supreme Court indicated, without deciding, that if courts of appeals are permitted to consider additional issues in permissive interlocutory appeals, pendent jurisdiction would be confined to cases where the pendent issue "was inextricably intertwined with" the issue over which the court had interlocutory appellate jurisdiction.[63] The Tenth Circuit has adopted the *Swint* formulation for pendent appellate jurisdiction.[64] Only when the pendent issue "is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well[,]" will the court reach a pendent claim in a permissive interlocutory appeal.[65]

The exercise of pendent jurisdiction in interlocutory appeals is discretionary,[66] and the Tenth Circuit exercises that discretion sparingly.[67]

### Procedural Requirements

Petitions for permissive appeals must comply with FRAP 5 and Tenth Circuit Rule 5, which address the required form and content of petitions, cross-petitions, responses, and replies.[68]

> " Section 1292(b) does not state factors a court of appeals should consider in deciding whether to review on an interlocutory basis an order that could be challenged instead as part of an eventual appeal from a final judgment. As a result, the court of appeals has unbridled discretion under § 1292(b). "

FRAP 5(a)(2) requires the petition to be filed within the time set by the statute authorizing the interlocutory appeal or, if the statute includes no filing deadline, within the time for filing a notice of appeal.[69] As noted above, these deadlines may not be extended.[70]

Petitions are generally submitted without oral argument.[71] If the petition is granted, no notice of appeal need be filed, the date of the order granting the petition is treated as the date of the notice of appeal, and the parties file briefs on the merits as in a traditional appeal.[72]

### Practice Tips

Practitioners filing permissive interlocutory appeals may find these tips helpful:

- A district court order stating strong reasons for certification under § 1292(b) will be more persuasive to the court of appeals than one merely parroting the statutory elements, so a motion for certification in the district court should persuasively argue how each element is met.
- Even short amicus briefs may be useful in persuading the court to accept the appeal, much as amicus briefs in support of a Supreme Court petition for writ of certiorari can be helpful to a petitioner.
- A petitioner should avoid overstating the bases for a permissive appeal because the court of appeals may vacate its order granting permission to appeal and dismiss the appeal at any time before its decision.
- Advocates should always remember the distinction between the petition and the eventual appeal, if accepted. At the petition stage, the focus is on whether the court of appeals should exercise its discretion to take the appeal—which will typically turn on considerations in addition to the merits of the issues on appeal. If the court grants the petition, the focus typically shifts exclusively to the merits.

### Extraordinary Writs

The All Writs Act vests all federal courts with jurisdiction to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."[73] However, a writ is an extraordinary means of obtaining interlocutory review, and a court will grant it only in truly compelling circumstances:

The Supreme Court has made it clear that mandamus is a "drastic" remedy that is "to be invoked only in extraordinary situations.

… [T]he writ of mandamus has traditionally been used in the federal courts only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so. . . . Petitioners must show that their right to the writ is "clear and indisputable."[74]

The criteria for issuance of an extraordinary writ are that (1) "the party seeking the writ has no other adequate means to secure the relief desired"; (2) "the petitioning party will be damaged or prejudiced in a way not correctable on appeal"; (3) "the district court's order constitutes an abuse of discretion"; (4) "the district court's order represents an often repeated error and manifests a persistent disregard of federal rules"; and (5) "the district court's order raises new and important problems or issues of law of the first impression."[75] Despite these high bars for interlocutory intervention, the Tenth Circuit has on exceedingly rare occasions granted extraordinary writs.[76]

FRAP 21 and Tenth Circuit Rule 21.1 provide procedures for the filing and disposition of extraordinary writs.[77] There is no filing deadline, but the petition should be filed as promptly as possible.[78] The rules prescribe the content and form of a petition[79] and permit the court of appeals to deny a petition without an answer or to order an answer within a set time.[80] Petitions for extraordinary writs receive preference over "ordinary civil cases."[81]

### Practice Tips

Practitioners filing for extraordinary writs should keep the following points in mind:

- Given the remote chance of success, lawyers should consider all available alternatives before filing an extraordinary writ. Specifically, is there any way to change the district court judge's mind on the issue in question? Is an interlocutory appeal under § 1292(a) or (b) available? Can the party obtain adequate relief through an eventual appeal from a final judgment?
- The stringent standards for filing an extraordinary writ generally demand a fairly direct and aggressive attack on the district court—yet those rigorous criteria

also generally result in writs being denied. Advocates should think hard before maligning an action or inaction of the district court judge before whom they likely will need to continue to prosecute or defend the case during and after the (likely unsuccessful) extraordinary writ proceeding.

- Note that, unlike permissive interlocutory appeals discussed above, when a writ is filed and the court of appeals exercises its discretion to decide the issue on the merits, it may do so based on the writ and answer (if ordered), instead of ordering separate merits briefing. Therefore, the writ (and answer) must address both why the court of appeals should accept (or reject) the appeal and why the court should overturn (or approve) the challenged action or inaction.

### Conclusion

Despite the strong presumption that cases should proceed to final judgment before appeal, the law's strict limits on interlocutory appeals, the sundry procedural traps for the unwary, and the Tenth Circuit's historical reluctance to accept permissive appeals—despite all these hurdles, federal interlocutory appeals can be invaluable in the right case and under the right circumstances. **CL**



**Marcy G. Glenn** is a partner in the Appellate Practice Group at Holland & Hart LLP. For more than 30 years, she has litigated appeals in the US Supreme Court, federal courts of appeals, Colorado appellate courts, and other states' appellate courts. She also regularly handles complex trial-level briefing—mglenn@hollandhart.com.

**Coordinating Editor:** Judge Christina Finzel Gomez, christina.gomez@judicial.state.co.us

### NOTES

1. *See* 28 USC § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States, . . . except where a direct review may be had in the Supreme Court."); *Cobbledick v. United States*, 309 U.S. 323, 324–25 (1940) ("Finality as a condition of review is an historic characteristic of federal appellate procedure. It was written into the first Judiciary Act, and has been departed from only when observance of it would practically defeat the right to any review at all.") (Footnotes omitted).

2. For a discussion of civil interlocutory appeals in the Colorado appellate courts, *see* Masciocchi and Van Bockern, "Civil Interlocutory Appeals in State Courts," 49 *Colo. Law.* 38 (Oct. 2020), https://cl.cobar.org/features/civil-interlocutory-appeals-in-colorado-state-courts.

3. *Pimentel & Sons Guitar Makers, Inc. v. Pimentel*, 477 F.3d 1151, 1153 (10th Cir. 2007) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981)) (alteration in *Pimentel*).

4. *Id.*

5. *Caddo Nation of Okla. v. Wichita and Affiliated Tribes*, 877 F.3d 1171, 1173 n.1 (10th Cir. 2017). *See also S. Wind Women's Ctr. LLC v. Stitt*, 808 F. App'x 677, 680 (10th Cir. 2020) (unpublished); *Office of Pers. Mgmt. v. Am. Fed'n of Gov't Employees*, 473 U.S. 1301, 1304–05 (1985) (Burger, C.J. in chambers); *Populist Party v. Herschler*, 746 F.2d 656, 661 n.2 (10th Cir. 1984) (per curiam).

6. *Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 75–76 (1991); *Tooele Cty. v. United States*, 820 F.3d 1183, 1187 (10th Cir. 2016).

7. *See, e.g., Populist Party*, 746 F.2d at 661 n.2.

8. *Duvall v. Keating*, 162 F.3d 1058, 1062 (10th Cir. 1998) (reviewing denial of TRO to block impending execution). *But see S. Wind Women's Ctr.*, 808 F. App'x at 681 (TRO prohibiting enforcement of state executive order postponing non-emergency medical procedures, including abortions, due to COVID-19 pandemic was not appealable under § 1292(a)(1), in part because, unlike Duvall, "[a]ppellants' rights will not be irretrievably lost absent immediate review").

9. *E.g., Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1351 and n.6 (10th Cir. 1989).

10. *See, e.g., Pimentel*, 477 F.3d at 1154.

11. *Carson*, 450 U.S. at 84 (citations omitted). *See also, e.g., Hutchinson v. Pfeil*, 105 F.3d 566, 569 (10th Cir. 1997); *Keyes v. Sch. Dist. No. 1*, 895 F.2d 659, 663 (10th Cir. 1990). *See generally Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1167 (10th Cir. 2009) ("[W]e do not foreclose the possibility that a motion may seek to dissolve or modify an injunction in effect without seeking relief in those precise terms.").

12. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988).

13. *United States v. Section 17 Twp. 23 N., Range 22 E.*, 40 F.3d 320, 322–23 (10th Cir. 1994). *See also, e.g., Zou v. Linde Eng'g N. Am., Inc.*, No. 20-5099, 2020 WL 8175757 at *1 (10th Cir. Dec. 2, 2020) ("[T]he magistrate judge's order[,]

which imposes limits on discovery, prohibits further discovery requests absent leave of court, and prohibits further contempt/sanctions motions with respect to discovery, is not considered an injunction and is not appealable under § 1292(a)(1)."), *cert. denied*, No. 20-6882, 2021 WL 1072385 at *1 (U.S. Mar. 22, 2021).

14. *See, e.g., Tri-State*, 874 F.2d at 1353 (exercising pendent jurisdiction over otherwise nonappealable issues connected to interlocutory appeal from denial of an injunction).

15. *Colo. v. Idarado Mining Co.*, 916 F.2d 1486, 1491 (10th Cir. 1990) (declining to exercise pendent jurisdiction in interlocutory appeal from injunctive order, where additional issues were highly factual in nature), *cert. denied*, 499 U.S. 960 (1991).

16. *United States. v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) (citation omitted and bracketed numerals in original).

17. *Fed. Trade Comm'n v. Peterson*, 3 Fed. App'x 780, 782 (10th Cir. 2001) (unpublished).

18. 28 USC § 1292(a)(3).

19. *In re Aramark Sports and Entm't Servs., LLC*, 831 F.3d 1264 (10th Cir. 2016).

20. *Id.* at 1275–76.

21. 9 USC § 16(a)(1). *See also, e.g., Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1274, 1278 n.3 (10th Cir. 2017).

22. 12 USC § 1819(b)(2)(C).

23. 28 USC § 1447(d). *See also, e.g., First Union Mortg. Corp. v. Smith*, 229 F.3d 992, 994 (10th Cir. 2000).

24. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

25. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978), *superseded by statute on other grounds*.

26. *P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146–47 (1993).

27. *Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985).

28. *Nixon v. Fitzgerald*, 457 U.S. 731, 742–43 (1982).

29. *Osage Tribal Council v. United States Dep't of Labor*, 187 F.3d 1174, 1179–80 (10th Cir. 1999).

30. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 711–15 (1996).

31. *Cohen*, 337 U.S. at 545–47.

32. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170–72 (1974). For a more expansive discussion of the collateral order doctrine, *see* Glenn, "Appellate Review of Collateral Orders Under Federal and Colorado Law," 43 *Colo. Law.* 69 (Dec. 2014).

33. *See* FRAP 4.

34. *See* FRAP 28 to 32, 34.

35. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 74 (1996).

36. 28 USC § 1292(b).

37. *Id.*

38. *Pelt v. Utah*, 539 F.3d 1271, 1273–74 (10th Cir. 2008).

39. *Kerr v. Hickenlooper*, 744 F.3d 1156, 1162 (10th Cir. 2014), *vacated on other grounds*, 576 U.S. 1079 (2015).

40. *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1247–48 (10th Cir. 2004); *Kidneigh v. UNUM Life Ins. Co of Am.*, 345 F.3d 1182, 1184 (10th Cir. 2003).

41. *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1238 (10th Cir. 2001).

42. *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1150–51 (10th Cir. 2001).

43. 28 USC § 1292(b).

44. FRAP 5(a)(3).

45. FRCP 23(f).

46. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1189 (10th Cir. 2006).

47. *See Rivera v. Exeter Fin. Corp.*, No. 19-704, Order (10th Cir. Jan. 29. 2020), *denial of certification aff'd*, 829 F. App'x 887 (10th Cir. 2020) (unpublished); *Chaparral Energy LLC v. Naylor Farms Inc.*, No. 17-601, Order (10th Cir. June 7, 2017); *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 913 (10th Cir. 2018); *Soseeah v. Sentry Ins.*, 808 F.3d 800, 803, 807 (10th Cir. 2015).

48. *Vallario v. Vandehey*, 554 F.3d 1259, 1263–64 (10th Cir. 2009) (citations omitted).

49. FRCP 23(f).

50. *Nutraceutical Corp. v. Lambert*, __ U.S. __, 139 S.Ct. 710, 714 (2019).

51. *Id.* at 715 (holding that court of appeals could not extend deadline as equitably tolled); FRAP 26(b)(1) ("the court [of appeals] may not extend the time to file . . . a petition for permission to appeal"). *See also Delta Airlines v. Butler*, 383 F.3d 1143, 1145 (10th Cir. 2004) (district court lacked authority to extend time period and FRAP 26(b)(1) "specifically foreclose[s] appellate courts from granting an extension of time to file a petition for permission to appeal").

52. *Carpenter*, 456 F.3d at 1191–92 (decided under FRCP's 23(f) previous 10-day deadline).

53. *Id.* at 1190–92.

54. 28 USC § 1447(d).

55. This exception does not apply to certain securities and corporate governance class actions. 28 USC § 1453(d).

56. 28 USC § 1453(c)(1).

57. 28 USC § 1453(c)(2).

58. *See Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1093 (10th Cir. 2005).

59. 28 USC § 1453(c)(3)(A).

60. 28 USC § 1453(c)(3)(B).

61. 28 USC § 1453(c)(4).

62. *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35 (1995).

63. *Id.* at 51.

64. *Moore v. City of Wynnewood*, 57 F.3d 924, 929–30 (10th Cir. 1995) (exercising pendent appellate jurisdiction over city's appeal from denial of summary judgment on state law claim, which was inextricably intertwined with police chief's permissible appeal (under the collateral order doctrine) from denial of qualified immunity on federal civil rights claim). *But see Estate of Ceballos v. Husk*, 919 F.3d 1204, 1221 (10th Cir. 2019) (distinguishing *Moore* and declining to exercise pendent jurisdiction where issues raised in city's appeal from denial

of summary judgment on inadequate training claim "do no[t] overlap with the issue Officer Husk permissibly raised in his interlocutory appeal").

65. *Moore*, 57 F.3d at 930.

66. *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1114 (10th Cir. 1999).

67. *Stewart v. Okla.*, 292 F.3d 1257, 1260 (10th Cir. 2002), *cert. denied sub nom., Okla. Dep't of Corrs. v. Stewart*, 537 U.S. 1104 (2003).

68. FRAP 5(b), (c); 10th Cir. R. 5.1. Responses, cross-petitions, and replies are all optional—not mandatory. FRAP 5(b)(2).

69. FRAP 5(a)(2).

70. *See supra* note 51.

71. FRAP 5(b)(3).

72. FRAP 5(d)(2).

73. 28 USC § 1651(a).

74. *In re Antrobus*, 519 F.3d 1123, 1124 (10th Cir. 2008) (citations omitted).

75. *Pacificare of Okla., Inc. v. Burrage*, 59 F.3d 151, 153 (10th Cir. 1995) (internal quotation marks and citation omitted).

76. *E.g., Clyma v. Sunoco, Inc.*, 594 F.3d 777, 782–83 (10th Cir. 2010); *Sheet Metal Workers Int'l Ass'n, AFL-CIO v. Seay*, 693 F.2d 1000, 1005–06 (10th Cir. 1982), *reh'g denied and op. modified*, 696 F.2d 780 (10th Cir. 1983).

77. FRAP 21; 10th Cir. R. 21.1.

78. *See Cheney v. Dist. Ct.*, 542 U.S. 367, 378–79 (2004) (in dictum, assuming that laches may apply to a petition).

79. FRAP 21(a), (d).

80. FRAP 21(b)(1).

81. FRAP 21(b)(6).

**149**

# Exhibit 20

# Santander will exit U.S. home lending, review commercial segments

By **Laura Alix**

**February 02, 2022, 5:31 p.m. EST2 Min Read**

Banco Santander plans to exit U.S. residential mortgage lending and review its stateside presence in certain commercial segments as part of a broader overhaul of its American franchise.

Santander will focus on growing its U.S. auto lending and consumer lending segments, the Spanish banking giant said Wednesday. It also plans to concentrate on banking middle-market clients in this country, and on working with corporate clients across its global footprint.

The changes are part of a multiyear effort, internally called One Santander, that has already included an exit from retail banking in Puerto Rico and the downsizing of the company's Northeast U.S. branch footprint.



*Boston-based Santander Bank plans to stop originating new mortgages and home equity loans, while also making more auto loans, under a plan announced Wednesday.*
*Ron Antonelli/Bloomberg*

"We are simplifying our business to focus on those areas where we can be successful with clients and deliver solid returns," Tim Wennes, president and CEO of Santander Bank and its U.S. holding company, said in an interview.

Profits from Santander's U.S. business more than doubled to $2.3 billion last year on higher revenues and a lower cost of credit, Banco Santander said Wednesday. Its U.S. businesses contributed 22% of the parent company's profits in 2021, up from 7% in 2019, Executive Chairman Ana Botin said during a conference call.

Last year, Madrid-based Banco Santander announced a buyout of the minority shareholders in Santander Consumer USA, its Dallas-based auto lending unit. That process was completed on Monday, according to disclosures filed with the Securities and Exchange Commission.

Santander's U.S. holding company is also awaiting regulatory approval of its acquisition of Amherst Pierpont Securities, a New York-based independent broker-dealer. That deal, first announced in July 2021, is expected to give Santander a larger foothold in fixed-income trading, which surged during the pandemic.

Santander Bank, which has $89.5 billion of assets, said that it plans to stop originating new mortgages and home equity loans later this month because of a lack of scale in those areas. The company reasoned that its capital and resources could be better spent on more profitable growth areas, such as auto lending and priority segments within commercial lending, Wennes said.

"We didn't see a clear path to above cost-of-capital returns and made a decision to stop new originations," Wennes said. The decision should have no immediate impact on customers in Santander's mortgage servicing portfolio, he added.

Over time, Santander intends to originate more auto loans on the balance sheet of its Boston-based bank, and to use retail deposits gathered through the bank to fund prime auto loans originated by Santander Consumer, according to the company.

Santander's U.S. consumer banking unit will also continue to focus on making unsecured personal loans, issuing credit cards and offering small-business loans, the company said.

While Santander is reviewing certain segments within commercial and industrial lending, the company said it intends to ramp up its middle-market business banking. And through its corporate and investment bank, Santander plans to connect with larger international corporate clients that have connections in some of its other markets, like Spain and Chile, the company said.

Laura Alix
Staff Writer, American Banker



Lillian J Clark
70 Elm St
Enfield, CT 06082-3631

# Important information about your Santander Home Equity Line of Credit.

February 3, 2022

Dear Lillian J Clark,

<mark>As of February 11th</mark>, Santander will no longer be taking applications for new mortgages or home equity lines of credit. Please let us reassure you that **this move won't affect your current home equity line of credit in any way.**

- You'll continue to be our valued client
- Your interest rate will not be impacted by this change
- Your repayment terms will remain the same
- You'll continue to enjoy all the same benefits and services

Your business is important to us, and we appreciate the opportunity to meet your needs. We've prepared some detailed answers to questions you may have about this business decision.

Please scan the QR code below or visit SantanderBank.com/home-lending-changes to learn more.

Thank you for being a valued client.

Sincerely,

Stuart Bernstein
Santander Head of Branch Banking and Santander Private Client



Santander Bank, N.A. is a Member FDIC and a wholly owned subsidiary of Banco Santander, S.A. ©2022 Santander Bank, N.A. All rights reserved. Santander, Santander Bank and the Flame Logo are trademarks of Banco Santander, S.A. or its subsidiaries in the United States or other countries. All other trademarks are the property of their respective owners.

**153**

HELOC

Please Sign In and use this article's on page print button to print this article.

**Banking & Financial Services**

# Santander to lay off 53 in Conshohocken as it exits U.S. residential mortgage business



Santander Bank plans to lay off 53 local employees as part of a broader plan to exit the residential mortgage and home equity origination space in the United States.

MICHAEL POTTER



By Jeff Blumenthal  –  Reporter, Philadelphia Business Journal
a day ago

**IN THIS ARTICLE**

**Residential Real Estate**
Industry

**Michael Pagano**
Person

Santander Bank plans to lay off 53 employees in Conshohocken as part of a broader plan to exit the residential mortgage and home equity origination space in the United States.

The Boston-based bank, a subsidiary of Spanish banking giant Santander Group (NYSE: SAN), said the cuts will involve almost 400 employees, or 4.5% of its approximately 8,700 workers.

In a letter submitted to the Pennsylvania Department of Labor and Industry, Michael Pagano, head of employee relations at Santander, said workers were notified by Feb. 2 and placed on a paid notice period until their effective termination date on or after April 8. At that point, they will be eligible for severance benefits. Pagano said while the layoffs are permanent, the affected employees can apply for existing vacancies within the company.

In a statement, Santander said that its U.S. strategy is to simplify, focusing on at-scale businesses that can

**154**

achieve profitable growth. The bank said it stopped new originations of home mortgages and home equity loans because the company hadn't achieved scale in those areas and the capital and resources could be better spent on areas, such as auto lending and segments of business and commercial banking.

In August, Santander paid $2.5 billion to buy out the minority stake in its Dallas-based auto financing unit, Santander Consumer (NYSE: SC). Later in the year, executives discussed plans to beef up commercial lending in the Philadelphia region and across its footprint.

"We will discontinue residential mortgage and home equity originations as we continue to focus on investing in products that have scale and that leverage our core strengths," a spokeswoman said via email. "This move will allow us to unlock capital to fuel our growth and help Santander U.S. continue to deliver attractive, sustainable returns. We remain committed to our clients, small businesses and the communities we serve and are ensuring that our current clients and those in our pipeline are not impacted."

While the bank is discontinuing new originations, it said there will be no immediate impact to existing home loan clients. It will continue to service our existing and pending home loans while evaluating strategic options for the remaining book of business.

While it might seem odd to exit the residential mortgage business as it has been booming during the pandemic, activity began to wane in the second half of 2021. The Mortgage Bankers Association said it expects originations to decline 33% year-over-year to $2.59 trillion in 2022 — citing higher rates, lower volumes, and fiercer competition.

Santander said U.S. business more than doubled to $2.3 billion in 2021, contributing almost 22% of Santander Group's global profits. It said that number is up from 7% in 2019.

Santander, which remains the seventh-largest deposit taker in the Philadelphia region, has also been saving money but pruning its retail branch network. It has closed 13 local branches since the start of 2021, leaving it with 60.

# Exhibit 21

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

Clark, et al.                    )

                                 )          Civil Case No. 3:22-CV-00039-SVN

        vs.                      )

                                 )          February 11, 2022

Santander Bank, N.A., et al.     )

                                 )

# MOTION FOR DEFENDANT SANTANDER BANK, N.A. TO PRESERVE ALL U.S. RESIDENTIAL MORTGAGE AND HELOC RECORDS, AND ALL RELATED EMPLOYMENT RECORDS

## Statement of Facts

1.) On Monday, January 10, 2022, at 3:19 PM, Gordon Clark, and the *Estate of Lillian J. Clark*, filed a 22-count federal *Complaint* against *Santander Bank, N.A.* and twelve (12) additional Defendants with the *United States District Court: District of Connecticut in Hartford,* which is ***presently pending*** before USDC Judge Sarala V. Nagala.

2.) On or around February 2, 2022, Defendant *Santander Bank, N.A.*, ***abruptly, suddenly, inexplicably, and publicly*** announced their *exit* from the *U.S. Residential Mortgage and HELOC* lending market (**please see: Exhibit A – *American Banker* article**).

3.) Shortly after February 3, 2022, Plaintiffs received via *USPS First Class Mail* a *notification letter* from Defendant *Santander Bank, N.A.* of their said ***abrupt, sudden, inexplicable, and public*** decision to *exit* from the *U.S. Residential Mortgage and HELOC* lending market ***starting today***, February 11, 2022, (**please see: Exhibit B – *Santander Bank, N.A.* notification letter dated February 3, 2022**).

4.) On February 9, 2022, the *Philadelphia Business Journal* published an article that Defendant *Santander Bank, N.A.*, has announced the *layoffs* of approximately ***400 employees*** due to their ***abrupt, sudden, inexplicable, and public*** *exit* from the *U.S. Residential Mortgage and HELOC* lending market (**please see: Exhibit C – *Philadelphia Business Journal* article**).

1

**157**

WHEREFORE, the Plaintiffs, in an effort to *preserve all evidence related to this case respectfully* requests that this **MOTION FOR DEFENDANT SANTANDER BANK, N.A. TO PRESERVE ALL U.S. RESIDENTIAL MORTGAGE AND HELOC RECORDS, AND ALL RELATED EMPLOYMENT RECORDS** be *granted* by this Court.

Thank you for your time, consideration, and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on February 11, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Certificate of Service

I, Plaintiff Gordon Clark, certify that a copy of the above **MOTION FOR DEFENDANT SANTANDER BANK, N.A. TO PRESERVE ALL U.S. RESIDENTIAL MORTGAGE AND HELOC RECORDS, AND ALL RELATED EMPLOYMENT RECORDS** will be served via *electronic service* on February 11, 2022, to the following:

Mr. Patrick S. Tracey, Esq. *(Represents all five (5) Santander Bank, N.A. named Defendants)*
c/o Bowditch & Dewey, LLP
101 Federal Street, Suite 1405
Boston, MA 02110
**Served via Electronic Service**

Mr. Jeffrey M. Knickerbocker, Esq.
*(Represents himself, and the five (5) additional Bendett & McHugh, P.C. named Defendants)*
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Mr. Sean R. Higgins, Esq. *(Represents both Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**


Dated and signed at Enfield, Connecticut, on February 11, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
*(Husband & Executor of the Estate of Lillian J. Clark)*
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit A

# Santander will exit U.S. home lending, review commercial segments

**By** **Laura Alix**

**February 02, 2022, 5:31 p.m. EST2 Min Read**

Banco Santander plans to exit U.S. residential mortgage lending and review its stateside presence in certain commercial segments as part of a broader overhaul of its American franchise.

Santander will focus on growing its U.S. auto lending and consumer lending segments, the Spanish banking giant said Wednesday. It also plans to concentrate on banking middle-market clients in this country, and on working with corporate clients across its global footprint.

The changes are part of a multiyear effort, internally called One Santander, that has already included an exit from retail banking in Puerto Rico and the downsizing of the company's Northeast U.S. branch footprint.



*Boston-based Santander Bank plans to stop originating new mortgages and home equity loans, while also making more auto loans, under a plan announced Wednesday.*
*Ron Antonelli/Bloomberg*

"We are simplifying our business to focus on those areas where we can be successful with clients and deliver solid returns," Tim Wennes, president and CEO of Santander Bank and its U.S. holding company, said in an interview.

Profits from Santander's U.S. business more than doubled to $2.3 billion last year on higher revenues and a lower cost of credit, Banco Santander said Wednesday. Its U.S. businesses contributed 22% of the parent company's profits in 2021, up from 7% in 2019, Executive Chairman Ana Botin said during a conference call.

Last year, Madrid-based Banco Santander announced a buyout of the minority shareholders in Santander Consumer USA, its Dallas-based auto lending unit. That process was completed on Monday, according to disclosures filed with the Securities and Exchange Commission.

Santander's U.S. holding company is also awaiting regulatory approval of its acquisition of Amherst Pierpont Securities, a New York-based independent broker-dealer. That deal, first announced in July 2021, is expected to give Santander a larger foothold in fixed-income trading, which surged during the pandemic.

Santander Bank, which has $89.5 billion of assets, said that it plans to stop originating new mortgages and home equity loans later this month because of a lack of scale in those areas. The company reasoned that its capital and resources could be better spent on more profitable growth areas, such as auto lending and priority segments within commercial lending, Wennes said.

"We didn't see a clear path to above cost-of-capital returns and made a decision to stop new originations," Wennes said. The decision should have no immediate impact on customers in Santander's mortgage servicing portfolio, he added.

Over time, Santander intends to originate more auto loans on the balance sheet of its Boston-based bank, and to use retail deposits gathered through the bank to fund prime auto loans originated by Santander Consumer, according to the company.

Santander's U.S. consumer banking unit will also continue to focus on making unsecured personal loans, issuing credit cards and offering small-business loans, the company said.

While Santander is reviewing certain segments within commercial and industrial lending, the company said it intends to ramp up its middle-market business banking. And through its corporate and investment bank, Santander plans to connect with larger international corporate clients that have connections in some of its other markets, like Spain and Chile, the company said.

Laura Alix
Staff Writer, American Banker

# Exhibit B



Important
information about
your Santander
Home Equity
Line of Credit.

Lillian J Clark
70 Elm St
Enfield, CT 06082-3631

February 3, 2022

Dear Lillian J Clark,

As of February 11th, Santander will no longer be taking applications for new mortgages or home equity lines of credit.
Please let us reassure you that **this move won't affect your current home equity line of credit in any way**.

- You'll continue to be our valued client
- Your interest rate will not be impacted by this change
- Your repayment terms will remain the same
- You'll continue to enjoy all the same benefits and services

Your business is important to us, and we appreciate the opportunity to meet your needs. We've prepared some detailed answers to questions you may have about this business decision.

Please scan the QR code below or visit SantanderBank.com/home-lending-changes to learn more.

Thank you for being a valued client.

Sincerely,

Stuart Bernstein
Santander Head of Branch Banking and Santander Private Client



Santander Bank, N.A. is a Member FDIC and a wholly owned subsidiary of Banco Santander, S.A. ©2022 Santander Bank, N.A. All rights reserved. Santander, Santander Bank and the Flame Logo are trademarks of Banco Santander, S.A. or its subsidiaries in the United States or other countries. All other trademarks are the property of their respective owners.

**164**

HELOC

# Exhibit C

Please Sign In and use this article's on page print button to print this article.

Banking & Financial Services

# Santander to lay off 53 in Conshohocken as it exits U.S. residential mortgage business



Santander Bank plans to lay off 53 local employees as part of a broader plan to exit the residential mortgage and home equity origination space in the United States.

MICHAEL POTTER

 By Jeff Blumenthal  –  Reporter, Philadelphia Business Journal
a day ago

**IN THIS ARTICLE**

**Residential Real Estate**
Industry

**Michael Pagano**
Person

Santander Bank plans to lay off 53 employees in Conshohocken as part of a broader plan to exit the residential mortgage and home equity origination space in the United States.

The Boston-based bank, a subsidiary of Spanish banking giant Santander Group (NYSE: SAN), said the cuts will involve almost 400 employees, or 4.5% of its approximately 8,700 workers.

In a letter submitted to the Pennsylvania Department of Labor and Industry, Michael Pagano, head of employee relations at Santander, said workers were notified by Feb. 2 and placed on a paid notice period until their effective termination date on or after April 8. At that point, they will be eligible for severance benefits. Pagano said while the layoffs are permanent, the affected employees can apply for existing vacancies within the company.

In a statement, Santander said that its U.S. strategy is to simplify, focusing on at-scale businesses that can

achieve profitable growth. The bank said it stopped new originations of home mortgages and home equity loans because the company hadn't achieved scale in those areas and the capital and resources could be better spent on areas, such as auto lending and segments of business and commercial banking.

In August, Santander paid $2.5 billion to buy out the minority stake in its Dallas-based auto financing unit, Santander Consumer (NYSE: SC). Later in the year, executives discussed plans to beef up commercial lending in the Philadelphia region and across its footprint.

"We will discontinue residential mortgage and home equity originations as we continue to focus on investing in products that have scale and that leverage our core strengths," a spokeswoman said via email. "This move will allow us to unlock capital to fuel our growth and help Santander U.S. continue to deliver attractive, sustainable returns. We remain committed to our clients, small businesses and the communities we serve and are ensuring that our current clients and those in our pipeline are not impacted."

While the bank is discontinuing new originations, it said there will be no immediate impact to existing home loan clients. It will continue to service our existing and pending home loans while evaluating strategic options for the remaining book of business.

While it might seem odd to exit the residential mortgage business as it has been booming during the pandemic, activity began to wane in the second half of 2021. The Mortgage Bankers Association said it expects originations to decline 33% year-over-year to $2.59 trillion in 2022 — citing higher rates, lower volumes, and fiercer competition.

Santander said U.S. business more than doubled to $2.3 billion in 2021, contributing almost 22% of Santander Group's global profits. It said that number is up from 7% in 2019.

Santander, which remains the seventh-largest deposit taker in the Philadelphia region, has also been saving money but pruning its retail branch network. It has closed 13 local branches since the start of 2021, leaving it with 60.

**167**

# Exhibit 22

## Local Rule 46.2 Attorney Discipline

**(a)**     **Grievance Panel.** All attorney grievance and discipline matters are initially handled by a panel of judges, the "Grievance Panel."

**(b)**     **Committee on Admissions and Grievances.**

    **(1)**     **Appointment of Committee Members, Chair, and Secretary.**

        **(A)**     A standing committee of members of the bar, the "Committee on Admissions and Grievances," is appointed by the court to serve staggered three-year terms.

        **(B)**     The court designates a Committee member to serve as chair, and appoints a bar member to serve as secretary. The Committee's secretary is not entitled to vote on its proceedings.

    **(2)**     **Referrals.**

        **(A)**     The court's Grievance Panel may refer to the Committee, for investigation, hearing and report, the following types of matters:

            **(i)**     an accusation or evidence of attorney misconduct, including affirmative misconduct, negligent conduct, or conduct caused by or resulting from physical or mental infirmity, or the use of alcohol, drugs or other substances;

            **(ii)**     any other circumstance suggesting that an attorney may be unable to meet obligations to the court; or

            **(iii)**     any other situation in which the Grievance Panel seeks the guidance of the Committee, including matters relating to applications for admission or reinstatement to the court's bar, possible reciprocal discipline based on the imposition of discipline by another court or bar, or possible discipline based on an attorney's criminal conviction.

        **(B)**     The Committee may refer a matter to an appropriate attorney disciplinary authority for preliminary investigation, or may conduct a joint investigation with that authority. For the purpose of this rule, an attorney disciplinary authority includes any court, bar association, attorney admissions or discipline committee, government agency, or other licensing authority responsible for regulating the conduct of attorneys practicing law in that jurisdiction.

    **(3)**     **Committee Proceedings.**

        **(A)**     **Investigation.** Unless the Grievance Panel directs otherwise, the

Committee may commence an investigation of a matter referred to it before the provision of notice to the attorney. The Committee determines the appropriate extent and methods of investigation.

**(B)**     **Notice of Charges and Order to Show Cause.** If the Committee determines to bring charges against an attorney, it will provide the attorney with a written notice of the charges and the reasons the conduct may warrant the imposition of discipline or other corrective measures, and will order the attorney to show cause why discipline or other corrective measures, either specified in the notice and order or to be later determined, should not be imposed. A notice and order is served on the attorney personally or by certified or registered mail.

**(C)**     **Representation by Counsel.** An attorney subject to proceedings under this rule is entitled to be represented by counsel throughout the proceedings.

**(D)**     **Attorney Answer to Notice of Charges and Order to Show Cause.** Unless the Committee directs otherwise, the attorney must respond to the notice of charges and order to show cause within 28 days after service by filing an answer, any supporting evidence and any request for a hearing.

    **(i)**     Absent a court order to the contrary, the attorney may examine all documents in the record before submitting an answer.

    **(ii)**     The answer must include the following information: (a) a list of all bars to which the attorney is admitted, including all bar numbers and other bar identification information; (b) a list of all cases pending before the court in which the attorney is involved; (c) a list of any pending or previous disciplinary proceedings, and any discipline imposed, by an attorney disciplinary authority; (d) a statement of the alleged facts that are controverted; (e) the basis on which any controverted facts are disputed; and (f) any additional facts that are relevant to the Committee's determinations on the need for discipline or other corrective measures, including facts relevant to defense or mitigation.

    **(iii)**     The attorney must produce all documents requested in the Committee's notice of charges and order to show cause.

    **(iv)**     The answer must be made under oath or in such other form that the penalties for perjury apply.

    **(v)**     A copy of the answer may, in the discretion of the Committee, be furnished to a complainant or to other persons whose participation is relevant to the proceeding.

**(E)**     **Hearing Procedures.** After the attorney has answered the Committee's notice of charges and order to show cause, or after the time to answer has

expired, the Committee may hold a hearing to take testimony and receive other evidence, to hear argument, or both. If the Committee holds a hearing:

(i) the Committee must provide at least 14 days notice to the attorney of any hearing;

(ii) the attorney has the right to appear, to present witnesses and other evidence, and to confront and cross-examine under oath any witness against the attorney;

(iii) the Committee, or the person presiding over the hearing, may announce and be governed by any other rules of procedure warranted by the circumstances;

(iv) the attorney and all witnesses must testify under oath or affirmation; and

(v) a record and transcript of the hearing must be made.

(F) **Subpoenas and Other Orders.**

(i) **Subpoenas and Orders Requiring Production of Evidence, Testimony, or Examination.** The Committee or the attorney who is the subject of a proceeding before the Committee may apply to the Grievance Panel, on a showing of good cause, for a subpoena or other order requiring (a) the production of relevant documents or other evidence in the possession of third parties or the attorney, (b) the presence and testimony of relevant witnesses or the attorney at a deposition or hearing, or (c) a witness or the attorney to submit to a physical or mental examination by a suitably licensed or certified examiner.

(ii) **Protective Orders.** The Committee, the attorney, or any other affected person may apply to the Grievance Panel for a protective order.

(iii) **Sanction Orders.** The Committee, the attorney, or any other affected person may apply to the Grievance Panel for an order sanctioning a person who fails to obey a Committee or Grievance Panel order or who violates the Committee's or the Court's confidentiality rules.

(G) **Burden of Proof.** A finding of misconduct must be supported by clear and convincing evidence. A finding as to any other issue, including issues pertaining to the imposition of discipline or other corrective measures, must be supported by a preponderance of the evidence.

(H)  **Exception to Procedures.** In a particular matter, the Grievance Panel or the Committee may determine that one or more of the procedures described in this rule are unnecessary or inappropriate, in which case it will so advise the attorney.

(I)  **Effect of Attorney's Incapacity, Death, or Actual or Proffered Resignation on Committee Proceedings.** Once a matter has been referred to the Committee by the Grievance Panel, the Committee in the first instance determines the effect of the subject attorney's incapacity, death, or actual or proffered resignation on Committee proceedings. That determination is then incorporated into the Committee's report to the Grievance Panel.

(4)  **Committee Report.**

(A)  **Filing Procedure.** The Committee must file with the clerk the record of its proceedings, a report containing its findings and recommendations, and any separate or dissenting statements of Committee members. The clerk retains the report under seal after furnishing the Grievance Panel with copies. The Committee may, at its discretion, inform a complainant or other interested party that the report has been filed with the court. The clerk mails a copy of the report to the attorney and makes the record of the proceedings available to the attorney.

(B)  **Committee Recommendations.** The Committee may recommend to the Grievance Panel that the attorney be:

(i)  removed from the bar of the court;

(ii)  if not a member of the bar of the court, precluded from becoming a member or from appearing in future cases before the court;

(iii)  suspended from practice before the court, for either an indefinite or a specified period of time;

(iv)  publicly or privately reprimanded;

(v)  monetarily sanctioned;

(vi)  removed from the court's pro bono or Criminal Justice Act panels;

(vii)  referred to another attorney disciplinary authority, law enforcement agency, or other agency or organization;

(viii)  subject to other disciplinary or corrective measures as the circumstances may warrant, including any combination of the preceding possible measures; or

> **(ix)** not subject to discipline and the charges dismissed.

> **(C) Attorney Response to Committee Report.** Within 21 days after the filing of the report, the attorney must file a response conforming to the requirements of FRAP 27(d). The response may oppose, seek to mitigate, or waive objection to the report. The Grievance Panel may request that the Committee reply to the attorney's response.

**(5) Decision by the Court.** After receipt of the attorney's responding statement and any Committee reply (or after expiration of the time for the filing of the statement and reply), the Grievance Panel, or another panel of the court as directed by the Grievance Panel, rules on the matter within a reasonable time by majority vote.

**(6) Confidentiality.** All matters referred to, all proceedings conducted by, and all records possessed by the Committee remain confidential, unless the Grievance Panel orders otherwise, or the Committee acts under (b)(2)(B) or (b)(7). The Committee may make recommendations to the Grievance Panel concerning confidentiality issues, including the possible need for a protective order or an order sanctioning the violation of a confidentiality rule, or the desirability of making public, in whole or part, a matter that is otherwise confidential under these rules. The Committee may recommend public disclosure, or notification to a particular person or entity, in order to protect the public, the administration of justice, or the legal profession.

**(7) Procedure to Disclose Information to a New York State Attorney Disciplinary Authority.** A disciplinary authority of a New York State supreme court appellate division may request, from the Grievance Panel or the Committee, expedited disclosure of confidential records for use by that disciplinary authority in its own investigation or proceeding. The request shall be made in writing and submitted to the Grievance Panel. The request should, to the extent practicable, identify the nature of the pending investigation or proceeding and the specific records sought. The request may also seek deferral of notice of the request for so long as the matter is under investigation or consideration by the appellate division disciplinary authority. Upon receipt of the request, the Grievance Panel may determine the request or take any other action it deems appropriate. Prior to taking such action, the Grievance Panel shall seek the assurance of the appellate division disciplinary authority that any confidential records disclosed to the appellate division disciplinary authority in response to the request shall not be used for any purpose other than the investigation or proceeding pending before the disciplinary authority.

**(c) Reciprocal Suspension or Disbarment.**

**(1) Notification Requirement.** An attorney admitted to practice in this court who is disbarred, suspended, publicly censured, or otherwise disciplined by an attorney disciplinary authority must file with the clerk a copy of that disciplinary order within 28 days. For the purpose of this rule, an attorney who resigns from the bar of a state or court while under investigation for alleged misconduct is deemed disbarred by that state or court, and the attorney's resignation, along with any

acknowledgment or acceptance of that resignation by the state or court, is deemed an order of disbarment.

(2) **Reciprocal Order.** When the court receives a copy of an order entered by an attorney disciplinary authority disbarring or suspending an attorney from practice, the clerk enters an order disbarring or suspending the attorney from practice before this court on comparable terms and conditions. This court's order becomes effective 28 days after it is filed, unless the court orders otherwise.

(3) **Motion to Modify or Vacate.** Within 21 days after the filing of this court's order, the attorney may move to modify or vacate the order. The motion will be decided by the Grievance Panel, unless referred to the Committee. The timely filing of a motion stays the court's order until the motion is determined. Unless good cause is shown, an untimely motion will not be considered.

(d) **Attorney Convicted of Crime.**

(1) **Notification Requirement.** An attorney admitted to practice in this court who has pled guilty to or been found guilty of a crime (a "guilty verdict") must notify the clerk in writing within 28 days after entry of the guilty verdict.

(2) **Response to Notification.**

(A) When the court receives notification of a guilty verdict for a serious crime, as defined below, the clerk: (i) immediately enters an order suspending the attorney, and (ii) serves a copy of the order on the attorney by mail at the attorney's last known address.

(B) When the court receives notification of a guilty verdict for a crime that is not a serious crime, the clerk forwards the relevant documents to the Grievance Panel, which determines whether to enter a suspension order, commence a disciplinary proceeding, or refer the matter to the Committee.

(C) The term "serious crime" means a federal or state felony, or a federal or state crime other than a felony that includes as a necessary element – as determined by the statutory or common law definition of the crime in the jurisdiction where the plea or verdict has been entered – any of the following: (i) interference with the administration of justice; (ii) false statement under oath; (iii) misrepresentation; (iv) fraud; (v) willful failure to file an income tax return; (vi) deceit; (vii) bribery; (viii) extortion; (ix) misappropriation; (x) theft; or (xi) an attempt, or conspiracy, or solicitation of another to commit a serious crime.

(3) **Evidentiary Effect.** A guilty verdict for any crime is clear and convincing evidence of conduct unbecoming a member of the bar.

(4) **Motion to Modify or Vacate.** The attorney may move to modify or vacate a suspension or other disciplinary order under (d). The motion will be decided by

**174**

the Grievance Panel, unless referred to the Committee.

**(5)**     **Reinstatement.** An attorney suspended under (d)(2) will be reinstated upon the filing of a clerk's certificate showing reversal of the underlying conviction, although the Grievance Panel may continue any proceeding then pending against the attorney.

**(6)**     **Disbarment.** A suspension order under (d)(2)(A) will be converted to a disbarment order upon exhaustion of all direct appeals from a criminal conviction, unless the court orders otherwise.

# Exhibit

# 23

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| Clark, et al. | ) | Civil Case No. 3:22-CV-00039-SVN |
|  | ) |  |
| vs. | ) |  |
|  | ) | May 12, 2022 |
| Santander Bank, N.A., et al. | ) |  |
|  | ) |  |

## PLAINTIFFS' MOTION FOR SANCTIONS AGAINST ATTORNEYS RIDGELY WHITMORE BROWN AND SEAN R. HIGGINS, AND POSSIBLY ALSO AGAINST ATTORNEYS JEFFREY M. KNICKERBOCKER AND PATRICK TRACEY, BASED ON SWORN TESTIMONY AND EVIDENCE PRESENTED AT PUBLIC HEARING

Pursuant to the applicable provisions of the *Connecticut Practice Book*, including, but not limited to the *Connecticut Attorney's Oath*, and the *Rules of Professional Conduct: Rule 1.18(a) and (b)*; Rule 4.1; and the *Federal Rules of Civil Procedure*: Rule11(c)(4).  The Plaintiffs *respectfully* moves this Court to grant **PLAINTIFFS' MOTION FOR SANCTIONS AGAINST ATTORNEYS RIDGELY WHITMORE BROWN AND SEAN R. HIGGINS, AND POSSIBLY ALSO AGAINST ATTORNEYS JEFFREY M. KNICKERBOCKER AND PATRICK TRACEY, BASED ON SWORN TESTIMONY AND EVIDENCE PRESENTED AT PUBLIC HEARING**.

### Memorandum of Law
*[Bold italic added throughout document for emphasis].*

1.) ***The Ninth (9th) Commandment*** is:

> ***"Thou shalt not bear false witness against thy neighbor."***

> Exodus 20:16

2.) ***The Tenth (10th) Commandment*** is:

> ***"Thou shalt not covet thy neighbor's house …, nor any thing that is thy neighbor's."***

> Exodus 20:17

1

3.) **The Second (2nd) Great Commandment** is:

> **"… Thou shalt love thy neighbor as thyself."**

> Matthew 22:39

4.) There is a **Common Law Maxim**, which states the following:

> **"Truth is the essence of justice.  Without truth justice cannot exist."**

5.) There is a **Common Law Maxim**, which states the following:

> "There is **nothing more sacred, more inviolate, than the house of every citizen.**"

6.) *United States Constitution: Freedom to Contract Clause, Article I, Section 10, Clause 1*, which states, in part:

> "No State shall … pass any … Law impairing the Obligation of Contracts …"

7.) *"The U.S. Constitution states only one command **twice**,"* in the 5th Amendment, and the 14th Amendment, that is, **the command/clause of due process of law**.

8.) *United States Constitution: Due Process of Law Clause – **5th Amendment***, which states, in part:

> "… nor be deprived of life, liberty, or property, **without due process of law**; nor shall private property be taken for public use, without just compensation; and the **14th Amendment, Section 1**, which states, in part: "… nor shall any state deprive any person of life, liberty, or property, **without due process of law**; nor deny to any person within its jurisdiction the equal protection of the laws."

9.) The **Connecticut Attorney's Oath** reads as follows:

> "You solemnly swear or solemnly and sincerely affirm, as the case may be, that you will do **nothing dishonest**, and will not knowingly allow **anything dishonest** to be done in court, and that you will inform the court of **any dishonesty** of which you have knowledge; that you will not knowingly maintain or assist in maintaining any cause of action that is **false** or unlawful; **that you will not obstruct any cause of action for personal gain or malice**; but that you will exercise the office of attorney, in any court in which you may practice, according

2

*to the best of your learning and judgment, faithfully, to both your client and the court; so help you God or **upon penalty of perjury**."*

**(General Statutes § 1-25 and annotations.)**

10.)               **RULES OF PROFESSIONAL CONDUCT**
                   **Preamble: A Lawyer's Responsibilities**

A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and ***a public citizen having special responsibility for the quality of justice***.

***As negotiator***, a lawyer seeks a result advantageous to the client ***but consistent with requirements of honest dealing with others***.

11.)               **CLIENT-LAWYER RELATIONSHIPS**
                 **Rule 1.18. Duties to Prospective Client**

(a)  A person who consults with a lawyer concerning the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

(b)  Even when no client-lawyer relationship ensues, ***a lawyer who has learned information from a prospective client shall not use or reveal that information***, except as Rule 1.9 would permit with respect to information of a former client.

12.)       **TRANSACTIONS WITH PERSONS OTHER THAN CLIENTS**
           **Rule 4.1. Truthfulness in Statements to Others**

In the course of representing a client ***a lawyer shall not knowingly:***
***(1) Make a false statement of material fact or law to a third person;*** or
***(2) Fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client,*** unless disclosure is prohibited by Rule 1.6.

**COMMENTARY: Misrepresentation.**
A lawyer ***is required to be truthful when dealing with others*** on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. ***A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements***.

3

**179**

13.)        Federal Rules of Civil Procedure: Rule11(c)(4) states:

> *Nature of a Sanction. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.*

## Statement of Facts
*[Bold italic added throughout document for emphasis].*

1.) Based on *multiple joint filings* by the Defendants, it appears that all the Defendants have agreed verbally and/or in writing to a ***cooperation, coordination, and/or working agreement*** against the Plaintiffs in this matter, which is their choice.  However, this Court should take *Judicial Notice* that the Defendants have vast human and financial resources at their disposal, and that Mr. Clark is presently *pro se*, and Mr. Clark has had to interact with five (5) *opposing law firms*, and now ten (10) *opposing attorneys* in Mr. Clark's ongoing efforts to resolve this matter, based on *truth and justice*.

2.) On Tuesday, May 3, 2022, Mr. Clark contacted another *prospective attorney*, Attorney Ridgely Whitmore Brown (Mr. Brown) of the *Law Office of Ridgely Whitmore Brown* in Stamford, Connecticut to *potentially represent* the Plaintiffs' interests in the pending *Superior Court* and USDC cases.  After approximately a 45-minute phone call, and a subsequent over one (1) hour video call, Mr. Brown and Mr. Clark agreed to meet *face to face* sometime over the weekend in Stamford, Connecticut.

3.) On Saturday, May 7, 2022, said *prospective attorney* (Mr. Brown) and Mr. Clark met *face to face* for over four (4) hours in Mr. Brown's law office located at 15 Fifth Street in Stamford, Connecticut to discuss said pending cases, and *potential representation*.

4.) On Monday, May 9, 2022, at 10:54 AM, Mr. Clark, emailed *opposing counsel*, Patrick Tracey (Mr. Tracey), Sean Higgins (Mr. Higgins), and Jeffrey M. Knickerbocker (Mr. Knickerbocker) notifying them of Plaintiffs' intent to file a *Motion for a 21-Day Time Extension* requesting their *consent or not* by 3 PM.

Mr. Knickerbocker responded in 5-minutes via email stating that he *objects/does not consent* to said Motion; Mr. Tracey responded in about 2-hours via email also stating that he *objects/does not consent* to said Motion.  However, Mr. Higgins *did not respond* by 5 PM or at any time thereafter, which, ***unbeknownst to Mr. Clark at the time***, appears to have been due to Mr. Higgins ***immorally, unethically, unlawfully, and illegally***

4

**180**

**conspiring** with Mr. Brown for Mr. Clark to **withdraw the Plaintiffs' federal Complaint**, even though Mr. Higgins **knowingly understood** that Mr. Brown **had not been hired/retained** by Mr. Clark to represent the Plaintiffs in this matter, **yet Mr. Higgins disregarded his moral, ethical, lawful, and legal responsibilities and duties** and continued to **conspire** with Mr. Brown for Mr. Clark to **withdraw the Plaintiffs' federal Complaint**.

5.) On Monday, May 9, 2022, at 3:14 PM, Mr. Brown forwarded Mr. Clark an email with his attached *proposed fee agreement* (**Please see attached: Exhibit A, and Exhibit B**).

6.) On Tuesday, May 10, 2022, at 10:57 AM, Mr. Clark forwarded Mr. Brown an email **declining** Mr. Brown's *proposed fee agreement* (**Please see attached: Exhibit C**), which states, *in part*, the following:

> " … it appears that we are *too far apart* to come to a *mutually acceptable* representation and fee agreement."

> " … I simply cannot afford your $575 hourly rate *at this time*."

> " … I do not believe that our interests are aligned nor incentivized for our *mutual benefit* in your fee agreement.

> " … I do not want to offend you, so I will not make you any counteroffer."

> "Finally, you also mentioned that you would *probably* recommend me withdrawing my federal case, which you had not previously mentioned, … "

> " … although we were not able to come to a *mutually acceptable* representation and fee agreement, … "

7.) On Tuesday, May 10, 2022, around 2:45 PM, Mr. Clark left his home in Enfield, Connecticut to go to the *Hartford Law Library* located at the *Superior Court* in Hartford at 95 Washington Street.  While enroute, Mr. Clark received a phone call from Mr. Brown; however, Mr. Clark *prefers* to not take any calls while driving.  Therefore, Mr. Clark did not answer said call, and Mr. Brown left Mr. Clark a 32-second voicemail message on or around 2:59 PM, **clearly confirming** that Mr. Brown and Mr. Clark **had not** come to any representation nor fee agreement (**Please see attached: Exhibit D**), which states, *in its entirety*, the following:

> ***"Gordon, Ridge Brown speaking.  I am invested in your case, cause its interesting as you are.  So, I would like to tell you a few things, that I think you should do whether or not you engage my services; and then I will try to figure out a compromise fee arrangement and discuss it with you.  Please give a call. Thanks."***

After hearing Mr. Brown's voicemail message, Mr. Clark had every intention of returning Mr. Brown's phone call when he returned home after 5 PM.

8.) On Tuesday, May 10, 2022, sometime after 5 PM, Mr. Clark returned home from the *Hartford Law Library* and discovered two (2) emails that Mr. Brown had sent to Mr. Clark, shortly before Mr. Brown called Mr. Clark and leaving said voicemail message at 2:59 PM.  The ***first email*** was sent at 2:54 PM by Mr. Brown (**Please see attached: Exhibit E**), which stated, *in its entirety*, the following:

**First email (sent at 2:54 PM):**

> "Thanks.  I'm going to call you in a few and I am forwarding Higgins email fyi"

*Needless to say*, Mr. Clark was ***immediately stunned and sickened*** to read opposing counsel, Attorney Sean R. Higgins's (Mr. Higgins's) last name mentioned in said email from Mr. Brown, but Mr. Clark just thought it was a coincidence, and that the "Higgins" that Mr. Brown was referring to was just another case citation or someone else who shares the name "Higgins."  However, after reading Mr. Higgins's email sent to Mr. Brown and ***forwarded*** to Mr. Clark by Mr. Brown a few minutes after Mr. Brown's *first email* at 2:56 PM, ***any and all benefit of the doubt*** that Mr. Clark had for Mr. Brown and Mr. Higgins ***instantly evaporated***.

9.) On Tuesday, May 10, 2022, sometime after 5 PM, Mr. Clark returned home from the *Hartford Law Library* and discovered two (2) emails that Mr. Brown had sent to Mr. Clark, shortly before Mr. Brown called Mr. Clark and leaving said voicemail message at 2:59 PM.  The ***second email*** was an email ***originally*** sent by Mr. Higgins to Mr. Brown on Monday, May 9, 2022, at 8:27 PM, ***after business hours***, and Cc'd to attorneys Jeffrey M. Knickerbocker (Mr. Knickerbocker) and Patrick Tracey (Mr. Tracey), which Mr. Brown ***forwarded*** to Mr. Clark at 2:56 PM on Tuesday, May 10, 2022 (**Please see attached: Exhibit F**), which stated, *in its entirety*, the following:

**Second *forwarded* email (sent at 2:56 PM):**

> "Ridge:

I am copying Patrick Tracey and Jeff Knickerbocker, counsel for the other defendants in the federal lawsuit filed by Gordon Clark.  Following up on our discussion today, I understand that you may appear for Mr. Clark in the state court foreclosure case.  As for the federal court case, if Mr. Clark were to dismiss the lawsuit and proceed only in the state court, I suspect that the defendants would be agreeable to such an arrangement.  That said, I thought it would be best to include all counsel in one email in the interests of getting on the same page.  Perhaps a conference call makes sense?  If not, maybe you want to have Mr. Clark send over a proposed stipulation of dismissal?  Open to suggestions, though I speak only for my clients Wells Fargo and Mr. Powell.  I will let Patrick and Jeff speak for their respective clients.  Thank you.

Sean"

Once again, *needless to say*, Mr. Clark was **stunned and sickened** to read *opposing counsel*, Attorney Sean R. Higgins's (Mr. Higgins's) email dated Monday, May 9, 2022, at 8:27 PM, **after business hours**.  Where Mr. Higgins **clearly acknowledges** that Mr. Brown *was not* Mr. Clark's *retained attorney* (**"… that you may appear for Mr. Clark …"**), yet Mr. Higgins was following up with **proposed next steps** in Mr. Brown's and Mr. Higgins's **conspiracy to convince Mr. Clark to withdraw the Plaintiffs' federal Complaint**.  After reading Mr. Higgins's above email, which **clearly proves** Mr. Brown's **immoral, unethical, and illegal behavior and complete and total betrayal** of Mr. Clark's **private, confidential, and privileged information**, as well as Mr. Brown's and Mr. Higgins's **immoral, unethical, and illegal behavior exercised with impunity**.  Based on said **egregious and reprehensible behavior** by Mr. Brown and Mr. Higgins, Mr. Clark decided not to return Mr. Brown's phone call, *but instead*, Mr. Clark had to *rush to compose* a *Legal Notification to Cease and Desist* letter and emailed it to Mr. Brown, and all *opposing counsel* at 8:34 PM on Tuesday, May 10, 2022.

10.)   On Tuesday, May 10, 2022, at 8:34 PM, Mr. Clark emailed Mr. Brown a *Legal Notification to Cease and Desist* letter, and Cc'd all other opposing counsel, that is, Mr. Higgins, Mr. Knickerbocker, and Mr. Tracey (**Please see attached: Exhibit G**), which states, *in part*, the following:

1. Mr. Brown, you **have not** been hired by me at **any point in time**, verbally nor in writing, to be my legal counsel in **any matter whatsoever**, and you acknowledged this fact with a voicemail message you left on my phone on Tuesday, May 10, 2022, on or around 2:59 PM.

2. Mr. Brown, you also were **never** given any permission, nor did you **ever** ask for my permission, nor did you **ever** inform me that you were going to contact Attorney Sean R. Higgins of *K&L Gates, LLP* of Boston, and/or contact any

other opposing counsel concerning my pending Superior Court and USDC cases, ***and yet you did***.

3. Mr. Brown, this letter is ***legal notification to cease and desist*** from communicating ***in any manner*** with Attorney Sean R. Higgins of *K&L Gates, LLP* of Boston, nor with any other opposing counsel concerning my pending Superior Court and USDC cases.

11.)     On Wednesday, May 11, 2022, at 9:48 AM, Mr. Brown sent his *last email to date* to Mr. Clark (**Please see attached: Exhibit H**), which states, *in part*, the following:

"Dear Gary—

Acknowledged.

I am surprised at the tone of the letter, … "

*First of all*, Mr. Clark's name is not Gary, its Gordon, and Mr. Brown ***knows*** that, since in over six (6) hours of discussions over two (2) days, Mr. Brown ***never called*** Mr. Clark by any other name but Gordon.  Moreover, despite Mr. Brown's age of 75 years, Mr. Brown has a *very sharp mind*, and continues to be a *practicing and accomplished* attorney in Connecticut for decades.

Therefore, *it is clear* to Mr. Clark, that Mr. Brown in said above email is *laying the groundwork* for a defense of a *simple misunderstanding*, instead of an ***egregious, immoral, unethical, and illegal breach of the law***, the *Connecticut Attorney's Oath*, and the *Rules of Professional Conduct* (Rule 1.18, and 4.1), a *false claim* that Mr. Brown will *likely* base on his age and/or health, which is *disingenuous on its face*, based on the ***clear evidence otherwise***.

12.)     Finally, Mr. Clark believes that *all the above facts* are *another good reason* for this Court to *vacate its stay of discovery*, by ***granting*** *Plaintiffs' Motion to Vacate Stay of Discovery*, so that Mr. Clark can *discover* exactly what kind of past relationships existed between Mr. Brown and *all opposing counsel*, and exactly what ***private, confidential, and privileged information*** about Mr. Clark's pending *USDC and Superior Court cases* was ***immorally, unethically, and illegally disclosed and communicated*** between Attorney Ridgely Whitmore Brown and attorneys Sean R. Higgins, Jeffrey M. Knickerbocker, and Patrick Tracey from Tuesday, May 3, 2022, to date, so that Mr. Clark can fully determine how much damage has been done by Mr. Brown's ***immoral, unethical, and illegal disclosure*** to *opposing counsel*, and to properly assess how much damage has been done to Mr. Clark's pending federal and state lawsuits.

8

13.)     Federal Rules of Civil Procedure: Rule11(c)(4) states:

> *Nature of a Sanction. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.*

WHEREFORE, the Plaintiffs move this Court to:

1) Sanction Mr. Brown and Mr. Higgins, and any or all other *opposing counsel* that upon sworn testimony and a *public hearing* are proven to be *complicit* in Mr. Brown and Mr. Higgins **conspiratorial scheme to convince Mr. Clark to withdraw the Plaintiffs USDC Complaint**.

2) Require that *all liable attorneys* pay Mr. Clark for his **extremely valuable time** that Mr. Clark **also** places a value of **$575 an hour**, as Mr. Brown does, for having to expend at least 39 hours of time from Tuesday, May 3, 2022, *to date*, to consult with and travel to Mr. Brown in Stamford; to research, compose, and serve a *Legal Notification to Cease and Desist* letter; and to also research, compose and file three (3) *Motions* with this Court concerning Mr. Brown's, Mr. Higgins, and *possibly* other *opposing counsels* **immoral, unethical, illegal, egregious, and reprehensible behavior that clearly undermines and damages** Mr. Clark's pending USDC and *Superior Court* lawsuits.

3) Such other relief as this Court may deem appropriate.

WHEREFORE, based on ***all the material facts and relevant law*** referenced above, the Plaintiffs, *respectfully* moves this Court to *grant* the **PLAINTIFFS' MOTION FOR SANCTIONS AGAINST ATTORNEYS RIDGELY WHITMORE BROWN AND SEAN R. HIGGINS, AND POSSIBLY ALSO AGAINST ATTORNEYS JEFFREY M. KNICKERBOCKER AND PATRICK TRACEY, BASED ON SWORN TESTIMONY AND EVIDENCE PRESENTED AT PUBLIC HEARING** for their *repeated, ongoing, malicious, egregious, and reprehensible* **abuse of the legal process** in an **unjust, illegal, and beyond the pale** effort to **injure** the Plaintiffs and **steal** the Plaintiffs' property, in **complete disregard** of the *material facts and relevant law* in this case, along with **complete contempt** for the Plaintiffs and this Court, in addition to **complete disdain** for basic *Contract Law*, *Property Law*, the *Connecticut Attorney's Oath*, and the *Rules of Professional Conduct*.  All while **surreptitiously conspiring** to use *court procedures* that the Plaintiffs **do not fully understand**, along with their *immense legal contacts/connections/network* in the Defendants' and their attorneys' **ongoing efforts to intimidate and deny** the Plaintiffs their *U.S. Constitution guaranteed and protected right to due*

*process of law*, which is certainly **not** *moral, ethical, lawful, just, right, legal, nor equitable* behavior in *any way, shape, or form*; and **all of which** this Court should *admonish and sanction* with its **full and inherent authority and discretion**, and to the **fullest extent of the law**.

## CERTIFICATION

I, Gordon Clark, hereby certify that, pursuant to **Connecticut General Statutes § 42-110g(c)**, and as *required by law*, a copy of this **PLAINTIFFS' MOTION FOR SANCTIONS AGAINST ATTORNEYS RIDGELY WHITMORE BROWN AND SEAN R. HIGGINS, AND POSSIBLY ALSO AGAINST ATTORNEYS JEFFREY M. KNICKERBOCKER AND PATRICK TRACEY, BASED ON SWORN TESTIMONY AND EVIDENCE PRESENTED AT PUBLIC HEARING** will be mailed via *USPS Certified Mail* to the *Connecticut Attorney General*, Mr. William Tong, and the *Connecticut Commissioner of the Department of Consumer Protection*, Ms. Michelle H. Seagull.

Attorney General William Tong
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
**Mailed via *USPS Certified Mail***

Commissioner Michelle H. Seagull
Department of Consumer Protection
450 Columbus Boulevard, Suite 901
Hartford, CT 06103-1840
**Mailed via *USPS Certified Mail***

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on May 12, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Certificate of Service

I, Plaintiff Gordon Clark, certify that a copy of the above **PLAINTIFFS' MOTION FOR SANCTIONS AGAINST ATTORNEYS RIDGELY WHITMORE BROWN AND SEAN R. HIGGINS, AND POSSIBLY ALSO AGAINST ATTORNEYS JEFFREY M. KNICKERBOCKER AND PATRICK TRACEY, BASED ON SWORN TESTIMONY AND EVIDENCE PRESENTED AT PUBLIC HEARING** will be served via *electronic service* and/or *USPS First Class Mail* on May 12, 2022, to the following:

Mr. Patrick S. Tracey, Esq. *(Represents all six (6) Santander Bank, N.A. named Defendants)*
c/o Bowditch & Dewey, LLP
101 Federal Street, Suite 1405
Boston, MA 02110
**Served via Electronic Service**

Mr. Jeffrey M. Knickerbocker, Esq.
*(Represents himself, and the five (5) additional Bendett & McHugh, P.C. named Defendants)*
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Mr. Sean R. Higgins, Esq. *(Represents both Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**

Ridgely Whitmore Brown, Esq.
Law Office of Ridgely Whitmore Brown
15 Fifth Street
Stamford, CT 06905
203.918.1563
ridgebrown@ridgelylaw.com
**Sent via email and *USPS First Class Mail***

Dated and signed at Enfield, Connecticut, on May 12, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

11

**187**

# Exhibit A

**Santander v. Gordon et al**

ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

Mon 5/9/2022 3:14 PM

To: gordon christianeconomics.net <gordon@christianeconomics.net>

Cc: ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

Good Afternoon Gordon,

Please find attached a copy of the fee agreement in connection with the above captioned matter.

Thank you,
Lauren Renee


RIDGELY WHITMORE BROWN
LAWYER
15 FIFTH STREET
STAMFORD, CONNECTICUT 06905
*Phone* (203) 918-1563

--------------------------------------------------------------------

IRS Required Statement:  This document (and any attachments) was not
intended or written to be used, and it cannot be used by the recipient, for
the purpose of avoiding penalties that may be imposed on any taxpayer.

--------------------------------------------------------------------

--------------------------------------------------------------------

This message is intended only for the use of the addressee and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If the reader of this message is not the intended
recipient, or the employee or agent responsible for delivering the message
to the intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited. If you
have received this e-mail in error, please notify us immediately by return
e-mail and delete this e-mail and all attachments from your system.
Thank You.

--------------------------------------------------------------------

**189**

# Exhibit B

# RIDGELY WHITMORE BROWN
**LAWYER**
**15 FIFTH STREET**
**STAMFORD, CONNECTICUT 06905**
**(203) 918-1563**

**WRITER'S E-MAIL ADDRESS:**

RidgeBrown@Ridgelylaw.com

**WRITER'S DIRECT DIAL NUMBER:**

*(203) 918-1563*

May 9, 2022

Mr. Gordon Clark
70 Elm Street
Enfield, CT 06082

Re: Santander Bank, N.A. v. Lillian J. Clark, et al.

Dear Mr. Clark,

     The purpose of this letter is to describe the scope of our representation and to agree in writing on our fee arrangement. In connection with our representation of you on the above captioned matter we will agree to represent you as legal counsel on the following terms and conditions:

1.     We will devote our full professional ability to this matter and you agree to cooperate with us.  Neither you nor I will settle (or in criminal cases, plead) the case without the other's approval in writing or on the court record.

2.     This letter also includes a bill for an initial FLAT FEE.  You are not engaging my services for hourly work in the **first instance**.  You are paying for experience, expertise, and judgment involved in setting the initial course of this matter. The flat fee covers a 17 hour upset; upset means we will not start billing hourly until we have expended 17 hours. We will charge $575 per hour for work until further notice.

4.     We bill periodically on amounts due, and we expect payment upon receipt.  We will itemize disbursements and also bill for approximate telephone, photocopy, travel and other miscellaneous expenses.  Fees are billed based on rates of between $65 and $575 per hour depending on who is handling the matter and the nature of the matter.  Our hourly rates are subject to possible upward adjustment after one year.

5.     You agree to pay all costs of investigation for preparation and trial of each case, including sheriff's fees, court entry fees, expert witness fees and the like.

**191**

6.      You agree that we have made no promises or guarantees regarding the outcome of this case or your claim.  This agreement is for services rendered and to be rendered in connection with the preparation for and trial of the case.  This agreement does not include any legal services for taking the case beyond the trial court level in an appeal whether it is an appeal taken by the plaintiff or by the defendant.  Legal fees for handling an appeal will be negotiated on an entirely separate basis and separate counsel may be involved.

7.      If you breach this fee agreement, you are responsible for all collection costs including reasonable attorney's fees.

8.      Any fee disputes hereunder shall be submitted to the Connecticut Bar Association fee arbitration for determination in accordance with its rules.

If the terms of representation are agreeable to you, please sign the duplicate copy of this letter and return it to me with a flat fee check or electronic payment* for $10,000.00.

Very truly yours,

Ridgely Whitmore Brown

_____
        Gordon Clark

* Please contact Lauren to arrange electronic payment.

RWB/lh

5/9 P. S. I will enter an appearance in both state and Fed cases but after skimming the cases I will probably suggest a withdrawal of the Federal case.

**192**

**RIDGELY WHITMORE BROWN**
LAWYER
15 FIFTH STREET
STAMFORD, CONNECTICUT 06905
(203) 918-1563

May 9, 2022

Mr. Gordon Clark
70 Elm Street
Enfield, CT 06082

Re: Santander Bank, N.A. v. Lillian J. Clark, et al.

## BILL FOR FLAT FEE

**FOR PROFESSIONAL SERVICES RENDERED OR TO BE RENDERED** as per the fee agreement.

$10,000.00

**193**

# Exhibit C

Re: Santander v. Gordon et al

gordon christianeconomics.net <gordon@christianeconomics.net>

Tue 5/10/2022 10:57 AM

To: ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

Dear Ridge:

It is my *sincere* hope and prayer that all is well with you and your family.  Moreover, thank you for forwarding me a copy of your *proposed fee agreement* in a timely manner; I *truly* appreciate it.

In addition, although I was *hoping* to be able to work with you on this case, it appears that we are *too far apart* to come to a *mutually acceptable* representation and fee agreement.  Moreover, as I stated to you on Saturday, I believe that you have every right to set your own wages; however, I simply cannot afford your $575 hourly rate *at this time*.  Furthermore, I do not believe that our interests are aligned nor incentivized for our mutual benefit in your fee agreement.  Lastly, I do not want to offend you, so I will not make you any counteroffer.  However, any counteroffer would have included a contingency fee, that obviously would only apply if we were to prevail in this litigation, and it appears that you are not interested in *representing and/or advising* me based, *in part*, or entirely on a contingency fee, and that you prefer hourly billing for your time, which is *certainly* your prerogative.  Finally, you also mentioned that you would *probably* recommend me withdrawing my federal case, which you had not previously mentioned, which I *may* be open to, but only if you have a *very good reason* to do so.

Many thanks again for your time, consideration, and understanding; and *blessings always* to you and yours.  Please continue to stay healthy and be safe.

Gordon
860.833.3195

P.S. Ridge, although we were not able to come to a *mutually acceptable* representation and fee agreement, if it is alright with you, the next time I am in your area, I would still like to drop off *a small gift of thanks* to you for your time, which, once again, I hope will be *something tasty* that I plan to purchase for you at the upcoming *Windsor Shad Festival and Parade* on Saturday, May 21, 2022.

Gordon Clark
70 Elm Street
Enfield, CT 06082

---

**195**

# Exhibit D

**Transcript of Attorney Ridgely Whitmore Brown's 32-second voicemail message left for Gordon Clark on <mark>Tuesday, May 10, 2022, on or around 2:59 PM.</mark>**

> *"Gordon, Ridge Brown speaking.  I am invested in your case, cause its interesting as you are.  So, I would like to tell you a few things, that I think you should do <mark>whether or not you engage my services;</mark> and then I will try to figure out a compromise fee arrangement and discuss it with you.  Please give a call.  Thanks."*

# Exhibit E

**RE: Santander v. Gordon et al**

ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

Tue 5/10/2022 2:54 PM

To: gordon christianeconomics.net <gordon@christianeconomics.net>

Cc: ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

Thanks.  I'm going to call you in a few and I am forwarding Higgins email fyi

# Exhibit F

**FW: Gordon Clark v. Santander, et al; Case 3:22-cv-00039-SVN**

ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

Tue 5/10/2022 2:56 PM

To: gordon christianeconomics.net <gordon@christianeconomics.net>

Cc: ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

I am calling.

---

**From:** Higgins, Sean R. <Sean.Higgins@klgates.com>
**Sent:** Monday, May 9, 2022 8:27 PM
**To:** ridgebrown@ridgelylaw.com
**Cc:** Jeffrey M. Knickerbocker <jknickerbocker@bmpc-law.com>; Patrick S. Tracey <ptracey@bowditch.com>
**Subject:** Gordon Clark v. Santander, et al; Case 3:22-cv-00039-SVN

Ridge:

I am copying Patrick Tracey and Jeff Knickerbocker, counsel for the other defendants in the federal lawsuit filed by Gordon Clark. Following up on our discussion today, I understand that you may appear for Mr. Clark in the state court foreclosure case. As for the federal court case, if Mr. Clark were to dismiss the lawsuit and proceed only in the state court, I suspect that the defendants would be agreeable to such an arrangement. That said, I thought it would be best to include all counsel in one email in the interests of getting on the same page. Perhaps a conference call makes sense? If not, maybe you want to have Mr. Clark send over a proposed stipulation of dismissal? Open to suggestions, though I speak only for my clients Wells Fargo and Mr. Powell. I will let Patrick and Jeff speak for their respective clients. Thank you.

Sean

**K&L GATES**

**Sean R. Higgins**
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Phone: 617.261.3128
Mobile: 617.480.4714
Fax: 617.261.3175
sean.higgins@klgates.com
www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please reply to me with this message.

# Exhibit G

Ridgely Whitmore Brown, Esq.
Law Office of Ridgely Whitmore Brown
15 Fifth Street
Stamford, CT 06905
**Sent via email and USPS First Class Mail**

May 10, 2022

**RE: Legal Notification to Cease and Desist**

1.) Mr. Brown, you ***have not*** been hired by me at ***any point in time***, verbally nor in writing, to be my legal counsel in ***any matter whatsoever***, and you acknowledged this fact with a voicemail message you left on my phone on Tuesday, May 10, 2022, on or around 2:59 PM.

2.) Mr. Brown, you also were ***never*** given any permission, nor did you ***ever*** ask for my permission, nor did you ***ever*** inform me that you were going to contact Attorney Sean R. Higgins of *K&L Gates, LLP* of Boston, and/or contact any other opposing counsel concerning my pending Superior Court and USDC cases, ***and yet you did***.

3.) Mr. Brown, this letter is ***legal notification to cease and desist*** from communicating ***in any manner*** with Attorney Sean R. Higgins of *K&L Gates, LLP* of Boston, nor with any other opposing counsel concerning my pending Superior Court and USDC cases.

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195
gordon@christianeconomics.net

Cc:

Patrick S. Tracey, Esq. ***(Represents all six (6) Santander Bank, N.A. named Defendants)***
c/o Bowditch & Dewey
101 Federal Street, Suite 1405
Boston, MA 02110
**Sent via email and USPS First Class Mail**

1

**203**

Jeffrey M. Knickerbocker, Esq.
***(Represents himself, and the five (5) additional Bendett & McHugh, P.C. named Defendants)***
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Sent via email and USPS First Class Mail**


Sean R. Higgins, Esq. ***(Represents both Wells Fargo & Company named Defendants)***
c/o K & L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Sent via email and USPS First Class Mail**

# Exhibit H

**RE: URGENT: Legal Notification to Cease and Desist**

ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

Wed 5/11/2022 9:48 AM

To: gordon christianeconomics.net <gordon@christianeconomics.net>

Cc: ridgebrown@ridgelylaw.com <ridgebrown@ridgelylaw.com>

Dear Gary—

*Acknowledged.*

I am surprised at the tone of the letter, but do not want to engage in point-counter point.  Rather, I wish you luck and good health.

Best regards,

Ridge Brown

# Exhibit
# 24

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Clark, et al. | ) | Civil Case No. 3:22-CV-00039-SVN |
| | ) | |
| vs. | ) | |
| | ) | August 29, 2022 |
| Santander Bank, N.A., et al. | ) | |
| | ) | |

## JUDICIAL NOTICE OF
## SETTLEMENT NEGOTIATIONS

### Statement of Facts
*[Bold italic added throughout document for emphasis].*

1.) In the early morning on Friday, August 26, 2022, the Plaintiffs filed with this *USDC in Hartford* a **REPLY TO DEFENDANTS' JOINT OPPOSITION TO THE PLAINTIFFS' EMERGENCY MOTION TO STAY THIS USDC PROCEEDING PENDING THE SUPERIOR COURT OF HARTFORD RULING ON MOTION TO DISMISS WITH PREJUDICE DUE TO THE SUPERIOR COURT NO LONGER HAVING IN PERSONAM JURISDICTION OVER DECEDENT LILLIAN J. CLARK, AND FOR SANTANDER BANK, N.A.'S FAILURE TO MAKE A TIMELY CLAIM UPON WHICH RELIEF CAN BE GRANTED AGAINST THE ESTATE OF LILLIAN J. CLARK** (**Please see: Document 142**).

2.) Late in the afternoon on Friday, August 26, 2022, at 3:56 PM, Plaintiff Gordon Clark (Mr. Clark) received an email from *Santander Bank, N.A. Defendants'* attorney, Patrick S. Tracey (Mr. Tracey), of *Bowditch & Dewey, LLP* in Boston stating that Mr. Tracey's client, *Santander Bank, N.A.*, is "*open to settlement negotiations*" and requested that Mr. Clark provide Mr. Tracey with a "*reasonable settlement demand.*" Mr. Tracey also *kindly and professionally* made Mr. Clark aware of *Rule 408* of the *Federal Rules of Evidence* concerning the *non-admissibility* of said negotiations, in which Mr. Clark agreed to abide.

3.) On Friday, August 26, 2022, at 5:00 PM, Mr. Clark replied via email to Mr. Tracey by *first thanking* Mr. Tracey for reaching out to Mr. Clark in an effort to settle this matter and avoid further litigation. However, Mr. Clark also stated in said email to Mr. Tracey that our definitions of a *reasonable settlement demand* are *likely* quite different. Nevertheless, Mr. Clark, in *good faith*, and *always* wanting to resolve this matter amicably with *Santander Bank, N.A.* stated that Mr. Clark will email Mr. Tracey by

1

Monday morning (August 29, 2022) what Mr. Clark considers to be a *reasonable settlement demand* for Mr. Tracey and his client, *Santander Bank, N.A.*, to consider and/or make a *timely* counteroffer, if they so choose to do so.

4.) On Monday, August 29, 2022, shortly after 8:00 AM, Mr. Clark, *as promised*, emailed Mr. Tracey, the Plaintiffs' *private, confidential, and out-of-court* proposed *Settlement Agreement* for Mr. Tracey and his client's, *Santander Bank, N.A.'s*, consideration.

5.) Mr. Clark will be sure to notify this USDC in the coming days if a ***mutually acceptable Settlement Agreement*** is achieved or not.

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on August 29, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

2

# Certificate of Service

I, Plaintiff Gordon Clark, certify that a copy of the above **JUDICIAL NOTICE OF SETTLEMENT NEGOTIATIONS** will be served via *electronic service* on August 29, 2022, to the following:

Patrick S. Tracey, Esq. *(Represents all six (6) Santander Bank, N.A. named Defendants)*
c/o Bowditch & Dewey, LLP
101 Federal Street, Suite 1405
Boston, MA 02110
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq.
*(Represents himself, and the five (5) additional Bendett & McHugh, P.C. named Defendants)*
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Represents both Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**

Dated and signed at Enfield, Connecticut, on August 29, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit 25



Bowditch & Dewey, LLP

101 Federal Street | Suite 1405 | Boston, MA 02110
617-757-6500 | bowditch.com

**Patrick S. Tracey**
Direct telephone: 617-757-6504
Direct facsimile: 508-929-3020
Email: ptracey@bowditch.com

**VIA ECF**

August 30, 2022

Justice Sarala V. Nagala
Abraham Ribicoff Federal Building
United States Courthouse
450 Main Street-Suite 108
Hartford, CT 06103

*Re:    Clark, et al. v. Santander Bank, et al.: C.A. No. 3:22-cv-00039-SVN*

Dear Judge Nagala:

Please find a status report in response to Plaintiffs' filing of "Judicial Notice of Settlement Negotiations" submitted to the court on August 29, 2022. *See* ECF No. 143 and the Court's ECF filings at Nos. 144, 145 and 146. Notably, counsel for Santander Bank, N.A. and the Santander individually named defendants (collectively, "Santander"), contacted Mr. Clark requesting a reasonable settlement demand to potentially facilitate a sensible resolution to the case without resorting to further litigation. Unfortunately, Mr. Clark provided an extremely unreasonable settlement demand not based on the merits of the case.

At this juncture, Santander does not view the court mandated Settlement Conference as a productive use of time and resources. While Judge Farrish is a skilled and talented jurist, it appears that the Plaintiffs and Santander are too far apart in their respective positions for a Settlement Conference to be a worthwhile exercise for the Plaintiffs, Santander and the Court. Moreover, Santander has expended significant time, resources, and financial costs in defending this matter. A Settlement Conference will only add unnecessary costs and drain resources for Santander. As such, Santander is respectfully requesting the Court to cancel the Settlement Conference as it wishes to rely upon the pending motion to dismiss submitted by the Santander defendants.

Thank you for your time and attention to this matter.

Sincerely,

*/s/ Patrick S. Tracey*

Patrick S. Tracey

4886-3476-3824.1

**212**

# Exhibit
# 26

**Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Order**

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Mon 8/29/2022 2:40 PM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Connecticut

### Notice of Electronic Filing

The following transaction was entered on 8/29/2022 at 2:39 PM EDT and filed on 8/29/2022

**Case Name:**       Clark et al v. Santander Bank, N.A. et al
**Case Number:**    3:22-cv-00039-SVN
**Filer:**
**Document Number:** 144(No document attached)

**Docket Text:**
**ORDER. Based on Plaintiff's recent filing discussing settlement negotiations between Plaintiff and Defendant Santander Bank, the Court will refer this matter to a U.S. Magistrate Judge for purposes of a settlement conference.** **Signed by Judge Sarala V. Nagala on 8/29/22. (Marks, Joshua)**

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker     jknickerbocker@bmpc-law.com, jmknicker@yahoo.com

Sean R. Higgins     sean.higgins@klgates.com

Patrick S. Tracey     ptracey@bowditch.com, cdocketing@bowditch.com, gkeville@bowditch.com, jgribouski@bowditch.com

Gordon Clark     gordon@christianeconomics.net

**3:22-cv-00039-SVN Notice has been delivered by other means to:**

## Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Order Referring Case to Magistrate Judge

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Mon 8/29/2022 3:54 PM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Connecticut

### Notice of Electronic Filing

The following transaction was entered on 8/29/2022 at 3:53 PM EDT and filed on 8/29/2022

**Case Name:**        Clark et al v. Santander Bank, N.A. et al

**Case Number:**      3:22-cv-00039-SVN

**Filer:**

**Document Number:** 145(No document attached)

**Docket Text:**
**ORDER REFERRING CASE to Magistrate Judge Thomas O. Farrish to conduct a settlement conference.**
**Signed by Judge Sarala V. Nagala on 8/29/2022.(Bozek, M.)**

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker      jknickerbocker@bmpc-law.com, jmknicker@yahoo.com

Sean R. Higgins      sean.higgins@klgates.com

Patrick S. Tracey      ptracey@bowditch.com, cdocketing@bowditch.com, gkeville@bowditch.com, jgribouski@bowditch.com

Gordon Clark      gordon@christianeconomics.net

**3:22-cv-00039-SVN Notice has been delivered by other means to:**

## Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Order

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Tue 8/30/2022 9:08 AM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Connecticut**

**Notice of Electronic Filing**

The following transaction was entered on 8/30/2022 at 9:08 AM EDT and filed on 8/30/2022

**Case Name:** Clark et al v. Santander Bank, N.A. et al

**Case Number:** 3:22-cv-00039-SVN

**Filer:**

**Document Number:** 146(No document attached)

**Docket Text:**
**ORDER: Telephonic pre-settlement conference set for September 8, 2022 at 9:00 a.m. before Judge Thomas O. Farrish.** Please call in to the Court's conference call line at 1-888-557-8511 and enter the pass code of 4478772# when prompted. A date for the settlement conference will be set during the telephone call. Because the parties will likely be ordered to attend the conference, either in-person or via videoconference, counsel are instructed to obtain their client's schedules over the next ninety days and have them available during the pre-conference. Counsel should also have their own calendars available to aid in scheduling. During the telephone call, counsel should be prepared to discuss what, if any, information needs to be exchanged and anything else that needs to be accomplished prior to the settlement conference to maximize its chances of success. If either counsel has a firm, unavoidable conflict at the appointed date and time, e.g., a previously-scheduled appearance in another court, s/he should not file a motion for continuance on the docket but rather should call Chambers at 860-240-3605 as soon as possible with opposing counsel on the line to work out an alternate day and time for the pre-conference with Judge Farrish's law clerk.
**Signed by Judge Thomas O. Farrish on 8/30/22.(Wood, R.)**

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker    jknickerbocker@bmpc-law.com, jmknicker@yahoo.com

# Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Order

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Thu 9/22/2022 9:56 AM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

### District of Connecticut

**Notice of Electronic Filing**

The following transaction was entered on 9/22/2022 at 9:55 AM EDT and filed on 9/22/2022

**Case Name:** Clark et al v. Santander Bank, N.A. et al
**Case Number:** 3:22-cv-00039-SVN
**Filer:**
**Document Number:** 150(No document attached)

**Docket Text:**
**SETTLEMENT CONFERENCE ORDER. Judge Farrish will conduct a settlement conference over Zoom on Tuesday, October 25, 2022 at 1:00 p.m.** The courtroom deputy will e-mail the connection information to Mr. Clark and to defendants' appearing counsel by Microsoft Outlook Calendar invitation. Any party wishing to submit a written mediation statement in advance of the conference may do so by 5:00 p.m. on October 18, 2022. Mediation statements are limited to ten double-spaced pages and may be submitted on an *ex parte* basis via e-mail to TOF_Settlement@ctd.uscourts.gov. It is so ordered.
Signed by Judge Thomas O. Farrish on 9/22/22.(Wood, R.)


**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker     jknickerbocker@bmpc-law.com, jmknicker@yahoo.com

Sean R. Higgins     sean.higgins@klgates.com

Patrick S. Tracey     ptracey@bowditch.com, cdocketing@bowditch.com, gkeville@bowditch.com, jgribouski@bowditch.com

Gordon Clark     gordon@christianeconomics.net

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Gordon Clark | ) | Civil Case No. 3:22-CV-00039-SVN |
| | ) | |
| vs. | ) | |
| | ) | October 17, 2022 |
| Santander Bank, N.A., et al. | ) | |
| | ) | |

## JUDICIAL NOTICE IN REFERENCE TO RECENT FILINGS AND UPCOMING SETTLEMENT CONFERENCE

### Statement of Facts
*[Bold italic added throughout document for emphasis].*

1.) October 18, 2022, tomorrow, will mark 2-years since the *tragic passing* of Plaintiff Gordon Clark's (Mr. Clark's) *beloved and precious* wife, Lillian J. Clark (Mrs. Clark).

2.) Consequently, based on the upcoming *2-year statute of limitations* since the passing of Mrs. Clark on October 18, 2020, as well as USDC Magistrate Judge Thomas O. Farrish's (Judge Farrish's) *understandably and extremely busy schedule* not being able to accommodate our *Settlement Conference* before October 18, 2022, despite Judge Farrish staff's *kind and honorable efforts* to do so.  The Plaintiff respectfully, and in good faith, as well as to protect its interests and claims, ***had to file*** with this Court *today* their **AMENDED MOTION TO FILE SECOND AMENDED COMPLAINT**, and **AMENDED SECOND AMENDED COMPLAINT**.

3.) Nonetheless, Mr. Clark wants to assure this Court, *and specifically*, Judge Farrish, that Mr. Clark has every intention of participating in *good faith* throughout the upcoming *Settlement Conference* scheduled for Tuesday, October 25, 2022, at 2:00 PM.  More specifically, Mr. Clark intends to honor his September 16, 2022, *ex parte letter*, sent to Judge Farrish both *in spirit and in content*.

4.) Mr. Clark will be sure to notify this USDC in the coming days if a ***mutually acceptable*** *Settlement Agreement* is achieved or not.

1

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on October 17, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Certificate of Service

I, Plaintiff Gordon Clark, certify that a copy of the above **JUDICIAL NOTICE IN REFERENCE TO RECENT FILINGS AND UPCOMING SETTLEMENT CONFERENCE** will be served via *electronic service* on October 17, 2022, to the following:

Patrick S. Tracey, Esq. *(Represents all six (6) Santander Bank, N.A. named Defendants)*
c/o Bowditch & Dewey, LLP
101 Federal Street, Suite 1405
Boston, MA 02110
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq.
*(Represents himself, and the five (5) additional Bendett & McHugh, P.C. named Defendants)*
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Represents all three (3) Wells Fargo named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**


Dated and signed at Enfield, Connecticut, on October 17, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
*(Husband & Executor of the Estate of Lillian J. Clark)*
70 Elm Street, Enfield, CT 06082
860.833.3195

Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Settlement Conference

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Tue 10/25/2022 3:19 PM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Connecticut

**Notice of Electronic Filing**

The following transaction was entered on 10/25/2022 at 3:19 PM EDT and filed on 10/25/2022

**Case Name:**        Clark et al v. Santander Bank, N.A. et al

**Case Number:**      3:22-cv-00039-SVN

**Filer:**

**Document Number:** 158(No document attached)

**Docket Text:**

**Minute Entry for proceedings held before Judge Thomas O. Farrish: Settlement Conference held on 10/25/2022. The case did not settle. Total Time: 1 hour and 9 minutes (Wood, R.)**

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker      jknickerbocker@bmpc-law.com, jmknicker@yahoo.com

Sean R. Higgins      sean.higgins@klgates.com

Patrick S. Tracey      ptracey@bowditch.com, cdocketing@bowditch.com, gkeville@bowditch.com, jgribouski@bowditch.com

Gordon Clark      gordon@christianeconomics.net

**3:22-cv-00039-SVN Notice has been delivered by other means to:**

## Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Add and Terminate Judges

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Wed 11/2/2022 12:04 PM

To: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Connecticut

## Notice of Electronic Filing

The following transaction was entered on 11/2/2022 at 12:03 PM EDT and filed on 11/2/2022

**Case Name:**        Clark et al v. Santander Bank, N.A. et al

**Case Number:**      3:22-cv-00039-SVN

**Filer:**

**Document Number:** No document attached

**Docket Text:**

**Judge Thomas O. Farrish no longer assigned to case. Referral Completed. (Bozek, M.)**

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker      jknickerbocker@bmpc-law.com, jmknicker@yahoo.com

Sean R. Higgins      sean.higgins@klgates.com

Patrick S. Tracey      ptracey@bowditch.com, cdocketing@bowditch.com, gkeville@bowditch.com, jgribouski@bowditch.com

Gordon Clark      gordon@christianeconomics.net

**3:22-cv-00039-SVN Notice has been delivered by other means to:**

# Exhibit 27

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| Gordon Clark | ) | Civil Case No. 3:22-CV-00039-SVN |
|  | ) |  |
| vs. | ) |  |
|  | ) | November 10, 2022 |
| Santander Bank, N.A., et al. | ) |  |
|  | ) |  |

# PLAINTIFFS' EMERGENCY MOTION FOR SETTLEMENT CONFERENCE WITH DIFFERENT USDC MAGISTRATE JUDGE

Pursuant to the applicable provisions of the *Connecticut Practice Book*, including, but not limited to the *Connecticut Attorney's Oath*, the *Rules of Professional Conduct*, and the *Federal Rules of Civil Procedure*.  The Plaintiffs *respectfully* moves this Court to *grant* their **EMERGENCY MOTION FOR SETTLEMENT CONFERENCE WITH DIFFERENT USDC MAGISTRATE JUDGE**.

## Memorandum of Law
*[Bold italic added throughout document for emphasis].*

1.) ***The Ninth (9th) Commandment*** is:

> ***"Thou shalt not bear false witness against thy neighbor."***

Exodus 20:16

2.) ***The Tenth (10th) Commandment*** is:

> ***"Thou shalt not covet thy neighbor's house …, nor any thing that is thy neighbor's."***

Exodus 20:17

3.) ***The Second (2nd) Great Commandment*** is:

> ***"… Thou shalt love thy neighbor as thyself."***

Matthew 22:39

**ORAL ARGUMENT REQUESTED, IF NEEDED.  THANK YOU.**

1

4.)  ***"Therefore shall a man leave his father and his mother, and shall cleave unto his wife: and they shall be one flesh."***

Genesis 2:24

5.)  ***"For this cause shall a man leave his father and mother, and cleave to his wife; And they twain shall be one flesh: so then they are no more twain, but one flesh. What therefore God hath joined together, let not man put asunder."***

Mark 10:7-9

6.)  There is a **Common Law Maxim**, which states the following:

*"**Truth is the essence of justice.  Without truth justice cannot exist**."*

7.)  There is a **Common Law Maxim**, which states the following:

*"There is **nothing more sacred, more inviolate, than the house of every citizen**."*

8.)  *United States Constitution – 1ˢᵗ Amendment*, which reads as follows:

*"Congress shall make no law respecting an establishment of religion, **or prohibiting the free exercise thereof; or abridging the freedom of speech**, or of the press; or the right of the people peaceably to assemble, and **to petition the government for a redress of grievances**."*

9.)  *"The U.S. Constitution states only one command **twice**,"* in the *5ᵗʰ Amendment*, and the *14ᵗʰ Amendment, that is, **the command/clause of due process of law**.*

10.)  *United States Constitution*: *Due Process of Law Clause – **5ᵗʰ Amendment***, which states, in part:

*"... nor be deprived of life, liberty, or property, **without due process of law; nor shall private property be taken for public use, without just compensation**; and the **14ᵗʰ Amendment, Section 1**, which states, in part: "... nor shall any state deprive any person of life, liberty, or property, **without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws**."*

11.)  *United States Constitution*: *Freedom to Contract Clause, Article I, Section 10, Clause 1*, which states, in part:

2

**225**

*"No State shall ... pass any ... Law impairing the Obligation of Contracts ..."*

12.)      The **Connecticut Attorney's Oath** reads as follows:

> *"You solemnly swear or solemnly and sincerely affirm, as the case may be, that you will do **nothing dishonest**, and will not knowingly allow **anything dishonest** to be done in court, and that you will inform the court of **any dishonesty** of which you have knowledge; that you will not knowingly maintain or assist in maintaining any cause of action that is **false** or unlawful; **that you will not obstruct any cause of action for personal gain or malice**; but that you will exercise the office of attorney, in any court in which you may practice, according to the best of your learning and judgment, faithfully, to both your client and the court; so help you God or **upon penalty of perjury**."*

> ***(General Statutes § 1-25 and annotations.)***

## Statement of Facts
*[Bold italic added throughout document for emphasis].*

1.) On August 29, 2022, this Court issued an *Order* [145] referring this case to USDC Magistrate Judge Thomas O. Farrish (Judge Farrish) for *Settlement Conference* (**Please see: Document 145**).

2.) On August 30, 2022, Judge Farrish issued an *Order* [146] for a *pre-settlement conference call* on September 8, 2022 (**Please see: Document 146**).

3.) On August 30, 2022, *Santander Bank Defendants'* attorney Patrick Tracey (Mr. Tracey) of *Bowditch & Dewey, LLP*, ***docketed a letter*** [147] addressed to USDC Judge Sarala V. Nagala (Judge Nagala) requesting that said *Settlement Conference* be cancelled.  Where Mr. Tracey *alleged* that Plaintiff Gordon Clark (Mr. Clark), *" ... **provided an extremely unreasonable settlement demand not based on the merits of the case.**"* (**Please see attached: Document 147**).

4.) On September 1, 2022, Judge Farrish issued an *Order* [148] rescheduling the *pre-settlement conference call* to September 9, 2022 (**Please see: Document 148**).

5.) On September 12, 2022, Judge Farrish issued a *Minute Order* [149] stating, in part, the following (**Please see: Document 149**):

> *"Judge Farrish directed the plaintiff to submit an ex parte letter of no more than five pages, addressed to his chambers at 450 Main St., Hartford, CT, 06103. The letter should explain, in a civil and respectful tone, (1) the facts and law that cause the plaintiff to believe that he will prevail on his claims; (2) the plaintiff's assessment of each side's damage claims; and (3) what the plaintiff would be willing to accept by way of a settlement.  Judge Farrish will review the letter and, if he concludes that a mediation would likely be productive, will contact the parties to discuss scheduling.*

6.) Mr. Clark sent said *5-page ex parte letter* to Judge Farrish on September 16, 2022.

7.) On September 20, 2022, Mr. Clark received an email from Judge Farrish's clerk inquiring as to Mr. Clark's availability for a *video settlement conference*.

8.) On September 22, 2022, Judge Farrish issued an *Order* [150] for a *video settlement conference* on October 25, 2022 (**Please see: Document 150**).

9.) On October 17, 2022, eight (8) days prior to said scheduled *Settlement Conference*, Mr. Clark, *in good faith* and in an effort to make the *Settlement Conference as productive and as fruitful as possible*, sent via email to Judge Farrish and Mr. Tracey a revised PDF copy of Mr. Clark's *proposed Settlement Agreement*.  Mr. Clark never received any counter proposal/offer from Mr. Tracey **prior** to said *Settlement Conference*, nor **during** said *Settlement Conference*, nor **at any time thereafter**.

10.)     On October 25, 2022, Judge Farrish presided over said *video settlement conference*.

11.)     On October 25, 2022, Judge Farrish issued a *Minute Order* [158] stating that this case did not settle (**Please see: Document 158**).

12.)     On October 26, 2022, Mr. Clark sent Judge Farrish via email a *second (2nd) revised proposed Settlement Agreement*, which was actually the *third (3rd) proposed Settlement Agreement* by Mr. Clark (September 16, 2022; October 17, 2022; and October 26, 2022), which Mr. Clark asked Judge Farrish to share with Mr. Tracey.

13.)     On October 28, 2022, at 1:26 PM, Mr. Clark received an email from Judge Farrish stating that he was not able to forward Mr. Tracey said *second (2nd) revised proposed Settlement Agreement* until today.

4

**227**

14.)        Before Mr. Clark was able to reply to Judge Farrish's said email, on October 28, 2022, at 3:09 PM, Mr. Clark received a second (2nd) email from Judge Farrish asking Mr. Clark if he would be available for a *brief call*, while proposing three (3) dates and times. Mr. Clark agreed to the first day and time available, which was on October 31, 2022.

15.)        Mr. Clark received and participated *in good faith* in said *brief call* from Judge Farrish on October 31, 2022.

16.)        On October 31, 2022, Mr. Clark, *in good faith*, sent Judge Farrish a follow up email to our *brief call*.

17.)        On November 2, 2022, this Court issued a notice that Judge Farrish is no longer assigned to this case (**Please see: Document 160**).

18.)        On November 2, 2022, Mr. Clark sent via *USPS Certified Mail* to Judge Nagala a letter requesting a *Settlement Conference with a Different USDC Magistrate Judge*, ***which contained no confidential settlement communications between the parties***, because other than Mr. Clark's *multiple proposed Settlement Agreements*, ***there has not been a single word communicated verbally nor in writing*** concerning Mr. Clark's proposed settlement nor any counteroffers by any of the Defendants to Mr. Clark throughout this entire litigation/ordeal.  A copy of said letter to Judge Nagala was also sent via *USPS Certified Mail* to Judge Farrish, and to all three (3) opposing counsel.

19.)        On November 9, 2022, this Court issued an *Order* [165] stating, *in part*, why this Court could not review said November 2, 2022, while not knowing that the content of said November 2, 2022, letter ***was not*** an *ex parte letter* and contains ***no confidential settlement communications between the parties***; and was *simply a request* for a *Settlement Conference with a Different USDC Magistrate Judge* in a ***final good faith effort*** to settle this matter in the coming days, and to avoid Mr. Clark having to file a *Notice of Appeal*.

20.)        Due to this Court's aforementioned *Order* [165], Mr. Clark, as a *pro se litigant*, realized his *procedural error* of sending Judge Nagala said *request* for a *Settlement Conference with a Different USDC Magistrate Judge*; and that the *proper procedure* was to simply file a motion instead, which Mr. Clark has done today with this filing, and with limited time and resources.

21.)        Based on all the above, and for the nine (9) reasons found below, Mr. Clark, and *with all due respect* to USDC Magistrate Judge Thomas O. Farrish, as well as to this Court, *respectfully moves* this Court to grant said **EMERGENCY MOTION FOR**

**SETTLEMENT CONFERENCE WITH DIFFERENT USDC MAGISTRATE JUDGE**, *before* Thursday, November 17, 2022, or *by* Wednesday, November 16, 2022.

Once again, **with all due respect** to USDC Magistrate Judge Thomas O. Farrish (Judge Farrish), Attorney Patrick Tracey (Mr. Tracey), and all other opposing counsel, Plaintiffs *respectfully* request a *Settlement Conference with a Different USDC Magistrate Judge*, in a **good faith final effort** to resolve this matter *amicably* and to avoid further litigation and a *likely Notice of Appeal* filed by or before Thursday, November 17, 2022; that is, with this Court's consent/order, as well as the Defendants' consent to participate in a *good faith Settlement Conference* for the following nine (9) reasons, and as to why the previous *Settlement Conference* was unsuccessful, which include, but are not limited to:

1. **Possible conflict of interest**.  In Mr. Tracey's August 30, 2022, letter to this Court [147], Mr. Tracey expressed and acknowledged Judge Farrish as a *"skilled and talented jurist"* which implies a possible previous working relationship, *before or during* Judge Farrish's appointment to the USDC bench.

2. **USDC *Settlement Conference* procedures were not followed**.  Judge Farrish states on his USDC webpage that he *" ... ordinarily it will direct the parties (a) to exchange demands and offers prior to the conference; ... and (c) to attend the conference in person."*  Both of which, said (a) and (c), did not happen in this case.

3. **Plaintiffs were sequestered alone in a *Zoom* video conference room and was not allowed to speak *a single word directly* to any of the Defendants**.  The *Settlement Conference* scheduled for October 25, 2022, and the *subsequent requested phone call* by Judge Farrish on October 31, 2022, were *entirely* between Judge Farrish and the Plaintiffs.  The Plaintiffs ***never spoke a single word directly*** to any of the Defendants.  Throughout this entire *Settlement Conference* process, the Plaintiffs have been *negotiating with and/or against themselves*, and/or with and/or against Judge Farrish, ***but not with and/or against any of the Defendants***.

4. **Plaintiffs had offered three (3) written settlement demands, and the Defendants did not submit a *single counteroffer***.  The Plaintiffs, in *good faith* offered three (3) written settlement demands, the first was sent *ex parte* to Judge Farrish on September 16, 2022, the second to both Judge Farrish and Mr. Tracey on October 17, 2022, eight (8) days prior to our previously scheduled *Settlement Conference*, and the third to Judge Farrish on October 26, 2022, with Plaintiffs requesting that Judge Farrish share said *revised settlement demands* with Mr. Tracey.  However, once again, there was *not a single counteroffer* (verbal nor written) from Mr. Tracey nor from any of the Defendants.

5. **Judge Farrish did not act as a *neutral arbiter* and was negotiating on behalf of the Defendants**.  At the October 25, 2022, *Zoom* (video) *Settlement Conference* Judge Farrish repeatedly told the Plaintiffs that the Defendants **had made no counteroffers**, yet Judge Farrish first suggested a $125,000 settlement to the Plaintiffs, then reduced it to *"tens of thousands"* and then during the phone call on October 31, 2022, Judge Farrish had suggested a settlement of *"thousands."*

Additionally, Judge Farrish repeatedly attempted to undermine the Plaintiffs case by claiming that the Plaintiffs' claims will be difficult to prove, and by also stating that a recent settlement by *Santander Bank* in the *Southern District of New York*, that Plaintiffs referenced, published by the *Financial Times* on October 27, 2022, was a more serious claim than the twenty-five (25) claims by the Plaintiffs, and dismissed said SDNY case *out-of-hand* (**Please see attached: *Financial Times* article: *Santander to Pay $900,000 to Settle Pregnancy Discrimination Lawsuit***).

Where Plaintiff Gordon Clark (Mr. Clark) responded by stating the following verbally and in an email to Judge Farrish on October 31, 2022.

" … although you may see the *Santander Bank* case recently reported in the *Financial Times* that I mentioned to you earlier today as apples and oranges. Where *Santander Bank* settled for $900,000 a gender discrimination case filed in the *Southern District of New York* where one (1) former female *Santander Bank* employee was fired (**Please see attached: *Financial Times* article**).

Once again, *although I am biased*, and I am certainly not making light of gender discrimination that led to wrongful termination. However, the *intentional infliction of emotional distress* that two (2) people/Plaintiffs in this case, not one (1), *that is*, my wife and I, had to endure and suffer through for 6-years, which also significantly contributed to my *beloved* wife's *untimely passing and/or wrongful death*, *with all due respect to you*, Judge Farrish, is *far more egregious* than one (1) individual being discriminated against and wrongfully terminated. And therefore, if a gender discrimination and wrongful termination case was settled by *Santander Bank* for $900,000 brought by a single Plaintiff *with only a handful of claims*, how can *Santander Bank* and/or any *fair-minded individual* conclude that a 25-count Complaint brought by *multiple* Plaintiffs, along with the *pain and suffering* my wife endured for 6-years, which *cut short* her *precious* life is not worth *at least* … in compensatory damages?"

6. **Settlement Conference lacked proper decorum**.  Although the Plaintiffs *are not easily offended*, Judge Farrish repeatedly, at least four (4) times, made the following offensive description/statement, that is, that the Plaintiffs were, *"Not dangling the meat low enough for the dogs to jump up and get it."*  Although this is an adversarial process, Plaintiffs do not consider his adversaries as dogs nor considers settlement negotiations as a game to make dogs jump.  Plaintiffs are pursuing this matter with the *utmost seriousness* out of *duty and honor* to Lillian J. Clark, and the *tragic and grave results* (untimely death/wrongful death of Lillian J. Clark) by the Defendants' *repeated, intentional, and negligent behavior*.

Where Mr. Clark responded by stating the following in an email to Judge Farrish on October 26, 2022.

"Judge Farrish, although I *truly* appreciate you sharing the wisdom of your Louisiana colleague, I do not believe that *I am not hanging the meat low enough*, as you said, since the fifteen (15) Defendants, including the former and present CEOs of *Santander Bank, N.A.*, Mr. Scott Powell, and Mr. Timothy Wennes,

respectively, and their insurers for that matter, that is, *if they were in my shoes*, and their *loved one* had to endure such *intentional infliction of emotional distress for years* while battling *daily* for their life against Parkinson's disease would *never settle* for … or less.  But since I am poor *for the time being*, and have yet to find an *honest, competent, experienced, trustworthy, and affordable attorney/litigator*, along with my *lowly pro se status* in the eyes of most people in the legal profession, it is difficult to receive the respect that this case deserves. Nevertheless, if this matter is not *amicably* settled in the coming few days, I have *every intention* of continuing to *zealously defend* and work *diligently and faithfully* to *earn the respect* that my *precious* wife and this case deserves in *loving duty and honor for my beloved and faithful wife* of 27-years, *no matter how long it takes me*, *all by His Grace*.  Semper fi."

Moreover, Judge Farrish, also described this case/litigation as a "*rock fight*."  Where the Plaintiffs, that is, Mr. Clark in his *multiple capacities* immediately stated that he *does not throw rocks*, nor does Mr. Clark *start fights*.  It was *Santander Bank, N.A.* that *erroneously initiated this litigation* with the *Superior Court of Hartford*.  Mr. Clark *unequivocally* stated that he believes that he is a *peacemaker*, and in *good faith* is attempting to settle this matter *amicably* for the benefit of all parties; and in an effort to avoid further litigation, that will require additional time and costs for all parties, as well as for our already overburdened court system.

Furthermore, Judge Farrish, described this case/litigation as "*going to war*."  Once again, although Mr. Clark *is not a pacifist*, Mr. Clark considers the *priceless, but not indestructible* United States legal system *as a civilized way to avoid war*, and Mr. Clark is not in *any way, shape, or form* wanting to *go to war* with any of the Defendants. Instead, Mr. Clark, *out of duty and honor*, is *defending* his *beloved* wife, and standing against the *grave harm* that *cut short her precious life*, and to hold those accountable to *the fullest extent of the law*, *peacefully, and not by going to war*.

7. **Multiple misrepresentations of Plaintiffs'** *proposed settlement offer*.  Judge Farrish made multiple misrepresentations of Plaintiffs' *proposed settlement offer* by twice claiming proposed terms were 33% higher than actuality; and by also *incorrectly describing multiple terms* that have *no out-of-pocket expense* as the *complete opposite*, that is, as a *substantial out-of-pocket expense*.

8. **Repeatedly offered unsolicited legal advice**.  Judge Farrish suggested that Plaintiffs will find it expensive and difficult to find a medical expert to testify in this matter, while stating that if Plaintiffs did so, that the Defendants will depose said expert, which would increase Plaintiffs' costs.  Not knowing that Mr. Clark grew up in the *allopathic medical industry*, and that some of Mr. Clark's family have been in the medical industry for over 40 years; and therefore, finding said expert would not be a problem for Mr. Clark, especially, since a friend of Mr. Clark was once the *head of trauma surgery* for *St. Francis Hospital in Hartford*.

9. **Unreasonable pressure to settle**.  Before ending the phone call on October 31, 2022, Judge Farrish *not only* repeatedly asked the Plaintiffs to propose a settlement for *only* the

8

*Wells Fargo* Defendants, but also repeatedly stated that if after some additional consideration by the Plaintiffs, if the Plaintiffs wanted to lower its offer *yet again*, **without receiving a single counteroffer**, that the Plaintiffs should email Judge Farrish.

Where Mr. Clark responded by stating the following in said email to Judge Farrish on October 31, 2022.

" … Judge Farrish, my present *settlement demand* is less than 10% of the $15,000,000 in *compensatory damages* that I am seeking in my *Amended Second Amended Complaint*, which although I am *admittedly biased*, I believe **is more than** a *fair and reasonable settlement demand* when one considers the liability of the 25-counts in this case.

Moreover, not only would Mr. Tracey on behalf of his client, *Santander Bank*, be cutting its losses short in this case by accepting my *fair and reasonable settlement demand* of … in *compensatory damages*.  But they would also be capping their legal expenses in this case, as well as avoiding any possibility of incurring *catastrophic punitive damages* under the *Connecticut Unfair Trade Practices Act* (CUTPA).  Consequently, if Mr. Tracey does not accept this *fair and reasonable* settlement demand *or* make a *fair and reasonable* counteroffer, I believe that in the *not-too-distant future*, Mr. Tracey and his client, *Santander Bank*, as well as all the other Defendants, will *likely* look back on my *present settlement demand* as an opportunity lost."

" … Judge Farrish, *once again*, using your descriptive words, I believe that **I am dangling the meat more than low enough** for *Santander Bank*, a $40 billion bank, based on the fact that *Santander Bank* has recently settled **far less serious claims for a similar amount** just four (4) days ago in the *Southern District of New York*.

Therefore, it appears to me that the **real question** is not whether or not *I am dangling the meat low enough*, but rather is Mr. Tracey and/or his client, *Santander Bank*, acting in *good faith* or are they choosing to **further discriminate against me** and/or this case due to my *pro se status* and/or for some other *unjust reason*, such as my race, which, by the way, *race discrimination* is *Count Ten* (10) of my *Amended Second Amended Complaint* [152-1], as well as one of my strongest claims.

Frankly, Judge Farrish, throughout the past 8-years, since this problem began with *Santander Bank* in 2014, I think that it is fair to say that I have conducted myself with *honesty, honor, and proper decorum*; and although some of my language may have been *unnecessarily too strong* in some of my court filings, **it was not vulgar language, and it was all true**. And I believe that *with all due respect* to Mr. Tracey and his colleagues, they are all grown men, and experienced attorneys, in an adversarial process who appear to be **protesting too much** before this Court, and/or discriminating against me in multiple *ways, shapes, and forms*.

9

Because I believe that if I were either an attorney, *not a pro se litigant*, and/or not of Asian descent, I would have been treated with *far more dignity and respect* over the years by *Santander Bank* and its employees, and *especially* throughout this legal process; *and if so*, this abuse of the legal system by *Santander Bank* would have never happened and/or this matter would have been settled long ago, instead of *Santander Bank* continuing to choose to further torment my *beloved and deceased* wife and me, *in life and in death*, since 2014, which just increases *Santander Bank's* and all other Defendants' liability going forward."

" … lastly, and *most importantly*, Judge Farrish, and concerning the **make-or-break**, *paragraph 7*, in the *Settlement Agreement*, and since my *beloved* wife can no longer participate in this litigation nor any *Settlement Conference*, I ask you and Mr. Tracey to please consider the following:

Although my *beloved* wife of 27-years, Lilli, was and is *priceless* to me, I look at **paragraph 7** as the **only measure of some level of justice** in this entire *Settlement Agreement* for what Lilli and I were unjustly put through and had to endure, *especially*, during the last years and days of her *precious* life.  Moreover, in an effort to turn this *tragedy of misdeeds* into something that honors in *loving memory* Lilli's *kind, loving, humble, faithful, and sacrificial* life, while also seeking to *benefit others in need*.  I plan to use the majority of any *compensatory damages* to start a ministry and/or foundation that *truly* helps orphans, as Lilli and I both are, since I have **never known anyone** who **loved all children** more than my *beautiful*, Lilli.

However, if *Santander Bank and I* are not able to *mutually agree* on a *fair and reasonable* amount in *compensatory damages*, I will be **forced** to continue this litigation based on my 25-count *Amended Second Amended Complaint* that is seeking $15,000,000 in *compensatory damages*, which includes, but is not limited to counts for *wrongful death, negligence, and intentional infliction of emotional distress*; as well as for *multiple violations of the Connecticut Unfair Trade Practices Act* where I will be seeking *unlimited punitive damages*, if necessary.

Thank you, Judge Farrish, for your time and consideration, I *sincerely* appreciate it; and I hope and trust that you can understand, Judge Farrish, that this process is **not at all easy for me**, but since it is impossible for her to be here throughout this legal process, I want to make sure that **it is clear** as to whom I am **zealously defending** in this matter, *that is*, my *beloved and precious* wife of 27-years, Lilli."

Therefore, once again, it is Mr. Clark's *sincere hope* that this Court will consider and grant this *Motion* for a *Settlement Conference* (*preferably in person* or at least *face to face* (directly) over *Zoom*) *with a Different USDC Magistrate Judge*, in a **good faith final effort** to resolve this matter and avoid further litigation and a *likely Notice of Appeal* filed by or before Thursday, November 17, 2022; that is, if the Defendants consent to participate in *good faith* to a *Settlement Conference* as well, and/or if Mr. Clark **is not able to find**, despite his *ongoing, sincere, and good faith* search and efforts to find an **honest, competent, experienced, trustworthy, and affordable** attorney/**litigator** to represent his interests in this matter in the coming days.  However, if Mr.

Clark *is able to finally find* an **honest, competent, experienced, trustworthy, and affordable** attorney/**litigator** to represent his interests in this matter in the coming days, the Plaintiffs can **assure** the Defendants and this Court that the Plaintiffs **will not be settling for anything close to 10% of the compensatory damages** they are seeking, because, once again, *if the Defendants were in my shoes*, and their *loved one* had to endure such *intentional infliction of emotional distress for years* while battling *daily* for their life against Parkinson's disease would **never settle** for … or less.

Lastly, Mr. Clark would *greatly appreciate* the opportunity to participate in a **truly and sincerely** *good faith Settlement Conference* in the near future, in a *final effort* to resolve this matter *amicably* for the benefit of all parties and to eliminate the burden on this Court, and **not in another *Settlement Conference*, that is, *in name only*.**

Nonetheless, regardless of how this Court decides on this *Motion*, the Plaintiffs wanted this Court to know that the Plaintiffs acted in *good faith* and with *honesty, fairness, and reasonableness* throughout said previous *Settlement Conference*, and continues to do so. And if **anyone** characterizes the Plaintiffs' participation in said previous *Settlement Conference* in any other manner they **are not** *speaking honestly, justly, nor honorably*.

WHEREFORE, once again, based on *all the material facts and relevant law* referenced above, the Plaintiffs, *respectfully* moves this Court to **grant** their **EMERGENCY MOTION FOR SETTLEMENT CONFERENCE WITH DIFFERENT USDC MAGISTRATE JUDGE.**

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on November 10, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Certificate of Service

I, Plaintiff Gordon Clark, certify that a copy of the above **PLAINTIFFS' EMERGENCY MOTION FOR SETTLEMENT CONFERENCE WITH DIFFERENT USDC MAGISTRATE JUDGE** will be served via *electronic service* on November 10, 2022, to the following:

Patrick S. Tracey, Esq. *(Represents all six (6) Santander Bank, N.A. named Defendants)*
c/o Bowditch & Dewey, LLP
101 Federal Street, Suite 1405
Boston, MA 02110
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq.
*(Represents himself, and the five (5) additional Bendett & McHugh, P.C. named Defendants)*
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Represents both Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**

Dated and signed at Enfield, Connecticut, on November 10, 2022, by Plaintiff Gordon Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit A



Bowditch & Dewey, LLP

101 Federal Street | Suite 1405 | Boston, MA 02110
617-757-6500 | bowditch.com

**Patrick S. Tracey**
Direct telephone: 617-757-6504
Direct facsimile: 508-929-3020
Email: ptracey@bowditch.com

<u>**VIA ECF**</u>

August 30, 2022

Justice Sarala V. Nagala
Abraham Ribicoff Federal Building
United States Courthouse
450 Main Street-Suite 108
Hartford, CT 06103

***Re:*** ***Clark, et al. v. Santander Bank, et al.: C.A. No. 3:22-cv-00039-SVN***

Dear Judge Nagala:

Please find a status report in response to Plaintiffs' filing of "Judicial Notice of Settlement Negotiations" submitted to the court on August 29, 2022. *See* ECF No. 143 and the Court's ECF filings at Nos. 144, 145 and 146. Notably, counsel for Santander Bank, N.A. and the Santander individually named defendants (collectively, "Santander"), contacted Mr. Clark requesting a reasonable settlement demand to potentially facilitate a sensible resolution to the case without resorting to further litigation. Unfortunately, Mr. Clark provided an extremely unreasonable settlement demand not based on the merits of the case.

At this juncture, Santander does not view the court mandated Settlement Conference as a productive use of time and resources. While Judge Farrish is a skilled and talented jurist, it appears that the Plaintiffs and Santander are too far apart in their respective positions for a Settlement Conference to be a worthwhile exercise for the Plaintiffs, Santander and the Court. Moreover, Santander has expended significant time, resources, and financial costs in defending this matter. A Settlement Conference will only add unnecessary costs and drain resources for Santander. As such, Santander is respectfully requesting the Court to cancel the Settlement Conference as it wishes to rely upon the pending motion to dismiss submitted by the Santander defendants.

Thank you for your time and attention to this matter.

Sincerely,

*/s/ Patrick S. Tracey*

Patrick S. Tracey

4886-3476-3824.1

# Exhibit B

Banco Santander SA

## Santander to pay $900,000 to settle pregnancy discrimination lawsuit

Former vice-president says she received lower bonuses, lost client accounts and was eventually fired while pregnant



Santander said the claims against it were 'without merit' © Bloomberg

**Emma Dunkley** in London and **Joe Miller** in New York  YESTERDAY

---

### Receive free Banco Santander SA updates

We'll send you a *myFT Daily Digest* email rounding up the latest Banco Santander SA news every morning.

| Enter your email address | Sign up |

---

Santander will pay $900,000 to a former vice-president who alleged the bank cut her bonuses, removed her client accounts and terminated her employment because she was pregnant.

Erin McKenna, who was fired in November 2020, sued the bank in early 2021, claiming that she had been the victim of discrimination.

According to her complaint, McKenna, who worked in fixed income and emerging market sales, had two high-risk pregnancies between 2019 and 2020 and wanted to work from home.

Although the bank initially agreed to her request, Santander later told McKenna she would be fired if she did not return to the office, according to her complaint.

McKenna also alleged that the bank cut her annual bonus twice and took away most of her accounts when she returned from her first pregnancy, telling her she was "lucky" to receive even the reduced bonuses.

During her second pregnancy in 2020 she said she had asked again to work from home and was promptly fired, the complaint said.

McKenna said that she was "devastated" when Santander fired her, at which point she was three and a half months pregnant. She sued the bank and her former supervisor in Manhattan federal court for sex and pregnancy discrimination, and retaliation.

Santander agreed to pay $900,000 to resolve the case without accepting liability to cover McKenna's economic damages, attorneys' fees and costs.

Valdi Licul, a partner at law firm Wigdor, which represented McKenna, said: "All too often,

**239**

employers act as if women can either be mothers or productive employees, but not both. Erin's recovery sends a powerful message that such an attitude is against the law."

McKenna added: "I hope this victory encourages other women, especially in finance, to find the courage to do the same."

Santander said it still believed McKenna's claims were "without merit" but "recognising the time and expense associated with ongoing litigation, we have decided to take this action to expeditiously resolve this matter".

It comes a few years after US investment bank Jefferies reached an agreement with Shabari Nayak, a former-vice president who claimed the lender had derailed her career once she became pregnant, and stripped her of bonuses for which she was eligible.

Nayak, who was also represented by Wigdor, settled for an undisclosed amount in 2018.

Copyright The Financial Times Limited 2022. All rights reserved.

# Exhibit

# 28

# THE DECLARATION OF INDEPENDENCE—1776 [1]

IN CONGRESS, JULY 4, 1776

*The unanimous Declaration of the thirteen united States of America*

WHEN in the Course of human events, it becomes necessary for one people to dissolve the political bands which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which the Laws of Nature and of Nature's God entitle them, a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.

We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed,—That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness. Prudence, indeed, will dictate that Governments long established should not be changed for light and transient causes; and accordingly all experience hath shewn, that mankind are more disposed to suffer, while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed. But when a long train of abuses and usurpations, pursuing invariably the same Object evinces a design to reduce them under absolute Despotism, it is their right, it is their duty, to throw off such Government, and to provide new Guards for their future security.—Such has been the patient sufferance of these Colonies; and such is now the necessity which constrains them to alter their former Systems of Government. The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over these States. To prove this, let Facts be submitted to a candid world.

He has refused his Assent to Laws, the most wholesome and necessary for the public good.

He has forbidden his Governors to pass Laws of immediate and pressing importance, unless suspended in their operation till his Assent should be obtained; and when so suspended, he has utterly neglected to attend to them.

He has refused to pass other Laws for the accommodation of large districts of people, unless those people would relinquish the right of Representation in the Legislature, a right inestimable to them and formidable to tyrants only.

He has called together legislative bodies at places unusual, uncomfortable, and distance

---

[1] The delegates of the United Colonies of New Hampshire; Massachusetts Bay; Rhode Island and Providence Plantations; Connecticut; New York; New Jersey; Pennsylvania; New Castle, Kent, and Sussex, in Delaware; Maryland; Virginia; North Carolina, and South Carolina, In Congress assembled at Philadelphia, *Resolved* on the 10th of May, 1776, to recommend to the respective assemblies and conventions of the United Colonies, where no government sufficient to the exigencies of their affairs had been established, to adopt such a government as should, in the opinion of the representatives of the people, best conduce to the happiness and safety of their constituents in particular, and of America in general. A preamble to this resolution, agreed to on the 15th of May, stated the intention to be totally to suppress the exercise of every kind of authority under the British crown. On the 7th of June, certain resolutions respecting independency were moved and seconded. On the 10th of June it was resolved, that a committee should be appointed to prepare a declaration to the following effect: "That the United Colonies are, and of right ought to be, free and independent States; that they are absolved from all allegiance to the British crown; and that all political connection between them and the State of Great Britain is, and ought to be, totally dissolved." On the preceding day it was determined that the committee for preparing the declaration should consist of five, and they were chosen accordingly, in the following order: Mr. Jefferson, Mr. J. Adams, Mr. Franklin, Mr. Sherman, and Mr. R. R. Livingston. On the 11th of June a resolution was passed to appoint a committee to prepare and digest the form of a confederation to be entered into between the colonies, and another committee to prepare a plan of treaties to be proposed to foreign powers. On the 12th of June, it was resolved, that a committee of Congress should be appointed by the name of a board of war and ordnance, to consist of five members. On the 25th of June, a declaration of the deputies of Pennsylvania, met in provincial conference, expressing their willingness to concur in a vote declaring the United Colonies free and independent States, was laid before Congress and read. On the 28th of June, the committee appointed to prepare a declaration of independence brought in a draught, which was read, and ordered to lie on the table. On the 1st of July, a resolution of the convention of Maryland, passed the 28th of June, authorizing the deputies of that colony to concur in declaring the United Colonies free and independent States, was laid before Congress and read. On the same day Congress resolved itself into a committee of the whole, to take into consideration the resolution respecting independency. On the 2d of July, a resolution declaring the colonies free and independent States, was adopted. A declaration to that effect was, on the same and the following days, taken into further consideration. Finally, on the 4th of July, the Declaration of Independence was agreed to, engrossed on paper, signed by John Hancock as president, and directed to be sent to the several assemblies, conventions, and committees, or councils of safety, and to the several commanding officers of the continental troops, and to be proclaimed in each of the United States, and at the head of the Army. It was also ordered to be entered upon the Journals of Congress, and on the 2d of August, a copy engrossed on parchment was signed by all but one of the fifty-six signers whose names are appended to it. That one was Matthew Thornton, of New Hampshire, who on taking his seat in November asked and obtained the privilege of signing it. Several who signed it on the 2d of August were absent when it was adopt-

ed on the 4th of July, but, approving of it, they thus signified their approbation.

NOTE.—The proof of this document, as published above, was read by Mr. Ferdinand Jefferson, the Keeper of the Rolls at the Department of State, at Washington, who compared it with the fac-simile of the original in his custody. He says: "In the facsimile, as in the original, the whole instrument runs on without a break, but dashes are mostly inserted. I have, in this copy, followed the arrangement of paragraphs adopted in the publication of the Declaration in the newspaper of John Dunlap, and as printed by him for the Congress, which printed copy is inserted in the original Journal of the old Congress. The same paragraphs are also made by the author, in the original draught preserved in the Department of State."

VerDate Aug 31 2005   08:33 Feb 15, 2008   Jkt 040101   PO 00000   Frm 00001   Fmt 5820   Sfmt 5820   Y:\TS\2006MAIN\2006V1.MN\V1PRE4.MN   BOB

from the depository of their public Records, for the sole purpose of fatiguing them into compliance with his measures.

He has dissolved Representative Houses repeatedly, for opposing with manly firmness his invasions on the rights of the people.

He has refused for a long time, after such dissolutions, to cause others to be elected; whereby the Legislative powers, incapable of Annihilation, have returned to the People at large for their exercise; the State remaining in the mean time exposed to all the dangers of invasion from without, and convulsions within.

He has endeavoured to prevent the population of these States; for that purpose obstructing the Laws for Naturalization of Foreigners; refusing to pass others to encourage their migrations hither, and raising the conditions of new Appropriations of Lands.

He has obstructed the Administration of Justice, by refusing his Assent to Laws for establishing Judiciary powers.

He has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.

He has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance.

He has kept among us, in times of peace, Standing Armies without the Consent of our legislatures.

He has affected to render the Military independent of and superior to the Civil power.

He has combined with others to subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his Assent to their acts of pretended Legislation:

For quartering large bodies of armed troops among us:

For protecting them, by a mock Trial, from punishment for any Murders which they should commit on the Inhabitants of these States:

For cutting off our Trade with all parts of the world:

For imposing Taxes on us without our Consent:

For depriving us in many cases, of the benefits of Trial by Jury:

For transporting us beyond Seas to be tried for pretended offenses:

For abolishing the free System of English Laws in a neighbouring Province, establishing therein an Arbitrary government, and enlarging its Boundaries so as to render it at once an example and fit instrument for introducing the same absolute rule into these Colonies:

For taking away our Charters, abolishing our most valuable Laws, and altering fundamentally the Forms of our Governments:

For suspending our own Legislatures, and declaring themselves invested with power to legislate for us in all cases whatsoever.

He has abdicated Government here, by declaring us out of his Protection and waging War against us.

He has plundered our seas, ravaged our Coasts, burnt our towns, and destroyed the lives of our people.

He is at this time transporting large Armies of foreign Mercenaries to compleat the works of death, desolation and tyranny, already begun with circumstances of Cruelty & perfidy scarcely paralleled in the most barbarous ages, and totally unworthy the Head of a civilized nation.

He has constrained our fellow Citizens taken Captive on the high Seas to bear Arms against their Country, to become the executioners of their friends and Brethren, or to fall themselves by their Hands.

He has excited domestic insurrections amongst us, and has endeavoured to bring on the inhabitants of our frontiers, the merciless Indian Savages, whose known rule of warfare, is an undistinguished destruction of all ages, sexes and conditions.

In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury. A Prince, whose character is thus marked by every act which may define a Tyrant, is unfit to be the ruler of a free people.

Nor have We been wanting in attentions to our Brittish brethren. We have warned them from time to time of attempts by their legislature to extend an unwarrantable jurisdiction over us. We have reminded them of the circumstances of our emigration and settlement here. We have appealed to their native justice and magnanimity, and we have conjured them by the ties of our common kindred to disavow these usurpations, which, would inevitably interrupt our connections and correspondence. They too have been deaf to the voice of justice and of consanguinity. We must, therefore, acquiesce in the necessity, which denounces our Separation, and hold them, as we hold the rest of mankind, Enemies in War, in Peace Friends.

WE, THEREFORE, the Representatives of the UNITED STATES OF AMERICA, in General Congress, Assembled, appealing to the Supreme Judge of the world for the rectitude of our intentions, do, in the Name, and by Authority of the good People of these Colonies, solemnly publish and declare, That these United Colonies are, and of Right ought to be FREE AND INDEPENDENT STATES; that they are Absolved from all Allegiance to the British Crown, and that all political connection between them and the State of Great Britain, is and ought to be totally dissolved; and that as Free and Independent States, they have full Power to levy War, conclude Peace, contract Alliances, establish Commerce, and to do all other Acts and Things which Independent States may of right do. And for the support of this Declaration, with a firm reliance on the protection of divine Providence, we mutually pledge to each other our Lives, our Fortunes and our sacred Honor.

JOHN HANCOCK.

*New Hampshire*

JOSIAH BARTLETT,        MATTHEW THORNTON.
WM. WHIPPLE,

*Massachusetts Bay*

SAML. ADAMS,        ROBT. TREAT PAINE,
JOHN ADAMS,        ELBRIDGE GERRY.

*Rhode Island*

STEP. HOPKINS,        WILLIAM ELLERY.

**243**

### Connecticut

ROGER SHERMAN,           WM. WILLIAMS,
SAM'EL HUNTINGTON,       OLIVER WOLCOTT.

### New York

WM. FLOYD,               FRANS. LEWIS,
PHIL. LIVINGSTON,        LEWIS MORRIS.

### New Jersey

RICHD. STOCKTON,         JOHN HART,
JNO. WITHERSPOON,        ABRA. CLARK.
FRAS. HOPKINSON,

### Pennsylvania

ROBT. MORRIS,            JAS. SMITH,
BENJAMIN RUSH,           GEO. TAYLOR,
BENJA. FRANKLIN,         JAMES WILSON,
JOHN MORTON,             GEO. ROSS.
GEO. CLYMER,

### Delaware

CAESAR RODNEY,           THO. M'KEAN.
GEO. READ,

### Maryland

SAMUEL CHASE,            CHARLES CARROLL OF
WM. PACA,                   Carrollton.
THOS. STONE,

### Virginia

GEORGE WYTHE,            THOS. NELSON, jr.,
RICHARD HENRY LEE,       FRANCIS LIGHTFOOT
TH. JEFFERSON,              LEE,
BENJA. HARRISON,         CARTER BRAXTON.

### North Carolina

WM. HOOPER,              JOHN PENN.
JOSEPH HEWES,

### South Carolina

THOS. HEYWARD,           THOMAS LYNCH, Junr.,
  Junr.,                 ARTHUR MIDDLETON.
EDWARD RUTLEDGE,

### Georgia

BUTTON GWINNETT,         GEO. WALTON.
LYMAN HALL,

NOTE.—Mr. Ferdinand Jefferson, Keeper of the Rolls in the Department of State, at Washington, says: ''The names of the signers are spelt above as in the fac-simile of the original, but the punctuation of them is not always the same; neither do the names of the States appear in the fac-simile of the original. The names of the signers of each State are grouped together in the fac-simile of the original, except the name of Matthew Thornton, which follows that of Oliver Wolcott.''

# Exhibit

# 29

# The Judiciary Act of 1789

## September 24, 1789.

## 1 Stat. 73.

CHAP. XX. – *An Act to establish the Judicial Courts of the United States.*

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the supreme court of the United States shall consist of a chief justice and five associate justices, any four of whom shall be a quorum, and shall hold annually at the seat of government two sessions, the one commencing the first Monday of February, and the other the first Monday of August. That the associate justices shall have precedence according to the date of their commissions, or when the commissions of two or more of them bear date on the same day, according to their respective ages.

SEC. 2. *And be it further enacted*, That the United States shall be, and they hereby are divided into thirteen districts, to be limited and called as follows, to wit: one to consist of that part of the State of Massachusetts which lies easterly of the State of New Hampshire, and to be called Maine District; one to consist of the State of New Hampshire, and to be called New Hampshire District; one to consist of the remaining part of the State of Massachusetts, and to be called Massachusetts district; one to consist of the State of Connecticut, and to be called Connecticut District; one to consist of the State of New York, and to be called New York District; one to consist of the State of New Jersey, and to be called New Jersey District; one to consist of the State of Pennsylvania, and to be called Pennsylvania District; one to consist of the State of Delaware, and to be called Delaware District; one to consist of the State of Maryland, and to be called Maryland District; one to consist of the State of Virginia, except that part called the District of Kentucky, and to be called Virginia District; one to consist of the remaining part of the State of Virginia, and to be called Kentucky District; one to consist of the State of South Carolina, and to be called South Carolina District; and one to consist of the State of Georgia, and to be called Georgia District.

SEC. 3. *And be it further enacted*, That there be a court called a District Court, in each of the afore mentioned districts, to consist of one judge, who shall reside in the district for which he is appointed, and shall be called a District Judge, and shall hold annually four sessions, the first of which to commence as follows, to wit: in the districts of New York and of New Jersey on the first, in the district of Pennsylvania on the second, in the district of Connecticut on the third, and in the district of Delaware on the fourth, Tuesdays of November next; in the districts of Massachusetts, of Maine, and of Maryland, on the first, in the district of Georgia on the second, and in the districts of New Hampshire, of Virginia, and of Kentucky, on the third Tuesdays of December next; and the other three sessions progressively in the respective districts on the like Tuesdays of every third calendar month afterwards, and in the district of South Carolina, on the third Monday in March and September, the first Monday in July, and the second Monday in December of each and every year, commencing in December next; and that the District Judge shall have power to hold special courts at his discretion. That the stated District Court shall be held at the places following, to wit: in the district of Maine, at Portland and Pownalsborough

alternately, beginning at the first; in the district of New Hampshire, at Exeter and Portsmouth alternately, beginning at the first; in the district of Massachusetts, at Boston and Salem alternately, beginning at the first; in the district of Connecticut, alternately at Hartford and New Haven, beginning at the first; in the district of New York, at New York; in the district of New Jersey, alternately at New Brunswick and Burlington, beginning at the first; in the district of Pennsylvania, at Philadelphia and York Town alternately, beginning at the first; in the district of Delaware, alternately at Newcastle and Dover, beginning at the first; in the district of Maryland, alternately at Baltimore and Easton, beginning at the first; in the district of Virginia, alternately at Richmond and Williamsburgh, beginning at the first; in the district of Kentucky, at Harrodsburgh; in the district of South Carolina, at Charleston; and in the district of Georgia, alternately at Savannah and Augusta, beginning at the first; and that the special courts shall be held at the same place in each district as the stated courts, or in districts that have two, at either of them, in the discretion of the judge, or at such other place in the district, as the nature of the business and his discretion shall direct. And that in the districts that have but one place for holding the District Court, the records thereof shall be kept at that place; and in districts that have two, at that place in each district which the judge shall appoint.

SEC. 4. *And be it further enacted*, That the before mentioned districts, except those of Maine and Kentucky, shall be divided into three circuits, and be called the eastern, the middle, and the southern circuit. That the eastern circuit shall consist of the districts of New Hampshire, Massachusetts, Connecticut and New York; that the middle circuit shall consist of the districts of New Jersey, Pennsylvania, Delaware, Maryland and Virginia; and that the southern circuit shall consist of the districts of South Carolina and Georgia, and that there shall be held annually in each district of said circuits, two courts, which shall be called Circuit Courts, and shall consist of any two justices of the Supreme Court, and the district judge of such districts, any two of whom shall constitute a quorum: *Provided*, That no district judge shall give a vote in any case of appeal or error from his own decision; but may assign the reasons of such his decision.

SEC. 5. *And be it further enacted*, That the first session of the said circuit court in the several districts shall commence at the times following, to wit: in New Jersey on the second, in New York on the fourth, in Pennsylvania on the eleventh, in Connecticut on the twenty-second, and in Delaware on the twenty-seventh, days of April next; in Massachusetts on the third, in Maryland on the seventh, in South Carolina on the twelfth, in New Hampshire on the twentieth, in Virginia on the twenty-second, and in Georgia on the twenty-eighth, days of May next, and the subsequent sessions in the respective districts on the like days of every sixth calendar month afterwards, except in South Carolina, where the session of the said court shall commence on the first, and in Georgia where it shall commence on the seventeenth day of October, and except when any of those days shall happen on a Sunday, and then the session shall commence on the next day following. And the sessions of the said circuit court shall be held in the district of New Hampshire, at Portsmouth and Exeter alternately, beginning at the first; in the district of Massachusetts, at Boston; in the district of Connecticut, alternately at Hartford and New Haven, beginning at the last; in the district of New York, alternately at New York and Albany, beginning at the first; in the district of New Jersey, at Trenton; in the district of Pennsylvania, alternately at Philadelphia and Yorktown, beginning at the first; in the district of Delaware, alternately at New Castle and Dover, beginning at the first; in the district of Maryland, alternately at Annapolis and Easton, beginning at the first; in the district of Virginia, alternately at Charlottesville and

Williamsburgh, beginning at the first; in the district of South Carolina, alternately at Columbia and Charleston, beginning at the first; and in the district of Georgia, alternately at Savannah and Augusta, beginning at the first. And the circuit courts shall have power to hold special sessions for the trial of criminal causes at any other time at their discretion, or at the discretion of the Supreme Court.

SEC. 6. *And be it further enacted*, That the Supreme Court may, by any one or more of its justices being present, be adjourned from day to day until a quorum be convened; and that a circuit court may also be adjourned from day to day by any one of its judges, or if none are present, by the marshal of the district until a quorum be convened; and that a district court, in case of the inability of the judge to attend at the commencement of a session, may by virtue of a written order from the said judge, directed to the marshal of the district, be adjourned by the said marshal to such day, antecedent to the next stated session of the said court, as in the said order shall be appointed; and in case of the death of the said judge, and his vacancy not being supplied, all process, pleadings and proceedings of what nature soever, pending before the said court, shall be continued of course until the next stated session after the appointment and acceptance of the office by his successor.

SEC. 7. *And be it* [*further*] *enacted*, That the Supreme Court, and the district courts shall have power to appoint clerks for their respective courts, and that the clerk for each district court shall be clerk also of the circuit court in such district, and each of the said clerks shall, before he enters upon the execution of his office, take the following oath or affirmation, to wit: "I, A. B., being appointed clerk of , do solemnly swear, or affirm, that I will truly and faithfully enter and record all the orders, decrees, judgments and proceedings of the said court, and that I will faithfully and impartially discharge and perform all the duties of my said office, according to the best of my abilities and understanding. So help me God." Which words, so help me God, shall be omitted in all cases where an affirmation is admitted instead of an oath. And the said clerks shall also severally give bond, with sufficient sureties, (to be approved of by the Supreme and district courts respectively) to the United States, in the sum of two thousand dollars, faithfully to discharge the duties of his office, and seasonably to record the decrees, judgments and determinations of the court of which he is clerk.

SEC. 8. *And be it further enacted*, That the justices of the Supreme Court, and the district judges, before they proceed to execute the duties of their respective offices, shall take the following oath or affirmation, to wit: "I, A. B., do solemnly swear or affirm, that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent on me as , according to the best of my abilities and understanding, agreeably to the constitution, and laws of the United States. So help me God."

SEC. 9. *And be it further enacted*, That the district courts shall have, exclusively of the courts of the several States, cognizance of all crimes and offences that shall be cognizable under the authority of the United States, committed within their respective districts, or upon the high seas; where no other punishment than whipping, not exceeding thirty stripes, a fine not exceeding one hundred dollars, or a term of imprisonment not exceeding six months, is to be inflicted; and shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction,

including all seizures under laws of impost, navigation or trade of the United States, where the seizures are made, on waters which are navigable from the sea by vessels of ten or more tons burthen, within their respective districts as well as upon the high seas; saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it; and shall also have exclusive original cognizance of all seizures on land, or other waters than as aforesaid, made, and of all suits for penalties and forfeitures incurred, under the laws of the United States. And shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States. And shall also have cognizance, concurrent as last mentioned, of all suits at common law where the United States sue, and the matter in dispute amounts, exclusive of costs, to the sum or value of one hundred dollars. And shall also have jurisdiction exclusively of the courts of the several States, of all suits against consuls or vice-consuls, except for offences above the description aforesaid. And the trial of issues in fact, in the district courts, in all causes except civil causes of admiralty and maritime jurisdiction, shall be by jury.

SEC. 10. *And be it further enacted*, That the district court in Kentucky district shall, besides the jurisdiction aforesaid, have jurisdiction of all other causes, except of appeals and writs of error, hereinafter made cognizable in a circuit court, and shall proceed therein in the same manner as a circuit court, and writs of error and appeals shall lie from decisions therein to the Supreme Court in the same causes, as from a circuit court to the Supreme Court, and under the same regulations. And the district court in Maine district shall, besides the jurisdiction herein before granted, have jurisdiction of all causes, except of appeals and writs of error herein after made cognizable in a circuit court, and shall proceed therein in the same manner as a circuit court: And writs of error shall lie from decisions therein to the circuit court in the district of Massachusetts in the same manner as from other district courts to their respective circuit courts.

SEC. 11. *And be it further enacted*, That the circuit courts shall have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiffs, or petitioners; or an alien is a party, or the suit is between a citizen of the State where the suit is brought, and a citizen of another State. And shall have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct, and concurrent jurisdiction with the district courts of the crimes and offences cognizable therein. But no person shall be arrested in one district for trial in another, in any civil action before a circuit or district court. And no civil suit shall be brought before either of said courts against an inhabitant of the United States, by any original process in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ, nor shall any district or circuit court have cognizance of any suit to recover the contents of any promissory note or other chose in action in favour of an assignee, unless a suit might have been prosecuted in such court to recover the said contents if no assignment had been made, except in cases of foreign bills of exchange. And the circuit courts shall also have appellate jurisdiction from the district courts under the regulations and restrictions herein after provided.

SEC. 12. *And be it further enacted*, That if a suit be commenced in any state court against an alien, or by a citizen of the state in which the suit is brought against a citizen of another state, and the matter in dispute exceeds the aforesaid sum or value of five hundred dollars, exclusive of costs, to be made to appear to the satisfaction of the court; and the defendant shall, at the time of entering his appearance in such state court, file a petition for the removal of the cause for trial into the next circuit court, to be held in the district where the suit is pending, or if in the district of Maine to the district court next to be holden therein, or if in Kentucky district to the district court next to be holden therein, and offer good and sufficient surety for his entering in such court, on the first day of its session, copies of said process against him, and also for his there appearing and entering special bail in the cause, if special bail was originally requisite therein, it shall then be the duty of the state court to accept the surety, and proceed no further in the cause, and any bail that may have been originally taken shall be discharged, and the said copies being entered as aforesaid, in such court of the United States, the cause shall there proceed in the same manner as if it had been brought there by original process. And any attachment of the goods or estate of the defendant by the original process, shall hold the goods or estate so attached, to answer the final judgment in the same manner as by the laws of such state they would have been holden to answer final judgment, had it been rendered by the court in which the suit commenced. And if in any action commenced in a state court, the title of land be concerned, and the parties are citizens of the same state, and the matter in dispute exceeds the sum or value of five hundred dollars, exclusive of costs, the sum or value being made to appear to the satisfaction of the court, either party, before the trial, shall state to the court and make affidavit if they require it, that he claims and shall rely upon a right or title to the land, under a grant from a state other than that in which the suit is pending, and produce the original grant or an exemplification of it, except where the loss of public records shall put it out of his power, and shall move that the adverse party inform the court, whether he claims a right or title to the land under a grant from the state in which the suit is pending; the said adverse [party] shall give such information, or otherwise not be allowed to plead such grant, or give it in evidence upon the trial, and if he informs that he does claim under such grant, the party claiming under the grant first mentioned may then, on motion, remove the cause for trial to the next circuit court to be holden in such district, or if in the district of Maine, to the court next to be holden therein; or if in Kentucky district, to the district court next to be holden therein; but if he is the defendant, shall do it under the same regulations as in the before-mentioned case of the removal of a cause into such court by an alien; and neither party removing the cause, shall be allowed to plead or give evidence of any other title than that by him stated as aforesaid, as the ground of his claim; and the trial of issues in fact in the circuit courts shall, in all suits, except those of equity, and of admiralty, and maritime jurisdiction, be by jury.

SEC. 13. *And be it further enacted*, That the Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature, where a state is a party, except between a state and its citizens; and except also between a state and citizens of other states, or aliens, in which latter case it shall have original but not exclusive jurisdiction. And shall have exclusively all such jurisdiction of suits or proceedings against ambassadors, or other public ministers, or their domestics, or domestic servants, as a court of law can have or exercise consistently with the law of nations; and original, but not exclusive jurisdiction of all suits brought by ambassadors, or other public ministers, or in which a consul, or vice consul, shall be a party. And the trial of issues in fact in the Supreme Court, in all actions at law against citizens of the United States, shall be by jury.

The Supreme Court shall also have appellate jurisdiction from the circuit courts and courts of the several states, in the cases herein after specially provided for; and shall have power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction, and writs of *mandamus*, in cases warranted by the principles and usages of law, to any courts appointed, or persons holding office, under the authority of the United States.

SEC. 14. *And be it further enacted*, That all the before-mentioned courts of the United States, shall have power to issue writs of *scire facias, habeas corpus*, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. And that either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of *habeas corpus* for the purpose of an inquiry into the cause of commitment.——*Provided*, That writs of *habeas corpus* shall in no case extend to prisoners in gaol, unless where they are in custody, under or by colour of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify.

SEC. 15. *And be it further enacted*, That all the said courts of the United States, shall have power in the trial of actions at law, on motion and due notice thereof being given, to require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, in cases and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery; and if a plaintiff shall fail to comply with such order, to produce books or writings, it shall be lawful for the courts respectively, on motion, to give the like judgment for the defendant as in cases of nonsuit; and if a defendant shall fail to comply with such order, to produce books or writings, it shall be lawful for the courts respectively on motion as aforesaid, to give judgment against him or her by default.

SEC. 16. *And be it further enacted*, That suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy may be had at law.

SEC. 17. *And be it further enacted*, That all the said courts of the United States shall have power to grant new trials, in cases where there has been a trial by jury for reasons for which new trials have usually been granted in the courts of law; and shall have power to impose and administer all necessary oaths or affirmations, and to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same; and to make and establish all necessary rules for the orderly conducting business in the said courts, provided such rules are not repugnant to the laws of the United States.

SEC. 18. *And be it further enacted*, That when in a circuit court, judgment upon a verdict in a civil action shall be entered, execution may on motion of either party, at the discretion of the court, and on such conditions for the security of the adverse party as they may judge proper, be stayed forty-two days from the time of entering judgment, to give time to file in the clerk's office of said court, a petition for a new trial. And if such petition be there filed within said term of forty-two days, with a certificate thereon from either of the judges of such court, that he allows the same to be filed, which certificate he may make or refuse at his discretion, execution shall of

course be further stayed to the next session of said court. And if a new trial be granted, the former judgment shall be thereby rendered void.

SEC. 19. *And be it further enacted*, That it shall be the duty of circuit courts, in causes in equity and of admiralty and maritime jurisdiction, to cause the facts on which they found their sentence or decree, fully to appear upon the record either from the pleadings and decree itself, or a state of the case agreed by the parties, or their counsel, or if they disagree by a stating of the case by the court.

SEC. 20. *And be it further enacted*, That where in a circuit court, a plaintiff in an action, originally brought there, or a petitioner in equity, other than the United States, recovers less than the sum or value of five hundred dollars, or a libellant, upon his own appeal, less than the sum or value of three hundred dollars, he shall not be allowed, but at the discretion of the court, may be adjudged to pay costs.

SEC. 21. *And be it further enacted*, That from final decrees in a district court in causes of admiralty and maritime jurisdiction, where the matter in dispute exceeds the sum or value of three hundred dollars, exclusive of costs, an appeal shall be allowed to the next circuit court, to be held in such district. *Provided nevertheless*, That all such appeals from final decrees as aforesaid, from the district court of Maine, shall be made to the circuit court, next to be holden after each appeal in the district of Massachusetts.

SEC. 22. *And be it further enacted*, That final decrees and judgments in civil actions in a district court, where the matter in dispute exceeds the sum or value of fifty dollars, exclusive of costs, may be reexamined, and reversed or affirmed in a circuit court, holden in the same district, upon a writ of error, whereto shall be annexed and returned therewith at the day and place therein mentioned, an authenticated transcript of the record, an assignment of errors, and prayer for reversal, with a citation to the adverse party, signed by the judge of such district court, or a justice of the Supreme Court, the adverse party having at least twenty days' notice. And upon a like process, may final judgments and decrees in civil actions, and suits in equity in a circuit court, brought there by original process, or removed there from courts of the several States, or removed there by appeal from a district court where the matter in dispute exceeds the sum or value of two thousand dollars, exclusive of costs, be re-examined and reversed or affirmed in the Supreme Court, the citation being in such case signed by a judge of such circuit court, or justice of the Supreme Court, and the adverse party having at least thirty days' notice. But there shall be no reversal in either court on such writ of error for error in ruling any plea in abatement, other than a plea to the jurisdiction of the court, or such plea to a petition or bill in equity, as is in the nature of a demurrer, or for any error in fact. And writs of error shall not be brought but within five years after rendering or passing the judgment or decree complained of, or in case the person entitled to such writ of error be an infant, *feme covert, non compos mentis*, or imprisoned, then within five years as aforesaid, exclusive of the time of such disability. And every justice or judge signing a citation on any writ of error as aforesaid, shall take good and sufficient security, that the plaintiff in error shall prosecute his writ to effect, and answer all damages and costs if he fail to make his plea good.

SEC. 23. *And be it further enacted*, That a writ of error as aforesaid shall be a supersedeas and stay execution in cases only where the writ of error is served, by a copy thereof being lodged for the adverse party in the clerk's office where the record remains, within ten days, Sundays exclusive, after rendering the judgment or passing the decree complained of. Until the expiration of which term of ten days, executions shall not issue in any case where a writ of error may be a supersedeas; and whereupon such writ of error the Supreme or a circuit court shall affirm a judgment or decree, they shall adjudge or decree to the respondent in error just damages for his delay, and single or double costs at their discretion.

SEC. 24. *And be it further enacted*, That when a judgment or decree shall be reversed in a circuit court, such court shall proceed to render such judgment or pass such decree as the district court should have rendered or passed; and the Supreme Court shall do the same on reversals therein, except where the reversal is in favour of the plaintiff, or petitioner in the original suit, and the damages to be assessed, or matter to be decreed, are uncertain, in which case they shall remand the cause for a final decision. And the Supreme Court shall not issue execution in causes that are removed before them by writs of error, but shall send a special mandate to the circuit court to award execution thereupon.

SEC. 25. *And be it further enacted*, That a final judgment or decree in any suit, in the highest court of law or equity of a State in which a decision in the suit could be had, where is drawn in question the validity of a treaty or statute of, or an authority exercised under the United States, and the decision is against their validity; or where is drawn in question the validity of a statute of, or an authority exercised under any State, on the ground of their being repugnant to the constitution, treaties or laws of the United States, and the decision is in favour of such their validity, or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under the United States, and the decision is against the title, right, privilege or exemption specially set up or claimed by either party, under such clause of the said Constitution, treaty, statute or commission, may be re-examined and reversed or affirmed in the Supreme Court of the United States upon a writ of error, the citation being signed by the chief justice, or judge or chancellor of the court rendering or passing the judgment or decree complained of, or by a justice of the Supreme Court of the United States, in the same manner and under the same regulations, and the writ shall have the same effect, as if the judgment or decree complained of had been rendered or passed in a circuit court, and the proceeding upon the reversal shall also be the same, except that the Supreme Court, instead of remanding the cause for a final decision as before provided, may at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution. But no other error shall be assigned or regarded as a ground of reversal in any such case as aforesaid, than such as appears on the face of the record, and immediately respects the before mentioned questions of validity or construction of the said constitution, treaties, statutes, commissions, or authorities in dispute.

SEC. 26. *And be it further enacted*, That in all causes brought before either of the courts of the United States to recover the forfeiture annexed to any articles of agreement, covenant, bond, or other speciality, where the forfeiture, breach or non-performance shall appear, by the default or confession of the defendant, or upon demurrer, the court before whom the action is, shall render judgment therein for the plaintiff to recover so much as is due according to equity. And when the

sum for which judgment should be rendered is uncertain, the same shall, if either of the parties request it, be assessed by a jury.

SEC. 27. *And be it further enacted*, That a marshal shall be appointed in and for each district for the term of four years, but shall be removable from office at pleasure, whose duty it shall be to attend the district and circuit courts when sitting therein, and also the Supreme Court in the District in which that court shall sit. And to execute throughout the district, all lawful precepts directed to him, and issued under the authority of the United States, and he shall have power to command all necessary assistance in the execution of his duty, and to appoint as there shall be occasion, one or more deputies, who shall be removable from office by the judge of the district court, or the circuit court sitting within the district, at the pleasure of either; and before he enters on the duties of his office, he shall become bound for the faithful performance of the same, by himself and by his deputies before the judge of the district court to the United States, jointly and severally, with two good and sufficient sureties, inhabitants and freeholders of such district, to be approved by the district judge, in the sum of twenty thousand dollars, and shall take before said judge, as shall also his deputies, before they enter on the duties of their appointment, the following oath of office: "I, A. B., do solemnly swear or affirm, that I will faithfully execute all lawful precepts directed to the marshal of the district of _____ under the authority of the United States, and true returns make, and in all things well and truly, and without malice or partiality, perform the duties of the office of marshal (or marshal's deputy, as the case may be) of the district of , during my continuance in said office, and take only my lawful fees. So help me God."

SEC. 28. *And be it further enacted*, That in all causes wherein the marshal or his deputy shall be a party, the writs and precepts therein shall be directed to such disinterested person as the court, or any justice or judge thereof may appoint, and the person so appointed, is hereby authorized to execute and return the same. And in case of the death of any marshal, his deputy or deputies shall continue in office, unless otherwise specially removed; and shall execute the same in the name of the deceased, until another marshal shall be appointed and sworn: And the defaults or misfeasances in office of such deputy or deputies in the mean time, as well as before, shall be adjudged a breach of the condition of the bond given, as before directed, by the marshal who appointed them; and the executor or administrator of the deceased marshal shall have like remedy for the defaults and misfeasances in office of such deputy or deputies during such interval, as they would be entitled to if the marshal had continued in life and in the exercise of his said office, until his successor was appointed, and sworn or affirmed: And every marshal or his deputy when removed from office, or when the term for which the marshal is appointed shall expire, shall have power notwithstanding to execute all such precepts as may be in their hands respectively at the time of such removal or expiration of office; and the marshal shall be held answerable for the delivery to his successor of all prisoners which may be in his custody at the time of his removal, or when the term for which he is appointed shall expire, and for that purpose may retain such prisoners in his custody until his successor shall be appointed and qualified as the law directs.

SEC. 29. *And be it further enacted*, That in cases punishable with death, the trial shall be had in the county where the offence was committed, or where that cannot be done without great inconvenience, twelve petit jurors at least shall be summoned from thence. And jurors in all

cases to serve in the courts of the United States shall be designated by lot or otherwise in each State respectively according to the mode of forming juries therein now practised, so far as the laws of the same shall render such designation practicable by the courts or marshals of the United States; and the jurors shall have the same qualifications as are requisite for jurors by the laws of the State of which they are citizens, to serve in the highest courts of law of such State, and shall be returned as there shall be occasion for them, from such parts of the district from time to time as the court shall direct, so as shall be most favourable to an impartial trial, and so as not to incur an unnecessary expense, or unduly to burthen the citizens of any part of the district with such services. And writs of *venire facias* when directed by the court shall issue from the clerk's office, and shall be served and returned by the marshal in his proper person, or by his deputy, or in case the marshal or his deputy is not an indifferent person, or is interested in the event of the cause, by such fit person as the court shall specially appoint for that purpose, to whom they shall administer an oath or affirmation that he will truly and impartially serve and return such writ. And when from challenges or otherwise there shall not be a jury to determine any civil or criminal cause, the marshal or his deputy shall, by order of the court where such defect of jurors shall happen, return jurymen *de talibus circumstantibus* sufficient to complete the pannel; and when the marshal or his deputy are disqualified as aforesaid, jurors may be returned by such disinterested person as the court shall appoint.

Sec. 30. *And be it further enacted*, That the mode of proof by oral testimony and examination of witnesses in open court shall be the same in all the courts of the United States, as well in the trial of causes in equity and of admiralty and maritime jurisdiction, as of actions at common law. And when the testimony of any person shall be necessary in any civil cause depending in any district in any court of the United States, who shall live at a greater distance from the place of trial than one hundred miles, or is bound on a voyage to sea, or is about to go out of the United States, or out of such district, and to a greater distance from the place of trial than as aforesaid, before the time of trial, or is ancient or very infirm, the deposition of such person may be taken *de bene esse* before any justice or judge of any of the courts of the United States, or before any chancellor, justice or judge of a supreme or superior court, mayor or chief magistrate of a city, or judge of a county court or court of common pleas of any of the United States, not being of counsel or attorney to either of the parties, or interested in the event of the cause, provided that a notification from the magistrate before whom the deposition is to be taken to the adverse party, to be present at the taking of the same, and to put interrogatories, if he think fit, be first made out and served on the adverse party or his attorney as either may be nearest, if either is within one hundred miles of the place of such caption, allowing time for their attendance after notified, not less than at the rate of one day, Sundays exclusive, for every twenty miles travel. And in causes of admiralty and maritime jurisdiction, or other cases of seizure when a libel shall be filed, in which an adverse party is not named, and depositions of persons circumstanced as aforesaid shall be taken before a claim be put in, the like notification as aforesaid shall be given to the person having the agency or possession of the property libelled at the time of the capture or seizure of the same, if known to the libellant. And every person deposing as aforesaid shall be carefully examined and cautioned, and sworn or affirmed to testify the whole truth, and shall subscribe the testimony by him or her given after the same shall be reduced to writing, which shall be done only by the magistrate taking the deposition, or by the deponent in his presence. And the depositions so taken shall be retained by such magistrate until he deliver the same with his own hand into the court for which they are taken, or shall , together with a certificate of the reasons as

aforesaid of their being taken, and of the notice if any given to the adverse party, be by him the said magistrate sealed up and directed to such court, and remain under his seal until opened in court. And any person may be compelled to appear and depose as aforesaid in the same manner as to appear and testify in court. And in the trial of any cause of admiralty or maritime jurisdiction in a district court, the decree in which may be appealed from, if either party shall suggest to and satisfy the court that probably it will not be in his power to produce the witnesses there testifying before the circuit court should an appeal be had, and shall move that their testimony be taken down in writing, it shall be so done by the clerk of the court. And if an appeal be had, such testimony may be used on the trial of the same, if it shall appear to the satisfaction of the court which shall try the appeal, that the witnesses are then dead or gone out of the United States, or to a greater distance than as aforesaid from the place where the court is sitting, or that by reason of age, sickness, bodily infirmity or imprisonment, they are unable to travel and appear at court, but not otherwise. And unless the same shall be made to appear on the trial of any cause, with respect to witnesses whose depositions may have been taken therein, such depositions shall not be admitted or used in the cause. *Provided*, That nothing herein shall be construed to prevent any court of the United States from granting a *dedimus potestatem* to take depositions according to common usage, when it may be necessary to prevent a failure or delay of justice, which power they shall severally possess, nor to extend to depositions taken in *perpetuam rei memoriam*, which if they relate to matters that may be cognizable in any court of the United States, a circuit court on application thereto made as a court of equity, may, according to the usages in chancery direct to be taken.

SEC. 31. *And be it* [*further*] *enacted*, That where any suit shall be depending in any court of the United States, and either of the parties shall die before final judgment, the executor or administrator of such deceased party who was plaintiff, petitioner, or defendant, in case the cause of action doth by law survive, shall have full power to prosecute or defend any such suit or action until final judgment; and the defendant or defendants are hereby obliged to answer thereto accordingly; and the court before whom such cause may be depending, is hereby empowered and directed to hear and determine the same, and to render judgment for or against the executor or administrator, as the case may require. And if such executor or administrator having been duly served with a *scire facias* from the office of the clerk of the court where such suit is depending, twenty days beforehand, shall neglect or refuse to become a party to the suit, the court may render judgment against the estate of the deceased party, in the same manner as if the executor or administrator had voluntarily made himself a party to the suit. And the executor or administrator who shall become a party as aforesaid, shall, upon motion to the court where the suit is depending, be entitled to a continuance of the same until the next term of the said court. And if there be two or more plaintiffs or defendants, and one or more of them shall die, if the cause of action shall survive to the surviving plaintiff or plaintiffs, or against the surviving defendant or defendants, the writ or action shall not be thereby abated; but such death being suggested upon the record, the action shall proceed at the suit of the surviving plaintiff or plaintiffs against the surviving defendant or defendants.

SEC. 32. *And be it further enacted*, That no summons, writ, declaration, return, process, judgment, or other proceedings in civil causes in any of the courts of the United States, shall be abated, arrested, quashed or reversed, for any defect or want of form, but the said courts respectively shall proceed and give judgment according as the right of the cause and matter in

law shall appear unto them, without regarding any imperfections, defects, or want of form in such writ, declaration, or other pleading, return, process, judgment, or course of proceeding whatsoever, except those only in cases of demurrer, which the party demurring shall specially sit down and express together with his demurrer as the cause thereof. And the said courts respectively shall and may, by virtue of this act, from time to time, amend all and every such imperfections, defects and wants of form, other than those only which the party demurring shall express as aforesaid, and may at any time permit either of the parties to amend any defect in the process or pleadings, upon such conditions as the said courts respectively shall in their discretion, and by their rules prescribe.

SEC. 33. *And be it further enacted*, That for any crime or offence against the United States, the offender may, by any justice or judge of the United States, or by any justice of the peace, or other magistrate of any of the United States where he may be found agreeably to the usual mode of process against offenders in such state, and at the expense of the United States, be arrested, and imprisoned or bailed, as the case may be, for trial before such court of the United States as by this act has cognizance of the offence. And copies of the process shall be returned as speedily as may be into the clerk's office of such court, together with the recognizances of the witnesses for their appearance to testify in the case; which recognizances the magistrate before whom the examination shall be, may require on pain of imprisonment. And if such commitment of the offender, or the witnesses shall be in a district other than that in which the offence is to be tried, it shall be the duty of the judge of that district where the delinquent is imprisoned, seasonably to issue, and of the marshal of the same district to execute, a warrant for the removal of the offender, and the witnesses, or either of them, as the case may be, to the district in which the trial is to be had. And upon all arrests in criminal cases, bail shall be admitted, except where the punishment may be death, in which cases it shall not be admitted but by the supreme or a circuit court, or by a justice of the supreme court, or a judge of a district court, who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law. And if a person committed by a justice of the supreme or a judge of a district court for an offence not punishable with death, shall afterwards procure bail, and there be no judge of the United States in the district to take the same, it may be taken by any judge of the supreme or superior court of law of such state.

SEC. 34. *And be it further enacted*, That the laws of the several states, except where the constitution, treaties or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply.

SEC. 35. *And be it further enacted*, That in all courts of the United States, the parties may plead and manage their own causes personally or by assistance of such counsel or attorneys at law as by the rules of the said courts respectively shall be permitted to manage and conduct causes therein. And there shall be appointed in each district a meet person learned in the law to act as attorney for the United States in such district, who shall be sworn or affirmed to the faithful execution of his office, whose duty it shall be to prosecute in such district all delinquents for crimes and offences, cognizable under the authority of the United States, and all civil actions in which the United States shall be concerned, except before the supreme court in the district in which that court shall be holden. And he shall receive as compensation for his services such fees

as shall be taxed therefor in the respective courts before which the suits or prosecutions shall be. And there shall also be appointed a meet person, learned in the law, to act as attorney-general for the United States, who shall be sworn or affirmed to a faithful execution of his office; whose duty it shall be to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned, and to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments, and shall receive such compensation for his services as shall by law be provided.

APPROVED , September 24, 1789.

# Exhibit

# 30

113 F.3d 391

**Hilary PRIDGEN, in her individual capacity as shareholder &
director of Microbyx Corp., John Van Raalte, in his
individual capacity as shareholder & director of Microbyx
Corp., Hilary Pridgen and John Van Raalte, nominally and
derivatively on behalf of Microbyx Corp.,
Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants,
v.
John ANDRESEN, Defendant-Counter-Claimant,
Constance Andresen, on behalf of herself and as executrix of
the estate of John Andresen, and Microbyx Corp., a
nominal defendant,
Defendants-Counter-Claimants-
Appellants-Cross-Appellees.**

Nos. 568, 1413, Dockets 96-7428(L), 96-7456(XAP).

# United States Court of Appeals,
# Second Circuit.

Argued Feb. 12, 1997.
Decided May 19, 1997.

Yvette Harmon, Ross & Hardies, New York City (David B. Zabel, Cohen & Wolf, Bridgeport, CT, of
counsel), for Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants.

Constance Andresen, New York City, Pro Se.

Estate of John Andresen, New York City, Pro Se.

Before: JACOBS, CALABRESI, and LAY[*], Circuit Judges.
JACOBS, Circuit Judge.

1
    In this derivative action, shareholders of Microbyx Corporation ("Microbyx") have won a judgment in
the United States District Court for the District of Connecticut (Martinez, M.J.) against John Andresen,
the corporation's co-founder, and Constance Andresen. On appeal, the Andresens appeared pro se to
challenge the judgment, including the equitable award of attorney's fees pursuant to Delaware law and
Fed.R.Civ.P. 23.1, and to defend the cross-appeal in which the shareholders Hilary Pridgen and John
Van Raalte challenge the grant of relief as insufficient. John Andresen died after the submission of the
Andresens' brief; following convoluted motion practice, the estate of John Andresen has been
substituted as defendant-counter-claimant-appellant-cross-appellee. Many of the numerous issues
presented on this appeal are decided in a summary order filed simultaneously herewith. We write to
consider two issues: (1) whether Constance Andresen may represent the estate of John Andresen pro
se, and (2) whether we have jurisdiction to consider the Andresens' appeal from the aspect of the
judgment that requires them to pay attorneys' fees, the amount of which has not yet been determined.
We summarize only the proceedings that bear upon our disposition of these issues.

1

2

The amended complaint alleged that the Andresens, as officers of Microbyx, violated federal securities law, Delaware law, and the Microbyx by-laws, and that John Andresen breached his fiduciary duty of loyalty. In a nutshell, the allegations are that the Andresens raised $2.4 million of capital for Microbyx on the strength of a false representation that Microbyx was close to marketing a tampon testing kit that could detect certain cancers; that much of that money was paid to Sarles Associates ("Sarles"), an entity wholly owned by the Andresens; and that, although the payments to Sarles were made pursuant to a management contract, Sarles provided no services to Microbyx. The Andresens counterclaimed.

3

Following a two-week trial in October and November 1995, the jury found in favor of the shareholders, and awarded damages in the amount of $850,000 against John Andresen for breach of his fiduciary duty. The district court subsequently entered findings and conclusions as to equitable relief, and permanently enjoined both Andresens from voting certain illegally acquired proxies and from committing any future violations of securities laws or of the Microbyx by-laws. The court also awarded attorney's fees pursuant to Delaware law and Fed.R.Civ.P. 23.1, in an amount to be determined at a separate hearing. A second amended judgment was entered on May 8, 1996.

4

* The Andresens had been represented by counsel at trial, but appeared here pro se. In July 1996, the Andresens filed their brief and appendix addressing the issues on the appeal. On August 1, 1996 (before the shareholders filed their responsive brief), John Andresen died.[1] Constance Andresen then moved pursuant to Fed.R.App.P. 43(a) to substitute herself for her deceased husband. A prior panel of this Court denied that motion without prejudice to renewal upon submission of documentation showing that Mrs. Andresen had been appointed administrix or executrix of John Andresen's estate; the panel expressly reserved decision on whether she could represent his estate pro se. She subsequently renewed the substitution motion, citing her appointment as executrix of her deceased husband's estate by the Connecticut Probate Court, and we granted substitution at oral argument.

5

The issue remaining from that motion practice is whether or not Mrs. Andresen may appear pro se as executrix of her husband's estate. We need not decide this question categorically because we think the issue can be resolved on the basis of her admission at oral argument that there are creditors of the estate. The representation of this estate thus entails interests other than the interests of Mrs. Andresen alone, and therefore cannot be undertaken by Mrs. Andresen pro se.

6

The right to proceed pro se in civil actions is guaranteed by 28 U.S.C. § 1654: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." Pursuant to this statute, "[a] litigant in federal court has a right to act as his or her own counsel." Cheung v. Youth Orchestra Found. of Buffalo, Inc., 906 F.2d 59, 61 (2d Cir.1990). See generally O'Reilly v. New York Times Co., 692 F.2d 863, 867-70 (2d Cir.1982).

7

Nevertheless, appearance pro se denotes (in law latin) appearance for one's self; so that a person ordinarily may not appear pro se in the cause of another person or entity. Thus it is well established that a layperson may not represent a corporation, see Shapiro, Bernstein & Co. v. Continental Record Co., 386 F.2d 426, 427 (2d Cir.1967) (per curiam), may not assert pro se a claim that has been assigned to the litigant by a corporation, see Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir.1983), and may not appear pro se to pursue a shareholder's derivative suit, see Phillips v. Tobin, 548 F.2d 408, 411-12 (2d Cir.1976). We have also held that a layperson may not represent a partnership, see Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1310 (2d Cir.1991), or appear pro se on behalf of his or her minor child, see Cheung, 906 F.2d at 61. These limits on pro se

2

representation serve the interests of the represented party as well as the interests of adversaries and the court. See Jones, 722 F.2d at 22.

8

We now hold that an administratrix or executrix of an estate may not proceed pro se when the estate has beneficiaries or creditors other than the litigant. The only other federal court of appeal that has addressed this issue--the Eleventh Circuit--considered it in banc and was equally divided. The district court had disqualified co-representatives of an estate from proceeding pro se on the estate's behalf. A panel of the Eleventh Circuit reversed, see Reshard v. Britt, 819 F.2d 1573 (11th Cir.1987), with Chief Judge Roney dissenting; and the in banc panel split evenly, thereby affirming the district court's order as a matter of law, see Reshard v. Britt, 839 F.2d 1499 (11th Cir.1988) (per curiam) (in banc). We are persuaded by the reasoning of Chief Judge Roney's dissent to the panel opinion: when an estate has beneficiaries or creditors other than the administratrix or executrix, the action cannot be described as the litigant's own, because "the personal interests of the estate, other survivors, and possible creditors will be affected by the outcome" of the proceedings. 819 F.2d at 1583 (Roney, J., dissenting).

9

Having decided this issue on that basis, we have no occasion to decide whether an administratrix or executrix who is the sole beneficiary of an estate without creditors may appear pro se on its behalf.

10

Our ruling leaves John Andresen's estate unrepresented in this Court; however, John Andresen's appellate brief was filed during his lifetime, and we have decided the appeal as to his estate based on that brief. John Andresen had no opportunity to respond to the appellate arguments advanced in the shareholders' brief, but no reply is necessary for us to reach a decision. Cf. Fed.R.App.P. 31(c) (the consequence of failing to file an appellee brief is that "the appellee will not be heard at oral argument except by permission of the court").

B

11

Second, the Andresens challenge the district court's award of attorney's fees. We conclude that we lack jurisdiction to decide this issue because the district court order awarding attorney's fees left open the amount of the fees to be paid.

12

Circuits are split as to whether there is appellate jurisdiction to review an order awarding attorney's fees when the amount of the award remains to be determined. Compare BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1099 (7th Cir.1994) (citing Bittner v. Sadoff & Rudoy Indus., 728 F.2d 820, 826-27 (7th Cir.1984)) (review is available, notwithstanding the open amount of attorney's fees award, when the appeal of the order awarding fees is consolidated with the appeal from the final order deciding the merits of the action); Andrews v. Employees' Retirement Plan of First Ala. Bancshares, Inc., 938 F.2d 1245, 1247-48 & n. 6 (11th Cir.1991) (same), with Southern Travel Club, Inc. v. Carnival Air Lines, Inc., 986 F.2d 125, 131 (5th Cir.1993) (per curiam) (no jurisdiction to review an award of attorney's fees prior to reduction of the award to a sum certain); Pennsylvania v. Flaherty, 983 F.2d 1267, 1276 (3d Cir.1993) (same); Phelps v. Washburn Univ. of Topeka, 807 F.2d 153, 154-55 (10th Cir.1986) (per curiam) (same); Gates v. Central States Teamsters Pension Fund, 788 F.2d 1341, 1343 (8th Cir.1986) (same). See generally 15B Charles Alan Wright et al., Federal Practice and Procedure § 3915.6, at 332-35 (2d ed. 1991).

13

We have held that orders awarding attorney's fees as a sanction are not appealable until the amount of the sanction has been determined. See Discon, Inc. v. NYNEX Corp., 4 F.3d 130, 133 (2d Cir.1993); Cooper v. Salomon Bros. Inc., 1 F.3d 82, 84-85 (2d Cir.1993). In so holding, we specifically rejected the Seventh Circuit's analysis in Bittner as an unjustified broadening of appellate jurisdiction. See Cooper, 1 F.3d at 85. The same reasoning yields the same result with respect to appellate review

of an award of attorney's fees generally. See 15B Wright et al. § 3915.6, at 347 ("It is not surprising that the rules of finality for sanction orders parallel the rules for attorney fee awards."). Although this Court in Synergy Gas Co. v. Sasso, 853 F.2d 59 (2d Cir.1988), adjudicated an award of attorney's fees the amount of which had not yet been set, we later questioned that decision, noting that the availability of appellate jurisdiction had not been raised and that such adjudication "was at most an exercise of pendent appellate jurisdiction." Discon, 4 F.3d at 133.

C

14

The motion of Constance Andresen to appear pro se on behalf of the estate of John Andresen is denied. The appeal from the grant of attorney's fees is dismissed for lack of appellate jurisdiction.

*

The Honorable Donald P. Lay, of the United States Court of Appeals, for the Eighth Circuit, sitting by designation

1

After her husband's death, Mrs. Andresen moved for leave to file a reply brief out of time. That motion was granted insofar as she filed for herself and not on behalf of her husband

4

# Exhibit
# 31

# Iannaccone v. Law

142 F.3d 553 (2d Cir. 1998)

Decided Apr 27, 1998

No. 97-6045

Submitted October 30, 1997

Decided April 27, 1998

William G. Iannaccone, Cheektowaga, New York, pro se, for Plaintiff-Counter-Defendant-Appellant.

Sandra M. Grossfeld, Assistant Regional Counsel, New York, New York (Barbara L. Spivak, Chief Counsel, Region II, Arthur J. Fried, General Counsel, Office of the General Counsel, Social Security Administration, New York, New York; Patrick H. Nemoyer, United States Attorney, Western District of New York, Buffalo, New York, of counsel), for Defendant-Appellee Commissioner of Social Security.

John Richard Streb, Kenmore, New York, for Defendant-Counter-Claimant-Appellee Marie Law.

William G. Iannaccone, plaintiff, pro se, appeals from an order dated January 23, 1997 of the United States District Court for the Western District of New York (Skretny, J.), dismissing a social security benefits action brought by plaintiff Iannaccone as the administrator of a decedent's estate for plaintiff's failure to obtain counsel to represent the estate.

Affirmed, in part, reversed, in part, and remanded.

Before: CARDAMONE, WALKER, and JACOBS, Circuit Judges.

CARDAMONE, Circuit Judge

This appeal is from a January 23, 1997 order of the United States District Court for the Western District of New York (Skretny, J.), dismissing without prejudice an action brought by plaintiff William G. Iannaccone, appearing pro se, as administrator of his father's, Peter Iannaccone's, estate. The action consists of two claims. The first claim seeks judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) that denied social security benefits to which plaintiff claims his father was entitled during his lifetime. The second claim seeks damages from Marie Law, who was a custodian of the deceased, for her alleged conversion of the decedent's social security checks.

The district court dismissed both claims because the plaintiff administrator, a non-lawyer, purported to provide legal representation for the decedent's estate. The issue before us on this appeal is whether plaintiff may appear pro se with respect to both claims. Because the answer regarding each claim is different, it will be helpful to the explanation to examine the subject of pro se representation in civil actions.

## BACKGROUND [4] A. Family History

We turn first to the facts. William G. Iannaccone, the pro se plaintiff and appellant in this case, is the sole surviving child of Peter and Mamie Iannaccone. The father, Peter, was born on March 2, 1911 and the mother, Mamie, was born on March 30, 1918. They were married in 1938. The father served in the armed forces of the United



States during World War II and returned to civilian life in 1944 with a service-connected mental disorder disability. The couple separated that year, but never divorced. As a result of his disability, Peter Iannaccone was involuntarily confined to a Veterans Administration psychiatric hospital in Canandaigua, New York.

In October 1976, Mamie filed an application for disability insurance benefits, which was granted. Peter filed an application for retirement insurance benefits on his own social security account in November 1976, at age 65. His application was denied based on a determination that he did not have sufficient covered quarters of earnings under the law to meet the insured status requirement necessary to be entitled to retirement benefits.

## B. Administrative Proceedings

Mamie Iannaccone died on October 15, 1978. After her death, an application was filed in February 1979 for the lump sum death benefit on her social security account. Social security records show that a $255 lump sum death benefit was paid to her husband in March 1979.

After Peter's death on April 20, 1992, William Iannaccone, the 46-year-old plaintiff, was granted letters of administration upon his father's estate on November 5, 1992.

On April 23, 1992 plaintiff, as administrator of his father's estate, filed a claim with the Commissioner for amounts due his father as widower's insurance benefits on Mamie's account. The Commissioner approved payment of benefits to plaintiff on August 16, 1992, but only with respect to benefits owed for the six months immediately preceding the April 1992 application. Plaintiff requested reconsideration of the matter, asserting that his father's entitlement should be retroactive to 1976, when he attained age 65 and became eligible to receive those benefits. The administrative law judge (ALJ) conducted a hearing, considered the case de novo and, on August 18, 1994, deemed decedent to have filed an application for widower's insurance benefits on

January 25, 1984. Accordingly, the ALJ directed the agency to redetermine the past-due benefits to which he was entitled. The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 9, 1995. Plaintiff then sought review of the Commissioner's order in the district court.

## C. Judicial Proceedings

Peter Iannaccone received a 100 percent lifetime service-connected disability pension *556 from the Veterans Administration beginning in 1944. In 1960 a New York court declared him legally incompetent. Although no committee was appointed for him at that time, his wife apparently oversaw the management of his property and income until her death in 1978. Mamie Iannaccone's sister, Marie Law, was named the executrix of Mamie's estate. Plaintiff alleges that Marie Law thereafter exercised control over plaintiff's father's property and income. In 1983 and 1984 plaintiff claimed Mamie Law misused and embezzled Peter's funds, and he therefore petitioned the court for appointment of a committee for his father. In June 1984 the court appointed a committee of the person and property of Peter Iannaccone.

In July 1995 plaintiff filed a complaint in the district court seeking damages from Marie Law, decedent's sister-in-law, for alleged conversion of social security benefits payments made to decedent. In that same complaint, plaintiff also sought review of the Commissioner's order, as discussed above.

By order dated November 14, 1996 the district court ruled that pursuant to N.Y. Jud. Law § 478 (McKinney's 1983), a natural person cannot appear for a person other than himself in a court of record without having been admitted to the practice of law. The district court judge stayed the action and sua sponte ordered plaintiff to obtain counsel to represent the estate in the action before January 15, 1997. The order also provided that,

should plaintiff fail to obtain counsel, his complaint would be dismissed without prejudice, so that plaintiff could refile the action again whenever an attorney was prepared to present the estate's case. When plaintiff failed to obtain counsel, the district court, by order dated January 23, 1997, dismissed the case without prejudice. A judgment was entered accordingly on January 24, 1997. This appeal followed.

## DISCUSSION I. [16] A. Right of Self-Representation Generally

Before turning to the merits of whether plaintiff is entitled to appear pro se in this civil proceeding, we think it helpful to discuss the general right of self-representation. The right to proceed pro se in civil actions in federal courts is guaranteed by 28 U.S.C. § 1654, which provides: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." Section 1654's guarantee derives directly from the Judiciary Act of 1789. First introduced in the Senate on June 12, 1789 as part of Senate Bill [S-1], the right to self-representation appeared in section 31 of the Bill. But when the Bill became law, on September 24, 1789, the right was moved to section 35, which reads as follows: "That in all the Courts of the United States the Parties may plead and manage their own causes personally or by the assistance of such Counsel or Attornies at law as by the rules of the said Courts respectively shall be permitted to manage and conduct causes therein." V Documentary History of the First Federal Congress of the United States of America 1789-1791 1150, 1165, 1193 (1986). As can be seen, the right to self-representation has remained constant for over 200 years.

The framers of our Constitution thought self-representation in civil suits was a basic right that belongs to a free people. Although the Supreme Court alluded to civil pro se representation in Faretta v. California, 422 U.S. 806, 812-13 (1975),

the Court there focused its discussion on the right to represent oneself as a defendant in a criminal case, id. at 813 et seq., which the Constitution's Bill of Rights guarantees. In a criminal prosecution, a pro se party of course may only appear as a defendant. In a civil case, a person may appear pro se as either a plaintiff or defendant. And, as noted, the right of self-representation in one case is protected by the Constitution, and in the other, simply by statute. Further, in contrast to criminal defendants, civil litigants unable to afford counsel cannot ordinarily obtain appointment of counsel, *557 except in circumstances when there is a risk of loss of liberty, as in mental commitment or juvenile delinquency proceedings. See H.B. Kim, Note, Legal Education For the Pro Se Litigant: A Step Towards a Meaningful Right to Be Heard, 96 Yale L. J. 1641, 1646-47 (1987).

Moreover, the historical origins of self-representation in civil and criminal proceedings are different. In Faretta the Court discussed the historic requirement of having counsel, going back to the infamous English Star Chamber that forced counsel upon an unwilling defendant in a criminal proceeding, and the requirement's gradual reform. This reform was fervently embraced in colonial America for those accused of crime. See Faretta, 422 U.S. at 821-26.

## B. History of Self-Representation in Civil Litigation

Passing from the criminal to the civil context, we begin by observing that a person appearing pro se in federal court can be a mixed blessing because persons appearing pro se lack legal training and may, on occasion, burden the court by filing illogical or incomprehensible pleadings, affidavits and briefs. And sometimes a pro se litigant appears simply for the purpose of using the courtroom to advance a political or social agenda, or to pursue a matter that is legally unredressable. See E.J.R. Nichols, Note, Preserving Pro Se Representation in an Age of Rule 11 Sanctions, 67

Tex. L. Rev. 351, 351 nn.2 3 (1988). Yet, even given those potential burdens, there still remains a citizen's right of access to the courts, a strongly held notion stretching back to the beginnings of our Republic. The origins of the right to appear for oneself in civil proceedings derive from a number of sources, all deeply rooted in our history and culture. We undertake to discuss briefly five of those sources, though doubtless there are others.

First, history. Under the English common law with its complicated forms of action and veritable maze of writs and confusing procedures, the right to retain counsel in civil proceedings became a necessity. By the middle of the thirteenth century, lawyers so monopolized the courts in London that the King was forced to decree that, except for a few special causes, litigants were entitled to plead their own cases without lawyers. See Note, The Right to Counsel in Civil Litigation, 66 Colum. L. Rev. 1322, 1325 (1966).

Second, mistrust of lawyers made appearance in court without benefit of counsel the preferred course. See A.L. Downey, Note, Fools and Their Ethics: The Professional Responsibility of Pro Se Attorneys, 34 B.C. L. Rev. 529, 533 (1993). Lawyers had no position of honor or place in society in early colonial days. The pioneers who cleared the wilderness looked down upon them. For example, the Massachusetts Body of Liberties of 1641 expressly permitted every litigant to plead his own cause and provided, if forced to employ counsel, the litigant would pay counsel no fee for his services. See Charles A. Mary R. Beard, The Rise of American Civilization 100-01 (College ed. 1930).

Third, informality. In early colonial days, the rule of informality was a necessity in court proceedings since most presiding judges were not lawyers. See The Right to Counsel in Civil Litigation, supra, at 1328. By the time of the Revolution, legal proceedings had become more technical and reliance on precedent had evolved, both of which required people trained in legal

interpretation. As the decades of the 18th century passed, legal questions became more complex and the need for skilled attorneys was recognized. Enough individuals had gone into law so that by the time the First Continental Congress commenced, 24 of the 45 delegates were lawyers, and in the Constitutional Convention, 33 of the 55 members were lawyers. See Beard, supra, at 101. Nonetheless, the number of lawyers although growing was still few, many judges were still laymen, and the legal process still remained sufficiently simple to permit persons whether rich or poor to plead their own causes. See The Right to Counsel in Civil Litigation, supra, at 1329.

Fourth was religion. Colonial peoples' notions of their own individual rights and their reliance on themselves were part of the movement away from religious authority and towards religious freedom. 558 Thus, for example, *558 the Massachusetts Bay Colony spawned dissenters such as Anne Hutchinson and Roger Williams who, declaring that the colony's leaders had not followed the pilgrims' heritage, left and obtained a charter for Providence, Rhode Island, in 1663, where they preached that every person should be allowed to follow his own conscience in matters of religion. Connecticut, Rhode Island, and the Massachusetts Bay Colony which formed the heart of New England Puritanism were part of a religious heritage characterized by a prickly independence and stubborn self reliance. See 1 Page Smith, A New Age Now Begins: A People's History of the American Revolution 22-23 (1976).

Fifth, education and literacy of colonial Americans. During the 1700s most citizens were literate and nearly everyone read a newspaper. There were numerous libraries and bookshops in Boston, Philadelphia, and New York by the time of the Revolution. See Bensen Bobrick, Angel in the Whirlwind: The Triumph of the American Revolution 47-48 (1997). This broad literacy and the people's political involvement in their democratic institutions transformed the average American into a citizen-lawyer. See id. at 49.

From all these various strands and perhaps others as well evolved the notion, perhaps best expressed by Thomas Paine, arguing in 1777 for a Pennsylvania Declaration of Rights, who said that to plead one's cause was "a natural right," pleading through counsel was merely an "appendage" to the natural right of self-representation. See Faretta, 422 U.S. at 830 n.39.

## C. Qualifications on the Right

Having explained the breadth of the right, we note some qualifications that have been placed upon it. First, the right to self-representation must be timely asserted, preferably before trial. See O'Reilly v. New York Times Co., 692 F.2d 863, 867-68 (2d Cir. 1982). Second, a party seeking to assert his statutory right to self-representation must clearly and unequivocally discharge any lawyer previously retained. A party does not have a right to self-representation and representation by counsel at the same time. See id.; United States v. Mitchell, 137 F.2d 1006, 1010-11 (2d Cir. 1943).

Third, and key to this appeal, because pro se means to appear for one's self, a person may not appear on another person's behalf in the other's cause. A person must be litigating an interest personal to him. See Pridgen v. Andresen, 113 F.3d 391, 393 (2d Cir. 1997). For example, a lay person may not represent a corporation or a partnership or appear on behalf of his or her own minor child, see id.; Cheung v. Youth Orchestra Found. of Buffalo, Inc., 906 F.2d 59, 61 (2d Cir. 1990). Thus, the threshold question becomes whether a given matter is plaintiff's own case or one that belongs to another. See Phillips v. Tobin, 548 F.2d 408, 411 (2d Cir. 1976) ("The basic question raised by [ 28 U.S.C. § 1654] is whether this stockholder's derivative suit is the plaintiff's `own case' or is a suit belonging to the corporation."). To that question, we focus our attention in resolving the issues presented on this appeal.

## II. The Merits [32] A. The Conversion Claim

With the origins of the right and its limitations and conditions in mind, we pass to the merits. To begin with, we are not persuaded by plaintiff's argument that because he was permitted to proceed pro se before the Commissioner and was consistently recognized by the Commissioner as the "SSA Claimant/Estate's Non-attorney Representative" at every stage of the administrative proceedings, he should be allowed to proceed pro se in the district court under 42 U.S.C. §§ 405(g) 406(a). Section 406(a) of Title 42, which permits non-attorneys to represent claimants, applies only to administrative proceedings before the Commissioner. Section 406, which is entitled "Representation of claimants before Commissioner of Social Security," states in relevant part:

The Commissioner of Social Security may prescribe rules and regulations governing the recognition of agents or other persons, other than attorneys as hereinafter provided, representing claimants before the Commissioner of Social 559 Security. . . . *559

42 U.S.C. § 406(a)(1) (emphasis added). The plain language of the statute indicates that Congress only authorized the Commissioner to recognize non-attorneys representing claimants in proceedings held before the Commissioner. There is no parallel provision in the Act authorizing the Commissioner to permit non-attorney representation of claimants in proceedings before the courts.

Further, § 405(g), which establishes procedures for judicial review of the Commissioner's final decision, provides in relevant part:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice. . . .

42 U.S.C. § 405(g). This statutory provision does not address the specific procedural issue of whether a claimant may proceed pro se but simply grants a claimant the right to appeal a final decision of the Commissioner, as plaintiff has done here.

We agree with the district court's dismissal of plaintiff's claim, on behalf of Peter's estate against Marie Law, because clearly plaintiff was purporting to represent the estate in litigating an interest specific to the estate, that is, whether Law misappropriated social security benefits payments intended for Peter Iannaccone when he was living. In Pridgen we held that a representative of an estate may not proceed pro se in an action by the estate where the estate has beneficiaries or creditors other than the representative. 113 F.3d at 393. Under such circumstances, an action cannot be described as the litigant's own, because the personal interests of the estate, other survivors, and possible creditors, as here, will be affected by the outcome of the proceedings. A non-lawyer representative therefore would be litigating claims that are not personal to him. Because plaintiff admitted in his brief that there are creditors of the estate, i.e., the physicians who treated his father prior to his death, the rule we have adopted applies to his claim against Marie Law brought in his capacity as administrator of the estate and the district court properly dismissed it.

## B. The Underpayment Claim Against the Commissioner

While plaintiff, as the administrator of the estate, does not have the right to proceed pro se with the estate's claim against Law, he, as the sole surviving child of the deceased beneficiary, has the statutory right to proceed pro se with his underpayment claim against the Commissioner. The record shows that this case was brought originally before the Commissioner by plaintiff pursuant to 42 U.S.C. § 404(d) for underpayment of social security benefits that were due his deceased father.

Section 404(d) and its implementing regulation, 20 C.F.R. § 404.503, authorize distribution of underpayment by the Commissioner to certain individuals according to an established order of priority when the eligible beneficiary dies before the payment due is made. The deceased beneficiary's surviving spouse is the first person on the priority list, the spouse is then followed by the child or children of the deceased beneficiary. The seventh and last individual in the statutory order of priority is the legal representative of the estate of the deceased beneficiary. But the estate is not entitled to receive the benefits unless there is no individual who falls under any of the preceding categories of eligible claimants. See 42 U.S.C. § 404(d); 20 C.F.R. § 404.503.

Peter Iannaccone's wife Mamie predeceased him. Plaintiff, as decedent's sole surviving child, and not the estate, is the only claimant entitled to receive the underpayment by the Commissioner that was due Peter Iannaccone, the deceased beneficiary. Although the pleadings filed in the district court indicate that this was an action brought by "the Estate of Peter Iannaccone, by William Iannaccone, Administrator and Claimant," this claim was actually brought by plaintiff on his own behalf involving an interest personal to him because he is the only one entitled to receive the disputed underpayment under the Act. Cf. Cheung, 906 F.2d at 60 (finding that case was brought on behalf of the father's minor daughter under various civil rights statutes, even though the complaint was solely in the father's name, *560 and holding that father could not bring the case pro se).

Indeed, the Commissioner concedes in his brief that "plaintiff's role in the administrative proceedings was that of a party in interest, rather than that of a non-attorney representative." The record also shows that when the Commissioner approved plaintiff's application for amounts due his father, it sent a notification letter to plaintiff in May 1992, which stated that "[y]ou will soon receive a check for $4814.00 because we owed

560

money to Peter Iannaccone deceased." The action commenced in the district court sought review of the Commissioner's final decision and involved essentially the same claim for underpayment that plaintiff litigated in the administrative proceedings below. Therefore, the action in the district court should have been deemed plaintiff's own case and not a suit belonging to the estate of plaintiff's father.

Unlike the estate's claim against Marie Law, where the interest of the estate was being litigated, here it is only plaintiff's own interest being litigated because the estate and its creditors are not entitled to the amount of underpayment in dispute. No other person's interests will be affected by the outcome of the proceedings. Hence, the fact that the estate has outside creditors in this case is irrelevant in determining whether plaintiff himself may proceed pro se in his own claim against the Commissioner in the district court.

Having decided that plaintiff may properly appear on his own behalf without counsel in this proceeding, we decline to address plaintiff's arguments regarding the merits, including the failure of the ALJ to fully develop the record and the issue of whether Law was a proper defendant in this case, because these issues are not properly before us.

## CONCLUSION

Accordingly, for the reasons stated, we reverse the district court's judgment insofar as it dismissed plaintiff's pro se claim against the Commissioner, and remand that case for further proceedings in the district court where plaintiff may plead and conduct his own case personally; and, affirm the judgment insofar as it dismissed plaintiff's action against defendant Law as violative of N.Y. Judiciary Law § 478, because plaintiff is a non-lawyer.

 casetext

# Exhibit 32

From the Boston Business Journal:
https://www.bizjournals.com/boston/news/2023/06/25/branch-closures-santander.html?
utm_source=sy&utm_medium=nsyp&utm_campaign=yh

SUBSCRIBER CONTENT:

**Banking & Financial Services**

# In six months, there have been 46 applications for branch closures. Most are from one local bank



Santander Bank is located in Boston's Financial District.

GARY HIGGINS

 By Meera Raman – Reporter, Boston Business Journal
Jun 23, 2023

There have been 46 applications for bank branch closures in Massachusetts since the start of the year—and 33 are from Santander Bank.

At this point last year, there had only been 27 applications for branch closures filed through the federal Office of the Comptroller of the Currency (OCC). Some local banks are state-chartered, so their branch closures are not available through the OCC.

Experts agree that banks are trying to downsize their physical branches, but are struggling with the balance of mobile banking and in-person banking.

"Banks are redrawing their maps, but no one has given them the instructions on how to do that," said Chris Marinac, director of research at Janney Montgomery Scott.

## Santander's 'change of heart'?

Santander leads the pack of planned branch closures, with 72% of the applications.

The Spanish bank entered the retail and commercial banking business in the United States in 2010 with the acquisition of Sovereign Bank. In October 2013, Sovereign's name was changed to Santander. The bank chose the Northeast corridor for expansion, but Marinac believes that "they have had a change of heart back home at the parent company."

"I just think they made a decision back home that they needed to focus on their home country. They are less interested in the U.S., the U.S. has got tons of competition," Marinac said.

Since it entered the Massachusetts market, the bank has racked up the second-highest number of branches in the state, with 166 at the end of last year, tied with Bank of America. Providence-based Citizens Bank led the pack with 206.

But, the bank hasn't always had it easy. It had a rocky start after establishing Boston as its U.S. headquarters. It went through three CEOs between 2013 and 2015, repeatedly failed the Federal Reserve's stress tests, and lost deposits. Still, Santander remains the third-largest bank in state with $27 billion in Mass. deposits as of last December.

The bank has been applying to close many of its branches, and cites the rise of online banking as the reason.

"Like many industries, our customers' preferences have changed, with more customers choosing to bank with us online," the bank previously said in a statement to the Business Journal. "Therefore, we are reimagining the customer and employee experience by simplifying our processes, refining our branch footprint, and increasing our investment in digital capabilities to align with the evolving needs of our customers."

The move to mobile banking appears to be paying dividends for Santander. The bank ranked in second place in mobile satisfaction among regional banks in the most recent JD Power Survey. In addition, more than 1 million customers used the bank's digital channels in April, which was a new record, according to the bank.

The bank did not respond to a question asking how many branch closures it plans to have this year.

### Mobile up, branches down

Since 2009, Massachusetts has seen a 13% decrease in the number of physical bank branches, with 1,962 as of mid-2022 and 2,245 as of mid-2009, according to data from the Federal Deposit Insurance Corp. The largest declines were seen during and after the height of the pandemic.

Since the beginning of the pandemic, branches across the state have been shuttered. Since March 2020, there have been 284 branch closures in the state. Citizens closed 41, Bank of America closed 42, and Santander closed 41.

But 113 branches have also opened in the state since March 2020, led by JPMorgan & Chase Co., which has been expanding quickly since the bank entered the retail market in 2018. JPMorgan has already opened 30 branches and plans to open 90 branches in the state by the end of 2025.

Branch closures in the state are being led by a "change in customer preference," said Kathleen Murphy, president and CEO of the Massachusetts. Bankers Association.

According to an Oct. 2022 American Bankers Association study, 72% of banking customers use a mobile app or online banking on a computer. Those findings are consistent with a 2021 FDIC survey that found the use of mobile banking increased sharply between 2017 and 2021, becoming the most prevalent primary method of account access.

With the rise of online banking, banks have a larger reach to customers through their mobile devices. While mobile banking works well for day-to-day transactions, it doesn't eliminate the need for physical branches, Marinac said.

"Technology has fundamentally changed how the banking industry works, and the banking business is trying to catch up, but they don't have it figured out," said Suzanne Moot, a local banking consultant.

"Instead of figuring it out first, then closing branches, they are doing it the other way around," she added.

**Subscribe to the Morning Edition or Afternoon Edition for the business news you need to know, all free.**

# Exhibit 33

*The Washington Post*

*Democracy Dies in Darkness*

# Opinion   Self-government is worth defending from an illegitimate Supreme Court



By Jennifer Rubin

Columnist | **+ Follow**

July 3, 2023 at 3:09 p.m. EDT

On this Independence Day, we should reaffirm the twin pillars of democracy: Voters (not the mob) pick their leaders, and elected leaders (not unelected judges) make policy decisions for which they are held accountable. Just as we need to preserve the sanctity of elections (by prosecuting coup instigators), democracy defenders need to address judicial radicals' gross distortion of our system, resulting in the current Supreme Court's subversion of democracy.

Unhinged from judicial standards, the court now roves through the policy landscape, overturning decades of law and reordering Americans' lives and institutions. It upends women's health, revamps college admissions, snatches student aid from millions and redefines public accommodations (allowing egregious discrimination). In aggrandizing power, the court illegitimately dominates policymaking, undermining democracy to an extent we have not seen in nearly 100 years. (Ronald Brownstein pointed out that similar constitutional collisions in the 1850s and 1930s took a civil war or threat of court-packing to resolve.)

Something must change if we want to preserve rule by the people's elected leaders responsible to voters.

As a preliminary matter, it is essential to identify the problem. As morally and politically offensive as Supreme Court decisions on affirmative action, LGBTQ+ discrimination and student debt forgiveness might be to millions of Americans, merely criticizing the court's result is misguided and unproductive. The task is to expose the court's disintegration as a legitimate judicial body and note its emergence as a supreme right-wing policymaker. When the court operates on an ends-justify-the-means basis, shreds legal doctrine and dishonestly presents the facts, critics should not play whack-a-mole, decrying each individual rejection of widespread American values. In doing so, the court negates self-government.

+

One telltale sign that the justices have become partisan politicians: their refusal to adopt mandatory ethics rules, which destroys the essence of judicial impartiality that is the root of their legitimacy. When judges cease to eliminate conflicts of interest or the appearance thereof, they appear indistinguishable from politicians wined and dined in rarefied settings by lobbyists. The stench of financial corruption, coupled with justices' intemperate rants in partisan settings and in op-eds, convinces Americans that the justices are partisan players out to score points for their own side.

Moreover, the court strays out of its constitutional lane when it refuses to follow consistent rules of construction and honestly address cases' facts. When, for example, the majority casts aside stare decisis (as in the affirmative action case) without admitting it or refuses to apply the test for departing from precedent (as in *Dobbs v. Jackson Women's Health Organization*), it is simply muscling its way to desired outcomes because it has the votes.

Worse, cases are now manufactured to create policy. The majority has made complete hash out of standing and concepts such as "case and controversy" to reach decisions it had no business deciding.

In the student loan debt relief case, the court created standing out of whole cloth. As Justice Elena Kagan wrote in her dissent, "The requirement that the proper party — the party actually affected — challenge an action ensures that courts do not overstep their proper bounds. ... Without that requirement, courts become 'forums for the ventilation of public grievances' — for settlement of ideological and political disputes." Here the court deliberately ignored that the aggrieved party was not a litigant. Likewise, in the case of a web designer worried about selling her services to a gay couple (who appear to be fabricated), the court defied every principle of standing. When the court goes beyond actual cases and controversies to answer hypotheticals, it goes beyond its constitutional mandate.

And, worst of all, the newfangled "major questions doctrine" allows the court to subjectively decide when the issue is of "major political salience" (whatever the court says it is); if so, the court demands the application at issue be specifically authorized by statute (a standard lawmakers somehow never meet in this court's eyes). It has become a crutch whenever the court seeks to invalidate a program it doesn't like. In the student debt relief case, the court reached the desired result by ignoring the word "waive" in the statute authorizing loan forgiveness to reach the finding that Congress hadn't delegated power to, well, waive student debt. "The Court once again substitutes itself for Congress and the Executive Branch — and the hundreds of millions of people they represent — in making this Nation's most important, as well as most contested, policy decisions," Kagan wrote.

The mumbo-jumbo "major questions doctrine" is not the stuff of judging. No wonder the chief justice got touchy when Kagan pointed out that the court "is supposed to stick to its business — to decide only cases and controversies and to stay away from making this Nation's policy about subjects like student-loan relief." What the Slaughter-House Cases and substantive due process were to the New Deal-era right-wing court, the "major questions doctrine" is to the current court: a smokescreen for enforcing a right-wing agenda (or vetoing a progressive one).

In departing from the authentic judicial review, the right-wing majority unsurprisingly produces results perfectly aligned with the right's agenda on hot-button topics. (By the law of averages, its "analysis" should occasionally favor the other side.) When foretelling a case's outcome or following the majority's "reasoning" requires a crib sheet on GOP political aims, something is wrong.

And voters have figured out what's going on. According to an ABC News-Ipsos poll, 53 percent "believe that the nation's highest court rules mainly on the basis of their partisan political view rather than on the basis of the law (33%), while 14% say they don't know." Before the *Dobbs* opinion, a separate January 2022 poll showed that "38% of Americans believed that the justices rule mainly on the basis of law, versus 43% who believed that the court rules on the basis of their political views."

The transformation of the court into a partisan player contradicts the central premise of democracy. We should reject the obtuse and naive argument that this court isn't so bad because it didn't entirely obliterate Section 2 of the Voting Rights Act and declined to impose the outrageous independent state legislature doctrine. Now is no time for self-delusion. Ending the right-wing majority's intolerable war on self-government will require that the other two branches and the voters cut the court down to size. A single election or a single reform might not suffice. Cogent law review articles, informed public debate and exquisite dissents revealing that the right-wing judicial emperors have no clothes can assist reformers. Term limits, jurisdiction stripping, court expansion and ethics reform should be on the table. Simply put, if we want democracy to survive, each election must be a referendum on the court's legitimacy.

On this Independence Day, which celebrates rebellion against a monarch lacking consent of the governed, it behooves us to dedicate ourselves to robust and authentic democracy: government of the people, by the people, for the people — not by arrogant right-wing justices.

# Exhibit

# 34

The New York Times    https://www.nytimes.com/2023/07/14/opinion/supreme-court-ethics.html

GUEST ESSAY

# A Federal Judge Asks: Does the Supreme Court Realize How Bad It Smells?

July 14, 2023

By Michael Ponsor

Judge Ponsor is a senior judge on the U.S. District Court for the District of Massachusetts.

What has gone wrong with the Supreme Court's sense of smell?

I joined the federal bench in 1984, some years before any of the justices currently on the Supreme Court. Throughout my career, I have been bound and guided by a written code of conduct, backed by a committee of colleagues I can call on for advice. In fact, I checked with a member of that committee before writing this essay.

A few times in my nearly 40 years on the bench, complaints have been filed against me. This is not uncommon for a federal judge. So far, none have been found to have merit, but all of these complaints have been processed with respect, and I have paid close attention to them.

The Supreme Court has avoided imposing a formal ethical apparatus on itself like the one that applies to all other federal judges. I understand the general concern, in part. A complaint mechanism could become a political tool to paralyze the court or a playground for gadflies. However, a skillfully drafted code could overcome this problem. Even a nonenforceable code that the justices formally pledged to respect would be an improvement on the current void.

Reasonable people may disagree on this. The more important, uncontroversial point is that if there will not be formal ethical constraints on our Supreme Court — or even if there will be — its justices must have functioning noses. They must keep themselves far from any conduct with a dubious aroma, even if it may not breach a formal rule.

The fact is, when you become a judge, stuff happens. Many years ago, as a fairly new federal magistrate judge, I was chatting about our kids with a local attorney I knew only slightly. As our conversation unfolded, he mentioned that he'd been planning to take his 10-year-old to a Red Sox game that weekend but their plan had fallen through. Would I like to use his tickets?

I was tempted. The tickets were beyond my usual price range, and the game would be a fun outing with my 7-year-old. It didn't seem to me that the lawyer was trying to do anything improper. It seemed to be — and almost certainly was — just a spur-of-the-moment impulse arising out of a friendly conversation. Moreover, the seats at Fenway Park, like the much more expensive seat on the private jet used free by Justice Samuel Alito on his Alaska vacation, would probably go empty if I didn't take them. Who would be harmed?

To my chagrin, as I pondered the situation, I became aware of an aroma of something off. Not an actual smell, of course, but something like that — something like a whiff of milk on the verge of going sour or a pan left on the stove too long. It wasn't that the lawyer had evil intent; it was that I was approaching a boundary. Silently gnashing my teeth, I turned the tickets down.

A few years later, after I'd received my appointment as a life-tenured U.S. district judge, I issued a decision reversing the Social Security Administration's denial of disability benefits to an older plaintiff. I was in our clerk's office one day when the man and his wife approached me with a package. He had a woodworking hobby, and inside the package was an exquisitely crafted oak pencil case with bronze hinges. My ruling had made a big difference for them, and they wanted to extend this modest, personal gesture of gratitude. Again, they were obviously not being underhanded. Their lawsuit was over, and this was probably the last they would ever see of me. Nevertheless, as my police officer friends tell me, the road to perdition starts with a free cup of coffee. As politely as I could, I turned the pencil case down. It still pains me to remember their embarrassed, crestfallen faces.

All my judicial colleagues, whoever has appointed them, run into situations like these regularly, and I expect they have responded in just the same way. You don't just stay inside the lines; you stay well inside the lines. This is not a matter of politics or judicial philosophy. It is ethics in the trenches.

The recent descriptions of the behavior of some of our justices and particularly their attempts to defend their conduct have not just raised my eyebrows; they've raised the whole top of my head. Lavish, no-cost vacations? Hypertechnical arguments about how a free private airplane flight is a kind of facility? A justice's spouse prominently involved in advocating on issues before the court without the justice's recusal? Repeated omissions in mandatory financial disclosure statements brushed under the rug as inadvertent? A justice's taxpayer-financed staff reportedly helping to promote her books? Private school tuition for a justice's family member covered by a wealthy benefactor? Wow.

Although the exact numbers fluctuate because of vacancies, the core of our federal judiciary comprises roughly 540 magistrate judges, 670 district judges, 180 appeals court judges and nine Supreme Court justices — fewer than 1,500 men and women in a country of more than 330 million people and 3.8 million square miles. Much depends on this small cohort's acute sense of smell, its instinctive, uncompromising integrity and its appearance of integrity. If reports are true, some of our justices are, sadly, letting us down.

To me, this feels personal. For the country, it feels ominous. What in the world has happened to the Supreme Court's nose?

Michael Ponsor is a senior judge on the U.S. District Court for the District of Massachusetts.

The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.

Follow The New York Times Opinion section on Facebook, Twitter (@NYTopinion) and Instagram.

A version of this article appears in print on , Section SR, Page 4 of the New York edition with the headline: What Smells Off At the Court?

# Exhibit 35

# The Backstory Behind Judge Richard Posner's Retirement

**Judge Posner had some very specific reasons for his surprise retirement from the bench.**

By DAVID LAT
September 7, 2017 at 1:44 PM



*(Photo by Chensiyuan via Wikimedia Commons.)*

In May, when I had lunch with Judge Richard Posner and his clerks in Chicago, the esteemed jurist was in fine form, as enjoyable a conversationalist as ever.

In July — after he made controversial comments about aging federal judges, including a call for a mandatory retirement age of 80 — I asked him whether he'd apply that rule to himself. He kept his options open, telling me, "It will depend on how I feel [when I turn 80], both in terms of physical and particularly mental health and in terms of interest in the job."

So like much of the legal world, I was taken by surprise when Judge Posner, currently 78, announced his retirement from the Seventh Circuit. He announced the news right before Labor Day weekend, and it took effect immediately.

And it's a *total* retirement, not the usual move to senior status (a sort of quasi-retirement for federal judges), as I learned when we traded emails earlier this week. I wrote:

*Hi Dick. Congratulations on your retirement — major news in the legal world, of course!*

*I haven't been able to glean this from what I've read so far (although I haven't read everything on the news, having just returned from vacation), but I was wondering: will you be*

1

*taking senior status and still hearing cases, or are you departing from the Seventh Circuit completely?*

He responded:

*Nice to hear from you, David. And I'm not taking senior status; my departure is total. It has to do with fact that I don't think the court is treating the pro se appellants fairly, and none of the other judges agrees with me (or rather, they don't like the pro se's and don't want to do anything with them, with occasional exceptions only).*

I wasn't sure if Judge Posner's comments on pro se litigants were fair game for public discussion — but now they are, thanks to this Chicago Daily Law Bulletin piece:

*[Judge Posner] intended to stay on the Chicago-based 7th Circuit until he turned 80… [b]ut "difficulty" with his colleague… moved up that date.*

*"I was not getting along with the other judges because I was (and am) very concerned about how the court treats pro se litigants, who I believe deserve a better shake," Posner wrote.*

*About 55 percent to 60 percent of the litigants who file appeals with the 7th Circuit represent themselves without lawyers. Very few pro se litigants are provided the opportunity to argue their cases in court. The 7th Circuit rules on most of those cases based on the briefs.*

Posner has long been concerned about the plight of pro se litigants. Back in 2015, for example, he benchslapped a trial judge for mistreating a pro se plaintiff.

If you're interested in learning more about Judge Posner's problems with the Seventh Circuit's treatment of pro se litigants, stay tuned:

*Posner wrote that he has a book coming out soon that explains his views on the topic — as well as the views of his former colleagues — "in considerable detail."*

Now *that* should be a juicy read! Judge Posner is famously candid, so don't expect him to go easy on ex-colleagues he disagrees with.

I followed up with Judge Posner and asked how his stepping down would advance the cause of pro se litigants at the Seventh Circuit. Wouldn't it be better for him to remain on the court and continue to advocate for their improved treatment?

Alas, it's a lost cause, in his view: "I had zero support from the other judges; I was a voice crying in the wilderness."

I also asked Posner whether he felt, in light of his comments about superannuated federal judges, whether he himself has been affected negatively by aging. He replied, in Posnerian fashion, "I think there should be compulsory retirement for all federal judges and Justices at age 80; I am as yet a mere child of 78.5."

2

Judge Posner, you will be missed. I don't know that I'd want a judiciary full of Richard Posners, but it sure was great to have one.

**David Lat is a lawyer turned writer.** He publishes Original Jurisdiction, a newsletter on Substack about law and legal affairs, and he writes for newspapers and magazines, including the New York Times, Washington Post, and Wall Street Journal. Prior to launching Original Jurisdiction, David founded Above the Law, one of the nation's most widely read legal news websites, and Underneath Their Robes, a popular blog about federal judges that he wrote under a pseudonym. He is also the author of a novel set in the world of the federal courts, Supreme Ambitions. **Before entering the media world, David worked as a federal prosecutor in Newark, New Jersey; a litigation associate at Wachtell, Lipton, Rosen & Katz, in New York; and a law clerk to Judge Diarmuid F. O'Scannlain of the U.S. Court of Appeals for the Ninth Circuit. David graduated from Harvard College and Yale Law School, where he served as an editor of the Yale Law Journal.**

https://abovethelaw.com/2017/09/the-backstory-behind-judge-richard-posners-retirement/?rf=1

3

# Exhibit 36

https://theeagle.com/opinion/columnists/ben-franklin-a-republic-if-you-can-keep-it/article_855a6fc2-17af-11ee-8e9e-3b5e68096579.html

## Ben Franklin: 'A Republic, if you can keep it'

Jul 3, 2023



BLANCHE BRICK

As we approach the celebration of our Declaration of Independence, we need to remember that the fight for "Life, Liberty and the Pursuit of Happiness" never ends.

When Benjamin Franklin was asked by a citizen of Philadelphia, what kind of government had been created in the Constitutional Convention, he replied, "a Republic, if you can keep it."

While many of our citizens have been called on to make the ultimate sacrifice, most of us today are called upon to "keep the Republic" — in ways that may not require sacrificing our lives, but still require more commitment than many are willing to make.

One of the most challenging and difficult tasks we have today is trying to understand our history and be aware of the complexity of that history. It is difficult because we live in a world where historical information often is challenged as offensive to different political and cultural groups. We also live in a world that is changing faster than at any time in the past.

Thus, it is difficult, as Gordon Wood wrote in "The Creation of the American Republic, 1776-1787," to recognize that "many of the historiographical problems involved in interpreting the American Revolution and the formation of the Constitution stemmed from a failure to appreciate the distinctiveness of the political culture in which the Revolutionary generation operated."

In today's world, the "pursuit of happiness" often means "instant gratification," a quality that the study of history is not often able to provide. It is difficult to expect most citizens to devote time to reading our history in a disciplined fashion or to devote their lives to sharing that history with others as accurately as possible.

But this failure to understand and appreciate our past in the political and social culture in which past generations operated has often led to attempts to purge our past of its complexity. It is the complexity of the story of human nature that we must try to preserve rather than merely passing on simple answers to the complex problems we face today.

In thinking of the Declaration of Independence, we frequently focus on Thomas Jefferson's stirring phrase "all men are created equal," and fail to understand that this concept of "equal" was and still is more complex than many realize. If one reads the complete Declaration, one might conclude that Jefferson was not including Native Americans, which he referred to as "merciless savages," and few people today are unaware that when Jefferson wrote this phrase, he was a major slave owner who did not free his slaves.

This is not to join those historians who suggest that Jefferson was a hypocrite, but merely to remind ourselves that history is a complex story.

As Bernard Bailyn reminded us in "The Ideological Origins of the American Revolution," Jefferson did, in fact, instruct "the Virginia delegates to the First Continental Congress that 'the rights of human nature are deeply wounded by this infamous practice ... and the abolition of domestic slavery is the great object of desire in those colonies where it was unhappily introduced in their infant state.' " But it would take a Civil War to resolve this issue, "four score and seven years" later, as Abraham Lincoln stated in his Gettysburg Address.

Not only were the colonists calling for changes in the British government, but groups in England also were aware they were on a dangerous course. Again, Bailyn noted that in England, in the 18th century, different "solutions were advocated by both the "Left" and the "Right."

But "they both agreed that there was corruption ... in the manipulation of Parliament by a power-hungry ministry, and corruption generally, in the self-indulgence, effeminizing luxury, and gluttonous pursuit of gain of a generation sunk in new and unaccustomed wealth."

The colonists also were concerned about whether they would be able to "keep a Republic." As Gordon Wood suggested "before the ink was dry on the Declaration of Independence," many of the leaders of the revolution believed that:

"The American people seemed incapable of the virtue needed for republicanism. Too many were unwilling to respect the authority of their new elected leaders and were too deeply involved in trade and moneymaking to think beyond their narrow interests. ... These new popular leaders were exploiting the revolutionary rhetoric of liberty and equality to vault into political power and to promote the partial and local interests of their constituents at the expense of what the revolutionary gentry saw as the public good."

James Madison shared these concerns about the "moral capacity of the people," but he also believed that ordinary people had to have sufficient "virtue and intelligence to select men of virtue and wisdom ... or no theoretical checks, no form of government can render us secure."

This 4th of July as we celebrate "Life, Liberty and the Pursuit of Happiness," we should be grateful to the founding generation who gave us this Republic and who warned us that it was up to us to keep it ..."with liberty and justice for all."

History matters.

Blanche H. Brick is a retired professor of history at Blinn College, Bryan, and a former College Station City Council member.

# Exhibit 37

# Supreme Court solidifies protections for workers who ask for religious accommodations

BY JESSICA GRESKO

Published 11:01 AM EDT, June 29, 2023

WASHINGTON (AP) — The Supreme Court on Thursday used the case of a Christian mailman who didn't want to work Sundays to solidify protections for workers who ask for religious accommodations.

In a unanimous decision the justices made clear that workers who ask for accommodations, such as taking the Sabbath off, should get them unless their employers show doing so would result in "substantial increased costs" to the business.

The court made clear that businesses must cite more than minor costs — so-called "de minimis" costs — to reject requests for religious accommodations at work. Unlike most cases before the court, both sides in the case had agreed businesses needed to show more.

The case before the court involved a mail carrier in rural Pennsylvania. The man was told that as part of his job he'd need to start delivering Amazon packages on Sundays. He declined, saying his Sundays are for church and family. U.S. Postal Service officials initially tried to get substitutes for the man's shifts, but they couldn't always accommodate him. When he didn't show, that meant more work for others. Ultimately, the man quit and sued for religious discrimination.

The case is the latest religious confrontation the high court has been asked to referee. In recent years, the court's 6-3 conservative majority has been particularly sensitive to the concerns of religious plaintiffs. Last year, the court split along ideological lines in ruling for public high school football coach who wanted to pray on the field after games.

Other recent religious cases have drawn wide agreement among the justices, such as upholding a cross-shaped monument on public grounds and ruling that Boston had violated the free speech rights of a conservative activist when it refused his request to fly a Christian flag on a City Hall flagpole.

1

In the latest case, a federal law — Title VII of the Civil Rights Act of 1964 — requires employers to accommodate employees' religious practices unless doing so would be an "undue hardship" for the business. But a 1977 Supreme Court case, Trans World Airlines v. Hardison, says in part that employers can deny religious accommodations to employees when they impose "more than a de minimis cost" on the business.

During arguments in the case in April the Biden administration's top Supreme Court lawyer, Solicitor General Elizabeth Prelogar, who was representing the Post Office, told the justices that the Hardison case as a whole actually requires an employer who wants to deny an accommodation to show more.

But Justice Samuel Alito wrote in his majority opinion for the court that while some lower courts have understood Hardison the way the Biden administration suggested, other courts incorrectly latched on to the "de minimis" language "as the governing standard."

"In this case, both parties agree that the 'de minimis' test is not right, but they differ slightly in the alternative language they prefer. ... We think it is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business," Alito wrote.

The Biden administration has said that requests for religious accommodation come up most often when employees seek schedule changes like the Sabbath off or midday prayer breaks or exemptions from a company's dress code or grooming policies. They also come up when an employee wants to display a religious symbol in the workplace.

As for the particular dispute in front of them, the justices sent the case back to a lower court for another look in light of their decision. The case involves Gerald Groff, a former employee of the U.S. Postal Service in Pennsylvania's Amish Country. For years, Groff was a fill-in mail carrier who worked on days when other mail carriers were off.

But when an Amazon.com contract with the Postal Service required carriers to start delivering packages on Sundays, Groff balked. Initially, to avoid the shifts, Groff transferred to a more rural post office not yet doing Sunday deliveries, but eventually that post office was required to do them, too.

2

Whenever Groff was scheduled on a Sunday, another carrier had to work or his spot went unfilled. Officials said Groff's absences created a tense environment and contributed to morale problems. It also meant other carriers had to deliver more Sunday mail than they otherwise would.

Groff resigned in 2019 rather than wait to be fired. He sued the Postal service for failing to accommodate his religious practice. Lower courts ruled against him previously. As a result of the court's ruling, his case will get another look.

Groff said in a statement after the ruling that he was grateful the court heard his case. "I hope this decision allows others to be able to maintain their convictions without living in fear of losing their jobs because of what they believe," he said.

The case is Groff v. DeJoy, 22-174.

# Exhibit 38

AUGUST 1963

# Letter from Birmingham Jail

**by Martin Luther King, Jr.**

*From the Birmingham jail, where he was imprisoned as a participant in nonviolent demonstrations against segregation, Dr. Martin Luther King, Jr., wrote in longhand the letter which follows. It was his response to a public statement of concern and caution issued by eight white religious leaders of the South. Dr. King, who was born in 1929, did his undergraduate work at Morehouse College; attended the integrated Crozer Theological Seminary in Chester, Pennsylvania, one of six black pupils among a hundred students, and the president of his class; and won a fellowship to Boston University for his Ph.D.*

WHILE confined here in the Birmingham city jail, I came across your recent statement calling our present activities "unwise and untimely." Seldom, if ever, do I pause to answer criticism of my work and ideas. If I sought to answer all of the criticisms that cross my desk, my secretaries would be engaged in little else in the course of the day, and I would have no time for constructive work. But since I feel that you are men of genuine good will and your criticisms are sincerely set forth, I would like to answer your statement in what I hope will be patient and reasonable terms.

I think I should give the reason for my being in Birmingham, since you have been influenced by the argument of "outsiders coming in." I have the honor of serving as president of the Southern Christian Leadership Conference, an organization operating in every Southern state, with headquarters in Atlanta, Georgia. We have some eighty-five affiliate organizations all across the South, one being the Alabama Christian Movement for Human Rights. Whenever necessary and possible, we share staff, educational and financial resources with our affiliates. Several months ago our local affiliate here in Birmingham invited us to be on call to engage in a nonviolent direct-action program if such were deemed necessary. We readily consented, and when the hour came we lived up to our promises. So I am here, along with several members of my staff, because we were invited here. I am here because I have basic organizational ties here.

Beyond this, I am in Birmingham because injustice is here. Just as the eighth-century prophets left their little villages and carried their "thus saith the Lord" far beyond the boundaries of their hometowns; and just as the Apostle Paul left his little village of Tarsus and carried the gospel of Jesus Christ to practically every hamlet and city of the Greco-Roman world, I too am compelled to carry the gospel of freedom beyond my particular hometown. Like Paul, I must constantly respond to the Macedonian call for aid.

Moreover, I am cognizant of the interrelatedness of all communities and states. I cannot sit idly by in Atlanta and not be concerned about what happens in Birmingham. Injustice anywhere is a threat to justice everywhere. We are caught in an inescapable network of mutuality, tied in a single garment of destiny. Whatever affects one directly affects all indirectly. Never again can we afford to live with the narrow, provincial "outside agitator" idea. Anyone who lives inside the United States can never be considered an outsider.

You deplore the demonstrations that are presently taking place in Birmingham. But I am sorry that your statement did not express a similar concern for the conditions that brought the demonstrations into being. I am sure that each of you would want to go beyond the superficial social analyst who looks merely at effects and does not grapple with underlying causes. I would not hesitate to say that it is unfortunate that so-called demonstrations are taking place in Birmingham at this time, but I would say in more emphatic terms that it is even more unfortunate that the white power structure of this city left the Negro community with no other alternative.

IN ANY nonviolent campaign there are four basic steps: collection of the facts to determine whether injustices are alive, negotiation, self-purification, and direct action. We have gone through all of these steps in Birmingham. There can be no gainsaying of the fact that racial injustice engulfs this community. Birmingham is probably the most thoroughly segregated city in the United States. Its ugly record of police brutality is known in every section of this country. Its unjust treatment of Negroes in the courts is a notorious reality. There have been more unsolved bombings of Negro homes and churches in Birmingham than in any other city in this nation. These are the hard, brutal, and unbelievable facts. On the basis of them, Negro leaders sought to negotiate with the city fathers. But the political leaders consistently refused to engage in good-faith negotiation.

Then came the opportunity last September to talk with some of the leaders of the economic community. In these negotiating sessions certain promises were made by the merchants, such as the promise to remove the humiliating racial signs from the stores. On the basis of these promises, Reverend Shuttlesworth and the leaders of the Alabama Christian Movement for Human Rights agreed to call a moratorium on any type of demonstration. As the weeks and months unfolded, we realized that we were the victims of a broken promise. The signs remained. As in so many experiences of the past, we were confronted with blasted hopes, and the dark shadow of a deep disappointment settled upon us. So we had no alternative except that of preparing for direct action, whereby we would present our very bodies as a means of laying our case before the conscience of the local and national community. We were not unmindful of the difficulties involved. So we decided to go through a process of self-purification. We

started having workshops on nonviolence and repeatedly asked ourselves the questions, "Are you able to accept blows without retaliating?" and "Are you able to endure the ordeals of jail?" We decided to set our direct-action program around the Easter season, realizing that, with exception of Christmas, this was the largest shopping period of the year. Knowing that a strong economic withdrawal program would be the by-product of direct action, we felt that this was the best time to bring pressure on the merchants for the needed changes. Then it occurred to us that the March election was ahead, and so we speedily decided to postpone action until after election day. When we discovered that Mr. Conner was in the runoff, we decided again to postpone action so that the demonstration could not be used to cloud the issues. At this time we agreed to begin our nonviolent witness the day after the runoff.

This reveals that we did not move irresponsibly into direct action. We, too, wanted to see Mr. Conner defeated, so we went through postponement after postponement to aid in this community need. After this we felt that direct action could be delayed no longer.

You may well ask, "Why direct action, why sit-ins, marches, and so forth? Isn't negotiation a better path?" You are exactly right in your call for negotiation. Indeed, this is the purpose of direct action. Nonviolent direct action seeks to create such a crisis and establish such creative tension that a community that has consistently refused to negotiate is forced to confront the issue. It seeks so to dramatize the issue that it can no longer be ignored. I just referred to the creation of tension as a part of the work of the nonviolent resister. This may sound rather shocking. But I must confess that I am not afraid of the word "tension." I have earnestly worked and preached against violent tension, but there is a type of constructive nonviolent tension that is necessary for growth. Just as Socrates felt that it was necessary to create a tension in the mind so that individuals could rise from the bondage of myths and half-truths to the unfettered realm of creative analysis and objective appraisal, we must see the need of having nonviolent gadflies to create the kind of tension in society that will help men to rise from the dark depths of prejudice and racism to the majestic heights of understanding and brotherhood. So, the purpose of direct action is to create a situation so crisis-packed that it will inevitably open the door to negotiation. We therefore concur with you in your call for negotiation. Too long has our beloved Southland been bogged down in the tragic attempt to live in monologue rather than dialogue.

One of the basic points in your statement is that our acts are untimely. Some have asked, "Why didn't you give the new administration time to act?" The only answer that I can give to this inquiry is that the new administration must be prodded about as much as the outgoing one before it acts. We will be sadly mistaken if we feel that the election of Mr. Boutwell will bring the millennium to Birmingham. While Mr. Boutwell is much more articulate and gentle than Mr. Conner, they are both segregationists, dedicated to the task of maintaining the status quo. The hope I see in Mr. Boutwell is that he will be reasonable enough to see the futility of massive resistance to desegregation. But he will not see this without pressure from the devotees of civil rights. My friends, I must say to you that we have not made a single gain in civil rights without determined legal and nonviolent pressure. History is the long and tragic story of the fact that privileged groups seldom give up their privileges voluntarily. Individuals may see the moral light and voluntarily give up their unjust posture; but, as Reinhold Niebuhr has reminded us, groups are more immoral than individuals.

We know through painful experience that freedom is never voluntarily given by the oppressor; it must be demanded by the oppressed. Frankly, I have never yet engaged in a direct-action movement that was "well timed" according to the timetable of those who have not suffered unduly from the disease of segregation. For years now I have heard the word "wait." It rings in the ear of every Negro with a piercing familiarity. This "wait" has almost always meant "never." It has been a tranquilizing thalidomide, relieving the emotional stress for a moment, only to give birth to an ill-formed infant of frustration. We must come to see with the distinguished jurist of yesterday that "justice too long delayed is justice denied." We have waited for more than three hundred and forty years for our God-given and constitutional rights. The nations of Asia and Africa are moving with jetlike speed toward the goal of political independence, and we still creep at horse-and-buggy pace toward the gaining of a cup of coffee at a lunch counter. I guess it is easy for those who have never felt the stinging darts of segregation to say "wait." But when you have seen vicious mobs lynch your mothers and fathers at will and drown your sisters and brothers at whim; when you have seen hate-filled policemen curse, kick, brutalize, and even kill your black brothers and sisters with impunity; when you see the vast majority of your twenty million Negro brothers smothering in an airtight cage of poverty in the midst of an affluent society; when you suddenly find your tongue twisted and your speech stammering as you seek to explain to your six-year-old daughter why she cannot go to the public amusement park that has just been advertised on television, and see tears welling up in her little eyes when she is told that Funtown is closed to colored children, and see the depressing clouds of inferiority begin to form in her little mental sky, and see her begin to distort her little personality by unconsciously developing a bitterness toward white people; when you have to concoct an answer for a five-year-old son asking in agonizing pathos, "Daddy, why do white people treat colored people so mean?"; when you take a cross-country drive and find it necessary to sleep night after night in the uncomfortable corners of your automobile because no motel will accept you; when you are humiliated day in and day out by nagging signs reading "white" and "colored"; when your first name becomes "nigger" and your middle name becomes "boy" (however old you are) and your last name becomes "John," and when your wife and mother are never given the respected title "Mrs."; when you are harried by day and haunted by night by the fact that you are a Negro, living constantly at tiptoe stance, never knowing what to expect next, and plagued with inner fears and outer resentments; when you are forever fighting a degenerating sense of "nobodyness" -- then you will understand why we find it difficult to wait. There comes a time when the cup of endurance runs over and men are no longer willing to be plunged into an abyss of injustice where they experience the bleakness of corroding despair. I hope, sirs, you can understand our legitimate and unavoidable impatience.

YOU express a great deal of anxiety over our willingness to break laws. This is certainly a legitimate concern. Since we so diligently urge people to obey the Supreme Court's decision of 1954 outlawing segregation in the public schools, it is rather strange and paradoxical to find us consciously breaking laws. One may well ask, "How can you advocate breaking some laws and obeying others?" The answer is found in the fact that there are two types of laws: there are just laws, and there are unjust laws. I would agree with St. Augustine that "An unjust law is no law at all."

Now, what is the difference between the two? How does one determine when a law is just or unjust? A just law is a man-made code that squares with the moral law, or the law of God. An unjust law is a code that is out of harmony with the moral law. To put it in the terms of St. Thomas Aquinas, an unjust law is a human law that is not rooted in eternal and natural law. Any law that uplifts human personality is just. Any law that degrades human personality is unjust. All segregation statutes are unjust because segregation distorts the soul and damages the personality. It gives the segregator a false sense of superiority and the segregated a false sense of inferiority. To use the words of Martin Buber, the great Jewish philosopher, segregation substitutes an "I - it" relationship for the "I - thou" relationship and ends up relegating persons to the status of things. So segregation is not only politically, economically, and sociologically unsound, but it is morally wrong and sinful. Paul Tillich has said that sin is separation. Isn't segregation an existential expression of man's tragic separation, an expression of his awful estrangement, his terrible sinfulness? So I can urge men to obey the 1954 decision of the Supreme Court because it is morally right, and I can urge them to disobey segregation ordinances because they are morally wrong.

Let us turn to a more concrete example of just and unjust laws. An unjust law is a code that a majority inflicts on a minority that is not binding on itself. This is difference made legal. On the other hand, a just law is a code that a majority compels a minority to follow, and that it is willing to follow itself. This is sameness made legal.

Let me give another explanation. An unjust law is a code inflicted upon a minority which that minority had no part in enacting or creating because it did not have the unhampered right to vote. Who can say that the legislature of Alabama which set up the segregation laws was democratically elected? Throughout the state of Alabama all types of conniving methods are used to prevent Negroes from becoming registered voters, and there are some counties without a single Negro registered to vote, despite the fact that the Negroes constitute a majority of the population. Can any law set up in such a state be considered democratically structured?

These are just a few examples of unjust and just laws. There are some instances when a law is just on its face and unjust in its application. For instance, I was arrested Friday on a charge of parading without a permit. Now, there is nothing wrong with an ordinance which requires a permit for a parade, but when the ordinance is used to preserve segregation and to deny citizens the First Amendment privilege of peaceful assembly and peaceful protest, then it becomes unjust.

Of course, there is nothing new about this kind of civil disobedience. It was seen sublimely in the refusal of Shadrach, Meshach, and Abednego to obey the laws of Nebuchadnezzar because a higher moral law was involved. It was practiced superbly by the early Christians, who were willing to face hungry lions and the excruciating pain of chopping blocks before submitting to certain unjust laws of the Roman Empire. To a degree, academic freedom is a reality today because Socrates practiced civil disobedience.

We can never forget that everything Hitler did in Germany was "legal" and everything the Hungarian freedom fighters did in Hungary was "illegal." It was "illegal" to aid and comfort a Jew in Hitler's Germany. But I am sure that if I had lived in Germany during that time, I would have aided and comforted my Jewish brothers even though it was illegal. If I lived in a Communist country today where certain principles dear to the Christian faith are suppressed, I believe I would openly advocate disobeying these anti-religious laws.

I MUST make two honest confessions to you, my Christian and Jewish brothers. First, I must confess that over the last few years I have been gravely disappointed with the white moderate. I have almost reached the regrettable conclusion that the Negro's great stumbling block in the stride toward freedom is not the White Citizens Councillor or the Ku Klux Klanner but the white moderate who is more devoted to order than to justice; who prefers a negative peace which is the absence of tension to a positive peace which is the presence of justice; who constantly says, "I agree with you in the goal you seek, but I can't agree with your methods of direct action"; who paternalistically feels that he can set the timetable for another man's freedom; who lives by the myth of time; and who constantly advises the Negro to wait until a "more convenient season." Shallow understanding from people of good will is more frustrating than absolute misunderstanding from people of ill will. Lukewarm acceptance is much more bewildering than outright rejection.

In your statement you asserted that our actions, even though peaceful, must be condemned because they precipitate violence. But can this assertion be logically made? Isn't this like condemning the robbed man because his possession of money precipitated the evil act of robbery? Isn't this like condemning Socrates because his unswerving commitment to truth and his philosophical delvings precipitated the misguided popular mind to make him drink the hemlock? Isn't this like condemning Jesus because His unique God-consciousness and never-ceasing devotion to His will precipitated the evil act of crucifixion? We must come to see, as federal courts have consistently affirmed, that it is immoral to urge an individual to withdraw his efforts to gain his basic constitutional rights because the quest precipitates violence. Society must protect the robbed and punish the robber.

**295**

I had also hoped that the white moderate would reject the myth of time. I received a letter this morning from a white brother in Texas which said, "All Christians know that the colored people will receive equal rights eventually, but is it possible that you are in too great of a religious hurry? It has taken Christianity almost 2000 years to accomplish what it has. The teachings of Christ take time to come to earth." All that is said here grows out of a tragic misconception of time. It is the strangely irrational notion that there is something in the very flow of time that will inevitably cure all ills. Actually, time is neutral. It can be used either destructively or constructively. I am coming to feel that the people of ill will have used time much more effectively than the people of good will. We will have to repent in this generation not merely for the vitriolic words and actions of the bad people but for the appalling silence of the good people. We must come to see that human progress never rolls in on wheels of inevitability. It comes through the tireless efforts and persistent work of men willing to be coworkers with God, and without this hard work time itself becomes an ally of the forces of social stagnation.

YOU spoke of our activity in Birmingham as extreme. At first I was rather disappointed that fellow clergymen would see my nonviolent efforts as those of an extremist. I started thinking about the fact that I stand in the middle of two opposing forces in the Negro community. One is a force of complacency made up of Negroes who, as a result of long years of oppression, have been so completely drained of self-respect and a sense of "somebodyness" that they have adjusted to segregation, and, on the other hand, of a few Negroes in the middle class who, because of a degree of academic and economic security and because at points they profit by segregation, have unconsciously become insensitive to the problems of the masses. The other force is one of bitterness and hatred and comes perilously close to advocating violence. It is expressed in the various black nationalist groups that are springing up over the nation, the largest and best known being Elijah Muhammad's Muslim movement. This movement is nourished by the contemporary frustration over the continued existence of racial discrimination. It is made up of people who have lost faith in America, who have absolutely repudiated Christianity, and who have concluded that the white man is an incurable devil. I have tried to stand between these two forces, saying that we need not follow the do-nothingism of the complacent or the hatred and despair of the black nationalist. There is a more excellent way, of love and nonviolent protest. I'm grateful to God that, through the Negro church, the dimension of nonviolence entered our struggle. If this philosophy had not emerged, I am convinced that by now many streets of the South would be flowing with floods of blood. And I am further convinced that if our white brothers dismiss as "rabble-rousers" and "outside agitators" those of us who are working through the channels of nonviolent direct action and refuse to support our nonviolent efforts, millions of Negroes, out of frustration and despair, will seek solace and security in black nationalist ideologies, a development that will lead inevitably to a frightening racial nightmare.

Oppressed people cannot remain oppressed forever. The urge for freedom will eventually come. This is what has happened to the American Negro. Something within has reminded him of his birthright of freedom; something without has reminded him that he can gain it. Consciously and unconsciously, he has been swept in by what the Germans call the *Zeitgeist,* and with his black brothers of Africa and his brown and yellow brothers of Asia, South America, and the Caribbean, he is moving with a sense of cosmic urgency toward the promised land of racial justice. Recognizing this vital urge that has engulfed the Negro community, one should readily understand public demonstrations. The Negro has many pent-up resentments and latent frustrations. He has to get them out. So let him march sometime; let him have his prayer pilgrimages to the city hall; understand why he must have sit-ins and freedom rides. If his repressed emotions do not come out in these nonviolent ways, they will come out in ominous expressions of violence. This is not a threat; it is a fact of history. So I have not said to my people, "Get rid of your discontent." But I have tried to say that this normal and healthy discontent can be channeled through the creative outlet of nonviolent direct action. Now this approach is being dismissed as extremist. I must admit that I was initially disappointed in being so categorized.

But as I continued to think about the matter, I gradually gained a bit of satisfaction from being considered an extremist. Was not Jesus an extremist in love? -- "Love your enemies, bless them that curse you, pray for them that despitefully use you." Was not Amos an extremist for justice? -- "Let justice roll down like waters and righteousness like a mighty stream." Was not Paul an extremist for the gospel of Jesus Christ? -- "I bear in my body the marks of the Lord Jesus." Was not Martin Luther an extremist? -- "Here I stand; I can do no other so help me God." Was not John Bunyan an extremist? -- "I will stay in jail to the end of my days before I make a mockery of my conscience." Was not Abraham Lincoln an extremist? -- "This nation cannot survive half slave and half free." Was not Thomas Jefferson an extremist? -- "We hold these truths to be self-evident, that all men are created equal." So the question is not whether we will be extremist, but what kind of extremists we will be. Will we be extremists for hate, or will we be extremists for love? Will we be extremists for the preservation of injustice, or will we be extremists for the cause of justice?

I had hoped that the white moderate would see this. Maybe I was too optimistic. Maybe I expected too much. I guess I should have realized that few members of a race that has oppressed another race can understand or appreciate the deep groans and passionate yearnings of those that have been oppressed, and still fewer have the vision to see that injustice must be rooted out by strong, persistent, and determined action. I am thankful, however, that some of our white brothers have grasped the meaning of this social revolution and committed themselves to it. They are still all too small in quantity, but they are big in quality. Some, like Ralph McGill, Lillian Smith, Harry Golden, and James Dabbs, have written about our struggle in eloquent, prophetic, and understanding terms. Others have marched with us down nameless streets of the South. They sat in with us at lunch counters and rode in with us on the freedom rides. They have languished in filthy roach-infested jails, suffering the abuse and brutality of angry policemen who see them as "dirty nigger lovers." They, unlike many of their moderate brothers, have recognized the urgency of the moment and sensed the need for powerful "action" antidotes to combat the disease of segregation.

LET me rush on to mention my other disappointment. I have been disappointed with the white church and its leadership. Of course, there are some notable exceptions. I am not unmindful of the fact that each of you has taken some significant stands on this issue. I commend you, Reverend Stallings, for your Christian stand this past Sunday in welcoming Negroes to your Baptist Church worship service on a nonsegregated basis. I commend the Catholic leaders of this state for integrating Springhill College several years ago.

But despite these notable exceptions, I must honestly reiterate that I have been disappointed with the church. I do not say that as one of those negative critics who can always find something wrong with the church. I say it as a minister of the gospel who loves the church, who was nurtured in its bosom, who has been sustained by its Spiritual blessings, and who will remain true to it as long as the cord of life shall lengthen.

I had the strange feeling when I was suddenly catapulted into the leadership of the bus protest in Montgomery several years ago that we would have the support of the white church. I felt that the white ministers, priests, and rabbis of the South would be some of our strongest allies. Instead, some few have been outright opponents, refusing to understand the freedom movement and misrepresenting its leaders; all too many others have been more cautious than courageous and have remained silent behind the anesthetizing security of stained-glass windows.

In spite of my shattered dreams of the past, I came to Birmingham with the hope that the white religious leadership of this community would see the justice of our cause and with deep moral concern serve as the channel through which our just grievances could get to the power structure. I had hoped that each of you would understand. But again I have been disappointed.

I have heard numerous religious leaders of the South call upon their worshipers to comply with a desegregation decision because it is the law, but I have longed to hear white ministers say, follow this decree because integration is morally right and the Negro is your brother. In the midst of blatant injustices inflicted upon the Negro, I have watched white churches stand on the sidelines and merely mouth pious irrelevancies and sanctimonious trivialities. In the midst of a mighty struggle to rid our nation of racial and economic injustice, I have heard so many ministers say, "Those are social issues which the gospel has nothing to do with," and I have watched so many churches commit themselves to a completely otherworldly religion which made a strange distinction between bodies and souls, the sacred and the secular.

There was a time when the church was very powerful. It was during that period that the early Christians rejoiced when they were deemed worthy to suffer for what they believed. In those days the church was not merely a thermometer that recorded the ideas and principles of popular opinion; it was the thermostat that transformed the mores of society. Wherever the early Christians entered a town the power structure got disturbed and immediately sought to convict them for being "disturbers of the peace" and "outside agitators." But they went on with the conviction that they were "a colony of heaven" and had to obey God rather than man. They were small in number but big in commitment. They were too God-intoxicated to be "astronomically intimidated." They brought an end to such ancient evils as infanticide and gladiatorial contest.

Things are different now. The contemporary church is so often a weak, ineffectual voice with an uncertain sound. It is so often the arch supporter of the status quo. Far from being disturbed by the presence of the church, the power structure of the average community is consoled by the church's often vocal sanction of things as they are.

But the judgment of God is upon the church as never before. If the church of today does not recapture the sacrificial spirit of the early church, it will lose its authentic ring, forfeit the loyalty of millions, and be dismissed as an irrelevant social club with no meaning for the twentieth century. I meet young people every day whose disappointment with the church has risen to outright disgust.

I hope the church as a whole will meet the challenge of this decisive hour. But even if the church does not come to the aid of justice, I have no despair about the future. I have no fear about the outcome of our struggle in Birmingham, even if our motives are presently misunderstood. We will reach the goal of freedom in Birmingham and all over the nation, because the goal of America is freedom. Abused and scorned though we may be, our destiny is tied up with the destiny of America. Before the Pilgrims landed at Plymouth, we were here. Before the pen of Jefferson scratched across the pages of history the majestic word of the Declaration of Independence, we were here. For more than two centuries our foreparents labored here without wages; they made cotton king; and they built the homes of their masters in the midst of brutal injustice and shameful humiliation -- and yet out of a bottomless vitality our people continue to thrive and develop. If the inexpressible cruelties of slavery could not stop us, the opposition we now face will surely fail. We will win our freedom because the sacred heritage of our nation and the eternal will of God are embodied in our echoing demands.

I must close now. But before closing I am impelled to mention one other point in your statement that troubled me profoundly. You warmly commended the Birmingham police force for keeping "order" and "preventing violence." I don't believe you would have so warmly commended the police force if you had seen its angry violent dogs literally biting six unarmed, nonviolent Negroes. I don't believe you would so quickly commend the policemen if you would observe their ugly and inhuman treatment of Negroes here in the city jail; if you would watch them push and curse old Negro women and young Negro girls; if you would see them slap and kick old Negro men and young boys, if you would observe them, as they did on two occasions, refusing to give us food because we wanted to sing our grace together. I'm sorry that I can't join you in your praise for the police department.

It is true that they have been rather disciplined in their public handling of the demonstrators. In this sense they have been publicly "nonviolent." But for what purpose? To preserve the evil system of segregation. Over the last few years I have consistently preached that nonviolence demands that the means we use must be as pure as the ends we seek. So I have tried to make it clear that it is wrong to use immoral means to attain moral ends. But now I must affirm that it is just as wrong, or even more, to use moral means to preserve immoral ends.

I wish you had commended the Negro demonstrators of Birmingham for their sublime courage, their willingness to suffer, and their amazing discipline in the midst of the most inhuman provocation. One day the South will recognize its real heroes. They will be the James Merediths, courageously and with a majestic sense of purpose facing jeering and hostile mobs and the agonizing loneliness that characterizes the life of the pioneer. They will be old, oppressed, battered Negro women, symbolized in a seventy-two-year-old woman of Montgomery, Alabama, who rose up with a sense of dignity and with her people decided not to ride the segregated buses, and responded to one who inquired about her tiredness with ungrammatical profundity, "My feets is tired, but my soul is rested." They will be young high school and college students, young ministers of the gospel and a host of their elders courageously and nonviolently sitting in at lunch counters and willingly going to jail for conscience's sake. One day the South will know that when these disinherited children of God sat down at lunch counters they were in reality standing up for the best in the American dream and the most sacred values in our Judeo-Christian heritage.

Never before have I written a letter this long -- or should I say a book? I'm afraid that it is much too long to take your precious time. I can assure you that it would have been much shorter if I had been writing from a comfortable desk, but what else is there to do when you are alone for days in the dull monotony of a narrow jail cell other than write long letters, think strange thoughts, and pray long prayers?

If I have said anything in this letter that is an understatement of the truth and is indicative of an unreasonable impatience, I beg you to forgive me. If I have said anything in this letter that is an overstatement of the truth and is indicative of my having a patience that makes me patient with anything less than brotherhood, I beg God to forgive me.

*Yours for the cause of Peace and Brotherhood,*

MARTIN LUTHER KING, JR.

--------------------------------------------------------------------------

Copyright © 1963 Martin Luther King Jr. All rights reserved.

The Atlantic Monthly; August 1963 The Negro Is Your Brother Volume 212 No. 2 pages 78 - 88.

# CERTIFICATE OF SERVICE

I, *pro se* Plaintiff-Appellant Gordon Clark, certify that a copy of the above **PRO**

**SE PLAINTIFF-APPELLANT'S APPENDIX** will be served via *electronic*

*service* on July 26, 2023, to the following:

Patrick S. Tracey, Esq. *(Santander Bank, N.A. named Defendants)*
c/o Saul Ewing, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq. *(Bendett & McHugh, P.C. named Defendants)*
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**

Dated and signed at Enfield, Connecticut, on July 26, 2023, by *pro se* Plaintiff-

Appellant Gordon Clark, *in his individual, spousal, executor, beneficiary, and*

*creditor capacities.*

_____
Gordon Clark
*(Husband & Executor of the Estate of Lillian J. Clark)*
70 Elm Street, Enfield, CT 06082
860.833.3195

**299**